FILED

OCT 1 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Matthew Joseph McGrath )
14352 Wrangler Lane )
Apartment 12 )
Dale City, VA 22193, )
 )
    Plaintiff )
    v. )
 )
Condoleeza Rice, )
Secretary of State )
United States Department of State )
Harry S Truman Building )
2201 C Street, NW )
Washington, D.C. 20520, )
 )
    in her official capacity, )
 )
    Defendant )

CASE NUMBER  1:05CV02011

JUDGE: Reggie B. Walton

DECK TYPE: Employment Discrimination

DATE STAMP: 10/11/2005

**JURY DEMAND**

JURY ACTION

## COMPLAINT FOR RELIEF FROM
## EMPLOYMENT DISCRIMINATION

### I. Nature of the Claim

1. This is an action by an individual alleging discrimination in federal employment on the basis of gender (male), race (white), and reprisal for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), when defendant subjected him to a hostile work environment, gave him a negative performance rating after he filed a complaint of discrimination, removed him from his position, disciplined him, and then terminated him from employment with the U.S. Government.

2. Plaintiff seeks make whole relief in the form of reinstatement, back pay and other benefits with interest, medical expenses, compensatory damages, and reasonable attorneys fees as part of his costs.

-1-

## II. Description of the Parties

3.     Plaintiff is a citizen of the United States and resident of the State of Virginia. He
is a white male who was employed by defendant and her predecessors as a Foreign Service
Officer from June 10, 1984 through November 30, 2004. During the over twenty years he was
employed as a Foreign Service Officer, plaintiff served as a Public Affairs, Cultural Affairs, and
Information Officer, among other positions, in numerous locations in the United States and
overseas. At the time of his termination, plaintiff was an FSO-1, which is the highest grade in the
Foreign Service, with the exception of the Senior Foreign Service. Plaintiff timely filed a
discrimination complaint with defendant alleging that the U.S. Department of State discriminated
and retaliated against him, including, but not limited to, treating him in a discriminatory manner,
giving him negative performance appraisals after he alleged discrimination, disciplining him, and
removing him from his position, because of his gender, race, and in reprisal for his protected
activity.

8.   Defendant is the Secretary of State, and in her official capacity, has authority, <u>inter
alia</u>, over the hiring, firing, promotion, discipline, assignments, and terms and conditions of
employment of plaintiff and other persons employed by the U.S. Department of State. Defendant
is the named defendant, but is sued in her official capacity, as required by Title VII. 42 U.S.C. §
2000e-16(c).

## III. Jurisdiction and Venue

9.   The Court has jurisdiction over this action pursuant to Title VII, 42 U.S.C. § 2000e-
16(c).

10.   Venue lies in this Court because the Plaintiff was employed by defendant federal agency in the District of Columbia, the incidents constituting discrimination and harassment took place in the District of Columbia, the retaliatory employment decisions affecting Plaintiff were made in the District of Columbia, and all of the records concerning Plaintiff's employment are maintained in the District of Columbia.

### IV. **Statement of the Facts**

11.   Plaintiff is a white male. He began his service as a Foreign Service Officer (FSO) on June 10, 1984.  From that date until he was terminated by defendant effective on November 30, 2004, Mr. McGrath served in a variety of responsible posts in numerous countries throughout the world, including African and Third World countries, and is known as a strong advocate of diversity, multiculturalism and equal rights, and opportunities for persons of color.

12.   Mr. McGrath achieved Grade 1 - the highest level for a regular Foreign Service - in a time period much faster than the usual career FSO - within nine years of  becoming an FSO. His performance ratings from 1984 through 1999 were outstanding.

13.   On September 10, 2001, Mr. McGrath started working in the position of Chief of the Division of Cultural Programs for the U.S. Department of State [hereafter "Chief"].  Within the first weeks of  Mr. McGrath's employment in his new position, his supervisor, S. Van (Sam) Wunder, began to attempt to undermine Mr. McGrath's authority as Chief. Mr. Wunder is a white male.

14.   Mr. Wunder undermined Mr. McGrath's supervisory authority by going directly to Susie Baker and Catherine Wainscott about assignments, instead of going through Mr. McGrath.

-3-

Both Ms. Baker and Ms. Wainscott are white. Mr. Wunder treated African American women differently than he did white women in the office - in that he gave white women promotions and better work assignments than African American women.

