UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MATTHEW J. MCGRATH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2011 (RBW) |
| | ) | |
| CONDOLEEZZA RICE, Secretary, | ) | |
| United States Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

**MOTION FOR SUMMARY JUDGMENT**

Plaintiff brings this action against Defendant Condoleezza Rice ("Defendant"), Secretary, United States Department of States ("Agency" or "State") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), based upon Defendant's alleged race discrimination and retaliation against Plaintiff. Defendant hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 56, because there is no genuine issue of material fact that would prevent a judgment as a matter of law in Defendant's favor.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Undisputed Facts, and attached exhibits. Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. *See* L. Civ. R. 7(m).

Dated: September 15, 2008
       Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


      /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


      /s/
_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MATTHEW J. MCGRATH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2011 (RBW) |
| | ) | |
| CONDOLEEZZA RICE, Secretary, | ) | |
| United States Department of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Condoleezza Rice ("Defendant"), Secretary, United States Department of State ("Agency" or "State"), by and through her undersigned counsel, respectfully submits this memorandum of points and authorities in support of her motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(b).

**PRELIMINARY STATEMENT**

Plaintiff Matthew McGrath (a white, Caucasian male) purports to bring this case under Title VII alleging that he was discriminated against based upon his race and retaliated against based upon his opposition to discrimination and his EEO activity. Principally, Plaintiff claims that his supervisor, Mr. Van Samuel Wunder (also a white, Caucasian male) asked him to document the performance of a subordinate, Ms. E.J. Montgomery (a black, African-American female), with an eye towards terminating her. Plaintiff claims that he opposed this activity, and that he believed Mr. Wunder's request to be an illegal act of discrimination. Plaintiff further alleges that Mr. Wunder retaliated against him based upon this opposition in giving him an unsatisfactory performance evaluation (called an EER) and involuntarily curtailing (*i.e.*,

prematurely removing) him from his assignment.  Subsequent to his curtailment, Plaintiff also claims that the Agency retaliated against him by not assigning him a sufficiently desirable new position and by issuing him a Letter of Admonishment regarding an overdue credit card balance. As set forth below, Plaintiff's claims are meritless and refuted by the undisputed evidence adduced in this action.

*First*, the undisputed evidence clearly establishes that Plaintiff's performance was deficient in a number of respects while he was supervised by Mr. Wunder.  These well-documented deficiencies, and not some retaliatory or discriminatory motive, are what led to Mr. Wunder giving plaintiff an unsatisfactory EER and curtailing him from his assignment.  No reasonable juror could conclude otherwise.

*Second*, Plaintiff's self-serving story that he opposed Mr. Wunder's request to document the performance of Ms. Montgomery is utterly unsupported by anything other than Plaintiff's own statements and is belied by undisputed evidence adduced in this action.  For example, although Plaintiff claims that Mr. Wunder wanted to terminate Ms. Montgomery, based upon Plaintiff's own admissions, Mr. Wunder gave Ms. Montgomery an excellent performance rating. Consequently, no reasonable juror could conclude that Plaintiff opposed an act of discrimination made illegal under Title VII.

*Third*, even if Plaintiff's self-serving story were to be believed, Plaintiff's supposed "opposition" is a legally insufficient predicate upon which to base a Title VII claim of retaliation. For example, even assuming that Plaintiff's self-serving, uncorroborated story were true, there is no indication that could lead a reasonable person to believe that Mr. Wunder's direction to document Ms. Montgomery's performance was motivated by any racial or gender animus.

Further, the act of documenting a subordinate's performance is not an adverse action prohibited by Title VII.

*Fourth*, Plaintiff also claims that he was retaliated against for engaging in EEO activity. However, Plaintiff's claims in this regard are soundly refuted by the consistent statements of Mr. Wunder and Plaintiff's second-line supervisors that his performance was deficient, both before and after he engaged in such activity.

*Fifth*, Plaintiff simply fails to support any claim based upon his post-curtailment assignment history or the Letter of Admonishment that he received as a result of his failure to timely remit payment on his government credit card for a hotel bill he incurred.

*Lastly*, Plaintiff has wholly failed to support any claim of racial discrimination or hostile work environment (to the extent he even asserts one).

For these reasons, as more fully set forth below, the Court should enter summary judgment in Defendant's favor on the totality of Plaintiff's claims.[1]

## STATEMENT OF FACTS

## I.     BACKGROUND

### A.     Plaintiff, His Relevant Assignment, and His Staff.

Plaintiff, Matthew McGrath ("Plaintiff"), is a white, Caucasian male.  *See* Compl. at ¶ 1. Plaintiff was employed by State, and a predecessor agency, in the Foreign Service as a Foreign

---

[1]     Plaintiff's putative claim that the Foreign Service Grievance Board ("FSGB") acted arbitrarily and capriciously in terminating Plaintiff is foreclosed by the Court's Order, dated May 2, 2008.  Further, to the extent such a claim remains in this action, the FSGB's decision was clearly neither arbitrary nor capricious.  "The scope of review [of the FSGB] under this standard is a narrow and highly deferential one."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  Quite simply, as the FSGB concluded, Plaintiff has not identified any law, regulation, rule, or policy prohibiting the Agency from considering an employee evaluation that is the subject of another pending proceeding.  *See McGrath v. Dep't of State*, FSGB No. 2004-070, at *8 (May 18, 2006) (attached as an exhibit to Plaintiff's amended complaint).  Indeed, any such rule would prevent the Foreign Service from utilizing its selection out procedures, as an underperforming officer would only have to file successive challenges to an evaluation – as Plaintiff has – in order to forestall his or her selection out for years.

Service Officer ("FSO") from June 10, 1984, through November 30, 2004. *See* Compl. at ¶ 3. During his time in the Foreign Service, Plaintiff served as a Public Affairs Officer, Cultural Affairs Officer and Information Officer, among other positions. *See* Compl. at ¶ 3. From September 2001 to June 10, 2002, Plaintiff served as Chief of the Division of Cultural Programs (the "Assignment"), which is located within the Office of Citizen Exchanges in the Bureau of Educational and Cultural Affairs ("ECA"). *See* Compl. at ¶ 13; McGrath Dep. Tr. at 21, attached hereto as Ex. 1 ("Attached Ex. 1"). In short, Plaintiff's Assignment was to supervise and lead a staff of program officers in implementing various visual and performing art programs utilizing funds allocated by the government and provided through certain partnerships with private industry while adhering to certain usage guidelines. *See* McGrath EEO Tr. at 99-101, Attached Ex. 2. During the Assignment, Plaintiff was responsible for certain substantive duties, budgetary responsibilities, and supervising a staff of program officers and support personnel. *See id.* at 99-102.

In particular, during his Assignment, Plaintiff was responsible for supervising two program / administrative assistants (Mses. LaFaye Proctor and Deborah Chapman) and six program officers (Mses. Sandy Rouse, Leanne Mella, E.J. Montgomery, Kathryn Wainscott, Susie Baker, and Susan Cohen). *See* McGrath EEO Tr. at 104-105, Attached. Ex. 2. Of his eight subordinates, three were black, African-American women (Mses. Proctor, Chapman, and Montgomery); and the remainder were white, Caucasian women. *See id.* Additionally, Ms. Montgomery, who is a well-known figure in the visual art and other cultural communities, has Parkinson's disease, a fact which is publically known. *See* Biography of Ms. Montgomery, http://www.thehistorymakers.com/biography/biography.asp?bioindex=1000 (Last Checked: Sept. 13, 2008); McGrath EEO Tr. at 106, Attached Ex. 2.

B.    <u>Plaintiff's Supervisors.</u>

From September 2001 to June 10, 2002, Plaintiff's first-line supervisor was Mr. Van Samuel Wunder, the then Office Director for the Office of Citizen Exchanges.  *See* Compl. at ¶ 13; McGrath Dep. Tr. at 40, Attached Ex. 1.  From September 2001 to late-February or early-March 2002, Plaintiff's second-line supervisor was Mr. Brian Sexton, the then Deputy Assistant Secretary for Professional and Cultural Exchanges.  *See* McGrath Dep. Tr. at 40, Attached Ex. 1; Wunder Dep. Tr. at 13-15, Attached Ex. 3.  In or about late-February 2002 or early-March 2002, Mr. Steven Hart replaced Mr. Sexton as Plaintiff's second-line supervisor, and remained in that role until Plaintiff was involuntarily curtailed from his assignment on June 10, 2002.[2]  *See* Wunder Dep. Tr. at 15-17, Attached Ex. 3.

II.    **PLAINTIFF UNDERPERFORMS AND ULTIMATELY IS CURTAILED FROM HIS ASSIGNMENT WITH ECA FOR THAT REASON.**

The undisputed evidence clearly shows that Plaintiff had significant problems with his performance and management responsibilities in his Assignment with ECA.  Consequently, there is no genuine issue of material fact that he received a low rating and was curtailed from the Assignment for these reasons.

