# EXHIBIT 1

Capital Reporting Company

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------:
MATTHEW J. MCGRATH,                 :
                                    :
            Plaintiff,              :
                                    :
      vs.                           :No.:
                                    :05-2011(RBW)
CONDOLEEZA RICE,                    :
UNITED STATES SECRETARY OF STATE    :
                                    :
            Defendant.              :
------------------------------------:

                        Washington, D.C.

                    Monday, June 30, 2008

Deposition of:

            MATTHEW MCGRATH

called for oral examination by counsel for

Defendant, pursuant to notice, at U.S. Attorney's

Office, 501 Third Street, Fourth Floor, Northwest,

Washington, D.C., before Terri L. Hamilton,

of Capital Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 1:33

p.m., when were present on behalf

of the respective parties:

Capital Reporting Company

Page 2

1  A P P E A R E N C E S
2  On behalf of Plaintiff:
3    MICHELLE PERRY, ESQUIRE
4    Kalijarvi, Chuzi & Newman, P.C.
5    1901 L Street, Northwest
6    Washington, D.C. 20036
7    (202) 331-9260
8    and
9  On behalf of Defendant:
10   BRIAN HUDAK, ESQUIRE
11   U.S. Attorney's Office
12   501 Third Street, Northwest
13   Washington, D.C. 20530
14   (202) 514-9150
15
16  ALSO PRESENT:
17
18   Stephen Townley, Attorney-Advisor, Department
19   of State
20
21
22

Page 3

1  C O N T E N T S
2  EXAMINATION BY:                PAGE
3  Counsel for Defendant            4
4
5  MCGRATH DEPOSITION EXHIBITS    *    PAGE
6  1 March 8th, 2002 Memo           145
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  (*Exhibits attached to transcript.)

Page 4

1  WHEREUPON,
2          MATTHEW MCGRATH
3  called as a witness, and having been first duly
4  sworn, was examined and testified as follows:
5       EXAMINATION BY COUNSEL FOR DEFENDANT
6  BY MR. HUDAK:
7    Q   Good afternoon, Mr. McGrath.
8    A   Afternoon.
9    Q   Could you please state your full name for
10  the record.
11   A   Matthew, M-A-T-T-H-E-W, Joseph, McGrath,
12  M-C-G-R-A-T-H.
13   Q   What's your current home address?
14   A   14352 Wrangler, W-R-A-N-G-L-E-R, Lane,
15  Apartment 12, Dale City, Virginia 22193.
16   Q   Other than your testimony in connection
17  with this proceeding, and by this proceeding I mean
18  both the district court proceedings and preceding
19  administrative proceedings, have you ever been
20  deposed before?
21   A  I can't remember if I was deposed during
22  my divorce or not. I just -- that was a blank

Page 5

1  period.
2    Q   So perhaps in the divorce proceedings.
3  Any other circumstances?
4    A   In fact, I was deposed during the divorce
5  proceeding. I can remember that now. Blacked that
6  out. No, I don't think so.
7    Q   Have you ever provided sworn testimony of
8  any sort in any other proceeding except for this
9  one?
10   A   Except for the divorce?
11   Q   And except for the divorce.
12   A   All of this together with the
13  administrative, no, I don't think so. I can't
14  remember any anyway.
15   Q   Other than your divorce proceeding and
16  this proceeding have you ever been a party to a
17  civil action?
18   A   Not that I recall.
19   Q   I know you said you were deposed before
20  atleast once in your divorce proceeding and below
21  in the administrative proceeding, but I just want
22  to get a few ground rules on the record for our

2 (Pages 2 to 5)

Capital Reporting Company

Page 18

1  or I had to find new ones to start a much smaller
2  operation in pre Civil War days.
3      Q    Where was your next post?
4      A    I think I left Monrovia in August or
5  September of 1992 and went to Valletta Malta in the
6  Mediterranean.
7      Q    What position were you?
8      A    Public affairs officer.
9      Q    Was that a supervisory position?
10     A    Again, just a small -- in the beginning
11  five locals and then I was told to reduce staff to
12  two, so no Americans and two locals.
13     Q    How long were you in Malta for?
14     A    From August or September '92 until the
15  fall, two years more or less, I couldn't give you
16  the exact month, of '94. Probably September or
17  October of '94.
18     Q    And did you leave for a new post?
19     A    I -- I left for D.C., for an assignment
20  in D.C.
21     Q    How long were you here on that
22  assignment?

Page 19

1      A    From '94 to -- I can't give you -- I
2  can't remember exactly the month, but I was the
3  team leader for the global issues team in the
4  information department at USIA for two plus years.
5  It was a reinvention assignment. I think that was
6  two plus years, but I can't exactly remember the
7  month, but it was '96, early 97.
8      Q    Did you have supervisory duties as the
9  team leader?
10     A    Again, yes. Obviously there were no
11  locals in Washington. There was just -- there was
12  one foreign service officer and ten or eleven civil
13  servants.
14     Q    In '96 where'd you go?
15     A    Late '96/97 I went to the board of
16  examiners as an examiner.
17     Q    That's the foreign service board of
18  examiners?
19     A    That's right. I'm a little bit hazy
20  about the month.
21     Q    That's here in D.C. as well?
22     A    Yeah, in Rosslyn.

Page 20

1      Q    How long were you in that position?
2      A    Until 1998.
3      Q    In '98 where'd you go?
4      A    To the consulate general in Johannesburg,
5  South Africa.
6      Q    What was your position?
7      A    I was what they call the branch public
8  affairs officer because Johannesburg is not the
9  embassy. The embassy is Pretoria. It comes to the
10  same things, branch PAO.
11     Q    Did you have supervisory duties there?
12     A    Yep.
13     Q    How many U.S. citizens?
14     A    One American in this case.
15     Q    How many locals?
16     A    Nine or ten. I'd have to really stop and
17  count.
18     Q    And your duties as a branch public
19  affairs officer were similar to your duties that
20  you described earlier as a public affairs officer?
21     A    Well, in this case it was an American.
22  You divide the duties up. Her position was the

Page 21

1  assistant branch public affairs officer.
2      Q    How long were you in Johannesburg for?
3      A    August '98 to September 2001.
4      Q    In September 2001 where did you go?
5      A    Here. Washington assignment.
6      Q    What was that assignment?
7      A    Office director for the Office of
8  Cultural Programs, Bureau of Education and Cultural
9  Affairs.
10     Q    It's your allegations concerning this
11  post that give rise to this action, right?
12     A    To that assignment.
13     Q    Yes.
14     A    Yes.
15     Q    What year did you leave that office?
16     A    June 2002.
17     Q    What did you do in June of 2002?
18     A    I was unassigned so I was to report to
19  the human resources personnel office as an
20  unassigned officer for -- well, if I left Cultural
21  Programs in June, until February of 2003.
22     Q    Were you still getting paid at this time

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1  by the Department of State?
2      A   Yeah.
3      Q   Did you receive any reduction in pay from
4  becoming unassigned?
5      A   No.
6      Q   Did you receive any reduction in benefits
7  from becoming unassigned?
8      A   Define benefits.
9      Q   Were you still able to enroll in
10  government health coverage?
11      A   Yes.
12      Q   And the government's retirement savings
13  plan?
14      A   Yes.
15      Q   Was your leave reduced?
16      A   No.
17      Q   In February 2003 what was your next
18  position?
19      A   I was assigned to the declassification
20  unit.  I'm not exactly sure what the exact title of
21  it is.
22      Q   What does the declassification unit do?

Page 23

1      A   It -- it -- as an examiner, you examine
2  previous classified documents to determine whether
3  or not some, part, or all of that document should
4  be declassified after a certain period of time.
5      Q   How long were you in that position?
6      A   I geographically moved, but from
7  February -- doing the same thing February of 2003
8  until I guess it was November 30th of 2004.
9      Q   That's when you were terminated from the
10  foreign service?
11      A   Correct.
12      Q   Just going back here, the various posts
13  with the State Department.  Did you receive any
14  poor performance evaluations or less than
15  satisfactory performance evaluations when you were
16  posted in Honduras?
17      A   No.
18      Q   What about Barbados?
19      A   No.
20      Q   Sierra Leone?
21      A   No.
22      Q   Liberia?

Page 24

1      A   No, I got a meritorious step degree.
2      Q   Malta?
3      A   No.
4      Q   When you were assigned as the team leader
5  in D.C. from '94 to '96?
6      A   No.
7      Q   When you were assigned to the board of
8  examiners from 1996 to 1998?
9      A   No.
10      Q   When you were in Johannesburg, South
11  Africa?
12      A   No.
13      Q   Did you receive any poor performance or
14  less than satisfactory performance evaluations when
15  you were here in the Office of Cultural Programs?
16      A   Of what?
17      Q   What was the office you were here in?
18  What was the name of the office that you were here
19  in from September 2001 to June of --
20      A   Cultural Programs.
21      Q   Did you receive any unsatisfactory or
22  poor performance evaluations when you were here?