15. Because of Mr. McGrath's positive reputation concerning diversity issues, during the first week in Mr. McGrath's new position, his secretary, Deborah Chapman, came to Mr. McGrath's office with a warning that Mr. Wunder and Brian Sexton, the Deputy Assistant Secretary for Professional Exchanges, continually interfered with the office's activities and operations. She warned Mr. McGrath that they had a couple of favorites on his staff and that Mr. McGrath should be careful because those favorites would immediately run to Mr. Wunder and Mr. Sexton with malicious gossip.

16. Mr. Wunder's favorite employees in the Division were white employees. They included Ms. Baker and Ms. Wainscott. They did not include any of the three African Americans on Mr. McGrath's staff - Ms. Chapman, LaFaye Proctor and E.J. Montgomery.

17. One day, while Mr. McGrath was working in the Cultural Programs Division, both Ms. Proctor and Ms. Chapman overheard Ms. Wainscott talking with Ms. Baker about Mr. McGrath. Ms. Wainscott, referring to Mr. McGrath, stated: "He may be white but he acts black." Ms. Wainscott said this while she was in her office. She had the door open. Both Ms. Proctor and Ms. Chapman believe Ms. Wainscott was referring to Mr. McGrath's support for the rights of black employees.

18. In late September, 2001, Mr. Wunder began to question Mr. McGrath concerning the gossip Mr. Wunder heard that Mr. McGrath had a "big grievance," which, at the time, was

-4-

inaccurate. This questioning was inappropriate since Mr. Wunder had no business interfering with the grievance process as Mr. McGrath's supervisor.

19. Mr. Wunder and Mr. Sexton continued to use a member of Mr. McGrath's staff to do a pet project of Mr. Sexton, without going through Mr. McGrath.

20. Mr. McGrath repeatedly and strongly disagreed with Mr. Wunder about the allocation of the Division's limited cultural funds. Mr. McGrath desired to shift some of the funds which were disproportionately given to Western Europe to Africa and the Third World. Mr. McGrath believes that the main reason for Mr. Wunder's disagreement with Mr. McGrath on this subject was Mr. Wunder's discriminatory bias against people of color and people who advocate for fair treatment for racial and ethnic minorities.

21. On at least three occasions, Mr. Wunder brought up issues concerning one of his white favorites and one of the three African American women under Mr. McGrath's supervision. He wanted Mr. McGrath to intervene on the side of the white women. Mr. McGrath told Mr. Wunder that taking sides would be racially insensitive. Mr. McGrath believes that Mr. Wunder retaliated against him because Mr. Wunder knew that Mr. McGrath is an advocate for minorities.

22. In the morning of Thursday, January 17, 2002, before Mr. McGrath departed for home leave the next day, Mr. Wunder asked Mr. McGrath if there were any pending projects. Mr. McGrath stated there were no major urgent pending projects, only routine projects that could be handled by staff. Mr. Wunder did not tell Mr. McGrath that Mr. Wunder would be leaving the office early that day.

23. On Thursday, January 17, 2002, Mr. McGrath knew that the Secretary of State was

-5-

not going to be in Washington, D.C. on Sunday, January 20, 2002, and that Billy Taylor, an

honoree, was ill, and would not be attending an awards ceremony on January 20, 2002. Because

neither the honoree nor the Secretary of State was going to present, it would not be possible for

the Secretary of State to present an award to Mr. Taylor on January 20, 2002. Therefore, Mr.

McGrath did not consider the signing of a Certificate of Appreciation by the Secretary of State to

be a urgent pending matter at the time he spoke with Mr. Wunder on January 17, 2002.

24.    In the afternoon of January 17, 2002, Mr. McGrath became concerned that the

matter concerning the presentation of an award to Mr. Taylor might still occur prior to Mr.

McGrath's return from home leave on February 21, 2002. Therefore, Mr. McGrath tried to locate

Mr. Wunder to talk with him about this matter in the middle of the afternoon.

25.    Mr. McGrath could not locate Mr. Wunder. Mr. McGrath was told that Mr. Wunder

had left early for the day. Therefore, Mr. McGrath decided to leave the file pertaining to this

matter with Mr. Wunder. Mr. McGrath wrote a cover memorandum explaining the situation and

left the memorandum and the file with Mr. Wunder. Nevertheless, Mr. McGrath was chastized in

his performance evaluation for allegedly not informing Mr. Wunder about the award to Mr.

Taylor.

26.    Mr. McGrath held frequent meetings with his staff.  Based upon their observations,

Ms. Chapman and Ms. Proctor believe that Mr. McGrath was a good supervisor.