A.    **Plaintiff Joins ECA and Almost Immediately His Subordinates Begin to Complain.**

In mid-September 2001, Plaintiff joined ECA.  *See* McGrath Dep. Tr. at 21, Attached Ex. 1. At least one of his subordinates, Ms. Baker, has testified that almost from the very beginning

---

[2]    The term "curtail" generally means to leave one's assigned position within the Foreign Service.  *See* EEOC AJ Decision at 8, Attached Ex. 4.  A curtailment can be voluntary (*i.e.*, initiated by the FSO) or involuntary (*i.e.*, initiated by management).  *See id.*  A "curtailment," however, is not synonymous with termination, as the FSO remains with the Foreign Service and, thereafter, is reassigned to a different position.  *See id.*  As Plaintiff has testified, his involuntary curtailment did not affect his pay or other compensation as an FSO.  *See* McGrath Dep. Tr. at 21-22, Attached Ex. 1; *see also* 22 U.S.C. §§ 3981-82 (the Secretary of State "may assign a member of the Service to any position classified under section 501 in which that member is eligible to serve . . . and may assign a member from one such position to another such position as the needs of the service may require.").  Indeed, pursuant

of Plaintiff's Assignment, he was essentially non-existent as a supervisor. *See* Baker EEO Tr. at 297, Attached. Ex. 6; *see also* Wainscott EEO Tr. at 375-76, Attached Ex. 7 (Plaintiff was engaged for the first few months "but after that . . . I didn't have a lot of contact with him. . . . I found him difficult to work with as a manager, and again, I have been with the government for 30 years.").

Further, Plaintiff himself concedes that he started to have disagreements with his boss, Mr. Wunder, within the first few months after being assigned to ECA. *See* McGrath Dep. Tr. at 63, Attached. Ex. 1. Indeed, Plaintiff was unhappy, in part, because his subordinates felt that they could "go around" Plaintiff, to complain to Mr. Wunder about Plaintiff's performance and other matters. *See* McGrath Dep. Tr. at 63-66, Attached Ex. 1 ("Q: Were your subordinates going around you to him to complain about you during this period of time? A: To complain . . . about me and . . . other things in the office."). Plaintiff believes that at least three of the six program officers that he supervised had complained to Mr. Wunder during this period of time. *See id.* at 68 ("Do you know who was going around you at this point in time? A: Yes . . . It was Susie Baker, Kathy Wainscott, LeAnn (sic) Mella. It was at least those three.").

B.    **Plaintiff Ceases Having Staff Meetings Shortly After He Joins ECA.**

In the first few weeks after joining ECA, Plaintiff held regular weekly staff meetings. *See* Baker EEO Tr. at 298, Attached Ex. 6; Wainscott EEO Tr. at 375, Attached Ex. 7; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9. Indeed, Plaintiff agrees that it is important for a manager to have regular staff meetings. *See* McGrath Dep. Tr. at 59, Attached Ex. 1. Given this, it is remarkable that after *only three or four* group staff meetings, Plaintiff ceased having them, accordingly to his subordinates. *See* Baker EEO Tr. at 298,

---

to State Department policy, a "curtailment does not constitute a disciplinary action." *See* State Curtail Policy at 8, Attached Ex. 5.

Attached Ex. 6; Wainscott EEO Tr. at 375, Attached Ex. 7; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9; Rouse EEO Decl. at 5, Attached Ex. 10; Cohen EEO Decl. ar 6, Attached Ex. 11. Plaintiff appears to self-servingly disagree with his entire staff's recollection, and has testified that he continued to have staff meetings until "near the end" of his time with ECA. *See* McGrath Dep. Tr. at 98, 149, Attached Ex. 1.

> **C.    After Plaintiff is in His Position for Less Than Two Months, He Proposes to Take 42 Business Days of Leave.**

In November 2001, when Plaintiff had been in his Assignment with ECA for less than two months, Plaintiff proposed to take (a) annual leave on November 23 and 30, 2001 (2 days), (b) annual leave from December 13, 2001, through January 4, 2002 (three weeks and 2 days); and (c) residual home leave from January 18, 2002, through February 27, 2002 (six weeks less a day). *See* Email from McGrath to Wunder of 11/09/2001, Attached Ex. 12. That is, on November 9, 2001, Plaintiff proposed to take a total of 42 business days of leave when he had only worked a total 43 business days in his new Assignment. *See id.*

Despite the length of time Plaintiff proposed to be out of the office, his supervisor Mr. Wunder generally approved his leave requests. *See* Memo from Wunder to McGrath of 12/03/2001, Attached Ex. 13; Email from McGrath to Wunder of 01/17/2002, Attached Ex. 14. However, due to the pressing demands of the office, including a September 11th exhibition and a program called the Jazz Ambassadors, Mr. Wunder explained that he could only approve Plaintiff for annual leave from December 21, 2001, to January 4, 2002. *See* Memo from Wunder to McGrath of 12/03/2001, Attached Ex. 13. Further, Plaintiff's home leave was similarly reduced by six days. *See* Email from McGrath to Wunder of 01/17/2002, Attached Ex. 14. Nonetheless, Plaintiff was authorized and took 35 business days of leave from November 2001 through February 2002. *See* McGrath EEO Tr. at 266-67, Attached Ex. 2. Moreover, Plaintiff

was able to recoup certain annual leave days that Mr. Wunder had not approved in the following year. *See* McGrath EEO Tr. at 266-67, Attached Ex. 2.[3]

**D.    Plaintiff Fails to Complete a Highly Visible, Major Assignment Before Going on Leave.**

In January 2002, during the seven business days between Plaintiff's lengthy annual leave and Plaintiff's even lengthier home leave, Plaintiff was tasked with planning a program to honor a jazz musician named Billy Taylor as part of an event at the Kennedy Center coincident to the office's aforementioned Jazz Ambassador program. *See* McGrath EEO Tr. at 151, Attached Ex. 2. One of the tasks assigned to Plaintiff was to draft and coordinate the approval and printing of a Certificate of Appreciation signed by the Secretary of State (who at the time was Hon. Colin Powell) and to compile a package containing the certificate and talking points for the Secretary. *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15; Wunder EEO Tr. at 456-60, Attached Ex. 16. The ceremony where Mr. Taylor was to receive the certificate from Secretary Powell was scheduled for Sunday, January 20, 2002 -- the Sunday after Plaintiff left for home leave. *See* McGrath EEO Tr. at 151, Attached Ex. 2; Wunder EEO Tr. at 456-60, Attached Ex. 16.

Plaintiff does not dispute that he was assigned the responsibility to coordinate the Billy Taylor ceremony or that he did not have a certificate and talking points finalized when he departed the office on January 17, 2002, for his extended home leave. *See* McGrath EEO Tr. at 151-59, Attached Ex. 2. Rather, Plaintiff contends that he thought the event was not going to occur because Secretary Powell was out of the country and Mr. Taylor was sick. *See id.*

---

[3]    Although not a claim in Plaintiff's Amended Complaint, Plaintiff remarkably argues that Mr. Wunder's reduction of his leave from 42 business days to 35 business days was somehow the product of retaliation for "opposing discrimination." *See* McGrath Dep. Tr. at 33-34, Attached Ex. 1. Plaintiff's self-serving belief is unsupported by any evidence. Moreover, as Plaintiff's leave was reduced before January 7, 2002 (the date on which he supposedly refused to document Ms. Montgomery's performance), Plaintiff's self-serving, unsupported belief is belied by his own self-serving, unsupported version of the events. *See* McGrath Dep. Tr. at 133-38, Attached Ex. 1.

Plaintiff's contentions, even if true, are simply insufficient and unreasonable bases for not performing his assigned tasks in this regard.

Indeed, Plaintiff himself admits that when he left for home leave, he knew that the Kennedy Center event was going forward and was still scheduled to occur on January 20, 2002. *See* McGrath EEO Tr. at 153, Attached Ex. 2.  Moreover, Plaintiff knew (a) that Secretary Powell's wife often filled in for her husband when he was absent, and (b) that Mrs. Powell was on the board of directors for the Kennedy Center and was likely to attend the event. *See id.* at 156-57.[4]

Despite this knowledge and Plaintiff knowing that the appropriate officials at the State Department had not cleared the certificate for printing due to problems with the wording of Plaintiff's draft certificate (*see id.* at 159), Plaintiff admits that he specifically informed Mr. Wunder that "there were no pending projects" that required Mr. Wunder's attention during Plaintiff's home leave.  *See* McGrath Dep. Tr. at 148-49, Attached Ex. 1; Wunder EEO Tr. at 454-55, Attached Ex. 16.  Further, apparently realizing the error of his ways, immediately before leaving the building for home leave Plaintiff left Mr. Wunder a post-it note attached to a draft certificate on Mr. Wunder's chair, which said in substance that the certificate had not yet been approved and was not complete.  *See* Wunder EEO Tr. at 456-57, Attached Ex. 16; McGrath EEO Tr. at 155-56, Attached Ex. 2.

When Mr. Wunder discovered Plaintiff's post-it note, Mr. Wunder scrambled to remedy Plaintiff's oversight.  *See* Wunder EEO Tr. at 457-59, Attached Ex. 16.  Specifically, Mr. Wunder asked Plaintiff's staff if they knew about the project; none did.  *See id.*  Next, Mr. Wunder checked with a designer on staff, and learned that a certificate had not yet been

---

[4]      Tellingly, Plaintiff testified that it just "slipped [his] mind" that Mrs. Powell might conduct the presentation in Secretary Powell's absence.  *See* McGrath EEO Tr. at 157, Attached Ex. 2.

graphically designed. *See id.* Thereafter, Secretary Powell's office began to call and ask whether the Billy Taylor package was finished, at which point Mr. Wunder's supervisor, Mr. Sexton, took over the project. *See id.* Indeed, as Plaintiff should have expected, Mrs. Powell was prepared to make the presentation at the Kennedy Center event. *See id.* Through the efforts of Messrs. Wunder and Sexton, the ceremony occurred with Mrs. Powell handing a blank certificate to Billy Taylor's daughter. *See id.* Subsequently, Secretary Powell signed and shipped a finalized certificate to Dr. Taylor. *See id.*

After Mr. Wunder averted the crisis caused by Plaintiff's failures, Mr. Wunder wrote an email to the email address left by Plaintiff as the only means to reach him on home leave (*see* Email from McGrath to Wunder of 01/17/2002),[5] explaining the situation, his displeasure with Plaintiff's performance, and asking Plaintiff to contact him to determine whether there were any other similar programs that required Mr. Wunder's attention. *See* Wunder EEO Tr. at 459, Attached Ex. 16; Wunder Dep. Tr. at 90, Attached Ex. 3; Wunder EEO Decl. at 19, Attached Ex. 17. Plaintiff never responded. *See* Wunder EEO Tr. at 459, Attached Ex. 16; Wunder Dep. Tr. at 90, Attached Ex. 3; Wunder EEO Decl. at 19, Attached Ex. 17.