Page 25

1      A   Yes.
2      Q   You were only here for nine months so it
3  was during the only evaluation period in which you
4  were here you received a poor performance
5  evaluation, right?
6      A   Yes, I received two.  They were
7  duplicates.
8      Q   Other than the Office of Cultural
9  Programs and your prior history before that with
10  the State Department, did you ever receive any
11  reprimands?
12      A   I guess -- I guess I don't know.  Define
13  reprimand.  I'm struggling with --
14      Q   Censure, either formal or informal, for
15  doing something that is not permitted.
16      A   If this qualifies, when I -- I was back
17  here but for -- but for an incident that took place
18  at the end of my assignment in South Africa.
19      Q   What was that incident?
20      A   Right at the end August of 2001.
21      Q   What happened?
22      A   My daughter had disappeared and I

7 (Pages 22 to 25)

Capital Reporting Company

Page 30

1    Q   Any other ones beyond that that you
2  recall?
3       MS. PERRY:  While at Cultural Programs or
4  after Cultural Programs?
5  BY MR. HUDAK:
6    Q   Any other reprimand concerning conduct
7  that took place before you were at Cultural
8  Programs?
9    A   I don't remember any before Cultural
10  Programs, no.
11   Q   What actions do you believe were taken
12  against you that were unlawful for which you seek
13  redress in this action?
14   A   What actions were taken?
15   Q   Against you.
16   A   Against me.
17   Q   That you believe were unlawful that
18  you're seeking redress for in this action.
19   A   Well, it begins with the request to begin
20  termination proceedings against somebody based on
21  the color of their skin, their age, their handicap.
22   Q   But that wasn't an action taken against

Page 31

1  you, right?  They weren't requesting that you be
2  terminated for one of those factors?
3    A   No, but they were requesting that I take
4  those actions and that if I did not take those
5  actions, that it would be documented -- and
6  reflected on me.
7    Q   But I'm asking what specific actions were
8  taken against you that you believe were unlawful
9  and what you seek to remedy in this action?
10   A   Well, the poor evaluation report, the
11  request to first voluntarily terminate -- voluntary
12  curtail and the involuntarily curtailment.
13   Q   So can I just lump those together as
14  curtailment?
15   A   Well, I was being asked to voluntarily
16  curtail.  Second one I wasn't being asked.  I was
17  being told.
18   Q   All right.  Anything else?
19   A   The placement in an unassigned status,
20  for what is that, eight months, nine months.  The
21  assignment to the declassification unit, which has
22  an established reputation as being for those who

Page 32

1  are not thought highly of.
2    Q   Anything else?
3    A   The -- the shortening of my home leave in
4  January/February of 2002.
5    Q   Anything else?
6    A   That's a lot to think about.  I'm sure
7  something will come to me.
8    Q   Why don't we take these in reverse order.
9  Shortening of your home leave in December of 2002,
10  January 2001 you mentioned.  Who took that action
11  against you?
12   A   My supervisor, Sam Wonder.
13   Q   Why do you believe that action was
14  unlawful?
15   A   Because he had asked me to begin -- he
16  began asking me in the Fall of 2001 to begin taking
17  the steps necessary to terminate EJ Montgomery and
18  I had repeatedly refused to do that and it
19  escalated on January 7th right after the holidays
20  with that request.
21   Q   January 7th was after you took your home
22  leave?

Page 33

1    A   No, no, I think it was January 18th or
2  20th, somewhere like that I started.  It was after
3  the holidays and before the home leave.  It started
4  at the end of January.  I think it was the 18th.
5    Q   So you believe that Mr. Wonder shortened
6  your home leave simply because you were refusing to
7  terminate EJ?
8    A   Yes.
9    Q   Let me make sure I understand you.  You
10  believe Mr. Wonder thought or said to himself that
11  I am going to shorten Mr. McGrath's home leave
12  because he refuses to take action against Ms.
13  Montgomery?
14       MS. PERRY:  Objection, calls for
15  speculation.
16  BY MR. HUDAK:
17   Q   That's what you believe, isn't it?
18       MS. PERRY:  Same objection.
19  BY MR. HUDAK:
20   Q   You may answer the question.
21   A   Can you repeat it in a more shortened
22  phase?

9 (Pages 30 to 33)

Capital Reporting Company

Page 34

1    Q   Sure. Do you believe that Mr. Wonder, in
2   form or substance, thought or said to himself I am
3   going to shorten Mr. McGrath's home leave because
4   he's not taking adverse actions against
5   Ms. Montgomery?
6    A   Yeah.
7    Q   Do you believe there's any other reason
8   why he shortened your home leave?
9    A   You'd have to ask him. It may be one of
10   many reasons, but I think that was one of them.
11    Q   What are the other possible reasons?
12    A   You'll have to ask him. I don't know.
13    Q   Do you believe that it was motivated or
14   fueled by any other reason other than you failing
15   to take adverse action against Ms. Montgomery? I'm
16   asking for your belief. I'm not asking for what
17   his belief is.
18    A   I -- I -- there doesn't seem to be any
19   substance to it other than Ms. Montgomery because
20   the whole arrangement in asking for the direct
21   transfer instead of the home leave transfer was for
22   me to take my regular home leave at the appointed

Page 35

1   time, which was late January.
2    Q   Did Mr. Wonder ever write you a memo
3   saying why?
4    A   I don't remember that.
5    Q   Did he ever tell you that he had to
6   shorten your home leave because of events following
7   September 11th, 2001?
8    A   If -- if he did, I don't remember that.
9   But if he did, things weren't as hectic in January
10   as they were in September, October, November.
11    Q   Did he ever tell you that because of a
12   jazz project that you were working on that duties
13   associated with that would prevent you from taking
14   the full home leave that you requested?
15    A   I -- I don't recall that being -- those
16   things happened anyway. I don't recall that being
17   part of the conversation.
18    Q   Was the office busier after
19   September 11th than it was before?
20    A   In the immediate aftermath I would say
21   first month or two, but then only slightly more so.
22    Q   What additional activities were occurring

Page 36

1   in the office during that period after
2   September 11th?
3    A   Which period are you talking about now?
4    Q   The couple months that you said there
5   were increased activities for a couple months after
6   the September 11th tragedies.
7    A   Well, in September when this happened,
8   when September 11th happened, we had cultural,
9   American cultural people in the field that had to
10   be gotten home or otherwise secured. We had --
11   that's from an immediate safety point of view.
12   That took a couple weeks. We had to settle up on
13   the administrative financial matters for such
14   people.
15        There was less activity in Washington in
16   the sense that no one was going out, but we had to
17   bring some people back and we had to worry about
18   how to recoup the monies or how to reschedule,
19   that -- that -- that kind of thing. There was
20   also -- I mean there was talk about new programs,
21   but there's always talk about programs so I
22   wouldn't say that that made it very hectic. The

Page 37

1   immediate problem was the bands, jazz bands that
2   were about to go out.
3    Q   The jazz bands, can you describe what
4   those are?
5    A   Well, we have a program called Jazz
6   Ambassadors and they're usually staggered but they
7   usually fall within the same general time of year.
8   They're trios usually. They evolved into trios
9   because of budgetary -- they'd go on tours of
10   regions of the world to perform and there is a
11   staggered departure and return schedule and we had
12   some people out there and we had some people about
13   to go out on September 11th.
14    Q   In your duties in the Office of Cultural
15   Programs was that program under your watch?
16    A   It was under my watch. It was directly
17   under a part-time member of the staff.
18    Q   Who you were supervising?
19    A   Who I supervised.
20    Q   How many days of home leave did you
21   request at the end of December?
22    A   I requested the full compliment, 30.

10 (Pages 34 to 37)

Capital Reporting Company

Page 38

1    Q    And how many were you authorized to take?
2    A    I was authorized to take 20.
3    Q    What do you base your understanding that
4  the full compliment of home leave days is 30?
5    A    I base it on -- on -- on common practice
6  and the fact that one earns I think it's 30 days
7  every two years. I mean you can get more than 30
8  days depending on circumstances, but if memory
9  serves me correctly, you earn 15 days a year of
10  home leave.
11    Q    Have you ever previously been denied or
12  shortened in your home leave request?
13    A    I think there have been events where I've
14  had both slightly longer and slightly less and I
15  can't tell you exactly off the top of my head when.
16    Q    But do you believe that those
17  circumstances in which your home leave was
18  shortened do you belief that those prior
19  circumstances were unlawful?
20    A    No. I mean I can't think -- again, I
21  can't think of when that took place, but no, I
22  don't think those are unlawful.

Page 39

1    Q    Were other people in the Office of
2  Cultural Programs allowed to take home leave during
3  this time?
4    A    I was the only foreign service officer in
5  the office.
6    Q    So there's no one else out there that was
7  allowed to take 30 days of home leave during this
8  period of time?
9    A    Within -- only foreign service officers
10  are entitled to home leave and there were no other
11  foreign service officers in the Office of Cultural
12  Affairs.
13    Q    Was your supervisor a foreign service
14  officer?
15    A    Yeah.
16    Q    Was he taking 30 days of home leave
17  during this period of time?
18    A    He'd be there for -- he had been there --
19  he -- he had been there for awhile, so he would
20  have already taken his before that time. I mean he
21  had been there for some time. He would have taken
22  it within six months of arrival.