27.    Mr. Wunder gave Mr. McGrath two Foreign Service Employee Evaluation Reports

(EER) for the period September 8, 2001 through April 15, 2002. The first one was dated April

11, 2002. The second one was dated April 24, 2002.

28.  In the "Reviewer" box on the first page of the first EER, the words "None Appropriate" appear. The EER was signed and dated April 11, 2002, by Mr. Wunder. Mr. Wunder explained to Mr. McGrath that because the reviewing officer, Mr. Sexton, had left his position in early February, it was not necessary for Mr. Sexton to write a reviewing statement.

29.  A little more than a week later, after Mr. McGrath spoke with Stephen Hart, Mr. Sexton's replacement, on April 15, 2002, about Mr. McGrath's discrimination complaint, Mr. McGrath was given a second EER, this time with a reviewing statement written by Mr. Sexton. The second EER was written after Mr. McGrath filed his discrimination complaint and is much more negative than the first EER.

30.  Mr. McGrath believes that the second EER was written in retaliation for his filing a discrimination complaint.

31.  In the fall of 2001, Mr. Wunder began pressing Mr. McGrath to prepare documentation that would lead to the termination of the employment an elderly disabled African American female employee, E.J. Montgomery, who was under Mr. McGrath's supervision. For example, on two separate occasions, in order to try to motivate Mr. McGrath to terminate Ms. Montgomery for poor performance, Mr. Wunder falsely cited his own success in terminating an employee to whom Mr. Wunder referred as that "Cuban" - Mo Garcia.

32.  Because Mr. McGrath believed Ms. Montgomery did not deserve to be terminated, Mr. McGrath refused to prepare documents that would lead to her termination. Ms. Montgomery did her work.

33.  Mr. McGrath told Mr. Wunder that Mr. Wunder's instructions to Mr. McGrath to

document Ms. Montgomery's performance with the intent to terminate her employment was

unethical and illegal discrimination based upon Ms. Montgomery's age, race, and disability.

34.    After Mr. McGrath's return from home leave in late February 2002, he was

informed by members of his staff that Mr. Wunder had been upset with Ms. Montgomery's

alleged inability to perform the large amount of work Mr. Wunder had given to Ms. Montgomery

and her failure to meet the short deadlines Mr. Wunder had given her.

35.    Mr. McGrath believes that Mr. Wunder's expectations of Ms. Montgomery were

unreasonable and a set-up for her anticipated failure. Mr. McGrath also discovered that Mr.

Wunder had rescinded Mr. McGrath's previous approval of Ms. Montgomery's official travel to

Philadelphia during Mr. McGrath's leave, while allowing two white members of the staff - Ms.

Wainscott and Ms. Mella - to make much more expensive trips to New York and Brazil,

respectively.  Mr. McGrath discussed this with Ms. Montgomery and advised her that this was

not right.

36.    Ms. Montgomery later told Ms. Proctor that she complained about Mr. Wunder's

treatment of her to the union and that, as a result, Mr. Wunder and Mr. Hart had to go to diversity

training classes.

37.    In retaliation for Mr. McGrath's refusal to begin documentation to terminate Ms.

Montgomery, Mr. Wunder threatened Mr. McGrath with the same thing Mr. Wunder was asking

Mr. McGrath  to do to Ms. Montgomery - termination.

38.    Mr. Wunder wrote a memorandum to Mr. McGrath on March 8, 2002, entitled

"Sub-standard Performance" in which he criticized Mr. McGrath for the Billy Taylor episode,

-8-

among other alleged lapses by Mr. McGrath. Mr. McGrath and Mr. Wunder also had a lengthy,

heated discussion concerning Ms. Montgomery on March 8, 2002, during which Mr. Wunder

told Mr. McGrath that if he did not begin the process of terminating Ms. Montgomery, Mr.

Wunder would give Mr. McGrath a negative performance rating. Mr. McGrath realized that Mr.

Wunder was serious about trying to terminate Mr. McGrath's employment because of Mr.

McGrath's refusal to get rid of Ms. Montgomery. Mr. McGrath promptly sought EEO counseling

in March, 2002.

39.   Mr. McGrath told Ms. Chapman in March 2002 that Mr. Wunder wanted Mr.

McGrath to get rid of Ms. Montgomery by starting to document her performance. Mr. McGrath

was upset. He told Ms. Chapman that he thought that Mr. Wunder was trying to retaliate against

him because he would not terminate Ms. Montgomery. Mr. McGrath also told Ms. Proctor about

this.