### E. Plaintiff Fails to Communicate With His Staff and Supervisor, Particularly on Budget Items.

During Plaintiff's home leave, Mr. Wunder also learned of deficiencies in Plaintiff's management of his staff. As Mr. Wunder informed Plaintiff in his Memorandum of March 8, 2002, Mr. Wunder heard from several of Plaintiff's subordinates that Plaintiff (a) was not having regular staff meetings; (b) had not allotted time to properly supervise their work; and (c) had been openly dismissive of some of their attempts to raise problems with Plaintiff. *See* Memo

---

[5]    Although Plaintiff left his "hotmail.com" address as the only means to reach him during his home leave, Plaintiff subsequently admitted that he did not have access to such email address until the very end of his extended home leave period. *See* McGrath EEO Decl. at 12, Attached Ex. 18.

from Wunder to McGrath of 03/08/2002 at 2, Attached Ex. 15.  Indeed, Mses. Baker, Waiscott and Mella, each confirmed that Plaintiff was noticeably absent or "non-existent" in his supervisory role and that they were frustrated working for him because he gave them no guidance or information.  *See* Baker EEO Tr. at 297, 303-04, Attached Ex. 6; Wainscott EEO Tr. 376-78, 397-98, Attached Ex. 7; Mella EEO Tr. at 559-60, Attached Ex. 19.  Consequently, a number of Plaintiff's subordinates have testified that Plaintiff was not a good manager.  *See* Cohen EEO Decl. at 7, Attached Ex. 11; Mella EEO Decl. at 5, Attached Ex. 2; Wainscott EEO Decl. at 5-7, Attached Ex. 21.

Furthermore, during Plaintiff's home leave, when working to review the prior year's budget and propose a new budget for the following year, Mr. Wunder discovered (with the assistance of Ms. Wainscott and Mr. Hart) that one of Plaintiff's programs was significantly over budget.  *See* Memo from Wunder to McGrath at 03/08/2002 at 2, Attached Ex. 15.  Specifically, Mr. Wunder learned that Plaintiff had authorized expenditures of $40,000 on the Warhol project, when it was budgeted for only $10,000.  *See id.*; Wunder EEO Tr. at 546, Attached Ex. 16.

Although Plaintiff claims that he had diverted funds from another project and had not yet modified the new budget to allocate additional funds, Plaintiff does not deny that he spent 400% more on the Warhol program than budgeted and does not deny that he failed to inform Mr. Wunder of this modification.  *See* McGrath EEO Tr. at 163-65, Attached Ex. 2.  Plaintiff attempted to explain his failure to communicate this modification to Mr. Wunder by labeling the amount "chump change."  *See id.* at 164.  Notably, a number of Plaintiff's subordinates, who were principally responsible for certain ECA programs, were often left in the dark as to budgeting details of their own projects, as Plaintiff did not meet with them to review budgets and plans.  *See* Wainscott EEO Decl. at 5-6, Attached Ex. 21; Wainscott EEO Tr. at 375, Attached

Ex. 7; Cohen EEO Decl. at 6, Attached Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 300, Attached Ex. 6; *see also* Wunder EEO Tr. at 464, Attached Ex. 16; Hart EEO Decl. at 15, Attached Ex. 22.

      **F.**    **Plaintiff Fails to Attend Meetings With His Supervisor.**

Despite Mr. Wunder's prior email concerning Plaintiff's failures regarding the Billy Taylor ceremony, after Plaintiff returned from home leave at the end of February 2002, Plaintiff did not let Mr. Wunder know that he had returned to the office. *See* Wunder Dep. Tr. at 88-89, Attached Ex. 3. Instead, Mr. Wunder first learned that Plaintiff had returned to the office when he encountered him at an Agency social function. *See id.*; Wunder EEO Tr. at 461, 465-66, Attached Ex. 16.

Thereafter, in early-March, Plaintiff missed two meetings that Mr. Wunder had instructed Plaintiff to attend: (i) a meeting with a group of Foreign Service National Employees; and (ii) Mr. Wunder's regularly scheduled Division Chiefs meeting. *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15. Notably, at his deposition, although Plaintiff agreed it was important to attend meetings that Mr. Wunder instructed him to attend (*see* McGrath Dep. Tr. at 58-59, Attached Ex. 1), Plaintiff could not recall if he gave Mr. Wunder advance notice that he was going to miss the two early-March meetings. *See* McGrath Dep. Tr. at 146-48, Attached Ex. 1. Notably, at least one of Plaintiff's subordinates complained that Plaintiff was not conveying any information from Mr. Wunder's regularly scheduled Division Chiefs meetings, and sought notes from another Division Chief to learn what was going on in the office. *See* Wainscott EEO Tr. at 377-78, Attached Ex. 7.

G.    **Plaintiff Fails to Address His Performance Deficiencies.**

After Plaintiff's series of performance failures, at a counseling session in early-March 2002 Mr. Wunder gave Plaintiff a memorandum detailing what he perceived to be "sub-standard performance."  *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15; Wunder EEO Tr. at 466-67, Attached Ex. 16; Counseling Form with Memo attached, Attached Ex. 23.  In that memorandum, Mr. Wunder highlighted his dissatisfaction with Plaintiff's performance, specifically: (a) Plaintiff's failure to attend the two early-March meetings; (b) Plaintiff's failure to contact Mr. Wunder after returning from home leave; (c) Plaintiff's gross delinquencies regarding the Billy Taylor ceremony; (d) Plaintiff's generally problematic managerial conduct; and (e) the Warhol project's budgetary issue.  *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15.  Further, in that memorandum, Mr. Wunder specifically directed Plaintiff to (i) begin weekly staff meetings with his subordinates, which he viewed as important to properly managing a staff within ECA; and (ii) take time to meet with each of his subordinates individually regarding their projects.  *See id*; Wunder EEO Decl. at 20-22, Attached Ex. 17. Additionally, when Mr. Wunder presented his memorandum to Plaintiff, Mr. Wunder for the first time suggested that Plaintiff might consider voluntarily curtailing his Assignment with ECA. *See* Finalized EER at 3, Attached Ex. 24.

Despite these express directions, and Mr. Wunder's encouragement for Plaintiff to improve his managerial and supervisory skills, Plaintiff did not comply with Mr. Wunder's directions and continued his detached, "non-existent" management style.  *See* Wunder EEO Tr. at 468-70, Attached Ex. 16; Hart EEO Decl. at 12, Attached Ex. 22.  Indeed, Plaintiff's staff uniformly agreed that Plaintiff did not resume staff meetings after March 8, 2002, in response to Mr. Wunder's direction.  *See* Wainscott EEO Decl. at 7, Attached Ex. 21; Rouse EEO Decl. at 6,

- 13 -

Attached Ex. 10; Cohen EEO Decl. at 7, Attached Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 298, Attached Ex. 6; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9. Plaintiff does not contest this fact. *See* McGrath EEO Decl. at 16, Attached. Ex. 18. Moreover, almost all of Plaintiff's program officers confirm that Plaintiff also did not take time to meet with them individually in response to Mr. Wunder's direction of March 8, 2002. *See* Wainscott EEO Decl. at 7, Attached Ex. 21; Cohen EEO Decl. at 7-8, Attached Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 313, Attached Ex. 6.

Furthermore, although Plaintiff routinely objected to the manner in which the Festival Fund[6] was operated and how its monies were dispensed (*see* Wunder EEO Tr. at 472-73, Attached Ex. 16) -- arguing that the fund was skewed toward Western European events -- in late-March and early-April when Mr. Wunder gave Plaintiff the opportunity to prepare a package for the fund's partners suggesting certain modifications, Plaintiff refused. *See id.* at 480; Wainscott EEO Tr. at 385-87, Attached Ex. 7. That is, when Mr. Wunder told Plaintiff that the State Department was going to be presenting a couple of the modifications Plaintiff had proposed, Plaintiff refused to participate because State was not willing to advocate a complete change in the operation of the fund. *See* Wunder EEO Tr. at 480-81, Attached Ex. 16; Wainscott EEO Tr. at 385-87, Attached Ex. 7; Hart EEO Decl. at 10, Attached Ex. 22.

Additionally, during this period of time, Plaintiff failed to communicate with Ms. Baker, one of his staff, regarding a crucial and timely program with the Intercultural Public/Private Fellow Program. *See* Baker EEO Tr. at 293-95, Attached Ex. 6. Ms. Baker repeatedly asked Plaintiff for an update regarding panelists for the program because booking panelists for the

---

[6]       The Festival Fund is a public / private partnership fund operated by four entities (State, the National Endowment of the Arts, the Rockefeller Foundation, and the Pew Charitable Trust) that provided monies to send American performing and visual artists to overseas festivals. *See* Wunder EEO Tr. at 470-71, Attached Ex. 16.

program would have ordinarily been Ms. Baker's responsibility. *See id.* Plaintiff, however, told Ms. Baker that he would take care of the panelists. *See id.* Thereafter, weeks went by without Plaintiff updating Ms. Baker, who still remained principally responsible for the program. *See id.* Although Plaintiff eventually booked panelists for the program, he did so barely in time to have the panel and his delays caused Ms. Baker to work excessively long hours in order for the panel to occur. *See id.* at 310-11; *see also generally* Wunder EEO Decl. at 26, Attached Ex. 17.