Page 40

1    Q    So he didn't take any home leave during
2  this period of time?
3    A    Not -- no.
4    Q    Who was Mr. Wonder's boss?
5    A    His first boss was Brian Sexton.
6    Q    Then that became someone else?
7    A    Steve Hart.
8    Q    Were these individuals both foreign
9  service officers?
10    A    No, they were both political appointees.
11    Q    Was there anyone else under Mr. Wonder
12  that was a foreign service officer besides
13  yourself?
14    A    Off the top of my head I can only think
15  of civil servants. Right now I can only -- civil
16  servants come to mind at staff meetings plus
17  myself.
18    Q    Another unlawful action you mentioned was
19  the assignment to the declassification unit. Who
20  assigned you there?
21    A    I'm not a hundred percent sure. It was
22  somebody in personnel.

Page 41

1    Q    Why do you believe that you were assigned
2  there?
3    A    I believe I was assigned there as
4  punishment for filing the complaint.
5    Q    Who do you believe was punishing you?
6    A    That I don't know because I did not
7  request that assignment so it was a forcible
8  assignment. They have meetings with lots of
9  people.
10    Q    By they who do you mean?
11    A    The office of personnel.
12    Q    Do you even know if the person that
13  assigned you to the declassification unit knew
14  about your EEO activity?
15    A    I know atleast one of the people there
16  did.
17    Q    Do you know if the person who assigned
18  you to the declassification unit knew about your
19  EEO activity?
20    A    Well, as I don't know who assigned me, I
21  can't be sure it wasn't the person who knew.
22    Q    Who was the person that knew in the

11  (Pages 38 to 41)

Capital Reporting Company

Page 42

1 personnel office?
2   A   Jim Bigart.
3   Q   How do you know he knew about your
4 activity?
5   A   Because, as my career counselor, he had
6 originally commanded my presence to make the
7 request for the voluntary curtailment.
8   Q   What makes you think that he was involved
9 in your assignment to the declassification unit?
10   A   Well, a career developer, a career
11 counselor has to be one of the members of the panel
12 in deciding assignments. They're supposed to be
13 your representative.
14   Q   So they're supposed to be your
15 representative, so they don't ultimately make the
16 decision on who goes where?
17   A   They're one of the people who do. Never
18 having sat in a meeting I don't know exactly how it
19 functions.
20   Q   What's your basis for believing beyond
21 the mere fact that he knew of your prior EEO
22 activity? Do you have any other basis for

Page 43

1 believing he assigned you to the declassification
2 unit because of your EEO activity?
3   A   I know he wasn't -- I know he wasn't
4 sympathetic with my filing the complaint.
5   Q   How do you know that?
6   A   Because he told me I was a white man and
7 as a white man I didn't -- he didn't think I had
8 any business filing such a complaint.
9   Q   When did he tell you this?
10   A   He told me this -- I'm not exactly sure
11 of the date, but it was at the end of April when he
12 called me over to pass on the demand that I
13 voluntarily curtail and I explained to him what was
14 going on.
15   Q   This was in April of 2002?
16   A   Correct, I'm sorry, 2002.
17   Q   And you were assigned to the
18 declassification unit in February of 2003, right?
19   A   That's right.
20   Q   Do you have any other reason to believe
21 that Mr. Bigger --
22   A   Bigart, B-I-G-A-R-T.

Page 44

1   Q   Bigart assigned you to the
2 declassification unit because of your prior EEO
3 activity beyond that one conversation you just
4 discussed?
5   A   Well, he -- he -- it was clear he was
6 not -- as my representative, it was clear to me he
7 was not working very hard to find me a suitable
8 onward assignment after I left Cultural Programs.
9   Q   How was that clear?
10   A   Well, he told me that -- well, he only
11 found me -- he found me one or maybe two, atleast
12 two, I want to say two positions to go talk to
13 those people, to talk to them about possible jobs.
14 They weren't particularly good jobs, but he asked
15 me to go talk to two people that I can recall right
16 off the top of my head and he told me that I should
17 lie to the people when I talk to them or atleast
18 keep from them the truth that I had this complaint
19 pending.
20   Q   When you say lie to them or keep from
21 them the truth that you had this complaint pending,
22 did he say just don't tell them about it or did he

Page 45

1 say affirmatively represent you have no EEO active?
2   A   No, he told me not to -- not to -- not
3 to -- not to mention it to them during the
4 interview process.
5   Q   Did he explain why he gave you that
6 advice?
7   A   I'm not sure if he explained or not, but
8 it was -- it was -- he -- he may have said
9 something about -- about, you know, you'll get the
10 job if you don't tell them -- if you don't tell
11 them about this, something of that effect.
12   Q   When you went on those interviews, did
13 you tell them about your EEO activity?
14   A   Well, I told Bigart at the time that I
15 wasn't going to lie to anybody about it, that they
16 would know about it because the department people
17 talk and I would be asked about it later if I -- if
18 I -- even if they didn't know at the time of the
19 interview, they would hear about it shortly
20 thereafter because people talk and it would not be
21 a responsible professional way to go about business
22 to keep something that was either already found or

12 (Pages 42 to 45)

Capital Reporting Company

Page 58

1  other item on which you guys disagreed about?
2      A    Well, we disagreed on whether or not I
3  should take steps to -- to ensure that one of the
4  staff members performed better vis-a-vis one of the
5  other staff members.
6      Q    Did you disagree about the need to
7  conduct regular staff meetings?
8      A    We didn't disagree about that in the
9  beginning, but we disagreed about that towards the
10 end.
11     Q    And he believed it was important to have
12 regular staff meetings, right?
13     A    As I do.
14         MS. PERRY:  Objection, assumes facts not
15 in evidence.
16 BY MR. HUDAK:
17     Q    And you believe it was important to have
18 regular staff meetings?
19     A    That's why I had them.
20     Q    And you believe it's important to
21 regularly attend meetings your supervisor calls,
22 right?

Page 59

1      A    Yeah.
2      Q    You believe it's important to be in the
3  office when you're supposed to be?
4      A    Yes.
5          MS. PERRY:  Can we take a five minute
6  break?
7          MR. HUDAK:  Sure.
8          (Brief recess.)
9  BY MR. HUDAK:
10     Q    Have you ever heard of the term shoot out
11 as it applies to positions or applying for
12 positions within the State Department?
13     A    Shoot out?
14     Q    Yeah.
15     A    No.
16     Q    In these two to three interviews that you
17 had while you were unassigned, I assume that you
18 were not selected for the position you interviewed
19 for?
20     A    Well, one was on the phone so that was
21 with my friend and my former position.  No, I was
22 not.

Page 60

1      Q    And did you understand that you had the
2  right under State Department policies to contest
3  your non-selection before the selection panel for
4  these positions?
5      A    Well, again, I'm not as familiar with
6  State Department procedures as I am with USIA
7  because the merger came late in my career.  So I'm
8  not 100 percent sure I understand all the State
9  Department procedures as it goes to the USIA
10 procedures, but -- and interviewing was a more
11 informal process in USIA than it is at state so I
12 don't -- I never formally bid on those positions
13 because it was my understanding that you interview
14 first to see if both sides are more or less
15 agreeable and then it goes from there.  I could be
16 wrong about those procedures, but again, the merger
17 came late in my career so I'm not 100 percent sure
18 I understand the difference.
19     Q    Do you believe you submitted your formal
20 application for any of these two to three positions
21 you interviewed for?
22     A    No.  In fact, I -- I did not, no.  I know

Page 61

1  I did not.
2      Q    Why don't we talk a little bit about when
3  you first got there and your relationship with
4  Mr. Wonder.  When did you first meet Mr. Wonder?
5      A    It was either September 11th or
6  September 12th.  September 11th was not -- we
7  weren't in the office very long.  That was the
8  first day I reported at the old USIA building.  The
9  day before I had been at state where the office was
10 located processing and the next day was the 11th at
11 the old USIA building at three and four.  It was
12 301 4th Street.  Anyway, that was the first day I
13 was in that building and I arrived between the
14 first and second plane and I wasn't allowed
15 upstairs until after the second plane and then they
16 weren't there very long.  Maybe it was the 12th
17 because I went to work on the 12th.
18     Q    Did Mr. Wonder interview you for the
19 position?
20     A    No.
21     Q    Who interviewed you?
22     A    No one interviewed.  To my recollection

16 (Pages 58 to 61)

Capital Reporting Company

Page 62

1   no one interviewed me.
2       Q   Do you know who selected you?
3       A   I know Mr. Bigart represented me because
4   I asked for the job. He called me about the job
5   and I asked for it. But again, I don't know the
6   procedures so besides Mr. Bigart and his advocacy
7   in this case I don't know who else.
8       Q   Did you believe that Mr. Wonder had some
9   sort of role in the selection of the position that
10  was going to be under him?
11      A   I don't think is much of a role.
12      Q   When you guys first met, did you guys get
13  along?
14      A   I mean more or less. You mean in the
15  initial?
16      Q   You know, you meet your new boss for the
17  first time.
18      A   Like any two bureaucrats, yeah.
19      Q   During the month of September did you
20  guys get along?
21      A   We started having disagreements towards
22  the latter part of the month.