40.   Mr. McGrath spoke with Ms. Montgomery in mid-April 2002. He told her that Mr.

Wunder was trying to terminate her employment by having Mr. McGrath document her

shortcomings. Mr. McGrath counseled Ms. Montgomery about her EEO rights. Mr. McGrath

also told her that he would support her in any complaint that she might file concerning this and/or

if the agency tried to terminate her. Mr. Wunder continued to retaliate against Mr. McGrath.

41.   Because of Mr. McGrath's refusal to terminate Ms. Montgomery and because of

Mr. McGrath's own EEO activity, Mr. Wunder prepared an unsatisfactory performance rating of

Mr. McGrath dated April 24, 2002.

42.   Mr. Wunder then continued his retaliation of Mr. McGrath by sending him a

-9-

series of false accusatory memoranda on May 8, 2002; May 16, 2002; May 20, 2002; and May 21, 2002; and by attempting to intimidate him.

43.    Mr. Wunder rated Ms. Montgomery's performance for 2002 as excellent in order to make it falsely appear as if Mr. Wunder had not told Mr. McGrath he wanted Mr. McGrath to terminate Ms. Montgomery for poor performance.

44.    On January 15, 2002, Mr. McGrath charged $399.66 on his Government issued credit card because he stayed in a hotel for two nights in New York City on Government business.

45.    At the time he charged the hotel bill, the credit card billing address for Mr. McGrath had been changed to his office address in Washington, D.C. However, because of the security initiatives post-September 11, 2001, mail addressed to Government offices was seriously delayed. Mr. McGrath does not recall ever seeing the bill for this charge. Mr. McGrath did not neglect timely to pay any bill he received. At no time were there insufficient funds in his account to pay the bill.

46.    Mr. McGrath received a telephone call from Citibank on May 10, 2002, informing him that the payment for the hotel bill was overdue. During that call, he paid Citibank over the phone. He believed at that time that the bill was paid in full. He later found out that, unknown to him, he accidently failed to give Citibank the four zeros before the account number, which he thought were not necessary.

47.    Without telling Mr. McGrath, his credit union, State Department Federal Credit Union [hereafter "SDFCU"] refused Mr. McGrath's check, despite the fact that he authorized the

check, because, as he later found out, the zeros preceding his account number were not provided by Citibank.

48. Mr. McGrath does not understand why SDFCU did not honor his check when there is only one Matthew J. McGrath with his name and account number. In normal transactions with SDFCU, the zeros preceding his account number are never used. The statements Mr. McGrath received from SDFCU has his account number listed without the preceding zeros.

49. Mr. McGrath made an honest mistake and did not intend to delay or evade payment of the hotel bill.

50. On June 10, 2002, Mr. McGrath was involuntarily curtailed from the position of Chief of the Division of Cultural Programs effective June 10, 2002, in retaliation for his refusal to terminate Ms. Montgomery and in retaliation for his EEO activity.

51. After his curtailment in June 2002, Mr. McGrath remained a Foreign Service Officer, but without an assignment or an office. He did not receive a new assignment until February 2003, but this assignment did not have duties and responsibilities commensurate with his FSO-1 grade. Since Mr. McGrath had been involuntarily curtailed, he did not receive mail from his old office.

52. During the July-August 2002 time period, Mr. McGrath was unaware that his check to Citibank did not clear. He was never contacted by anyone at the State Department, although his career development Officer - Jim Bigart - had Mr. McGrath's home telephone number and cell phone number.

53. In September 2002, Mr. McGrath was contacted by Citibank, informed about the

-11-

returned check for the first time, and immediately paid the bill again successfully. Mr. McGrath only later found out that his salary had been garnished by the agency for the hotel bill.

54. Mr. McGrath did not knowingly cause a bill to become overdue nor did he neglect to pay any bill presented to him.

55. On October 23, 2002, Jo Ellen Powell, the defendant's Director of the Office of Employee Relations, Bureau of Human Resources proposed a two-day suspension of Mr. McGrath for allegedly failing to pay a Government-contracted charge in a timely matter - the New York City hotel bill referenced in preceding paragraphs. This proposal was in retaliation for Mr. McGrath's protected EEO activity. Following a written and oral reply to the proposal by Mr. McGrath, the proposed suspension was reduced to a Letter of Admonishment on December 31, 2002 by Mr. John Campbell, the Deputy Assistant Secretary for Human Resources. At the time, Mr. Campbell had been informed of Mr. McGrath's pending EEO complaints prior to issuing his decision. The Letter of Admonishment was placed in Mr. McGrath's Official Personnel File for one year.