Further, during this early-April 2002 timeframe, Plaintiff also failed to respond to Mr. Wunder's request for the names of Plaintiff's staff who should be authorized to attend a conference of the American Association of Museums, a major grantee partner of ECA. *See* Email from Wunder of 06/11/2002 at 2, Attached Ex. 25; Wunder EEO Decl. at 24, Attached Ex. 17. Plaintiff also failed to respond to Mr. Wunder's request to contact an individual at the Korean Embassy regarding a cultural program, a fact that Plaintiff does not contest. *See* McGrath EEO Tr. at 171-72, Attached Ex. 2; Email from Wunder of 06/11/2002 at 2, Attached Ex. 25; Wunder EEO Tr. at 481, Attached Ex. 16.

### H.    Based On Plaintiff's Poor Performance, Mr. Wunder Issues Plaintiff an Unsatisfactory Rating.

Over a month after Mr. Wunder informed Plaintiff of his performance deficiencies on March 8, 2002, Mr. Wunder issued Plaintiff an Employee Evaluation Report ("EER") -- *i.e.*, a performance evaluation -- on or about April 11, 2002. *See* McGrath EEO Tr. at 173, Attached Ex. 2; EEO Compl. at 5, Attached Ex. 26; Compl. at ¶ 28. In the EER presented to Plaintiff on April 11, 2002, Mr. Wunder reiterated a number of the concerns he expressed in his March 8, 2002, memorandum, including Plaintiff's substantial deficiencies in his management skills and his inability to complete his work, regardless of his interest level, in a timely and professional manner. *See* 04/11/2002 EER at 3, Attached Ex. 27. Moreover, Mr. Wunder reiterated his

concerns (a) that Plaintiff's staff members were not receiving proper leadership or direction from Plaintiff; (b) that Plaintiff missed scheduled meetings with Mr. Wunder; and (c) that Plaintiff 's performance regarding the Billy Taylor ceremony was unacceptable.  *See id.* at 4.

Mr. Wunder also noted in the EER that Plaintiff had raised "some important issues on how our cultural programs are designed and run, but [had] consistently failed to move on to the next steps of proposing solution and innovations to address these issues."  *See id.*  Specifically, Mr. Wunder noted that although Plaintiff had raised concerns that the Festival Fund "was skewed toward events in Western Europe," when he was asked "to develop a plan to convince the other partners to alter the operation of the Fund to address this imbalance, [Plaintiff] provided only additional critiques and eventually refused to work with the Program Officer for Performing Arts in his division responsible for the program."  *See id.* at 3.

Subsequent to receiving the EER on April 11, 2002, Plaintiff met with Mr. Wunder to discuss Mr. Wunder's rating on April 18, 2002.  *See* McGrath EEO Tr. at 174-75, Attached Ex. 2.  According to Mr. Wunder, although he asked Plaintiff for specific goals, feedback and comments, Plaintiff provided none.  *See* Email from Wunder of 06/11/2002 at 2, Attached Ex. 25; Wunder EEO Tr. at 481-82, Attached Ex. 16.  That is, as reflected on the EER itself, Plaintiff did not submit a statement concerning his performance rating and did not identify any inaccuracies in Mr. Wunder's narrative.  *See* 04/11/2002 EER at 6, Attached Ex. 27; Finalized EER at 6, Attached Ex. 24.  Tellingly, although Plaintiff subsequently argued that Mr. Wunder's rating is "negative and incomplete," when asked the direct questions, (a) "Do you consider the EER to contain inaccuracies?  If so, please identify the inaccuracies and state what is accurate;" and (b) "What are the specific statements in the EER that you consider both negative and an inaccurate reflection of your performance?  Please be specific," Plaintiff failed to articulate

anything specifically inaccurate about Mr. Wudner's EER narrative or rating. *See* McGrath EEO Decl. at 13, Attached Ex. 18.[7]

When Mr. Wunder first presented the EER to Plaintiff, he did not believe that a review statement by Plaintiff's second-line supervisor was necessary, as Mr. Sexton (who filled that role through February 2002) had departed ECA, and Mr. Hart (who filled the role following February 2002) had just been Plaintiff's second-line supervisor for a couple of months. *See* Compl. at ¶ 28; McGrath EEO Tr. at 174-75, Attached Ex. 2. Subsequent to meeting with Plaintiff regarding his EER, Mr. Wunder was informed by human resources that a review statement by Mr. Sexton was necessary and appropriate. *See* Wunder EEO Tr. at 481-83, 485-86, Attached Ex. 16; Email from Wunder to McGrath of 04/24/2002, Attached Ex. 28. Accordingly, Mr. Wunder solicited a review statement from Mr. Sexton and, thereafter, finalized Plaintiff's 2002 EER, which he presented to Plaintiff on April 29, 2002. *See* Wunder EEO Tr. at 481-83, 485-86, Attached Ex. 16.

Mr. Sexton's review, which spans only four paragraphs, largely focuses on his involvement with the Billy Taylor ceremony, which was necessitated by Plaintiff's delinquency and unsatisfactory performance as noted above. *See* Finalized EER at 5, Attached Ex. 24. Notably, Plaintiff concedes that Mr. Wunder's rating and narrative included on the finalized EER were identical to those included on the EER presented to him on April 11, 2002, and the only substantive change was the addition of Mr. Sexton's review. *See* McGrath Dep. Tr. at 161-63, Attached Ex. 1; *see also* Wunder EEO Tr. at 485-86, Attached. Ex. 16. Further, despite being offered a second chance to submit a statement, once again Plaintiff chose to not challenge the

---

[7]     Additionally, in conjunction with Plaintiff's 2002 EER, Mr. Wunder again suggested that Plaintiff should consider curtailing his assignment with ECA, given his apparent lack of interest in managing his staff and in the work of ECA. *See* Finalized EER at 3, Attached Ex. 24; Hart EEO Decl. at 18, Attached Ex. 22.

substance of Mr. Wunder's rating or Mr. Sexton's review.   *See* Wunder EEO Tr. at 486, Attached Ex. 16; Finalized EER at 6, Attached Ex. 24.

**I.      After Plaintiff's Unsatisfactory Rating, Plaintiff's Performance Gets Worse.**

After Plaintiff received his EER, instead of taking steps to improve his performance, Plaintiff's performance worsened.   As Mr. Wunder testified, after Plaintiff received his EER, "frankly it became extremely difficult to get response from Mr. McGrath to the right e-mails or telephone messages."   Wunder EEO Tr. at 487, Attached. Ex. 16; *see also* Hart EEO Decl. at 12, Attached Ex. 22.   Plaintiff himself confirms that he did not respond to certain telephone calls after his EER.   *See* McGrath EEO Decl. at 20, Attached Ex. 17.

Moreover, as Mr. Wunder detailed in an email to Assistant Secretary Barbara S. Pope, Plaintiff ignored a significant number of assignments given to him during this time.   *See* Email from Wunder of 06/11/2002, Attached. Ex. 25.   Mr. Wunder's beliefs are corroborated by Plaintiff's subordinates.   For example, Ms. Baker testified that Plaintiff became so absent that she attempted different avenues of communication, including printing out emails and leaving them with handwritten notes on Plaintiff's office chair.   *See* Baker EEO Tr. at 313, Attached Ex. 6.  An example of this is attached hereto, where Ms. Baker wrote a note on the face of a May 8, 2002, email she sent to Plaintiff stating, in part, "Matt -- I can't move forward without your action.   Could you please review these emails?"   *See* Email from Baker to McGrath of 05/08/2002 (with handwriting), Attached Ex. 29.   Not surprisingly, during the period of time immediately before Mr. Hart proposed Plaintiff's involuntary curtailment, other emails from Ms. Baker to Plaintiff also went unanswered.   *See* Email from Hart to Wunder of 05/20/2002 (attaching email chain containing Ms. Baker's emails), Attached Ex. 30.

In one last attempt to get some response from Plaintiff on his staff's programs and issues, on or about May 20, 2002, Mr. Wunder sent Plaintiff a memorandum asking for Plaintiff's responses to a significant number of outstanding items. *See* Wunder EEO Tr. at 488, Attached Ex. 16; Memo from Wunder to McGrath of 05/20/2002, Attached Ex. 31. Plaintiff did not respond to Mr. Wunder's memorandum. *See* McGrath EEO Tr. at 204-05, Attached Ex. 2; Wunder EEO Tr. at 488-89, Attached Ex. 16. Indeed, Plaintiff believed that Mr. Wunder was interfering with his work and that he was not going to respond to Mr. Wunder's inquiries because "I was busy, made more so by [Mr. Wunder's] poor management." *See* McGrath EEO Decl. at 19-20, Attached Ex. 18. Further, Plaintiff admits that he refused to attend a meeting with his staff on May 21, 2002, to discuss proposals and other items. *See id.* at 20-21.