Page 63

1       Q   What were those disagreements about?
2       A   There are several. I'm not sure if it
3   was in late September or maybe October we talked
4   about EJ for the first time, but we disagreed
5   about -- about his encouraging my staff members to
6   come to him. In other words, to go around me,
7   which had been their tradition and tradition to do
8   before I arrived.
9           We disagreed about -- about a dispute
10  between two members of the staff, which I had
11  warned him at the time could be racially -- in part
12  racially -- have a racial component to it. I was
13  later more or less convinced it did. At that time
14  I was unsure what was going on in the personal -- I
15  was new to the job, so I had sort of a wait and see
16  attitude if I can put it that way. We'd disagreed
17  about forcing the bands to pay back the money that
18  they had been paid for the tours they were on.
19      Q   And you mentioned EJ, you also had a
20  disagreement about her during that period of time?
21      A   Well, it came sometime either in late
22  September into early October, sometime in that time

Page 64

1   frame.
2       Q   We'll get to there in a second. The
3   people going to Mr. Wonder instead of coming
4   through you, you said that that had gone on in the
5   office before you arrived?
6       A   Yes.
7       Q   And did you believe that Mr. Wonder was
8   just micromanaging too much?
9       A   He was micro -- yes, he was micromanaging
10  and he was interfering.
11      Q   Did you have a conversation about him
12  micromanaging?
13      A   In the beginning we stuck to the sort of
14  general issues and general positions and then later
15  on we -- we -- such language as micromanaging were
16  used, yes.
17      Q   Just the conversations you had during
18  September of 2001, did you have a conversation
19  about him micromanaging?
20      A   Well, in general yes, but -- but I don't
21  think that word was used at that point.
22      Q   What do you recall being said at that

Page 65

1   point? What do you recall him saying to you and
2   you saying to him?
3       A   Well, when I wouldn't take sides with one
4   of the staffers --
5       Q   That's going to the second thing, the
6   dispute, right?
7       A   Well --
8       Q   Are they intertwined, the micromanaging
9   and --
10      A   Well, you were asking for an example and
11  that's the example that came to mind.
12      Q   Well, on the micromanaging front, and I
13  know you didn't necessarily use that word at that
14  point in time, do you recall any conversation with
15  Mr. Wonder during September of '01 in which this
16  micromanaging issue got raised?
17      A   Again, in general -- in general I think
18  late September, but it didn't get that specific
19  until a little bit later in the fall, October, mid
20  late October.
21      Q   When it did get more specific in mid to
22  late October, what did you say to him?

17 (Pages 62 to 65)

Capital Reporting Company

Page 66

1    A   I said that it wasn't healthy for an
2    office -- it wasn't healthy for an office that was
3    already -- had been discombobulated to have
4    staffers think that they could either go first to
5    the supervisor -- around the supervisor or if they
6    didn't like what the supervisor had to say to go
7    around him to the -- to his supervisor.
8        Q   Were your subordinates going around you
9    to him to complain about you during this period of
10   time?
11       A   To complain about -- about me and --
12   and -- and -- and other things in the office.
13       Q   Was this a cordial conversation that you
14   had with Mr. Wonder at this point in time?
15       A   The very first conversation?  No, it
16   wasn't quarrelsome.  I wouldn't describe it as
17   quarrelsome.  We disagreed, but I wouldn't say it
18   was quarrelsome.
19       Q   I mumble my words a lot.  Was it cordial?
20       A   Bureaucratic.
21       Q   Bureaucratic.  Just the facts, ma'am, if
22   you will?

Page 67

1    A   Well, a civilian's definition of cordial
2    and a bureaucrats definition of cordial.
3        Q   What did he say when you raised these
4    concerns?  What was his response?
5        A   Well, he was facially, bodily language
6    wise he was clearly frustrated that -- that I would
7    raise this with him and he, I won't say agreed, but
8    he was -- he was clearly frustrated with some of
9    the people, this is early -- this is in September,
10   he was clearly frustrated with some of the people
11   on the staff and not with others on the staff.
12       Q   Was he receptive to your concern that --
13       A   No.
14       Q   -- your subordinates were going around
15   you?
16       A   No, he just -- no, he -- he -- he sort of
17   sucked it in.  He sort of took it, but didn't --
18   didn't -- didn't -- appeared not to agree with me,
19   but didn't make an issue out of it.
20       Q   Did he say that it was his management
21   style to have an open-door policy?
22       A   I don't think he went -- I don't think he

Page 68

1    went that far.  It's just not common practice.
2    It's not common practice so I don't think he would
3    have gone that far.  I know he didn't go that far.
4        Q   Did he say he would consider your --
5        A   No, he didn't.  He was more -- it was
6    more just sucking it up.  He was more noncommittal.
7    Agree to disagree.  In the early stages it was
8    agree to disagree.
9        Q   Do you know how frequently your
10   subordinates were going around you to Mr. Wonder
11   during this period time?
12       A   Well, first of all, I didn't bug the
13   office so I don't, you know.  It was three floors
14   apart, so I don't know how many times.
15       Q   Do you know who was going around you at
16   this point in time?
17       A   Yes.
18       Q   Who?
19       A   It was Susie Baker, Kathy Wainscott,
20   LeAnn Mella.  It was atleast those three.
21       Q   Was EJ Montgomery going around you at
22   this time?

Page 69

1    A   No.
2        Q   How do you know that?
3        A   Again, I don't have the office bugged,
4    but it didn't -- I don't know of any incidents and
5    it just doesn't fit her style.
6        Q   You also mentioned that you guys
7    disagreed about a dispute between two of your
8    subordinates?
9        A   Yes.
10       Q   Can you please generally describe what
11   that dispute was.
12       A   Well, Kathryn Wainscott, one of the
13   programmers, came to me more or less during the
14   first week and said that I had to do something
15   about LaFaye Proctor who wasn't doing what she
16   was -- what Kathryn thought she was supposed to be
17   doing and would I please get her to do it for
18   Kathryn.
19       Q   What was the thing that she was supposed
20   to be doing?
21       A   Well, from what I could gather at the
22   time was that she -- she wanted LaFaye to do more

18 (Pages 66 to 69)

Capital Reporting Company

Page 98

1  wasn't biassed.
2      Q    Okay.
3      A    So there was complaints about that a lot
4  and my attempt to -- my attempt to structure the
5  specialist -- cultural specialist program so that
6  there was some structure and uniformity in how we
7  did it. It was not structured when I got there.
8      Q    Did you hear that she was complaining
9  about your leadership style?
10     A    Later I heard when -- near the end when I
11 stopped having staff meetings or meeting with
12 people individually she was.
13     Q    During this period from September to
14 December did you hear she was complaining about
15 your leadership style?
16     A    During that period, again, the LaFaye
17 thing, but in those first few months I mean we were
18 having staff meetings during those months. I mean
19 I'm confused what you mean by leadership.
20     Q    You were their supervisor, right?
21     A    Yeah.
22     Q    I mean as a supervisor, you're a leader

Page 99

1  of that office, right?
2      A    That's right. And if I take a position
3  that disagrees with them, is that leadership or is
4  that a ploy?
5      Q    Well, I'm not asking about the cultural
6  program. We've talked about that and we're not
7  talking about LaFaye, we talked about that.
8  Anything else? Did she complain about your method
9  in which you were supervising the folks in your
10 office?
11     A    I don't remember any -- any -- any --
12 other than the examples we've just talked about.
13 She may have complained about Susanne Cohen, but...
14     Q    Who's Susanne Cohen?
15     A    She's another program officer.
16     Q    African-American or Caucasian?
17     A    A Caucasian. I told you the
18 African-Americans. Caucasian. But that was a
19 question about her hours.
20     Q    Born in the United States?
21     A    Uh-huh.
22     Q    Did they get along personally or was it

Page 100

1  more of this bureaucratic?
2      A    More of which hours you're spending in
3  the office and that kind of thing.
4      Q    But generally did they get along?
5      A    Yeah.
6      Q    Were they friendly?
7      A    I wouldn't say they were friendly. I
8  would say she was like with EJ, was
9  bureaucratically correct. Not warm, but correct.
10     Q    Now, your interaction with Kathryn, would
11 you say you guys were friendly?
12     A    In the beginning I would say yes. I
13 would say even when she came to me to talk to me
14 about LaFaye and went around me I thought that was
15 very odd and different and how an office -- I mean
16 I heard rumors about how dysfunctional the office
17 had been, but I found that to be quite different
18 and appalling, but even then I was giving the
19 benefit of the doubt being new. I thought the
20 initial trip to New York that took place in
21 September/October for the festival fund I thought
22 that was -- that was fine.

Page 101

1      Q    By fine, do you mean friendly or just
2  kind of --
3      A    I mean -- I -- I mean -- I mean I won't
4  say warm, but I mean we certainly weren't hostile.
5  They were -- they were okay.
6      Q    Do you believe that your poor performance
7  evaluation in April of 2002 was in part based upon
8  the way you handled the Kathryn versus LaFaye
9  issue?
10     A    Well, I don't have the EER in front of
11 me, but I think it played a general role but I
12 don't think it was mentioned in the evaluation
13 report. I could be wrong about that.
14     Q    Do you believe that Mr. Wonder retaliated
15 against you for your handling of the Kathryn versus
16 LaFaye issue in issuing you a poor performance
17 evaluation?
18     A    Indirectly, but not directly.
19     Q    Do you believe that when you were
20 curtailed from your position that you were being
21 retaliated against for your treatment of the
22 Kathryn versus LaFaye issue?