56. The negative EER prepared by Mr. Wunder was discriminatorily placed in Mr. McGrath's Performance File despite the pending discrimination complaint. Based in large part on this negative performance rating, Mr. McGrath was terminated by defendant on April 21, 2004, effective on November 30, 2004.

57. Mr. McGrath believes that, given the racial insensitivities and bias of Mr. Wunder and other management officials in the agency, such as Mr. Hart, if Mr. McGrath were black, the agency may not have come down as hard on Mr. McGrath than they did because the agency

-12-

officials perceived Mr. McGrath as a white person siding with African Americans.

58.    As a white male himself, Mr. Wunder discriminated and retaliated against Mr.

McGrath because Mr. Wunder did not believe that other white males, such as Mr. McGrath

should be siding with African American females against white males.

### V. Exhaustion of Remedies

59.    Plaintiff initiated contact with an EEO counselor within 45 days of the complained

of events and filed a timely complaint of discrimination with the defendant pursuant to the

regulations of the Equal Employment Opportunity Commission.  More than 180 days have

passed since plaintiff filed the administrative complaint at issue herein. On July 11, 2005,

plaintiff received from defendant the Final Order of the agency concerning his complaint. The

Final Order was dated July 7, 2005.  Plaintiff has exhausted his administrative remedies. 42

U.S.C. § 2000e-16(c).

### VI.  Statement of the Claims

60.    Based upon the facts set forth in paragraphs 3 through 59, supra, defendant

discriminated against plaintiff in the terms and conditions of his employment because of his race,

gender, and/or in reprisal for his protected activity in violation of Title VII, causing plaintiff

financial and other injury.

61.    Based upon the facts set forth in paragraphs in paragraphs 3 through 59, supra,

plaintiff was curtailed (or removed) from his position of Chief of the Division of Cultural

Programs, by defendant because of his gender, race, and/or in reprisal for his protected activity in

violation of Title VII,  causing plaintiff financial and other injury.

-13-

62.   Based upon the facts set forth in paragraphs 3 through 59, supra, subsequent to McGrath's curtailment from his position as Chief of the Division of Cultural Programs, defendant failed and refused to give Mr. McGrath duties and responsibilities commensurate with his FSO-1 grade because of his gender, race, and/or in reprisal for his protected activity in violation of Title VII,  causing plaintiff financial and other injury.

63.   Based upon the facts set forth in paragraphs 3 through 59, supra, plaintiff was given a negative performance rating by defendant because of his gender, race, and/or in reprisal for his protected activity in violation of Title VII, causing plaintiff financial and other injury.

64.   Based upon the facts set forth in paragraphs 3 through 59, supra, plaintiff was disciplined by defendant because of his gender, race, and/or in reprisal for his protected activity in violation of Title VII, causing plaintiff financial and other injury.

65.   Based upon the facts set forth in paragraphs 3 through 59, supra, plaintiff's employment was terminated by defendant because of his gender, race, and/or in reprisal for his protected activity in violation of Title VII, causing plaintiff financial and other injury.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff requests that the Court:

a. Declare that defendant has violated Title VII with respect to plaintiffs;

b. Enjoin defendant from further discrimination against plaintiffs;

c. Reinstate plaintiff to his position as a FSO-1 Foreign Service Officer with defendant's agency, retroactive to the date plaintiff was terminated from his employment, plus appropriate back pay and interest and other benefits;

-14-

d.  Award plaintiff compensatory damages to the maximum extent allowed by law;

e.  Award plaintiff attorney fees as part of his costs; and

f.  Award plaintiff any other legal and equitable relief to which he is entitled by the evidence.

**Jury Demand**

Plaintiff requests a trial before a jury of all Title VII claims triable to a jury.

Respectfully submitted,

Stephen L. Spitz

D.C. Bar No. 180778

June D.W. Kalijarvi

D.C. Bar No. 183863

Michelle Perry

D.C. Bar No. 46187

KALIJARVI, CHUZI & NEWMAN

1901 L Street N.W., Suite 610

Washington, D.C. 20006

Telephone: (202)331-9260

Attorneys for Plaintiffs