**J.    Based Upon His Poor Performance, Plaintiff is Curtailed from His Assignment.**

After Plaintiff's long pattern of unsatisfactory performance, on or about May 22, 2002, Mr. Wunder and Mr. Hart confronted Plaintiff and told Plaintiff that he could either voluntarily curtail his assignment with ECA or Messrs. Wunder and Hart would propose his involuntary curtailment. *See* McGrath EEO Decl. at 21, Attached Ex. 18; Wunder EEO Tr. at 502, Attached Ex. 16. Plaintiff chose not to voluntarily curtail his assignment, and Messrs. Wunder and Hart proposed his involuntary curtailment. *See* Action Memo of 05/22/2002, Attached Ex. 32. On June 10, 2002, based upon Assistant Secretary Patricia Harrison's request, Plaintiff was curtailed from his Assignment with ECA. *See* Memo of 06/10/2002, Attached Ex. 33. As noted above, as a result of his curtailment, Plaintiff did not suffer any reduction in pay or benefits or any demotion and continued to be employed as an FSO with the State Department. *See* McGrath EEO Tr. at 272-75, Attached. Ex. 2; McGrath Dep. Tr. at 21-23, Attached Ex. 1.

While remaining a FSO, Plaintiff was moved to unassigned status after he was curtailed from his position with ECA. *See* McGrath Dep. Tr. at 21, Attached Ex. 1. Subsequently, in February 2003, after Plaintiff did not voluntarily obtain another assignment,[8] Plaintiff was involuntarily assigned to the State Department's declassification unit. *See* McGrath Dep. Tr. at 22-23, Attached Ex. 1.

Based upon Plaintiff's long running pattern of poor performance, the 2003 Foreign Service Selection SFS-V Board ("Selection Board") "low ranked" Plaintiff and referred him to the Performance Standards Board ("PSB") for possible "selection-out" of the Foreign Service. *See* Low Ranking Stmt, Attached Ex. 35. On April 21, 2004, Plaintiff was notified that he was being selected out of the Foreign Service by the PSB due to his history of poor performance, which as noted below spanned assignments other than his Assignment to ECA. *See* Letter to McGrath of 04/21/2004 (attaching Designation of Separation), Attached Ex. 36. Plaintiff does not allege, because he cannot, that Messrs. Wunder, Sexton or Hart had any involvement with the Selection Board or PSB.

### K.    Plaintiff's Poor Performance at ECA Is Consistent With His Performance in His Prior Posts.

The unfavorable impressions of Plaintiff's performance by supervisors within ECA are further corroborated by Plaintiff's history of poor performance recorded in his prior performance

---

[8]      Plaintiff also seems to allege that subsequent to his curtailment, some as of yet unidentified person(s) prevented Plaintiff from finding another suitably desirable assignment within the Foreign Service. *See* Compl. at ¶ 68. As Plaintiff himself described, FSOs are assigned to positions largely based upon a competitive bidding process. *See* McGrath Dep. Tr. at 60, Attached Ex. 1; Wunder Dep. Tr. at 19-27, Attached Ex. 3. Other than Plaintiff's self-serving and conclusory statements that his career counselor, Mr. Jim Bigart (who had no role whatsoever in any activities within ECA), was not working hard to find him an assignment, Plaintiff has adduced no evidence in support of this claim. *See* McGrath Dep. Tr. at 41-44, Attached Ex. 1. Tellingly, Mr. Bigart confirms he has no direct knowledge of Plaintiff's claims. *See* Bigart EEO Decl. at 3, Attached Ex. 34. Further, and most notably, Plaintiff could not even identify who was supposedly retaliating against him in this regard. McGrath Dep. Tr. at 41, Attached Ex. 1. Tellingly, Plaintiff concedes it was mere "speculation" whether he was not selected for post-curtailment assignments because of his EEO activity. *See id.* at 48.

reviews. Indeed, Plaintiff has conceded as much in prior motions before this Court. *See* Pl's Opp. to Def's MTD, or for Partial MSJ at 2, ¶ 3, Docket Entry No. 32.

In his 1999 EER, which was given to him while he was stationed in South Africa, his then supervisor noted concerns that Plaintiff was ignoring instructions from his supervisors, which he repeatedly did during his time with ECA. *See* 1999 EER at 4, Attached Ex. 37 ("I am concerned by the example which Mr. McGrath set through his unauthorized use of USIS vehicles for home-to-office transportation and other personnel use. In addition to ignoring repeated memos from our Executive Officer to cease, he has not reimbursed the U.S. government for this unauthorized use.").

Plaintiff's 2000 EER, which was also issued while Plaintiff was stationed in South Africa, also noted deficiencies in Plaintiff's performance that were repeated in his time with ECA. First, on the cover of Plaintiff's 2000 EER, the review panel noted that Plaintiff's EER was untimely submitted due to Plaintiff's conduct. *See* 2000 EER at 1, Attached. Ex. 38. Indeed, the review panel noted that Plaintiff failed to appear for a scheduled meeting with his then reviewer. *See id.* Second, Plaintiff's then rating official noted in his narrative that Plaintiff's management style "sparked low morale among a majority of his existing staff." *See* 2000 EER at 3, Attached Ex. 38.[9] Indeed, both the rating and reviewing officials on Plaintiff's 2000 EER expressed substantial concerns of Plaintiff's supervisory skills and management abilities. *See* 2000 EER at 3-5, Attached Ex. 38. Similar to his 2002 EER, Plaintiff did not provide a statement or refute these criticisms. *See id.* at 6.

---

[9]     Mr. Wunder noted a similar sentiment without knowledge of Plaintiff's 2000 EER (*see* Wunder Dep. Tr. at 21, Attached Ex. 3) in his aforementioned March 8, 2002, memorandum to Plaintiff, which detailed Plaintiff's poor performance at ECA. *See* Memo of 03/08/2002, Attached Ex. 15 ("The overall morale of the staff was very low[.]").

Plaintiff's 2001 EER, while generally positive, further noted that Plaintiff had problems dealing with certain management activities, specifically noting his area for improvement was "Managerial Skills," and that "more attention to maintaining self-restraint in trying circumstances would pay dividends." *See* 2001 EER at 5, Attached Ex. 39. Further, the reviewing official on Plaintiff's 2001 EER noted that Plaintiff had difficultly timely submitting certain work. *See id.* at 5 ("Matt needs to be more consistent in the timely submission of program evaluations, especially exchange program results reports.").

Lastly, Plaintiff was suspended for six days for misconduct relating to his departure from his post in South Africa, which occurred before he filled his position with ECA. *See* FSGB Decision of 08/27/2004, Attached Ex. 40.

\*   \*   \*

In sum, given Plaintiff's well-documented and undisputable poor performance, his discrimination and retaliation claims should fail because he cannot show that the Agency's legitimate non-discriminatory motivations are somehow pretextual.

## II.    THE UNDISPUTED FACTS REFUTE ANY NOTION THAT HIS RATING AND CURTAILMENT WERE THE PRODUCT OF RETALIATION.

Even if Plaintiff could somehow show that Mr. Wunder's reasons for giving Plaintiff an unsatisfactory EER and proposing his involuntary curtailment were somehow insincere or pretextual, Plaintiff's claims that he was retaliated against are belied by the undisputed evidence adduced in this action. Indeed, Plaintiff's self-serving and unsupported statements that he "opposed" discrimination are refuted by undisputable evidence. Moreover, even if Plaintiff's self-serving statements are accurate (for which there is no support), his belief that he was opposing discrimination was unreasonable. Lastly, Plaintiff's retaliation claim based on his EEO activity is similarly meritless.

**A.    Plaintiff's Self-Serving Claim That He "Opposed" Discrimination is Refuted By the Undisputable Evidence.**

1.    Plaintiff's Claims.

Plaintiff claims that Plaintiff's 2002 EER and subsequent involuntary curtailment were motivated by Mr. Wunder's desire to retaliate against Plaintiff for opposing discrimination. *See* Compl. at ¶¶ 41, 50. Specifically, Plaintiff claims that in early-January 2002, Mr. Wunder directed Plaintiff to document Ms. Montgomery's performance with the goal of terminating her. *See* Compl. at ¶¶ 31-33.[10]    Plaintiff further claims that he refused to comply with such a direction, told Mr. Wunder that such a direction was discriminatory, and was threatened with retaliation, specifically curtailment, if he did not comply. *See* McGrath Dep. Tr. at 136-39, Attached Ex. 1; EEO Compl. at 3, Attached Ex. 26.[11]    Plaintiff further alleges that during his extended home leave in January and February 2002, Mr. Wunder (a) assigned Ms. Montgomery a "large amount of special work to be done in a short amount of time" in an effort to set her up for failure; and (b) rescinded Plaintiff's approval of official travel for Ms. Montgomery. EEO Compl. at 4, Attached Ex. 26; Compl. at ¶¶ 34-35. Plaintiff's self-serving story, however, is completely unsupported by any evidence.

2.    Mr. Wunder Specifically Denies Plaintiff's Claims.

Although Mr. Wunder recalls a conversation with Plaintiff in January 2002 in which Ms. Montgomery's performance was discussed, Mr. Wunder specifically denies that he directed

---

[10]    Plaintiff also claims that Mr. Wunder previously "suggested" to him in the Fall of 2001 that he similarly document Ms. Montgomery's performance, but that such "suggestions" were not orders or directions, and he just ignored them in the hopes that they would just "go away." *See* McGrath Dep. Tr. at 130-34, Attached. Ex. 1.

[11]    Plaintiff's allegations in this regard are not consistent. For example, in his Complaint and at the EEO hearing, Plaintiff alleged that the primary meeting in which Mr. Wunder threatened Plaintiff with retaliation occurred in March 2002. *See* Compl. at ¶¶ 37-39. Whereas at his deposition, Plaintiff claimed the primary meeting occurred on January 7, 2002, and was uncertain of whether the issue came up in March 2002, stating "it may have come up on March 8th. I'm trying to think about that [ ] meeting[.]" *See* McGrath Dep. Tr. at 130-31, 134-36, Attached Ex. 1.