26 (Pages 98 to 101)

Page 110

1    Q   As best as you can recall, form,
2  substance, you know, if you can recall exact
3  quotes, what did he specifically say?
4    A   Well, the conversations evolved over a
5  several month period.
6    Q   At this first meeting, just talking about
7  this first meeting in mid October, early November,
8  what did he specifically say as best you can recall
9  in this conversation?
10   A   At this first conversation it was maybe
11 we should think about moving -- encouraging EJ
12 to -- to retire or moving her out.
13   Q   Did he say why he was expressing that
14 belief?
15   A   Well, yes, because he didn't think she
16 was up to her job.
17   Q   Specifically what did he say that she
18 wasn't able to do?
19   A   That she was requiring the assistance
20 sometimes of Deborah and LaFaye, for example, in
21 typing and doing a cable, not doing it, but doing
22 it in a timely fashion.

Page 111

1    Q   Did he suggest to you that perhaps there
2  was some reasonable accommodations that could be
3  made to help her fully satisfy her job duties?
4    A   Not in the beginning.
5    Q   So if I understand it correct you guys
6  were generally talking about the office, how it
7  came to be, you brought up EJ's name and said --
8    A   He brought up.
9    Q   He brought up EJ's --
10   A   I can't hear you.
11   Q   I'm sorry, I'm mumbling and my hand's
12 over my mouth. He brought up EJ's name, said that
13 she wasn't doing her job functions, and then what
14 was your response?
15   A   My response was that I disagreed. That I
16 considered her Parkinson's to be limiting, but not
17 in an area that I considered to be vital. That she
18 had this wealth of knowledge. I knew she knew
19 everybody from the field in the art world and the
20 art world knew her and her work and that if she
21 needed assistance from time to time from LaFaye or
22 Deborah, that that was worth it. I also pointed

Page 112

1  out that she was the only black member,
2  African-American member, we didn't have any men, on
3  staff and that she represented that point of view
4  at that senior level within the art community and
5  it was a welcome addition, diversity wise, and
6  being able to program and places around the world.
7    Q   Did he mention her race before you
8  brought that up?
9    A   No, I don't think he did, no.
10   Q   Why did you bring up race if it wasn't
11 part of the discussion?
12   A   I believe in diversity.
13   Q   Did you believe that he was making the
14 suggestion that it may be time for her to move
15 along because she was black?
16   A   I think he was making it because he
17 didn't believe in diversity.
18   Q   Do you think in form or substance that
19 Mr. Wonder thought I think that Ms. Montgomery
20 should be terminated because she is
21 African-American?
22      MS. PERRY: Are you asking if he thought

Page 113

1  it then or if he concluded it later?
2      THE WITNESS: I thought we were on the
3  first time.
4      MS. PERRY: Yeah, we're on the first
5  time, but it's not clear to me from his question.
6  BY MR. HUDAK:
7    Q   I'll pose the question again. Did you
8  think at that meeting Mr. wonder was making the
9  suggestion that perhaps it was time for Ms.
10 Montgomery to move on because she was black?
11   A   At the first meeting?
12   Q   Yes.
13   A   I suspected that that was playing a role
14 in his thinking. This is early on.
15   Q   There's a difference in your mind in
16 someone not believing in diversity and taking
17 intentional discriminatory acts? You understand
18 there's a distinction between those two things,
19 right?
20   A   There's a distinction and an overlap.
21   Q   What's the overlap?
22   A   Well, you can be a racist and not believe

29 (Pages 110 to 113)

Page 126

1  Secondary.
2    Q   And you believe that another motivating
3  reason was her Parkinson's disease?
4    A   I think it was a motivating reason, but
5  not the primary one.
6    Q   What was the primary one?
7    A   Her ethnicity, her race.
8    Q   Why do you think that was the primary one
9  as opposed to these other motivating ones?  What do
10 you base that on?
11   A   Well, it -- it -- it -- it -- first of
12 all, the others would be just -- almost as bad,
13 it's just that Sam's other behaviors and attitudes
14 were more directed on the racial side than they
15 were on the disability or on the age side.
16   Q   Did he ever take any other, aside from
17 this EJ situation, take any other actions while you
18 were there?  In the nine months that you were there
19 did he take any other actions against any
20 African-American people that you believe were
21 simply because they were black?
22   A   Again, I'm not quite sure about -- there

Page 127

1  was his standing up for Kathryn against LaFaye and
2  there was EJ and the only other -- EJ was the only
3  senior African-American and I don't think I recall
4  anything about Deborah Chapman and those were the
5  only three African-Americans, one senior, two
6  junior in office.
7    Q   Any other reason why you believe, besides
8  kind of course the conduct that you described, any
9  other reason you believe that race was the
10 motivating reason for doing these things to EJ
11 Montgomery was the primary motivator and then these
12 others reasons were not the primary reasons?
13   A   Any other examples?
14   Q   You talked about course of conduct, you
15 believe he just generally treated African-American
16 people in your office unfairly, right?
17   A   I generally believe he didn't believe in
18 diversity, yes.
19   Q   Well, two different concepts, as we
20 discussed earlier.
21   A   Yes, but both.
22   Q   But both.  So not only did he not believe

Page 128

1  in diversity, but he treated African-Americans
2  poorly?
3    A   Yes, two out of three in my office.
4    Q   Beyond this course of conduct is there
5  anything specific in relation to these specific
6  incidents that leads you to the conclusion that it
7  was primarily related to race and not some other
8  reason?
9    A   You're just talking about EJ, right?
10   Q   Just talking about EJ.
11   A   Well, I think it was that January 7th
12 meeting, that first meeting after I got back from
13 vacation where -- when I -- he ratcheted up about
14 getting rid of EJ and I had ratcheted up my defense
15 about her contributions was when he mentioned a
16 former colleague of ours by the name Moe Garcia.
17   Q   Was he black?
18   A   He was Cuban.
19   Q   Let me see if I understand you.  You
20 mentioned something about Moe Garcia who is Cuban.
21   A   That's right.
22   Q   He said, if I understand your past

Page 129

1  testimony correctly, you said that he had gotten
2  rid of Moe Garcia before in another job?
3    A   He said essentially you can -- if you do
4  this right, you can document EJ and you can -- you
5  can get rid of her the way I got rid of that Cuban,
6  referring to Moe's ethnicity -- I'm not sure where
7  Moe was born -- that Cuban Moe Garcia.  He referred
8  to his Nationality, ethnicity.
9    Q   That's a quote that you just said, that
10 Cuban?
11   A   That Cuban is definitely a quote.
12   Q   Was there anyone else that heard this?
13   A   No.
14   Q   Did you document it?
15   A   I wrote a note to myself that I include
16 it in my complaint.
17   Q   You wrote a note to yourself?
18   A   Yeah.
19   Q   Do you still have that note?
20   A   No, it was just a scrap of paper.
21   Q   Did you send an e-mail to him saying that
22 was inappropriate what you told me?

33 (Pages 126 to 129)

Page 130

1    A  I didn't send an e-mail, but I told him
2  that A, he hadn't gotten rid of Moe Garcia so what
3  was he trying to tell me because when he worked
4  with Moe -- I worked with Moe after he worked with
5  Moe. So I didn't call him a liar, but I knew he
6  was lying to me by throwing Moe's name out in
7  addition to his ethnicity. I knew he hadn't gotten
8  rid of Moe because I knew Moe was there after he
9  worked with him. So I pointed out that fact to
10  him, which caught him up, that he couldn't possibly
11  have gotten rid of Moe and then I pointed out to
12  him, because he was quite angry and he raised his
13  voice, I said that even if I had been willing to do
14  that, I didn't think if it went -- if -- if trying
15  to get rid of EJ went south, that he wouldn't -- he
16  would sell me out on it in a heartbeat and that
17  made him more angry.
18    Q  You had this initial conversation with
19  Mr. Wonder in October or November and then when was
20  the next conversation you had?
21    A  Oh, I think there was one more before the
22  Christmas holidays and then there was this January

Page 131

1  7th one.
2    Q  So three. Anymore?
3    A  There may have been another one. It
4  may -- it may have come up.
5    Q  Did you have a conversation in March?
6    A  It came up -- it -- it -- it -- it may
7  have come up on March 8th. I'm trying to think
8  about that -- that meeting, but -- but once he came
9  back from his overseas trip in March and I had
10  already begun the EEOC things and I believe he knew
11  what was going on and I don't think it came up, so
12  maybe it came up four times.
13    Q  We've talked about the
14  October/November one, the one immediately before
15  the holiday, what went on? Where were you guys
16  when you had that conversation?
17    A  Which conversation?
18    Q  The second one. The one immediately
19  before the holidays.
20    A  It was in the office. It was December
21  sometime. I couldn't pinpoint it right now. I was
22  hopeful that this would go away.

Page 132

1    Q  Were you in his office when you had this
2  next conversation?
3    A  Always. Almost always.
4    Q  Getting back to the first conversation.
5  Was anyone else present during that first
6  conversation?
7    A  No.
8    Q  Was anyone present during the second
9  conversation?
10    A  No.
11    Q  What specifically did he say during this
12  second conversation?
13    A  Well, you're talking about a conversation
14  that took place between the first one and the
15  January 7th one, atleast one conversation between
16  those two, and it was just more -- it was -- it was
17  more like -- the second conversation was more like
18  the first one, which was agreeing to disagreeing
19  and me giving my arguments, me being a little bit
20  firmer but not having a heated exchange, and then
21  the January 7th one, which escalated into a more
22  heated exchange.