Plaintiff to document Ms. Montgomery's performance to terminate her, or that Plaintiff mentioned anything about discrimination. *See* Wunder EEO Decl. at 3-12, Attached Ex. 17; Wunder Dep. Tr. at 54-62, Attached Ex. 3. Indeed, Plaintiff recalls that Plaintiff raised the issue of Ms. Montgomery's performance in an attempt to cast blame on his staff for his management deficiencies, specifically noting her slow performance and her difficultly with email. *See* Wunder Dep. Tr. at 54-56, Attached Ex. 3.

In response to Plaintiff's comment, Mr. Wunder told Plaintiff that he was her manager and he was responsible for organizing the work of the division and addressing his staff's performance. *See* Wunder EEO Decl. at 4, Attached Ex. 17; Wunder Dep. Tr. at 61, Attached Ex. 3. Mr. Wunder went on to state that if Ms. Montgomery needed some sort of an accommodation to perform her duties, Plaintiff should explore what accommodations were available. *See* Wunder EEO Decl. at 4, Attached Ex. 17; Wunder Dep. Tr. at 61, Attached Ex. 3. Mr. Wunder further stated that if, even with an accommodation, Ms. Montgomery could not perform her job duties, that the regulations do not require that sub-standard performance simply be accepted. *See* Wunder EEO Decl. at 4, Attached Ex. 17; Wunder Dep. Tr. at 61, Attached Ex. 3. Although Mr. Wunder recalls that Plaintiff expressed that he was uncomfortable addressing the disabilities of an employee of Ms. Montgomery's experience and stature, Mr. Wunder specifically does not recall Plaintiff protesting Mr. Wunder's directions as discriminatory, or even asking for clarification. *See* Wunder EEO Decl. at 7-8, Attached. Ex. 17; Wunder EEO Tr. at 544-45, Attached Ex. 3. In sum, Mr. Wunder stressed that it was Plaintiff's responsibility as Ms. Montgomery's supervisor to address these items, work with her, and document the steps he was taking. *See* Wunder EEO Tr. at 505-06, Attached Ex. 16.

As to the alleged additional work assignments, although when Plaintiff was away on extended home leave Mr. Wunder recalls giving Ms. Montgomery certain assignment that were similar to her normal duties, Mr. Wunder specifically denies that these were "additional" assignment or that he setup Ms. Montgomery for failure. *See* Wunder Dep. Tr. at 75-76, Attached Ex. 3; Wunder EEO Decl. at 11, Attached Ex. 17. Indeed, Mr. Wunder believes that Ms. Montgomery performed the assignments he gave to her in a satisfactory manner. *See* Wunder Dep. Tr. at 79-80, Attached Ex. 3; Wunder EEO Decl. at 11-12, Attached. Ex. 17.

As to the alleged travel that Mr. Wunder rescinded, Mr. Wunder concedes that he rescinded Plaintiff's approval of Ms. Montgomery's travel because Plaintiff had improperly authorized travel that was not directly tied to matters that Ms. Montgomery was working on. *See* Wunder EEO Decl. at 9-10, Attached Ex. 17; Hart EEO Decl. at 7-8, Attached Ex. 22. Notably, Mr. Wunder approved Ms. Montgomery to travel to Chicago later in the year. *See* Wunder EEO Decl. at 10, Attached Ex. 17.

3.    The Undisputed Evidence Contradicts Plaintiff's Claims.

Plaintiff's claims are further contradicted by undisputable evidence in this action.

*First*, Plaintiff concedes that he does not have any contemporaneous writings of the conversations that form the basis for his claims. *See* McGrath Dep. Tr. at 138-39, 144, Attached Ex. 1. Indeed, in response to Defendant's Interrogatories, aside from his own unsupported statements, Plaintiff identified no evidence that could support his claims. *See* Pl's Resps to Interrogs at 8-9, Attached Ex. 41.

*Second*, because of Plaintiff's involuntary curtailment, Mr. Wunder rated Plaintiff's staff in the 2002 performance appraisal process. *See* Compl. at ¶ 43; McGrath Dep. Tr. at 151, Attached Ex. 1. As Plaintiff alleges, in that review cycle Mr. Wunder rated Ms. Montgomery at

the "excellent" level.  *See* Compl. at ¶ 43.[12]  Moreover, Plaintiff concedes that to his knowledge

he is unaware of Ms. Montgomery ever receiving a low performance rating.  *See* McGrath Dep.

Tr. at 150-51, Attached. Ex. 1.  Indeed, Ms. Montgomery continues to be an employee of the

State Department.  *See* Montgomery EEO Tr. at 357, Attached Ex. 42; McGrath Dep. Tr. at 151,

Attached Ex. 1.

*Third*, Ms. Montgomery confirms that she does not recall Mr. Wunder assigning her any

"additional" duties during Plaintiff's extended home leave.  *See* Montgomery EEO Tr. at 354,

Attached Ex. 42.

*Fourth*, after Plaintiff failed to take any actions to accommodate Ms. Montgomery's

physical disabilities, Mr. Wunder himself explored the possibility of obtaining voice recognition

software for Ms. Montgomery to ease the burdens associated with her typing.  *See* Wunder EEO

Tr. at 535, Attached Ex. 16.  Indeed, Mr. Wunder raised the idea at the early-January meeting

with Plaintiff, a fact that Plaintiff appears himself to confirm.  *See* Wunder Dep. Tr. at 59-62,

Attached Ex. 3; McGrath EEO Tr. at 572, Attached Ex. 2 ("Q: Did Mr. Wunder ever raise with

you the idea of purchasing voice recognition software for Ms. Montgomery prior to April 2002?

A: I don't recall it before April.  April was a contentious month.  I heard him say January, but we

didn't -- we didn't get into the specifics about E.J. or really anyone to the extent he was

relating.").  Subsequently, Mr. Wunder obtained such software for Ms. Montgomery, a fact that

Ms. Montgomery herself confirms.  *See* Wunder EEO Tr. at 535, Attached Ex. 2; Montgomery

EEO Tr. at 357, Attached Ex. 42.

---

[12]     Plaintiff argues that Mr. Wunder's rating of Ms. Montgomery was only given to "cover-up" Mr. Wunder's retaliation against Plaintiff.  *See* Compl. at ¶ 43.  Plaintiff, however, conceded in his Interrogatory responses that he bases this allegation simply upon the fact that Mr. Wunder's rating came after Plaintiff's EEO complaint, and not upon any evidence that Mr. Wunder did not truthfully and sincerely evaluate Ms. Montgomery's performance.  *See* Pl's Resps. to Interrogs. at 9, Attached Ex. 41.

In short, Plaintiff's self-serving, uncorroborated allegations are refuted by undisputable evidence in this action.

**B.    Even if Plaintiff Subjectively Thought He Was Opposing Discrimination, His Belief Was Unreasonable.**

Even if Plaintiff's version of the events were believable, aside from his own subjective and self-serving statements, there is no evidence to support the notion that Mr. Wunder asked Plaintiff to document Ms. Montgomery's performance in an effort to impermissibly discriminate against her. Indeed, the staff of ECA is unanimous that Mr. Wunder did not harbor any racial animus or took any action based upon his staff's race. *See* Baker EEO Tr. at 316-17, Attached Ex. 6; Wainscott EEO Tr. at 406, Attached Ex. 7; Chapman EEO Tr. at 422, Attached Ex. 8; Proctor EEO Tr. at 436, Attached Ex. 9; Hart EEO Decl. at 6, Attached Ex. 22; Hunsley EEO Decl. at 7, Attached Ex. 43.

Further, in response to Defendant's Interrogatories, aside from his own unsupported statements, Plaintiff identified no evidence that could support the notion that any of Mr. Wunder's directions were based upon Ms. Montgomery's race, gender, age or disability. *See* Pl's Resps to Interrogs at 8-9, Attached Ex. 41. Indeed, even in his own self-serving, unsupported version of the events, Plaintiff himself claims that he first brought up Ms. Montgomery's race in his discussion with Mr. Wunder. *See* McGrath Dep. Tr. at 112, Attached Ex. 1.

**C.    Plaintiff's Claim That His EEO Filing Prompted A Harsher Review Is Similarly Refuted By Undisputed Evidence.**

Plaintiff also claims that he was retaliated against because he actually filed an EEO complaint. The undisputed facts in this case, however, affirmatively refute any such notion.

*First*, Plaintiff did not seek EEO counseling until April 16, 2002 -- after he first received his EER on April 11, 2002, from Mr. Wunder, which detailed his poor performance and rated his

performance unsatisfactory, and long after he first received notice of his performance deficiencies in Mr. Wunder's March 8, 2002, Memorandum. *See* EEO Counselor's Report at 2, Attached Ex. 44. Although Mr. Sexton provided a reviewing narrative after this time, his narrative was entirely consistent with issues raised by Mr. Wunder in the rating narrative and issues identified in the March 8, 2002 Memorandum. *Compare* Finalized EER at 5, Attached Ex. 24, *with* Memo of 03/08/2002, Attached Ex. 15, *and* 04/11/2002 EER, Attached Ex. 27.

*Second*, even if March 18, 2002, is the relevant date by which to measure Plaintiff's EEO activity (Plaintiff claims he contacted personnel on this date), Plaintiff's performance deficiencies had already been identified by Mr. Wunder in his March 8, 2002, Memorandum. *See* Memo of 03/08/2002, Attached Ex. 15.