Page 133

1    Q  In any of these first two conversations
2  the, October/November one, did you ever express to
3  him that, you know, I didn't want to deal with this
4  problem, it was here when I got here?
5    A  No, I wasn't going to punch his pile at
6  that. On the contrary it was my intention to
7  structure the office where it had been
8  structureless for years.
9    Q  Did he suggest at this meeting or command
10  you at this meeting?
11    A  Which meeting?
12    Q  Let's start with the first one because I
13  don't think I asked this question about the first
14  one. At the first meeting did he command you, tell
15  you, you, my subordinate, give her a poor
16  performance evaluation?
17    A  At the first meeting, no, he didn't
18  command me.
19    Q  Did he say you, my subordinate, terminate
20  her?
21    A  At the first meeting?
22    Q  Yes.

Capital Reporting Company

Page 134

1    A   No.
2    Q   Second meeting, did he say you, my
3  subordinate, give her a poor performance
4  evaluation?
5    A   He didn't order me, so no.
6    Q   Did he say you, my subordinate, terminate
7  her?
8    A   Is this the second meeting you're talking
9  about?
10   Q   Second conversation, yeah.
11   A   In the first couple meetings, first two
12 or three meetings, any meetings before January 7th
13 were, you know, suggestions, beginning to be
14 urgings, requests, but there were no commands or
15 orders.
16   Q   So before January 7th he neither
17 commanded you to give her a poor performance
18 evaluation or terminate, is that fair, before
19 January 7th?
20   A   No commands at that point.
21   Q   January 7th you're saying his tone
22 changed in this meeting?

Page 135

1    A   Tone changed in January 7th.
2    Q   Why did his tone change; do you know?
3    A   Not really.  I mean vacation for both of
4  us had just ended.  I don't -- I don't -- I'm sure
5  there's something I can remember about that, but I
6  mean may have something gone on in the office while
7  I was gone and he was there or vice versa, but I
8  wasn't aware of it.  He hadn't gotten rid of that
9  bone though.
10   Q   Third meeting.  Where did the third
11 meeting take place?
12   A   Well, the January 7th meeting --
13   Q   January 7th.  We'll call it --
14   A   Whether it was the third meeting before
15 the holidays or not.
16   Q   January 7th meeting.
17   A   In his office.
18   Q   How do you know it was January 7th?
19   A   Because it's in my EEO complaint because
20 I wrote it down.
21   Q   When did you write it down?
22   A   I probably wrote myself another, you

Page 136

1  know, Post-it.
2    Q   Discarded the Post-it?
3    A   Yeah.
4    Q   January 7th in his office.
5    A   That one scared me.
6    Q   How did the conversation begin?
7    A   Well, he had -- he was more edgy.  He
8  wanted -- he wanted -- again, I'm not exactly
9  sure -- beyond the EJ thing I don't recall too
10 much -- too much else.  I mean they, you know, like
11 I say, things had calmed down since the flurry in
12 the media the month after 9/11 so I'm not sure what
13 was his motivation at that point, whether somebody
14 had complained.  I just don't know.
15   Q   Now, your home leave request, he denied
16 that in December of '02, right?  He shortened your
17 home leave request in December '02?
18   A   I can't remember when he did it.  I -- I
19 really can't remember because there was -- there
20 was some annual leave taken for Christmas, it
21 wasn't very long, but it was -- I don't remember.
22 You have to use it within six months and September

Page 137

1  to March so it had to be taken, you know, it was
2  being delayed as it was so I don't remember when I
3  put in for it.
4    Q   But certainly before this January 7th
5  meeting you never refused a direct order from your
6  boss about EJ as we just discussed?
7    A   Not an order.
8    Q   January 7th meeting you said you don't
9  recall much else being discussed at this meeting
10 besides the EJ situation?
11   A   I recall him being angry and I recall the
12 EJ thing and then Moe Garcia.
13   Q   Who brought up the EJ thing?
14   A   He would have.  Absolutely I would never
15 bring up EJ.  As far as I'm concerned, it was a
16 done deal.
17   Q   What did he say about EJ at that point?
18   A   Again, as I said I think previously, that
19 I needed to start to document it, that that was
20 easy because he had done it with Moe Garcia, that
21 Cuban, and I'm not sure if it was that meeting or
22 one shortly after that in January before I went on

35 (Pages 134 to 137)

Page 138

1 home leave on the 18th where he said that if I
2 didn't, he would document me.
3    Q   So did he give you a direct order at that
4 meeting to document deficiencies in EJ's work?
5    A   I took it as an order in the sense that I
6 was told if I didn't document her he was going to
7 document me.
8    Q   And you said no to him at that meeting?
9    A   Yes.
10    Q   You said no to him because you didn't
11 believe her work was deficient?
12    A   I believe two things: First, he was
13 being discriminatory, he was threatening
14 retaliation, and because professionally I thought
15 she was a good worker.
16    Q   After this January 7th meeting did you
17 write any e-mail or any document that you still
18 possess in which you said contemporaneously he said
19 that thing about the Cuban-American, the individual
20 Moe Garcia, I assume he's Cuban-American?
21    A   Moe was old enough at the time that one
22 wonders where he was born but he could have been

Page 139

1 technically born in Batista's Cuba. I don't know.
2    Q   Did you ever document what transpired
3 during that January 7th meeting, at or about the
4 time, in the document you currently possess?
5    A   I don't think I have any document -- like
6 I say, even then -- even referring to Moe's, you
7 know, ethnicity, even being threatened with being
8 documented I still had this naive bureaucratic hope
9 that this would just -- that we would -- that we
10 would not agree to disagree, but that we would just
11 find some way to just get along on this thing, that
12 he knew now where I stood, that I wasn't going to
13 do anything about EJ and I -- that I had hoped that
14 he wouldn't be so foolish as to retaliate against
15 me.
16    Q   So even though that meeting scared you,
17 as you put it earlier, you didn't write yourself
18 even an e-mail saying this is what he did, I said
19 no?
20    A   No, I think my thinking was -- I mean I
21 didn't want to go to war.
22    Q   Did you discuss this meeting with anyone

Page 140

1 other than Mr. Wonder at or about the time it
2 occurred?
3    A   I discussed it with a friend and
4 colleague.
5    Q   Who?
6    A   Alfred Head.
7    Q   What did you tell him.
8    A   I've told Al more or less everything as
9 it transpired. We took walks at lunch most every
10 day and we're old friends and colleagues. He
11 worked in a different division, and not every day
12 but most every day we'd walk and we'd tell each
13 other issues in our lives and stuff and this was
14 the primary one in my mine and I would update him,
15 you know, almost daily on what was transpiring.
16    Q   At the January 7th meeting did you say in
17 form or substance to Mr. Wonder what you were doing
18 is racial discrimination?
19    A   I told him that, but I don't know if I
20 told him that at this meeting. It was a slightly
21 later meeting.
22    Q   I'm sorry, what was your friend's name?

Page 141

1    A   Alfred Head, H-E-A-D.
2    Q   When did you have a conversation with
3 Mr. Head after the January 7th meeting?
4    A   Well, depending whether we were both
5 working, you know, someone wasn't on vacation it
6 would have been almost contemporaneous because it
7 would have been hot and we walked almost every
8 afternoon at lunchtime.
9    Q   When did you first meet Mr. Head?
10    A   Well, I first met him in the -- I first
11 met him in 1985, but we didn't work together and
12 didn't really become friends until I think '97/'98.
13    Q   Did he work in the Office of Cultural
14 Programs?
15    A   No, he worked in a different office. He
16 worked in the information office.
17    Q   Did he know Mr. Wonder?
18    A   No. I think he might have known the name
19 and the face, but I don't think he ever worked with
20 him and I don't think he knew him.
21    Q   Did he know EJ Montgomery?
22    A   Yes.

36 (Pages 138 to 141)

Capital Reporting Company

Page 142

1    Q   Did he ever supervise EJ Montgomery's
2    work?
3    A   I think he worked with her like I did
4    from the field, but -- but -- well, I know for a
5    fact the professional -- Alfred Head is
6    African-American and I think the African-American
7    professionals, and by that I mean high ranking
8    civil servants and foreign servants, basically know
9    each other's work and I mean they're not a majority
10   in the U.S -- this is in USIA, so they generally
11   know each other and know each other's work.
12   Q   Did he ever supervise Ms. Montgomery?
13   A   I think I said no, to my knowledge.
14   Q   Certainly he wasn't supervising her work
15   during this 2001/2002 time frame?
16   A   No, it would a be rare foreign service
17   officer who would supervise EJ because she was a
18   domestic civil servant and Al and I were both
19   foreign service officers.
20   Q   The next meeting after January 7th, when
21   did that occur?
22   A   Well, the next -- I mean we met often. I

Page 143

1    mean staff meetings downstairs or other things.
2    Q   The next meeting about EJ with Mr. Wonder
3    --
4    A   I have a recollection of talking about
5    him once more before I went off on home leave, but
6    I couldn't exactly give you the day date.
7    Q   What was that conversation like?
8    A   That wasn't as heated as the 7th,
9    although I made myself -- I can remember myself
10   professionally just saying that this was my
11   position and that I couldn't move off of it and
12   that I -- and then I think it was then that I first
13   raised the issue that it would be wrong, illegal,
14   whatever to take the steps that he suggested and
15   that he could do what he wanted, but it wasn't
16   heated, it was one of these here are the terms for
17   our disagreement kind of thing.
18   Q   So you said that his action would be
19   illegal or wrong and it wasn't heated?
20   A   No, because I think the January 7th
21   meeting -- this was barely -- this was less than
22   two weeks later. I think from my own point the