Accordingly, there is no evidence that could support any inference of retaliation, as Plaintiff's performance was consistently described as unsatisfactory before, during and after his alleged EEO activity.[13]

## III. PLAINTIFF'S CLAIMS CONCERNING HIS FAILURE TO TIMELY REIMBURSE THE AGENCY FOR HIS CREDIT CARD EXPENDITURES ARE MERITLESS.

Plaintiff's claim that he was somehow retaliated against when the Agency issued him a Letter of Admonishment regarding his failure to timely remit payment for a hotel bill is utterly unsupported by any evidence. Indeed, Plaintiff (i) does not deny that he failed to timely remit payment, (ii) has not presented any evidence that the reasons for the Agency's issuance of a letter of admonishment were pretextual, (iii) has not identified any evidence that even hints that

---

[13]     Plaintiff has also failed to identify any evidence that Mr. Wunder racially discriminated against him by giving him an unsatisfactory EER and involuntarily curtailing him. Indeed, in response to Defendant's Interrogatories, Plaintiff acknowledges that his race claim is premised upon the unsupported and self-serving allegation that "Mr. Wunder did not previously order any of the minorities and/or woman (sic) in the office to take discriminatory action against Ms. Montgomery." *See* Pl's Resps. To Interrogs. at 11, Attached Ex. 41. As noted above, both Mr. Wunder and Plaintiff are white, Caucasian males.

the Agency's decision in this regard was the product of retaliation, and (iv) cannot explain how the aforementioned Letter of Admonishment had any material effect on him.

In his own Complaint, Plaintiff concedes that he did not timely remit payment for the hotel bill. *See* Compl. at ¶ 49. That is, Plaintiff concedes that the legitimate, non-discriminatory basis upon which the Agency issued him a letter of admonishment actually occurred.

Moreover, even if Plaintiff could show that this reason was somehow pretextual, which he cannot, Plaintiff has offered no evidence upon which a reasonable juror could infer retaliation. *First*, Plaintiff was sent multiple notices, both to his work address and home address, notifying him that his balance on his government credit card was delinquent. *See* Notice Letters, Attached Ex. 45. *Second*, after the Agency initially proposed that Plaintiff be suspended for two-days because of his delinquency, the Agency afforded Plaintiff a full opportunity to respond to the charges. *See* Letter of 10/23/2002, Attached Ex. 46; Letter of 12/31/2002, Attached Ex. 47. After considering Plaintiff's response, the Agency decided to reduce Plaintiff's sanction to a Letter of Admonishment, which was only placed in Plaintiff's Office of Employee Relations file, not his Official Personnel File, for one year. *See* Letter of 12/31/2002, Attached Ex. 47. *Third,* Plaintiff has adduced no evidence that the individual who issued Plaintiff's Letter of Admonishment, Mr. John Campbell, had any connection to, involvement in, or knowledge of Plaintiff's prior EEO activity or supposed opposition to discrimination. *See* Letter of 12/31/2002, Attached Ex. 47. *Lastly*, Plaintiff was issued his Letter of Admonishment more than six months after he filed his formal EEO complaint, which was then Plaintiff's most recent protected activity. *Compare* EEO Compl., Attached Ex. 26, *with* Letter of 12/31/2002, Attached Ex. 47.

## ARGUMENT

Based upon the overwhelming evidence adduced in this action, summary judgment is proper on all of Plaintiff's claims.

## I.    THE RELEVANT LEGAL STANDARDS.

### A.    The Legal Standard for Summary Judgment Under Rule 56.

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 154 (D.D.C. 2007) (Bates, J.), *quoting* Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial responsibility of showing an absence of a genuine issue of material facts.  *Id.*  In deciding whether a genuine issue of material facts exists, the court must "accept all evidence and make all inferences in the non-movant's favor."  *Id.*, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "A non-moving party, however, must establish more than the mere existence of a scintilla of evidence in support of its position."  *Id.* (citations and internal quotation marks omitted).  That is, "'[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.*, *quoting Anderson,* 477 U.S. at 249-50.

Furthermore, "[s]elf-serving testimony does not create genuine issues of material fact[.]" *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) (Robertson, J.) (granting summary judgment on plaintiff's Title VII discrimination and retaliation claims); *see also Hamilton v. Paulson*, 542 F. Supp. 2d 37, 42 (D.D.C. 2008) (Walton, J.) ("The non-moving party [ ] cannot rely on mere allegations or denials[.]") (internal quotations omitted); *Bonieskie v. Mukasey*, --- F. Supp. 2d ---, 2008 WL 839051, at *3 (D.D.C. Mar. 31, 2008) (Friedman, J.) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely

by the plaintiff's own self-serving, conclusory statements."); *Lindsey v. Rice*, 524 F. Supp. 2d 55,

60 (D.D.C. 2007) (Collyer, J.) (granting summary judgment where plaintiff's "self-serving

statements [were] too conclusory to survive [defendant's] summary judgment motion");

*Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 90 (D.D.C. 2006) (Walton, J.).

Indeed, "'conclusory allegations' and 'unsubstantiated speculation' do not create genuine issues

of material fact." *Bonieskie*, 2008 WL 839051, at *3 (citations omitted). Under this standard,

Plaintiff's claims should be dismissed in light of the undisputed and overwhelming facts in this

case.

### B.    The *McDonnell Douglas* Framework for Disparate Treatment Cases.

This Court has recently described the burden-shifting framework in analyzing Title VII

discrimination and retaliation cases:

> Title VII provides that "[a]ll personnel actions affecting employees ... in executive
> agencies ... shall be made free from any discrimination based on race, color,
> religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Where, as here, there
> is no direct evidence of discrimination on one of these impermissible categories,
> the Court assesses the plaintiff's claim under the framework set forth by the
> Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05
> (1973). Under the *McDonnell Douglas* framework, "the plaintiff must establish a
> prima facie case of discrimination" in the first instance, *Reeves v. Sanderson
> Plumbing Prods.*, 530 U.S. 133, 150 (2000), after which "the burden shifts to the
> defendant, who must 'articulate some legitimate, nondiscriminatory reason' for
> the adverse action.'" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007)
> (*quoting McDonnell Douglas*, 411 U.S. at 802).
>
> Assuming that the defendant can satisfy that burden, "the *McDonnell Douglas*
> framework-with its presumptions and burdens-disappear [s]," *Reeves*, 530 U.S. at
> 142-43 (internal quotation and citation omitted), and "the plaintiff must show that
> a reasonable jury could conclude from all of the evidence that the adverse
> employment decision was made for a discriminatory reason," *Lathram v. Snow*,
> 336 F.3d 1085, 1088 (D.C. Cir. 2003). In this context, the phrase "all of the
> evidence" refers to "any combination of (1) evidence establishing the plaintiff's
> prima facie case [,] (2) evidence the plaintiff presents to attack the employer's
> proffered explanation for its actions[,] and (3) any further evidence of
> discrimination that may be available to the plaintiff." *Holcomb*, 433 F.3d at 897
> (internal quotation and citation omitted). If the plaintiff is ultimately "unable to
> adduce evidence that could allow a reasonable trier of fact to conclude that [the

> defendant's] proffered reason was a pretext for discrimination, summary
> judgment must be entered against [the plaintiff]." *Paquin v. Fed. Nat'l Mortgage
> Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

*Hamilton*, 542 F. Supp. 2d at 42-43 (granting summary judgment, in part). Further, as with

discrimination claims, "'[c]laims of retaliation are governed by the *McDonnell Douglas* burden-

shifting framework,' *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). Thus, 'a plaintiff

must [first] establish a prima facie case of retaliation; if [ ]he meets that burden, the employer

must articulate a legitimate nonretaliatory reason for its action; [and] finally, the plaintiff has the

ultimate burden of establishing that the reason asserted by the employer is [a] pretext for

retaliation.' *Holcomb*, 433 F.3d at 901." *Hamilton*, 542 F. Supp. 2d at 57.

## C.    Prima Facie Case of Retaliation.

As Judge Bates recently observed:

> To establish a prima facie case of retaliation, a claimant must show that (1) she
> engaged in a statutorily protected activity; (2) she suffered a materially adverse
> action by her employer; and (3) a causal connection existed between the two."
> *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Title VII's anti-retaliation
> provision provides the basis for what constitutes a protected activity. The first
> prong, commonly referred to as the opposition clause, provides that "[i]t shall be
> an unlawful employment practice for an employer to discriminate against any of
> his employees . . . because he has opposed any practice made an unlawful
> employment practice by this subchapter." 42 U.S.C. § 2000e-3. The second
> prong-the participation clause-provides that "[i]t shall be an unlawful employment
> practice for an employer to discriminate against any of his employees . . . because
> he has made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this subchapter." *Id.*

*Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 14 (D.D.C. 2008) (Bates, J.)

(dismissing "opposition clause" retaliation claim). Additionally, in "opposition clause"

retaliation cases the D.C. Circuit has held that "an employee seeking the protection of the

opposition clause must demonstrate a good faith, reasonable belief that the challenged practice

violated Title VII." *See George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (affirming grant

of summary judgment on plaintiff's "opposition clause" retaliation claim in agency's favor),

*quoting Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981).

## II.   SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S RETALIATION BASED CLAIMS.

Quite simply there is no genuine issue of material fact that could prevent the Court from

entering summary judgment in Defendant's favor on Plaintiff's retaliation claims.