Page 144

1    conversation scared me because nobody wants to go
2    to war. I didn't want to go to war.
3    Q   Did you document what transpired at this
4    later January meeting?
5    A   No, that one I didn't. This one is just
6    in my memory because I -- if I had written a
7    Post-it to myself about it, it would -- even
8    throwing it away, it would have made it into my
9    complaint and it didn't.
10   Q   Do you currently have in your possession
11   any contemporaneous writings describing the events
12   of this meeting?
13   A   No.
14   Q   When was the next meeting about EJ?
15   A   Well, I believe EJ came up March 8th.
16   Now, on the 18th I went off on home leave, so 18th
17   came back on the 20 something of February. I
18   believe we met on the 8th and we talked about a lot
19   of things including EJ.
20   Q   Did you talk about your performance?
21   A   At this point, yes.
22   Q   And he had concerns about your

Page 145

1    performance?
2    A   Yes.
3    Q   In fact, he thought you blew off a
4    meeting when he asked everyone to go to a meeting?
5    A   This is March 8th?
6    Q   Yes.
7        MS. PERRY: I'm going to object to that
8    as assuming facts not in evidence yet, but you can
9    answer.
10       THE WITNESS: I mean I can't remember
11   what meeting he's talking about. If I got my
12   memory refreshed I could confirm or deny it.
13       (McGrath Exhibit Number 1
14       was marked for identification.)
15   BY MR. HUDAK:
16   Q   I'm handing you a document that's been
17   marked as Exhibit 1 for identification. It appears
18   to be a March 8th, 2002 memo from Sam Wonder to
19   Matt McGrath subject, substandard performance. Do
20   you see this?
21   A   Yeah.
22   Q   Do you see the first paragraph that says,

37 (Pages 142 to 145)

Capital Reporting Company

Page 146

1  "Yesterday you failed to appear for a briefing with
2  24 foreign service national employees after being
3  instructed by me to participate. You provided no
4  excuse other than a last minute telephone message
5  passed through Linda Tressa that you had an
6  appointment at State Med." Do you see that?
7       A   Uh-huh.
8       Q   Do you recall missing that meeting?
9       A   I recall this now. Yes, I recall both
10  the meeting and the conflict with -- with -- with
11  my physical.
12      Q   At the bottom it says, "You had been
13  advised of it for over a week before the event."
14  Do you recall being advised of it?
15      A   Yeah, but the appointment would have been
16  made more than a week before.
17      Q   Did you tell Mr. Wonder at the time the
18  meeting was scheduled that you were going to be
19  out?
20      A   I don't know how I -- how he communicated
21  that to me, if he did it in person. I either
22  forgot to tell him that or that I had the

Page 147

1  appointment, it was in my book and I forgot about
2  it or whatever. I don't remember. I mean I did
3  talk to Linda about the appointment.
4       Q   Do you believe this first paragraph is
5  accurate?
6       A   Well, I -- I object to no excuse and I'm
7  not sure that it was a last minute message. I
8  can't remember how much time before the meeting I
9  gave Linda, but I do remember the appointment at
10  State Med.
11      Q   Besides those two things, the no excuse
12  and the last minute, those characterizations in
13  here, is that first paragraph generally accurate?
14      A   With those stipulations, yeah.
15      Q   Second paragraph, let's omit the first
16  sentence of the second paragraph, "On March 6th
17  2002 you failed to attend a regular weekly division
18  chiefs meeting and provided no excuse or advance
19  notice or any representative from your office." Do
20  you see that?
21      A   Yeah.
22      Q   Is that an accurate statement?

Page 148

1       A   That I don't know. I mean generally
2  speaking if I didn't attend a meeting, somebody,
3  usually Kathryn, attended in my place, so why --
4  maybe she was busy too. I don't know.
5       Q   You don't know one way or another?
6       A   No, because I -- you know, because of
7  conflicts I might only attend 60 or 70 percent
8  meetings, that was standard for anybody, and other
9  deputies or somebody would attend in their place.
10      Q   I know your prior testimony we've talked
11  at length or you've discussed at length the Billy
12  Taylor incident so we won't necessarily go into
13  that. But can you read the third paragraph on
14  here.
15      A   The third paragraph?
16      Q   Yeah, and tell me whether or not you
17  think this is an accurate description of what
18  transpired.
19      A   I mean it leaves a lot of things out and
20  it has by commission and omission I don't think
21  it's generally accurate, no.
22      Q   Next paragraph down. "On January 17th,

Page 149

1  the day before you left on home leave" -- ignore
2  the characterization in the first part of the
3  paragraph -- "I had asked you directly on January
4  17th, the day before you left on home leave,
5  whether there were any pending projects on your
6  agenda. You responded no." Is that an accurate
7  statement?
8       A   Yeah, I believe that's an accurate
9  statement.
10      Q   Next paragraph down, "During your home
11  leave I also heard comments from virtually all of
12  your staff that you had, one, not had regular staff
13  meetings." Is it true that you weren't having
14  regular staff meetings at this time?
15      A   The staff meetings were held regularly
16  until -- well, you know, I was only back in the
17  office for maybe 12 -- not even 12 workdays between
18  Christmas and my home leave, so whether or not a
19  staff meeting happened in that 10 or 12 days I
20  don't know, but that's not an accurate paragraph at
21  all.
22      Q   So number two, "You had not taken the

38 (Pages 146 to 149)

Capital Reporting Company

Page 150

1  time to consult with your staff regarding their
2  program plans or even listen to them for more than
3  a few minutes at a time on any issue." Is that an
4  accurate statement?
5      A   That's an inaccurate statement.
6      Q   Three, "You had been openly dismissive of
7  some of their attempts to raise program issues with
8  you." Is that an accurate statement?
9      A   No.
10     Q   Next paragraph down where it mentions
11 that you were widely over budget on project Warhol.
12 Is that an accurate statement?
13     A   That is the most -- maybe the most
14 inaccurate, besides denying that he denied to get
15 rid of EJ, of anything in this whole saga.
16     Q   To your knowledge was Ms. Montgomery ever
17 given a low performance rating?
18     A   A what?
19     Q   A low performance rating.
20     A   I didn't -- I don't even know if it would
21 be -- I mean I'll defer to the lawyers, but I don't
22 know if even have the privacy right to go into her

Page 151

1  file and look at that.
2      Q   I'm just asking do you know?
3      A   No.
4      Q   Was Ms. Montgomery ever terminated for
5  cause?
6      A   Well, no, and I don't think -- no.
7      Q   During your time there was Ms.
8  Montgomery's performance ever subjected to
9  detrimental documentation like Mr. Wonder suggested
10 that you do?
11     A   Well, I was a rating officer and if I
12 didn't do it, who would.
13     Q   Would it surprise you if Ms. Montgomery,
14 both before you and after you were there, got
15 outstanding performance ratings from Mr. Wonder?
16     A   It surprises me in neither case, in both
17 cases.
18     Q   It would surprise you in both cases?
19     A   No, it doesn't surprise me in either
20 case.
21     Q   When did you first contact the EEO office
22 concerning your complaint?

Page 152

1      A   Well, when I first approached -- again, I
2  need specificity on that question.
3      Q   When did you first attempt to initiate
4  some sort of formal process complaining that you
5  were being retaliated against?
6      A   It was mid March, maybe the 18th, I'm not
7  a hundred percent of the date right off the top of
8  my head, of 2002.
9      Q   Was this in writing?
10     A   No.
11     Q   Do you have any writing or aware of any
12 writing that shows that you attempted to initiate
13 some sort of formal process complaining about
14 retaliation prior to the middle of April 2002?
15     A   Prior to the middle of April?
16     Q   Yes.
17     A   I don't know if -- if -- I don't know if
18 I -- I don't think I have any documentation. If
19 there was an e-mail, I'm not aware of it. I do
20 know I did it -- I had several conversations in
21 March. I don't know.
22     Q   And those conversations were with

Page 153

1  Ms. Hill?
2      A   Yes.
3      Q   Anyone else?
4      A   A couple of colleagues.
5      Q   Who?
6      A   Alfred Head and Mary Johnson. She's an
7  African-American colleague of mine, contemporaneous
8  more or less in age or whatever, and the person who
9  sent me to Ms. Hill, and I don't know recall, it
10 might have been Deborah or LaFaye or maybe somebody
11 outside the office, another party. That I can't
12 remember.
13     Q   Were you aware of the EEO process?
14     A   No, not at the time. I am now.
15     Q   Do you have any training, annual training
16 on EEO?
17     A   I had sensitivity training not in
18 complaint filing training.
19     Q   Do you have posters hung in your office
20 space discussing EEO procedures?
21     A   I don't know. I don't think they were in
22 the Cultural Programs office. They may have been

39 (Pages 150 to 153)

Page 158

1  giving a poor performance evaluation to you?
2     A   I don't understand.  A personal vendetta?
3     Q   No, I'm asking simply he didn't like you
4  so he was giving you a poor performance evaluation;
5  is that part of it?
6     A   I mean I don't -- I -- I think he
7  disliked what I stood for more than my personal
8  qualities.
9     Q   If EJ's situation didn't occur, do you
10 still think he would have given you a poor
11 performance evaluation because of your stances on
12 diversity and other issues?
13    A   That's speculation.  He had the bit in
14 his teeth for that one and he wasn't letting it go.
15    Q   I'm not asking you to speculate.  I'm
16 asking you in your beliefs sitting here today do
17 you believe that if the EJ situation didn't occur,
18 that he nonetheless would have given you a poor
19 performance evaluation because he simply didn't
20 like your position on diversity and you guys just
21 weren't getting along?
22    A   That's two parts.