### A.   Defendant Has Articulated Irrefutable Legitimate Non-Discriminatory Reasons for the Agency's Actions.

As noted above, Defendant's stated reasons for taking the actions upon which Plaintiff

bases his claims are legitimate and supported by overwhelming evidence.  That is, Plaintiff was

given an unsatisfactory EER by Mr. Wunder and was curtailed from his Assignment by Messrs.

Wunder and Hart because Plaintiff had substantial difficulties properly managing his staff,

appropriately supervising their work, and successfully completing substantive tasks assigned to

him.  *See, supra*, at 5-22.  Moreover, Plaintiff was given a Letter of Admonishment by Mr.

Campbell because he admittedly failed to timely remit payment to cover a hotel bill charged to

his government credit card.  *See, supra*, at 28.  Accordingly, summary judgment is appropriate in

Defendant's favor.  *See generally Hamilton*, 542 F. Supp. 2d at 42-43 ("If the plaintiff is

ultimately 'unable to adduce evidence that could allow a reasonable trier of fact to conclude that

[the defendant's] proffered reason was a pretext for discrimination, summary judgment must be

entered against [the plaintiff].'"), *quoting Paquin*, 119 F.3d at 27-28.

### B.   There is No Other Evidence Upon Which A Reasonable Juror Could Find In Favor of Plaintiff on His "Participation Clause" Retaliation Claims.

Furthermore, Plaintiff has adduced no evidence upon which a reasonable juror could

conclude that the Agency was motivated by retaliation against Plaintiff's EEO activity or that the

Agency's stated reasons are pretextual.

*First*, as to the unsatisfactory EER and curtailment, prior to Plaintiff's EEO activity (which began on April 16, 2002, with him contacting the Office of Civil Rights for the first time), Mr. Wunder had already sent Plaintiff a memorandum on March 8, 2002, and provided Plaintiff a copy of his EER rating and narrative on April 11, 2002 -- both of which plainly set forth the deficiencies in Plaintiff's performance upon which the unsatisfactory EER and involuntary curtailment were based.  *See, supra,* at 27-28; *see generally Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[employers] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality"); *Riggiladez v. Harvey*, 510 F. Supp. 2d 106, 110 (D.D.C. 2007) (Leon, J.) ("an adverse employment action following soon after the employee's engagement in the protected activity cannot establish causation if the employer contemplated the adverse action before the employee's protected activity").

*Second*, as to the Letter of Admonishment, the Agency official responsible for issuing Plaintiff such letter was not previously involved in any of the events allegedly giving rise to Plaintiff's EEO complaint.  *See, supra,* at 29.  Moreover, the Letter of Admonishment was issued on December 12, 2002, well after Plaintiff sought informal EEO counsel in April 2002 and filed his formal EEO complaint in June 2002.  *See, supra*, at 29.  Accordingly, there is no basis for any inference of retaliation.  *See Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (three months is the outer limit for a temporal showing of causation) (Walton, J.).

*Lastly,* to the extent Plaintiff asserts an independent claim based upon the Agency's failure to reassign Plaintiff from June 2002 (when he was curtailed) to February 2003 (when he was assigned to the declassification unit), Plaintiff has failed to identify any facts upon which any fact finder could even remotely conclude that Plaintiff was retaliated against for his EEO

activity. As noted above, Plaintiff has failed to even identify who retaliated against him, let alone facts that could create a triable issue of fact. Indeed, Plaintiff concedes it is mere speculation that he was not selected for a suitably desirable assignment following his curtailment based upon his EEO activity. *See, supra*, at 20-21, n.7.

### C.    **Plaintiff's "Opposition Clause" Retaliation Claims Similarly Fail.**

Plaintiff has similarly adduced no evidence that his "opposition clause" retaliation claims are anything but meritless.

*First*, aside from Plaintiff's unsupported, self-serving story, there is no evidence that Mr. Wunder even asked Plaintiff to document Ms. Montgomery's performance. *See, supra,* at 25-27. Indeed, the undisputable evidence in this regard belies this contention. *See id.*

*Second*, even if Plaintiff's story were to be believed for purposes of this Motion, Plaintiff's belief that Mr. Wunder was seeking to discriminate against Ms. Montgomery is simply unreasonable given the circumstances. *See, supra*, at 27. Notably, aside from Plaintiff, no one in ECA expressed any concern that Mr. Wunder harbored any racial animus against African-American individuals. *See id.* Moreover, based upon Plaintiff's own story, he, not Mr. Wunder, was the first one to interject race into the discussion. *See id.*

*Lastly*, "documenting" a subordinate's performance, which is the action Plaintiff supposedly opposed, is an insufficient adverse action under Title VII upon which to base a claim of discrimination. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 46-47 (D.D.C. 2001) (Roberts, J.) (finding that supervisor's criticism of plaintiff was not an adverse action, noting "if criticizing employees were found actionable as retaliatory, the court 'would be deterring employers from documenting performance difficulties, for fear that they could be sued for doing so'"*), quoting Sweeny v. West*, 149 F.3d 550, 557 (7th Cir. 1998). Consequently, Plaintiff's opposition to such

action is an insufficient basis upon which to base an "opposition clause" retaliation claim because such an action is not a "practice made . . . unlawful" by Title VII within the meaning of 42 U.S.C. § 2000e-3(a). *See King v. Jacksoni,* 487 F.3d 970, 973 (D.C. Cir. 2007) (affirming dismissal of "opposition clause" retaliation claim premised upon opposition to implementation of affirmative action plan because implementation of such a plan was not an "unlawful employment practice" under Title VII); *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1010 (8th Cir. 2005) (stating that commenting about absence of black employees, without alleging discrimination, was insufficient to qualify as protected activity).

## II.     SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S RACE CLAIMS.

Plaintiff's race based claims are similarly meritless.

*First*, for the reasons described above, Plaintiff has not adduced any evidence upon which a reasonable juror could conclude that Defendant's stated reasons for Plaintiff's unsatisfactory EER, involuntary curtailment, reassignment, or Letter of Admonishment were somehow pretextual.

*Second*, as noted above, the sole support for Plaintiff's race claims is his unsupported notion that "Mr. Wunder did not previously order any of the minorities . . . in the office to take discriminatory action against Ms. Montgomery." *See* Pl's Resps. to Interrogs. at 11, Attached Ex. 41. This unsupported conclusory statement is simply insufficient to create a triable issue of fact. *See generally Bonieskie,* 2008 WL 839051, at *3 ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements.").

*Lastly*, the races of Plaintiff and Mr. Wunder undercut any claim of race discrimination. Indeed, Plaintiff's claims are "reverse discrimination" claims, which require Plaintiff to "'show additional background circumstances that support the suspicion that the defendant is that unusual

employer who discriminates against the majority' in lieu of the first prong of the traditional prima facie test." *Hamilton*, 542 F. Supp. 2d at 44, n.6, *quoting Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 851 (D.C. Cir. 2006) (internal quotation and citation omitted).  Clearly, Plaintiff's unsupported contention cannot satisfy this heightened requirement.

## II.    TO THE EXTENT HE ASSERTS ONE, SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM.

Plaintiff has simply failed to adduce any facts that could support a hostile work environment claim. For a plaintiff to establish the existence of a hostile work environment violation under Title VII, he must demonstrate that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race, gender, or national origin; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Laurent*, 2008 WL 1710912 at *4, *citing Gustave-Schmidt v. Chao,* 360 F. Supp. 2d 105, 120 (D.D.C. 2004) (Walton, J.) (granting summary judgment on plaintiff's non-selection, termination, and hostile work environment claims).

Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.  *Nurriddin*, 382 F. Supp. 2d at 107.  Indeed, "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.*, *quoting Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).  That is, "anti-discrimination laws do not prohibit all workplace harassment, only harassment motivated by a

discriminatory criterion." *Elam v. Board of Trustees of Univ. of D.C.*, 530 F. Supp. 2d 4, 23 (D.D.C. 2007) (Bates, J.) (granting summary judgment on plaintiff's hostile work environment claim).

Further, a hostile work environment claim cannot be based upon discrete employment actions that might serve as the basis for disparate treatment claims. As Judge Bates as noted:

> [A]lleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim. *See, e.g., Lester v. Natsios,* 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims ... are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); *Gardner v. Tripp County, South Dakota,* 66 F. Supp. 2d 1094, 1101 (D.S.D.1998) (explaining that retaliation claims are distinct from hostile work environment claims because "if the same set of facts could support both claims, state and federal provisions that provide a separate cause of action for retaliatory acts would be rendered superfluous"); *Parker v. State, Dep't of Public Safety,* 11 F.Supp.2d 467, 475 (D.Del.1998) (stating that "the dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.").

*Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 164 (D.D.C. 2007) (Bates, J.) (granting summary judgment on plaintiff's hostile work environment claim).

Plaintiff simply does not plead and has not shown any pervasive pattern of conduct that could rise to the level of a hostile work environment premised on Plaintiff's race or in reprisal for protected activity. At most, Plaintiff alleges a series of disparate treatment claims, which are insufficient for the reasons noted above.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully asks this Court to enter summary judgment on all of Plaintiff's claims in Defendant's favor.

Dated: September 15, 2008
      Washington, DC

                                Respectfully submitted,

                                _____
                                JEFFREY A. TAYLOR, D.C. BAR #498610
                                United States Attorney

                                     /s/
                                _____
                                RUDOLPH CONTRERAS, D.C. BAR #434122
                                Assistant United States Attorney

                                     /s/
                                _____
                                BRIAN P. HUDAK
                                Assistant United States Attorney
                                555 4th Street, NW
                                Washington, DC 20530
                                (202) 514-7143

                                *Attorneys for Defendant*