Page 159

1     Q   Well, let's break it down.  Do you
2  believe that he would have, absent the EJ
3  situation, do you believe sitting here today that
4  he would have given you a poor performance
5  evaluation because of your stance on diversity?
6        MS. PERRY:  Objection, calls for
7  speculation.  You can answer.
8        THE WITNESS:  Yeah.
9  BY MR. HUDAK:
10    Q   Do you believe that removing the EJ
11 situation that he would have given you a poor
12 performance evaluation because he just didn't get
13 along with you?
14       MS. PERRY:  Objection, calls for
15 speculation.  You can answer.
16       THE WITNESS:  I don't think it would have
17 been anywhere -- if he gave me a weak one, it would
18 have just been a weak one, it wouldn't be anywhere
19 as near as malicious and mean spirited as it was.
20 BY MR. HUDAK:
21    Q   Are you aware that Mr. Wonder approved
22 travel for EJ on numerous other occasions?

Page 160

1        MS. PERRY:  Objection, assumes facts not
2  in evidence.
3        THE WITNESS:  I -- I -- you know, I'm
4  sure other travel at other times had been approved.
5  I don't know of any, but yeah.
6  BY MR. HUDAK:
7     Q   Are you aware that he approved travel to
8  Chicago for EJ?
9     A   When was this?
10    Q   During 2002.
11    A   After I left?
12    Q   At any point during 2002.
13    A   Considering I was there from the first of
14 January to June 10th of 2002 it had to be
15 afterwards.  No, I wouldn't be surprised if he
16 approved that at all after I left.
17    Q   Would it surprise you that he approved
18 travel for EJ before you got there?
19    A   Sometime before I got there.  Before the,
20 you know -- before I got there, yeah.
21    Q   While you were there at Cultural Programs
22 did Mr. Wonder obtain voice recognition software

Page 161

1  for EJ?
2     A   I think he did it after I left.  I'm not
3  sure.
4     Q   Did he ever suggest to you that that was
5  one of the things that you might like to do?
6     A   At the very end he suggested it.  At the
7  very end of all of this.
8     Q   As a reasonable accommodation for her
9  disability, is that how he phrased it?
10    A   I don't know how he appraised it.
11    Q   Phrased it.
12    A   I mean things had come to a head at that
13 point; the complaint.  I'm not sure how he -- he --
14 you know, I had no objection to it, but I don't
15 think that was a primary issue.
16    Q   If I understand the situation correctly,
17 and just a few wrap up questions and they might be
18 a little scattered so I apologize, you say you got
19 two performance evaluations in April of '02?
20    A   Yeah.
21    Q   First one Mr. Wonder's review was only on
22 there, right?

41 (Pages 158 to 161)

Capital Reporting Company

Page 162

1    A    Mr. Wonder's rating.
2    Q    Yes.  And review?
3    A    No, Mr. Wonder doesn't review.  There was
4  no review statement on the one I got on April 11th.
5    Q    Mr. Wonder didn't write anything on
6  there, didn't give you a review on that one, his
7  text wasn't on there?
8    A    No.  We're having a semantic problem.  As
9  my supervisor, he's the rating officer.  He writes
10  the rating in the rating section and then his
11  supervisor writes a review.
12    Q    But his rating includes a narrative?
13    A    Yes.
14    Q    And that narrative was on the one you
15  received at the beginning of April?
16    A    Yes, it was a signed statement without a
17  review.  It was a signed evaluation report without
18  a written statement.
19    Q    And the only thing that changed between
20  that one and the second one was the addition of
21  this reviewing statement?
22    A    I looked -- I compared the two of them

Page 163

1  and I couldn't see any changes in the body of the
2  rating, so I mean there may have been, but I don't
3  remember seeing any.
4    Q    After you contacted Ms. Hill, and that
5  was in the middle of March '02?
6    A    Yeah, I want to say the 18th, but I could
7  be a day or two off.  I had tried to contact her
8  before that.
9    Q    When did you try to contact her?
10    A    Oh, a few days, like three or four days
11  before that.
12    Q    That time moving forward, the rest of
13  your time there in the Office of Cultural Programs,
14  how much time were you devoting to your complaint?
15    A    Almost no time.  Until the time I decided
16  I needed to talk to somebody, which was in mid
17  March I -- I mean besides conversations with
18  friends and colleagues I hadn't really devoted, you
19  know, work hour time.  That was, you know...
20    Q    March moving forward until you left
21  Cultural Programs, how much time did you spend
22  working on your complaint?

Page 164

1    A    Well, I don't know.  I can't quantify it.
2  I know the misdirection with Ms. Hill took --
3  didn't take time, but because she wasn't responding
4  and I didn't want to do it other than in person I
5  would have to travel to her office to get an update
6  because she wasn't responding to me and then being
7  directed to OCR and Ms. Baldwin and those meetings.
8  I mean I can't quantify it.
9    Q    After you got your poor performance
10  evaluation in April of '02 did you continue to
11  fulfill the responsibilities of your position as
12  you understood them?
13    A    Considering, you know, other -- those
14  distractions, yeah.
15    Q    Did you show up for meetings?
16    A    I showed up for some meetings.
17    Q    Did you hold regular staff meetings?
18    A    By this point I continued to talk to
19  staff on an individual basis.  I thought that was
20  more productive.  The staff meetings had been
21  unproductive, so by this time I was doing
22  individual meetings.

Page 165

1    Q    But you weren't doing staff meetings?
2    A    I was attending senior staff meetings,
3  but my own staff, no.
4    Q    Were you responding to Mr. Wonder's
5  directions when he would ask you to stop by his
6  office?
7    A    I mean we had several conversations
8  during this time.  He and I and personnel and I and
9  Mr. Hart and I.
10    MR. HUDAK:  Why don't we take a break.  I
11  think I'm almost done.
12    (Brief recess.)
13  BY MR. HUDAK:
14    Q    Just a few more questions.  Do you know
15  Ms. Hill's race?
16    A    Yes, she's African-American.
17    Q    Do you believe you have been
18  discriminated against because of your race?
19    A    In a way, yes, I do.
20    Q    How is that?
21    A    In -- in -- in a way -- the best I can do
22  is an example in a way where I think we can relate

42 (Pages 162 to 165)

# Capital Reporting Company

Page 170

1    Q   Did you --
2    A   Again, that was almost over three years
3  ago.
4    Q   Did you call them, follow-up?
5    A   No because during the period before I was
6  terminated the last year or so and until
7  Thanksgiving 2006 I was commuting to Wisconsin
8  because my father was dying so I was spending maybe
9  a third or more of the year in Wisconsin at my
10  father's place helping with him.
11    Q   Did you have any condition or disability
12  that prevented you from working from November of
13  2004 to the present?
14    A   No, I'm not disabled.
15    MR. HUDAK:  I don't have any further
16  questions at this time.
17    MS. PERRY:  Okay.  Read and sign.
18    (Whereupon, at 5:15 p.m., the
19    deposition of MATTHEW MCGRATH
20    was concluded.)
21    * * * * *
22

Page 171

1    CERTIFICATE OF NOTARY PUBLIC
2    I, TERRI L. HAMILTON, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by and of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any counsel or attorney
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of this action.
16
17
18    TERRI L. HAMILTON
19    Notary Public in and for the
     Commonwealth of Virginia
     I.D. Number 7036436
20
21  My commission expires:
22  November 30, 2010

Page 172

1  A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3
4  I, MATTHEW MCGRATH, do hereby acknowledge I
5  have read and examined the foregoing pages of
6  testimony, and the same is a true, correct and
7  complete transcription of the testimony given by me,
8  and any changes or corrections, if any, appear
9  in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19
20  _____
21  Date            MATTHEW MCGRATH
22

Page 173

1  MICHELLE PERRY, ESQUIRE
2  Kalijarvi, Chuzi & Newman, P.C.
3  1901 L Street, Northwest
4  Washington, D.C. 20036
   (202) 331-9260
5  IN RE:  Matthew McGrath v. Condoleeza Rice,
6    Secretary of State
7  Dear Ms. Perry:
8    Enclosed please find your copy of the
9  deposition of MATTHEW MCGRATH, along
   with the original signature page.  As agreed, you
10  will be responsible for contacting the witness
11  regarding signature.
     Within 30 days of receipt, please forward
12  errata sheet and original signed signature page to
13  counsel for Defendant, Brian Hudak.
14    If you have any questions, please do not
15  hesitate to call.  Thank you.
16
17  Yours,
18
19
20  Terri L. Hamilton
21  Reporter/Notary
22  cc: Brian Hudak.

44  (Pages 170 to 173)