# EXHIBIT
# 2

mec
JMO

**1**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - x
MATTHEW McGRATH,                :
            Complainant,        :
                                : EEOC Case No.
      v.                        : 100-2003-08249X
                                :
UNITED STATES DEPARTMENT OF     : Agency Case No.
STATE,                          : 02-38
            Agency.             :
- - - - - - - - - - - - - - - x

Tuesday, March 15, 2005

U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20530

The hearing in the above-entitled matter

convened, pursuant to notice, at 12:54 p.m.

BEFORE:

HONORABLE RICHARD E. SCHNEIDER
Administrative Judge
Equal Employment Opportunity Commission
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

mec

**2**

APPEARANCES:

On behalf of the Complainant:

MICHELLE L. PERRY, ESQ.
Kalijarvi, Chuzi & Newman, P.C.
Suite 610
1901 L Street, N.W.
Washington, D.C. 20036
(202) 331-9260

On behalf of the Agency:

KATHLEEN MURPHY, ESQ.
MELINDA CHANDLER, ESQ.
Office of the Legal Adviser
U.S. Department of State
L/EMP Room 5425
2201 C Street, N.W.
Washington, D.C. 20530
(202) 647-4646

mec

**3**

## C O N T E N T S

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Linda E. Bessett (By telephone) | 11 | 35 | 43 | -- |
| Matthew McGrath | 52 | -- | -- | -- |

- - -

## E X H I B I T S

| COMPLAINANT'S | IDENTIFIED | RECEIVED |
|---|---|---|
| No. 18 | (Previously) | 21 |
| No. 45 | (Previously) | 25 |
| No. 46 | | 50 |
| No. 27 | (Previously) | 81 |
| No. 28 | (Previously) | 83 |
| No. 29 | (Previously) | 93 |
| No. 30 | (Previously) | 96 |
| No. 32 | (Previously) | 126 |
| No. 21 | (Previously) | 132 |
| No. 22 | (Previously) | 137 |
| No. 38 | (Previously) | 142 |
| No. 33 | (Previously) | 167 |
| No. 34 | (Previously) | 169 |
| No. 1 | (Previously) | 177 |
| No. 37 | (Previously) | 205 |
| No. 17 | (Previously) | 209 |
| No. 43 | (Previously) | 211 |
| No. 4 | (Previously) | 223 |
| No. 5 | (Previously) | 223 |
| No. 6 | (Previously) | 223 |
| No. 7 | (Previously) | 223 |
| No. 8 | (Previously) | 223 |
| No. 9 | (Previously) | 223 |
| No. 11 | (Previously) | 223 |
| No. 12 | (Previously) | 223 |
| No. 23 | (Previously) | 223 |
| No. 42 | (Previously) | 223 |

mec

**4**

1          P R O C E E D I N G S

2          JUDGE SCHNEIDER:  Let's go on the record.

3  I declare this hearing open.  My name is Richard E.

4  Schneider.  I am an administrative judge with the

5  Equal Employment Opportunity Commission assigned to

6  conduct a hearing in the discrimination complaint

7  filed by Matthew McGrath, whom I will sometimes

8  refer to as the complainant, against his employer,

9  the United States Department of State, which I will

10  sometimes refer to as the agency.

11          The complaint before me is identified by

12  EEOC Number 100-2003-08249X, and by Agency Number

13  02-38.

14          In addition to the court reporter and

15  myself and my law clerks, present at today's

16  hearing are the following people:  the complainant,

17  Matthew McGrath; the complainant's attorney, Ms.

18  Michelle Perry; the agency's attorneys, Kathleen

19  Murphy and Melinda Chandler.

20          The purpose of today's hearing is to

21  provide complainant the opportunity to present his

22  case.  My function is to ensure the equitable,

mec                                                                         49

1    told me at least two, maybe three -- that his wife
2    was sleeping with his daughter and he was concerned
3    about inappropriate behavior, and he felt like no
4    one listened to it and no report was made to Child
5    Protective Services or somebody in a position to
6    investigate and to intervene, and he felt like it
7    was ignored, and he became more and more concerned
8    about his daughter.  And then when the wife took
9    the daughter to Tokyo without his knowledge, I
10   think that really made it very difficult for him
11   because he didn't know what was going on and he was
12   denied access to his daughter.
13          JUDGE SCHNEIDER:  Okay.  Thank you.
14          Any follow up to my questions?
15          MS. PERRY:  No, Your Honor.
16          MS. MURPHY:  No, Your Honor.
17          JUDGE SCHNEIDER:  Okay.  Dr. Bessett,
18   that's all from us.  Thank you.  Thank you very
19   much for your time today.
20          THE WITNESS:  Okay.  If there are any
21   other questions, I will be available at three
22   o'clock.

mec                                                                         50

1          JUDGE SCHNEIDER:  Thank you.  And again, I
2    ask you to not discuss this matter with anyone
3    else.
4          THE WITNESS:  Certainly.
5          JUDGE SCHNEIDER:  Thank you.  Have a good
6    day.
7          THE WITNESS:  Thank you.  Bye-bye.
8          [Witness excused.]
9          JUDGE SCHNEIDER:  Okay.  We will go off
10   the record while we get our next witness.
11          [Off the record.]
12          JUDGE SCHNEIDER:  Okay.  We are back on
13   the record.
14                  [Complainant's Exhibit No. 46
15                  was marked for
16                  identification.]
17          JUDGE SCHNEIDER:  A couple things.  One,
18   during Dr. Bessett's testimony, there was a
19   discussion of complainant's proposed exhibit number
20   46, and I have marked it as Complainant's 46 but,
21   Ms. Perry, you decided not to move it into
22   evidence?

mec                                                                         51

1          MS. PERRY:  That's correct.
2          JUDGE SCHNEIDER:  Okay.  That's fine.
3          Also we have left over a loose end
4    concerning opening statements.  Ms. Perry, do you
5    wish to do an opening statement?
6          MS. PERRY:  We will waive opening
7    statement, Your Honor.
8          JUDGE SCHNEIDER:  Thank you.
9          Ms. Murphy?
10          MS. MURPHY:  We will also waive opening
11   statements.
12          JUDGE SCHNEIDER:  Okay.  Great.  Thank
13   you.
14          Okay.  So our next witness is going to be
15   the complainant, Mr. Matthew McGrath.
16          Whereupon,
17                  MATTHEW JOSEPH McGRATH
18   was called as a witness and, having been first duly
19   sworn by the Administrative Judge, was examined and
20   testified as follows:
21          JUDGE SCHNEIDER:  Ms. Perry.
22          MS. PERRY:  Thank you.

mec                                                                         52

1                  DIRECT EXAMINATION
2          BY MS. PERRY:
3     Q    Good afternoon, Mr. McGrath.
4     A    Good afternoon.
5     Q    Could you state your full name for the
6    record.
7     A    Matthew Joseph McGrath.
8     Q    And could you state for us what your
9    educational background is after high school.
10    A    I have a bachelor's degree in history from
11   the University of Illinois, Champaign-Urbana, and I
12   have a master's degree in a multidisciplinary field
13   called intercultural studies.  It's a
14   cross-cultural international comparative
15   literature, politics, et cetera, from Governors
16   State University in Illinois.  In addition, I have
17   some additional undergraduate and graduate work and
18   a teaching certificate and some history graduate
19   work separate from those two.
20    Q    Are you currently employed?
21    A    No.
22    Q    Were you previously employed?

mec                                                                   97

1    A    The pool maintenance was the landscaping.
2  I was put in a house that was no longer in the
3  embassy's stock.  It had been deemed unsuitable to
4  be renewed.
5           JUDGE SCHNEIDER:  Why are we talking about
6  this?
7           MS. PERRY:  It's in an exhibit the agency
8  proposed, Your Honor.
9           BY MS. PERRY:
10    Q    Mr. McGrath, did you subsequently pay
11  that --
12           JUDGE SCHNEIDER:  Hang on a second.  What
13  exhibit?
14           MS. MURPHY:  Your Honor, it's an EER, an
15  evaluation that Mr. McGrath received before the
16  evaluations which Ms. Perry has moved to admit into
17  evidence, and there is a negative comment in there
18  which the agency wishes to make part of the record
19  because it goes to the question of Mr. McGrath's
20  performance.
21           It also goes to the question, I think,
22  of -- you know, we have listened to a great deal

mec                                                                   98

1  now about Mr. McGrath's career track and what a
2  great job he did and how quickly he was promoted,
3  and one of the purposes of that EER is to
4  demonstrate that there were questions about Mr.
5  McGrath's performance well before he met --
6           JUDGE SCHNEIDER:  Okay.  That is an
7  exhibit you will be moving in?
8           MS. MURPHY:  Pardon me?
9           JUDGE SCHNEIDER:  That's an exhibit you
10  will be moving in at an appropriate time?
11           MS. MURPHY:  That's right.  I plan to do
12  that on my cross.
13           JUDGE SCHNEIDER:  Okay.  Go ahead.
14           MS. PERRY:  Thank you, Your Honor.
15           BY MS. PERRY:
16    Q    Those pool and car maintenance costs, did
17  you pay those to the agency?
18    A    Yes.
19    Q    And outside of those two EERs, the one
20  that the agency is going to be moving into evidence
21  and the 2001 EER, were there any other EERs or
22  performance appraisals that you received in the

mec                                                                   99

1  last ten years that you would characterize as
2  negative?
3    A    I can't even remember any comments other
4  than the ones we have talked about right here,
5  right now.
6    Q    What position did you assume with the
7  State Department starting in September of 2001?
8    A    The chief of the Cultural Programs Unit,
9  Bureau of ECA, Educational and Cultural Affairs.
10    Q    Okay.  Let's focus on that time period
11  forward.  What day in September 2001 approximately
12  did you start with the Cultural Affairs office?
13    A    The morning of September 11th.  I had gone
14  to the department the day before to check in, but I
15  went to SA44, to the unit, to report to the unit
16  itself as opposed to the department on September
17  11th.
18    Q    And can you describe to us what the duties
19  were for the chief of the Cultural Affairs office?
20    A    The duties?
21    Q    Yes.
22    A    Well, again, it goes in three parts.  It's

mec                                                                  100

1  basically divided into -- duties into two areas.
2  One, the visual arts, and one is the performing
3  arts.  You can put movies into one or the other; it
4  sort of doesn't fit neatly into either, but that's
5  essentially the breakdown.  Again, with any public
6  affairs program, there are various different kinds
7  of programs within those broad approaches that are
8  meant to implement the exchanges and whatnot
9  involving visual arts and performing arts.  It
10  would take too long to go through all the programs.
11    Q    No.  That's fine.
12           So, in a nutshell, basically Cultural
13  Affairs was arranging for these events to occur; is
14  that correct?
15    A    Yes.  I mean, I don't -- arranging -- they
16  could be arranged in any number of ways.  To
17  implement it.  It may be initiated by us, it may
18  not be initiated by us.  All sorts of things can
19  happen.  But on the Washington side of it, because
20  there is the field side of it as well.
21    Q    Did you supervise a staff while assigned
22  to be the chief?

mec                                                           101

1    A    Uh-huh.

2    Q    And how many individuals were on your

3  staff?

4    A    There were six senior program officers, I

5  recall, and two admin assistants.

6    Q    Did you manage a budget while the chief?

7    A    I wasn't there long enough to say that I

8  managed a budget.  I would say I managed the budget

9  only in the sense that the budget had -- there had

10  to be budgetary decisions made.  But I was never

11  there -- I didn't create the budget.  I was

12  handling and troubleshooting the entire time I was

13  there.

14    Q    So was there a budget already in place

15  when you --

16    A    Yes.

17    Q    -- came in as the chief?

18    A    There was a budget -- I can't remember now

19  if it was July or so, but it had been written by my

20  predecessor and approved by his supervisor, my

21  supervisor, Sam Wunder.

22    Q    Did you identify priorities for the office

---

mec                                                           102

1  while you were assigned to be the chief?

2    A    Yes, although there wasn't very -- there

3  wasn't much flexibility in the program.  The

4  priorities had to do with a lot of troubleshooting

5  and problemsolving, much of it attributed to

6  September 11th because we either had people in the

7  field or we had people that were going to go in the

8  field and decisions had to be made and those kind

9  of things, and  there was money involved and the

10  like.  So it was difficult, the first day being

11  that, and managing things, and I mean more than

12  just money.

13    But there are too many earmarks, as they

14  say in Congress, there are too many earmarks and

15  too many things that had been earmarked by my

16  predecessor that there wasn't much wiggle room on.

17  It was only a $1.6 million budget.  Posts usually

18  have more than $1.6 million.  So there wasn't much

19  wiggle room there.

20    But yes, I mean, I had to sign the

21  vouchers, I had to track what had been done.  And

22  also you don't mess with an office budget or other

---

mec                                                           103

1  things when you first arrive.  The smart managerial

2  task is to trust that your predecessors and

3  everybody had set things in motion because it can

4  be dislocative to say, "I'm going to cancel this

5  and we're not going to do that" until you know your

6  way around and, in fact, until you set your second

7  budget.  Your first budget, I should say, the

8  second budget you are there.

9    Q    Who was your first-line supervisor while

10  you were the chief?

11    A    He's known as Sam Wunder, but I guess it's

12  S. Van Wunder.

13    Q    And who was your second-line supervisor

14  when you first became the chief?

15    A    For a brief period of time, it was Brian

16  Sexton.  He was a political appointee DAS.  I don't

17  know if he was the primary DAS; I don't know.  And

18  then when he left, another political appointee took

19  his job.  I believe there might have been a short

20  gap.  That was in February of 2002  and that was a

21  man named Steve Hart.

22    Q    So in February --

---

mec                                                           104

1    JUDGE SCHNEIDER:  I'm sorry.  Steve what?

2    THE WITNESS:  Hart, H-a-r-t.  Because of

3  the change of administration, the former was a

4  democrat, the other was a republican.

5    BY MS. PERRY:

6    Q    So did Mr. Sexton leave and Mr. Hart start

7  both in February 2002?

8    A    Well, I was on home leave, so I'm not

9  exactly sure what days were what, and it was a fait

10  accompli sometime after January 17th or 18th, and I

11  don't know exactly the date of that because I was

12  gone.

13    Q    You mentioned earlier that you supervised

14  six program officers and two admin individuals.

15  Can you name for us those program officers and

16  admin individuals?

17    A    It's easiest to name the assistants first.

18  There was LaFaye Proctor and Deborah Chapman.  The

19  whole staff -- you want the whole staff.

20    Q    Yes.

21    A    Deborah Chapman and LaFaye Proctor.  The

22  senior program managers were Sandy Rouse, Leanne

mec                                                          105

1  Mella, E.J. Montgomery, Evangeline Montgomery,
2  Kathryn Wainscott, Susie Baker, and Susan Cohen.  I
3  think that's six, right?
4      Q   It is.
5          Can you give me the races of each of those
6  employees?
7      A   The two admin assistants, LaFaye and
8  Deborah, are African-American, and E.J. is African
9  American.
10     Q   The others are all Caucasian?
11     A   Those are Caucasian.  There are no men on
12  staff.
13     A   And Ms. Montgomery -- at the time you
14  supervised her, approximately what was her age?
15     A   About 72.
16         By the way, they are all civil servants,
17  not Foreign Service.
18     Q   Does Ms. Montgomery have a continuing
19  illness?
20     A   Yes.  Parkinson's.  Apparently she has had
21  it for some time, but she had it then, that's for
22  sure.

mec                                                          106

1      Q   Were there any visible symptoms of Ms.
2  Montgomery's Parkinson's?
3      A   Only some.  I had an uncle who had
4  Parkinson's for years and years, so I'm familiar
5  with the signs of Parkinson's.  Slight hand
6  tremors, not continually but slight hand tremors
7  like this as I'm demonstrating, just very slight,
8  both hands, and a slow walk, for more steadiness
9  than anything else.
10     Q   Was Ms. Montgomery's Parkinson's a
11  well-known fact in the office?
12     A   Yes.
13     Q   Can you describe kind of the status of the
14  Cultural Affairs office when you first began, kind
15  of what the state of affairs was there?
16     A   Well, first of all, it had also been
17  downsized.  I described the downsizing in South
18  Africa, but several years before that, there was
19  a -- and again, when you downsize, you
20  generally -- what is communicated to staff,
21  Americans, foreign, civil servants, South Africans,
22  is a sort of devaluation.  In other words, "We're

mec                                                          107

1  going to cut your budget, we're going to cut your
2  people."  There was still some residual of that,
3  and I had heard that the three or four -- my three
4  or four predecessors had all failed to complete
5  their assignments, which is unprecedented.  Tom
6  Cunningham, Mr. Wunder himself, Mark Jacobs,
7  Rosemary Crockett -- there were several -- I was
8  told all four -- no one finished their assignment
9  there; they all curtailed, voluntarily they
10  curtailed.
11         I had talked to at least one of them about
12  the problems, not Tom, who was my immediate
13  predecessor, but Mark Jacobs, and he had described
14  to me exactly the same situation two or three years
15  before.
16         But even more important than that is that
17  the staff was ridden with essentially two cliques.
18  There was E.J. and Deborah and LaFaye and Sandy,
19  with Susan being the sort of set-aside, if I can
20  use that expression, and then there were all the
21  others, and although they didn't all get along,
22  they were sort of all the others.

mec                                                          108

1          The problem that I discovered right
2  away -- I mean, I knew there was this history, but
3  I had no idea of what was going on.  I was told in
4  the first couple of days -- one of the members of
5  the staff came in my office --
6      Q   What member of staff?
7      A   Deborah Chapman.
8      Q   And what did Ms. Chapman say to you?
9      A   Well, we had said hello the day before
10  when I first came.  Of course, September 11th, that
11  was a little bit crazy.  But we have a very good
12  mutual friend, very good friend of mine and very
13  good friend of hers, but we had never met, and she
14  had said, well, you know, I had been highly
15  recommended, and amazingly, because this doesn't
16  happen, she said I had to watch myself in the
17  office because at least two members of the staff
18  would carry messages downstairs to the front
19  office, which meant at the time Mr. Sexton and Mr.
20  Wunder, of course, and that I would see that I had
21  to be careful.  It was a friend of a friend warning
22  me that I would have -- that was a little extreme

mec                                                               145

1        BY MS. PERRY:

2        Q    So Kathryn was the drafter, you were the

3   clearance officer, and Mr. Wunder was --

4        A    Would send it out.

5        Q    -- the reviewing officer?

6        A    Yes.  And sometimes he, you know, he would

7   say -- there would be an issue, and sometimes

8   legitimately so.  But anyway, that's that.

9        Q    Okay.  Going back to the ICCP grant, --

10       A    Yes.

11       Q    -- who was the program manager in charge

12  of that grant?

13       A    That was looked at as an extension of the

14  program I said Mr. Sexton and Susie were running

15  before when I got there.

16       Q    Susie being?

17       A    Susie Baker.  Sorry.  I say an extension;

18  there was a push to put in -- and this is why I

19  think looking at grants is important, because there

20  was a push to put more and more things under

21  grants, which, of course, required more and more

22  thought into the grant because you were distancing

---

mec                                                               146

1   yourself from implementation more and more.

2        The Carnegie people and maybe the

3   Guggenheim had been in this special project that

4   Susie was working.  Again, there was this whole

5   issue of 1.6 million, which I had told Sam, you

6   know, I wasn't going to make a big deal out of it,

7   but I wanted to keep my distance.  I had been told

8   by Mike Graham, "We have told them to stop doing

9   that."  I wanted to look at the 1.6 and nothing

10  above that, nothing in addition to that as long as

11  the congressional mandate happened.  So this was

12  around that.  But 9/11 happened and there was more

13  money coming in.

14       Q    So Susie Baker was also managing the ICCP

15  program?

16       A    Yes, because the Carnegie people were a

17  prime applicant for this program.  They had been

18  the only grantee in the previous one, but with this

19  one, they were -- it was understood they were

20  applying.  Susie was working with them, Susie Baker

21  was working with them.

22       Q    So what was your involvement in the ICCP

---

mec                                                               147

1   grant?

2        A    Well, in one of my e-mails -- I don't know

3   if it's in here; I just stumbled on it in the house

4   the other night, in fact, but I make reference to

5   it in my affidavit -- Sam -- and this was in May

6   sometime -- Sam had told me there are ways to

7   manage are grant panel.

8        Q    Mr. McGrath, my question to you was what

9   was your involvement in the grant?  What work were

10  you --

11       A    What should have been my involvement?

12       Q    What work were you performing in

13  connection with the grant?

14       A    The work I was performing -- normally you

15  would just get reported to -- it is a kind of grant

16  that the ECA has been doing for years, only

17  cultural programs wasn't, and Susie worked for that

18  other division.  The RFP -- you just plug in what

19  it is.  It's a pretty boilerplate grant.  It just,

20  in this case, involves culture instead of politics.

21       So there is minimal involvement in theory

22  in that regard, but because of my questions -- in

---

mec                                                               148

1   practice -- because of my questions about my fears

2   of what might happen with this grant considering

3   what had happened before, I knew the make up of the

4   panel was crucial on this, and although normally it

5   wouldn't be my place to pick -- whatever it

6   was -- nine panelists, I -- believe it or not, I

7   have enough friends and people who owe me favors

8   that -- and it's a very difficult thing to do.

9   You've got to have people give up half a day or

10  more, their supervisors have to agree, they have to

11  read all the grant proposals, they have to have a

12  meeting and discuss it, so it's a favor.  I mean,

13  you are paid, but it's not your normal job.  And

14  you have to have a diverse group, racially, gender

15  wise, civil, Foreign Service.  So --

16       Q    So did you recruit the nine people --

17       A    Yes.  I sort of took -- I sort of took

18  that where it wasn't normally my job and I did the

19  recruiting to make sure that there was this balance

20  on these panels and did that.

21       Q    And did you communicate with Mr. Wunder

22  the panelists that you were recruiting?

mec

149

1  A    I would give him the numbers as I was

2  going.  It was slow going.  I would give him the

3  numbers, like I've got two now, or whatever, and

4  then when I got up to a higher number I would

5  rattle off the names, and I think I was only

6  missing one or two at that point, and he said, "Oh,

7  those are good people," as if I didn't know any

8  good people.  Then when I had it firm, when nobody

9  backed out, I gave them to Susie to run with.

10  Q    And was that grant competition completed

11  on time?

12  A    I believe so.  I don't -- I was not

13  permitted to sit in -- again, this was in the May

14  18th timeframe.  I was told -- normally I would be

15  an ex officio member of a panel like that, person

16  in my position.  You would be there to answer

17  questions and whatnot and I knew most of the people

18  on the panel either personally or by reputation,

19  but I was told -- I was told by Sam that I was not

20  permitted, I suppose because he knew that I was a

21  goner anyway, that I should not participate, and I

22  responded that I thought that there were a lot of

mec

150

1  people that shouldn't participate in there for fear

2  of skewing the grant.

3  So he kicked me out and I -- he kicked me

4  off the ex officio status and I then objected and

5  said he or the others should be there as well; let

6  the panels do their work.

7  Q    And when did Mr. Wunder inform you that

8  you were not to be present for the actual panel

9  meeting?

10  A    I think my response was dated May 17th.  I

11  don't see it here.  But he may have told me on the

12  16th or the 15th.  Again, I would have to go back

13  and pull the memo out.

14  Q    Okay.

15  MS. PERRY:  Your Honor, can we take like a

16  five-minute break?

17  JUDGE SCHNEIDER:  That's fine.  Let's go

18  off the record.

19  [Off the record.]

20  JUDGE SCHNEIDER:  We are back on the

21  record after a short break.  During the break, we

22  managed to get copies of the missing page from

mec

151

1  Complainant's Exhibit Number 29, so Complainant's

2  Exhibit 29 is now complete.  Correct, everybody?

3  MS. PERRY:  Yes, Your Honor.

4  JUDGE SCHNEIDER:  Thank you.

5  We will resume the direct examination of

6  the complainant.  Ms. Perry.

7  BY MS. PERRY:

8  Q    Mr. McGrath, did you handle the planning

9  for a program to honor jazz musician Billy Taylor?

10  A    There wasn't much to plan.  I was part of

11  the initiation of it, yes.

12  Q    And when was the ceremony scheduled to

13  occur?

14  A    Oh, I left on the 18th.  I think it was

15  Sunday the 20th of January.

16  Q    January 20th, 2002?

17  A    Yes.

18  Q    Prior -- you said you left.  Did you mean

19  you left on some type of vacation or home leave

20  starting January 18th?

21  A    I left fairly late on the 17th, which I

22  guess was a Thursday, is my recollection.  As I

mec

152

1  said, I deferred my home leave when I left South

2  Africa, so I was due some home leave.  Mr. Wunder

3  cut it back.

4  Q    So you were taking that deferred home

5  leave in January 2002?

6  A    I was taking back a shortened deferred

7  home leave, the first day being Friday -- I think

8  Friday -- January 18th, flying out of -- my home

9  leave was in Florida -- flying out of Washington

10  the morning of that Friday.

11  Q    As of Thursday, January 17, 2002, were you

12  aware of whether or not Mr. Taylor would be present

13  for the ceremony on the 20th?

14  A    I had -- I can't say exactly what day I

15  was aware of it, but I know that he was sick.

16  Q    So as of the day you left for home leave,

17  were you aware that he was sick?

18  A    Oh, yes.  I knew he wasn't -- I knew he

19  wasn't --

20  Q    And as of January 17th, 2002, were you

21  aware of whether or not the Secretary of State

22  would be available and present for the ceremony on

mec                                                                    153

1  the 20th for Mr. Taylor?

2      A    Whenever I -- whenever I finally knew

3  about Taylor, it had to be a couple of days for

4  Powell because his -- it wasn't an unplanned trip

5  for the Secretary.  He was going to the Indian

6  subcontinent, so I knew he wasn't going to be

7  there.

8          I had been talking to the Kennedy Center

9  about a variety of things, and so they then told

10  me, after I -- they knew that Powell wasn't going

11  to be there, either, but then telling me that

12  Taylor was sick.

13     Q    So were you aware as of January 17th,

14  2002, that a certificate did not need to be

15  completed by January 20th, 2002, for the ceremony

16  for Mr. Taylor?

17     A    The Kennedy Center told me they had sold

18  all the tickets -- I think it was in the Opera

19  Hall -- and that they had to go forward to it, but

20  they did no backup because selling tickets twice to

21  the same event in this short a period of time --

22     Q    So the --

mec                                                                    154

1      A    So they hadn't made up their minds yet.

2      Q    So was it your understanding that the

3  ceremony might go forward?

4      A    I didn't think the ceremony was going

5  forward.  My impression from -- on that last

6  day -- well, in fact, I thought I knew the day

7  before, I thought I knew the day before was that

8  they were going to have a show; in other words,

9  without the two principals.  They sold the tickets,

10  they were going to have a concert by other people,

11  and that would be it.

12     Q    And if there was a show held, would there

13  have been a need for a certificate to be completed

14  to be presented to Mr. Taylor?

15     A    I concluded from my conversations

16  that -- I mean, there had been a certificate in

17  preparation -- in fact, I had initiated the

18  certificate.  It had fallen -- it had gotten into

19  trouble in admin the week prior.  But it was my

20  impression and when I -- well, I had the impression

21  for a little bit of time, but certainly by the time

22  I knew Taylor was gone, was ill -- I mean, he was

mec                                                                    155

1  in his 80s -- there was just going to be a show,

2  that they had sold the tickets, it s too bad Powell

3  can't be there, he's going to India, you know, and

4  we'll just have the show.

5      Q    And did you communicate with Mr. Wunder

6  regarding the proposed show or program to honor

7  Billy Taylor before you left on home leave?

8      A    Well, as I was one of the initiators with

9  the Kennedy Center -- we had talked about it over

10  lunch or something -- he knew that this was coming

11  up.  I had told him the morning of the 17th that

12  there was no major issues pending, which, without

13  the two principals, I thought was an accurate

14  statement, that with both principals missing, there

15  would be no -- there was nothing urgent with the

16  show going on.

17          Later that day, in the afternoon, I

18  went -- I thought, well, you know, I'm going to be

19  gone three weeks or four weeks.  I talked to Sandy.

20  Sandy liked to keep her hands out of that kind of

21  stuff.  I said, well, you know, I'll

22  just -- "Instead of leaving it with you, Sandy,

mec                                                                    156

1  I'll put it on Sam just in case and give him an

2  in-case thing."  So that's what I -- I went down,

3  he wasn't there; I went down again, he didn't come

4  back.  By the time I was ready to leave late on the

5  17th -- I mean, not late, six or seven o'clock -- I

6  just said, all right, I'll just leave it with a

7  note.

8      Q    At any time prior to your leaving for home

9  leave, had you been informed that the Secretary of

10  State's spouse might be present to present the

11  award to Mr. Taylor?

12     A    Well, there's always the possibility she

13  was going to be present but not to present.  I say

14  always a possibility because she was on the board

15  of the Kennedy Center.  And also no one told

16  me -- and also she travelled only occasionally with

17  the Secretary.  So she did travel, she went to

18  South Africa with him when I was there.  I had no

19  firm knowledge that she was going to be with him,

20  travel to India, or not, or that she would be free

21  enough to go to the Kennedy Center.

22     Q    So you had not been informed that she

mec                                                          157

1    would be present?

2         A    I don't remember being informed of that.

3    If I say, it slipped my mind.  But if I did,

4    there's a regent's box or something they sit in,

5    you know, which she is a regent or whatever they

6    call it.

7         Q    Okay.  Looking at Complainant's Exhibit

8    Number 1, and I'm sorry, we've actually got a

9    couple of documents stuck together here --

10        A    Number 1?

11        Q    The last two pages of Complainant's

12   Exhibit Number 1.

13             MS. PERRY:  I believe this is also in the

14   ROI, but since I know where it is in here, I'm

15   going to have him look at it in here.

16             BY MS. PERRY:

17        Q    The last two pages of Complainant's

18   Exhibit Number 1 is a memo dated March 8, 2002, to

19   Mr. McGrath from Sam Wunder.  Did you receive this

20   memo dated March 8, 2002, from Mr Wunder?

21        A    I believe I did.  It looks strange because

22   he has not initialed it, but yes, I believe I did.

mec                                                          158

1         Q    Starting with the third full paragraph on

2    the first page that begins, "On January 18, 2002,"

3    this paragraph concerns planning for Mr. Taylor's

4    reception.  Do you believe that --

5         A    It wasn't a reception.

6         Q    Okay.  Show.  Do you believe that this

7    description of the events is an accurate

8    description of the events at issue with respect to

9    Mr. Taylor's show?

10        A    Well, I mean, my last day in the office

11   was the 17th.  I flew out on the morning of the

12   18th.  I didn't consider that to be a major -- even

13   if it had happened as originally discussed between

14   me and the Kennedy Center, I didn't consider that

15   to be a major project, but one that had to be

16   attended to, obviously.

17             I did draft the certificate, I did have it

18   cleared by the Kennedy Center, because this implies

19   "you were to have drafted."  I did turn it over to

20   admin for their -- they have a graphics guy who

21   puts these plaques together, at which point the

22   graphics guy and the admin officer, Deborah

mec                                                          159

1    Hunsley, the personnel officer who would later be

2    involved in my curtailment, told me they weren't

3    going to do it the way it was because it was

4    inappropriately worded.

5             This is before I knew about the two

6    participants not being there.

7             I said that it wasn't their position to do

8    that and that the Kennedy Center had cleared off on

9    it and Sandy and I had written it, and so if they

10   would just please -- to make it short, they

11   wouldn't do it.  So it basically -  it was at that

12   stage.  And then I found out he wasn't going, so I

13   didn't.  So that --

14        Q    Okay.  On the second page, the first full

15   paragraph that starts, "During your home leave"

16   states, "I also heard comments from virtually all

17   of you staff that you had 1) not had regular staff

18   meetings, 2) not taken time to consult with your

19   staff regarding their program plans or even

20   listened to them for more than a few minutes at a

21   time on any issue, and 3) had been openly

22   dismissive of some of their attempts to raise

mec                                                          160

1    program issues with you."

2             Do you see that sentence?

3         A    Yes.

4         Q    Do you agree with this characterization of

5    your interaction with your staff in the Cultural

6    Affairs program?

7         A    No.  I will respond to them, I guess, the

8    way they are numbered.

9             First, I began having regular staff

10   meetings, and I think I had four.

11        Q    When you say you began, you mean you began

12   at the beginning of your time?

13        A    Yes.  When I arrived, yes.

14        Q    Okay.  Why didn't you have more than four

15   staff meetings?

16        A    Because they -- each of them was a

17   disruptive event.  One or more members -- Leanne

18   Mella particularly was a difficult participant in

19   them, and by the fourth meeting, it just became

20   untenable -- one of these people that just likes to

21   obstruct meetings.  So I dismissed the meeting,

22   said we wouldn't meet regularly but I would meet

mec
161

1  individually.

2          So it depends on your definition of staff

3  meetings.  I met with them constantly one on one,

4  one on two, depending on the issue they had or the

5  issue I had.

6      Q    Did you ever refuse to meet with a staff

7  member of your -- with a member of your staff?

8      A    No.  No.  My door was open, it was at the

9  end of the hall.  I had one on either side and we

10 could talk to each other without leaving our desks

11 and often unfortunately we did talk to each other

12 sitting behind our desks.  So no, I didn't refuse,

13 no.

14     Q    Is it accurate to say you had not taken

15 time to consult with your staff regarding their

16 program plans?

17     A    Well, first of all, most of the programs

18 were set in stone.  As I was saying, most of it was

19 troubleshooting; this shipment didn't get there,

20 this speaker -- we have to reprogram for 9/11.  So

21 it's not -- the budget had already been set.  Even

22 my efforts to reform the culture were not

mec
162

1  suggestions in the sense that I made, however good

2  my suggestions were.  I was making suggestions to

3  change things.

4          What I was finding myself doing the first

5  few months is troubleshooting programs, the normal

6  problems you have with a program and because it was

7  already entrained or the problems associated with

8  9/11.

9      Q    It also says that you were openly

10 dismissive of some of their attempts to raise

11 program issues with you.  Do you agree with this

12 characterization?

13     A    No, but only to the extent that there was

14 nothing I could do about the budget.  It had very

15 little leeway.  There was some jealousy between

16 portfolios feeling that so-and-so had more in the

17 budget.  For example, if I made a decision, a 9/11

18 decision -- well, we're going to have to pull that

19 person back, they're scared, that kind of stuff --

20     Q    So did you have any control over the

21 budget?

22     A    I had very little control over the budget.

mec
163

1  It had been set.  As I said, I was new, I wasn't

2  going to change it.

3      Q    So the next paragraph goes on to discuss a

4  budget issue with the Andy Warhol project, which it

5  says was wildly over budget by 400 percent.  Had

6  you set the budget for the Andy Warhol project?

7      A    Of all the things, I must say this is the

8  most outrageous thing that I have been accused of

9  and the most unfair and inaccurate.  No, I did not

10 set the budget; B) Mr. Wunder approved the budget;

11 C) It had been a two-plus-year project that had

12 been funded not by my cultural program's budget,

13 but by millennium funds or some other pot of money

14 outside the cultural program that was

15 directed -- managed there, but directed -- the

16 funds came from a different pot of money; D) -- or

17 whatever it was -- Deborah handled the vouchers.

18 This became known I believe in early December.

19 Deborah processed -- with the fiscal data, she

20 always processed that program using how it was

21 funded for the previous two-plus years for that

22 program.

mec
164

1          I signed off on it because I'm new, I

2  trust she has put the right fiscal data on it.  It

3  comes back saying, well, the fiscal data was right,

4  but there was no more money in that fund and that

5  they were going to cease.  Whether this had to do

6  with the 1.6 million or not, I don't know.

7  Sometimes pots of money run out.  This wasn't our

8  pot of money.  She couldn't do it and it had to

9  come out of fiscal data in our budget.

10         Now, again, Mr. Wunder and Mr. Carmichael,

11 my predecessor, had set in around the first of

12 August, a month and a half before I got there, a

13 $10,000 budget for tidying up.  There was always

14 some chump change put in to send a courier here, a

15 courier there.  You have no idea how expensive

16 shipping Andy Warhol or equivalent -- it's an

17 unbelievably expensive thing.  You have to sign

18 away your life to do it.  So $10,000 is chump

19 change, but so is $40,000 chump change.

20         So when Deborah came to me and said we

21 have to find it, I had to look in the budget and I

22 had to find $30,000 to conclude that.

mec                                                          165

1      Q    And did you, in fact, find that $30,000?

2      A    It had to come out of, as I remember

3  correctly, our speaker's program.

4      Q    Okay.

5      A    Now, Leanne had been there longer than I

6  had and she should have -- she managed the Warhol

7  thing and she should have had it.  Again, I didn't

8  want to -- sorry, I'm angry about this, but I would

9  not have blamed myself, I would not have blamed

10  Leanne even though she was responsible and been

11  there much longer than me, or longer than me.  I

12  wouldn't have even blamed Sam or my predecessor

13  because they set a budget thinking that, probably

14  like Deborah, that that  money was coming out of

15  that pot of money.

16          But when we were told it's not coming out

17  of that pot and we had to do it, I did the best I

18  could for it, and yet I'm told that I'm such an

19  idiot, having managed both budgets, that I could

20  miss this thing by $30,000 -- $40,000 wouldn't have

21  shipped two paintings from Croatia to Slovenia.

22  I'm sorry, but I don't understand --

---

mec                                                          166

1      Q    Okay.

2      A    This is malicious in the extreme.

3      Q    And looking at Complainant's Exhibit 33,

4  do you recognize this document?

5      A    We're at 33?

6      Q    Yes.

7      A    Yes.

8      Q    Can you identify for us what this document

9  is?

10          JUDGE SCHNEIDER:  Is that already in or is

11  that a new one?

12          MS. PERRY:  It's a new one.

13          JUDGE SCHNEIDER:  I have it.  And 1 you

14  didn't move in yet?

15          MS. PERRY:  No, Your Honor.  I think

16  that's actually in the ROI.  I just used it for

17  purposes of --

18          JUDGE SCHNEIDER:  Okay.  We are looking at

19  Complainant's?

20          MS. PERRY:  Exhibit 33.

21          BY MS. PERRY:

22      Q    Mr. McGrath, are you at 33?

---

mec                                                          167

1      A    Yes.

2      Q    Okay.  Is this an e-mail exchange between

3  you and Mr. Wunder with an attachment of a proposed

4  distribution for fiscal year 2002 supplemental

5  funds?

6      A    Yes, this is a -- I'll call them 9/11

7  funds.  Yes.  It's dated March, and Mr. Hart is

8  cc'd on it.

9      Q    Okay.

10          MS. PERRY:  Your Honor, I ask that

11  Complainant's Exhibit 33 be admitted into evidence.

12          JUDGE SCHNEIDER:  Ms. Murphy?

13          MS. MURPHY:  No objection.

14          JUDGE SCHNEIDER:  Okay.  Complainant's

15  Exhibit 33, --

16          MS. PERRY:  Thank you, Your Honor.

17          JUDGE SCHNEIDER:  -- which is several

18  things.  On the top, anyway, is e-mail from Mr.

19  Wunder to Mr. McGrath sent Tuesday, March 26, 2002.

20  It is admitted into evidence.

21                    [Complainant's Exhibit No. 33

22                     was received into evidence.]

---

mec                                                          168

1          MS. PERRY:  Thank you.

2          BY MS. PERRY:

3      Q    Did you at times request meetings with

4  your staff members, Mr. McGrath?

5      A    Staff meetings -- as I said, I talked with

6  them individually and in small groups, but not as a

7  whole group.

8      Q    After the first --

9      A    After the first month, yes.

10      Q    Looking at Complainant's Exhibit 34, do

11  you recognize this document?

12      A    Yes.

13      Q    Is this an e-mail exchange including

14  yourself, Mr. Wunder, Ms. Baker, and Ms. Rouse?

15      A    I recognize it, but give me a second.

16  Dated April 19th?

17      Q    Yes.

18      A    Yes.  Okay.

19          MS. PERRY:  Your Honor, I ask that

20  Complainant's Exhibit 34 be admitted into evidence.

21          JUDGE SCHNEIDER:  Any objections?

22          MS. MURPHY:  No, Your Honor.

mec                                                             169

1           JUDGE SCHNEIDER:  So Complainant's

2    Exhibit's 34, which is a series of e-mails from

3    McGrath, Matthew, sent Friday, April 19, 2002, at

4    9:34 a.m., is admitted into evidence.

5                        [Complainant's Exhibit No. 34

6                        was received into evidence.]

7           MS. PERRY:  Thank you, Your Honor.

8           BY MS. PERRY:

9       Q   Mr. McGrath, did you ever purposely -- did

10   you ever fail to return a telephone call from a

11   staff member?

12      A   I may have in a busy period, but it's not

13   a habit of mine.

14      Q   Did you ever fail, purposely fail to

15   respond to an e-mail from a staff member requesting

16   information?

17      A   Are we still looking at --

18      Q   I'm not asking you any questions on it.

19      A   Oh.  Okay.

20      Q   Did you ever fail to respond to an e-mail

21   from a staff member asking questions or asking for

22   information?

mec                                                             170

1       A   I may have if I was -- I may have put it

2    off, delayed it, while I was doing something else

3    with a higher priority, but no.

4       Q   Did you also interact with people outside

5    of the Cultural Affairs office in connection with

6    the grant programs?

7       A   I interacted with a lot of people.

8    Myers-Briggs called my type the initiators.  So I

9    talked -- Phelonious Monk Institute called me

10   because they had been stymied by the department to

11   do a concert and asked if I could help, which I

12   did.  So I met semi-regularly or talked

13   semi-regularly with the head of the Phelonious Monk

14   Institute.

15          I met with the Midwest Arts Council

16   Consortium once and then with the heads of the six

17   arts consortium -- again, part of the whole idea of

18   granting and changing the programs and stuff.

19          The NEA -- Penny Heed I think is the woman

20   at NEA.  I would meet with her for drinks down

21   on -- midway between the two offices.

22          The Kennedy Center people and I had lunch

mec                                                             171

1    and talked and I would go over there.

2           I mean, I wasn't there that long with the

3    leave in between.

4       Q   Did that interaction with individuals

5    outside of the office change as the events at issue

6    in your complaint unfolded?

7       A   Well, word was getting around

8    that -- especially with the arts, and even later

9    with Arts International, that I was -- that there

10   were these disagreements.  But I was -- they didn't

11   do anything specifically to me, I wouldn't say, at

12   least nothing I can think of right now.  We

13   remained friends until I left -- contacts -- put it

14   that way, until I left.  I wasn't able to conclude

15   some of the ideas I had.

16          I went to one of the Creative Associates

17   or one of the groups that Programs is a potential

18   grantee as well.  But anyway.

19      Q   Did you respond to a request to contact an

20   individual at the Korean Embassy by Mr. Wunder?

21      A   I remember something about that, yes.  The

22   timing of it I don't remember.  It's toward the

mec                                                             172

1    end, I believe, of my stay.

2       Q   So did you fail to respond to that request

3    because of the timing of the request?

4       A   Well, I was fighting for my job and I was

5    preparing an EEO complaint and I may not have

6    responded.

7       Q   Did you receive a yearly evaluation while

8    you were the chief of the Cultural Affairs office?

9       A   I received -- well, it's not the beginning

10   of the evaluation year, but September is the mid

11   point and it ends April 15th, so I received one

12   from early September through April 15th of 2002.

13      Q   In fact, you actually received two

14   evaluations from Mr. Wunder; is that correct?

15      A   That's right, I received two.

16      Q   When did you receive the first evaluation

17   from Mr. Wunder?

18      A   My recollection was the first one I

19   received in an envelope April 11th but did not open

20   it April 11th.

21      Q   If you look at --

22      A   A sealed envelope, I should say.

mec                                            173

1      Q    -- Complainant's Exhibit Number 1, the

2   first seven pages of this document.

3      A    I'm sorry.  One?

4      Q    Complainant's Exhibit Number 1.

5      A    Okay.  Yes.  Got it.

6      Q    The first seven pages after the little

7   cover page, which says, "Matt, I tried to talk to

8   you, talk this over today."

9      A    Uh-huh.

10     Q    Is this --

11     A    There is no date on that.

12     Q    Is this the performance evaluation you

13  received on April 11th, 2002?

14     A    This is the April 11th one, yes, that I

15  received in the sealed envelope.

16     Q    On the first page, I note, in the Reviewer

17  box, it says, "none appropriate."

18     A    That's right.

19     Q    Do you know why it says, "none

20  appropriate"?

21     A    Because when I finally talked to Sam about

22  it, and I believe it was April 18th, I kept it in

mec                                            174

1   the sealed envelope until I could get an

2   appointment with Steve Hart to discuss what I knew

3   to be in it, but I didn't open it.

4           April 15, I met with Steve Hart with the

5   sealed envelope, I put it in front of him, said it

6   was going to be bad, and at that point I told Steve

7   Hart what had been happening.

8      Q    But why does it say "non-appropriate" in

9   the Reviewer box?

10     A    Because on the 11th, when I -- when I

11  opened it after I talked to Steve, Sam -- let me

12  see.  Oh.  On the 18th -- I'm sorry.

13          On the 15th I met with Steve and told him

14  of my concerns, EEO concerns, et cetera.  On the

15  18th, Sam and I met.  So I received this on the

16  11th.  On the 15th, I went to my reviewing officer,

17  and on the 18th, I met one on one with Sam.  By

18  then I had -- between Steve and Sam I had opened

19  the envelope and read this.

20          Sam and I were -- Sam told me that the

21  reason it said "non-appropriate" is because none

22  were appropriate.  Brian had left months before, he

mec                                            175

1   was gone, he had only been a short time my

2   reviewer, and did I not think that that was proper,

3   and I agreed that it was.

4      Q    So did Mr. Wunder indicate to you at that

5   meeting on the 18th that he intended the document

6   at Complainant's Exhibit 1 to be your final EER for

7   the year for 2002?

8      A    It was clear from our meeting on the 18th.

9   I mean, once I read this the 16th or whatever, it

10  was clear.  But on the 18th, it was a very

11  contentious meeting.  I reminded him again of my

12  EEO concerns.  We went round and round the mulberry

13  bush, as it were, disagreeing about stuff, and, you

14  know, he didn't offer any changes, and I told him

15  how unfair I thought it was, and then the meeting

16  ended on an unfortunate note.

17     A    Okay.

18          MS. PERRY:  Your Honor, I ask that

19  Complainant's Exhibit Number 1, the first seven

20  pages, the actual EER plus the cover page by Mr.

21  Wunder, be admitted into evidence.

22          JUDGE SCHNEIDER:  The first seven pages.

mec                                            176

1           MS. PERRY:  In other words, the

2   performance appraisal plus the cover page from Mr.

3   Wunder.

4           JUDGE SCHNEIDER:  But not the memo, the

5   March 8th memo?

6           MS. PERRY:  But not the March 8th memo.

7   That's just in there because it is in the ROI and I

8   couldn't remember where it was.

9           JUDGE SCHNEIDER:  Okay.  So taking that

10  out.

11          MS. PERRY:  Yes.

12          JUDGE SCHNEIDER:  Any objections?

13          MS. MURPHY:  No, Your Honor.

14          JUDGE SCHNEIDER:  So Complainant's Exhibit

15  1 has a cover on State letterhead: "Matt, I called

16  to talk to -- Matt, I tried to call you to talk

17  this over today."  And that plus the evaluation

18  report for a period covered 9/8/2001 to April 15,

19  2002, and questions pertaining to this particular

20  paper, right under that is the line "reviewer

21  non-appropriate."  In case somebody goes looking

22  for it, they know where to look.

mec                                                                      201

1  the world is made up of these kinds of people and

2  there is nothing -- you know better than I there is

3  nothing you can do about it."

4      Q    And during these conversations with Mr.

5  Wunder regarding Ms. Montgomery, did Mr. Wunder

6  ever suggest that you purchase any type of

7  disability accommodation software, such as voice

8  recognition software, for Ms. Montgomery?

9      A    My recollection is he did it when he came

10  back from Moscow --

11      Q    This would have been in March or in April?

12      A    No, this would have been early April.

13  This would have been right around -- maybe right

14  before the 5th or something of April, the 10th of

15  April, because I think we discussed it on the 18th

16  and I think -- anyway, it was in that early April

17  time period, and it kind of surprised me because I

18  knew that the EEO thing was out there where it

19  shouldn't be.  I mean, I had really screwed up and

20  put it into Personnel, and I had no faith in

21  protecting my privacy at this point, and subsequent

22  conversations led me to believe -- to conclude that

mec                                                                      202

1  that was going on.  So I believe he was

2  preempting -- he now knew I was serious and it was

3  going to just now be between me and him, and he was

4  going to not give me any more reason to quarrel

5  with him.

6      Q    So did you think he was raising the issue

7  of voice recognition software to counter your

8  allegation that he was being discriminatory toward

9  Ms. Montgomery?

10      A    Yes.  Because it was after I gave him a

11  tongue lashing about the trips to -- the non-trips

12  to Philadelphia, which she paid out of her own

13  pocket, by the way.

14      Q    What happened after April 29th with

15  respect to your position as the chief of the

16  Cultural Affairs office?

17      A    Well, --

18          JUDGE SCHNEIDER:  Which year?

19          MS. PERRY:  April 29th, 2002.

20          THE WITNESS:  My recollection on that

21  date, two things happened, and I'm pretty sure of

22  this order, but I may be wrong.  I talked to Steve

mec                                                                      203

1  Hart earlier and I got the second EER with Brian

2  Sexton.  It's hard to compare them because it's

3  just so painful.

4          Anyway, so I got the second one and I

5  talked to Brian one last time, and he was more

6  distant.  I mean, he wasn't warm the first time; he

7  was more scared, if I can say.  The second time, he

8  was -- he showed very little emotion when I talked

9  to him.  And then I got the second EER.

10          BY MS. PERRY:

11      Q    Did you subsequently have a confrontation

12  with Mr. Wunder on May 16th?

13      A    Yes.

14      Q    And what did Mr. Wunder call you during

15  that confrontation on May 16th?  Did he call you a

16  zero?

17      A    Oh, no, I remember that.  He used the

18  Lord's name.  He said "goddamnit."  He was yelling.

19  You know, "Goddamnit, what's the matter with you?"

20  Loud.  Everybody could hear.  He called me a zero.

21  He was just -- he would storm out of my door and

22  walk back in the door.  He was really agitated.  I

mec                                                                      204

1  mean, I thought he was going to lose control.  He

2  was losing control.  I mean, I didn't feel -- I

3  felt intimidated, but I didn't feel -- I didn't

4  feel physically threatened by him, but he was -- he

5  was semi out of control.

6      Q    And why was Mr. Wunder upset with you on

7  May 16th?

8      A    Well, if you -- when I went to see Mr.

9  Bigart on the 25th, I had hired counsel.  I had

10  talked to Hattie Baldwin in Civil Rights.  They all

11  told me not to voluntarily curtail, which was my

12  instinct anyway, but Hattie, my counselor, said

13  that, my law firm gave me advice not to voluntarily

14  curtail, and I told him I wasn't going to do that,

15  which put them now in the situation where if they

16  really wanted to get rid of me, they had to

17  involuntarily curtail me, as they threatened.

18      Q    And did you receive a memo from Mr. Wunder

19  on May 20th, 2002, with some requests for some

20  information?

21      A    That followed a memo of mine on May 17th,

22  yes, and I think my memo precipitated his memo.

mec                                                                              205

1       Q    Did you respond to the memo of May 20th

2  from Mr. Wunder?

3       A    I didn't respond in writing.  I believe we

4  may have had a brief exchange.  He was finding

5  himself in my office more and more and saying stuff

6  to me, you know, "Have you called Jim Bigart yet?",

7  stuff like that in a forceful way.

8       Q    Okay.

9       A    But I didn't respond in writing.

10      Q    Looking at Complainant's Exhibit Number

11 37, do you recognize this document?

12      A    That is my involuntary curtailment.

13      Q    Did you receive this document on May 23rd,

14 2002?

15      A    Yes.  I dated it the same day.  You can

16 see I signed it at the bottom.

17           MS. PERRY:  Your Honor, we ask that

18 Complainant's Exhibit 37 be admitted into evidence.

19           MS. MURPHY:  No objection.

20           JUDGE SCHNEIDER:  Complainant's Exhibit

21 37, which is an action memorandum to Mr. McGrath

22 dated May 22nd, 2002, is admitted.

mec                                                                              206

1           [Complainant's Exhibit No. 37

2                was received into evidence.]

3  BY MS. PERRY:

4       Q    And the purpose of this memorandum, Mr.

5  McGrath, was this to inform you that Mr. Wunder and

6  Mr. Hart were seeking to have you involuntarily

7  curtail from your position as the chief?

8       A    Hattie Baldwin had talked to the DG's

9  office and she reported to me -- she has passed

10 now; she died sometime ago -- but she reported to

11 me that it would take a while because paperwork was

12 required.  Now, this goes back a few weeks.

13      Q    But was the purpose of this memo to tell

14 you that --

15      A    Yes.

16      Q    -- they were trying to involuntarily

17 curtail ment you?

18      A    Yes.  And this told me that the paperwork

19 had been completed.

20      Q    Okay.  Did you have any other

21 conversations with Mr. Wunder after May 23rd

22 regarding potential curtailment from your position?

mec                                                                              207

1       A    Well, I guess they gave me two weeks, and

2  I scheduled some leave and -- I was already

3  scheduled for leave.  So it was understood I was

4  supposed to give a written response, and because I

5  was leaving the next day, I guess, that I would do

6  it on my return.  After that, again, Sam was

7  popping in:  Did I call Jim Bigart?  You know, what

8  was what?

9           Even like on June 7th, I think it was,

10 when I came back, I was asked -- I think they were

11 still hoping I would voluntarily curtailment, that

12 I was going to have a change of heart, and I said

13 no, and he would wait for me to call Mr. Bigart and

14 wait for the response.  I have no idea -- I mean,

15 by that time I made it clear what I was going to do

16 and what I wasn't going to do.  I mean, I wasn't

17 negotiating.

18      Q    And what was your last day in Cultural

19 Affairs?

20      A    I think it was like the 8th or --

21      Q    Was it June 10th, 2002?

22      A    That could be.  That's about -- I would

mec                                                                              208

1  have to look at the calendar, but yes.

2       Q    And so were you involuntarily curtailed on

3  June 10th, 2002?

4       A    Oh, yes.  I had a stream of

5  visitors -- Sam, Deborah Hunsley -- they were all

6  making sure that I was packed and out of there.  I

7  was -- you know, I had the plague, I had to be

8  gone.  They were there on top of me all the time.

9       Q    Looking at Complainant's Exhibit Number

10 17.  Again, I apologize I didn't get these in

11 order.

12      A    Seventeen?

13      Q    Yes.  Do you recognize this document?

14      A    You know, I don't know if I ever saw this,

15 but I do know what it is and I do recognize it.

16      Q    Is this the Personnel action moving you

17 from Cultural Affairs into an unassigned position?

18      A    That's right.

19           MS. PERRY:  We ask that Complainant's

20 Exhibit 17 be admitted into evidence, Your Honor.

21           MS. MURPHY:  No objection.

22           THE WITNESS:  As I say, it probably is in

mec                                                                    229

1    comment on those they supervised and freeing them

2    from the response; however, that is the regulation,

3    and the review panel, I guess, took it out.

4    So -- I'm sorry, I lost my train of thought there.

5    What was the --

6        Q    Are you aware of whether or not the

7    Performance Standard Board was aware of your EEO

8    activity?

9        A    I can't -- I mean, the only thing is I

10   have to -- all I have to go on is how I know people

11   know stuff about you.  There are people that know

12   about my daughter and my wife.  There are people

13   that shouldn't know things.  It would be hard, with

14   all these meetings going on -- and I would also

15   have to look at who made up the Performance

16   Standard Board --  I didn't see the names -- and

17   that would be an indication because having been on

18   panels, I know people know stuff.  They share

19   things they shouldn't in the panels about

20   performances.  I mean, there are precepts that

21   prohibit that, but I saw violations of that all the

22   time on our promotion panel with favorites and

mec                                                                    230

1    being directed.  So knowing how it operates, you

2    would have to feel that with all this time elapsed,

3    it's got to percolate through the system.  I would

4    love to know the names of those people.

5        MS. PERRY:  Your Honor, all the rest of my

6    questions go to damages.  That's it on the

7    substantive issues.

8        JUDGE SCHNEIDER:  Okay.  Then why don't we

9    go ahead and break today.

10       MS. PERRY:  Okay.

11       JUDGE SCHNEIDER:  We will pick up

12   tomorrow, let's reassemble at 8:30 and be on the

13   record as soon as we can.

14       MS. PERRY:  And I promise damages will not

15   be a long discussion.  It's a very small section of

16   my outline.

17       JUDGE SCHNEIDER:  Okay.  Anything to

18   discuss before we go off the record?

19       MS. MURPHY:  No, Your Honor.

20       JUDGE SCHNEIDER:  We can talk after we go

21   off the record, but anything before we go off the

22   record?  Nothing?  Okay.

mec                                                                    231

1        Ms. Perry, anything else before we go off

2    the record?

3        MS. PERRY:  No, Your Honor.

4        JUDGE SCHNEIDER:  With that, that will

5    conclude the hearing for today.  We will now go off

6    the record.

7        [Whereupon, at 5:29 p.m., the hearing

8    recessed, to reconvene at 8:30 a.m., on Wednesday,

9    March 16, 2005.]

                                                                       232

## REPORTER CERTIFICATE

I, **JENNIFER M. O'CONNOR**, the official Court Reporter for

Miller Reporting Company, Inc., hereby certify that I recorded the

foregoing proceedings; that the proceedings have been reduced to

typewriting by me, or under my direction and that the foregoing

transcript is a correct and accurate record of the proceedings to the

best of my knowledge, ability and belief.



JENNIFER M. O'CONNOR

mec
JMO

233

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

```
- - - - - - - - - - - - x
                           :
MATTHEW McGRATH,           :
                           :
          Complainant,     : EEOC Case No.
                           : 100-2003-08249X
          v.               :
                           : Agency No.
UNITED STATES DEPARTMENT OF : 02-38
STATE,                     :
                           :
          Agency.          :
- - - - - - - - - - - - x
```

Wednesday, March 16, 2005

U.S. State Department
2201 C Street, N.W.
Washington, D.C.  20530

The above-entitled matter commenced,

pursuant to notice, at 8:48 a.m.

BEFORE:

HONORABLE RICHARD E. SCHNEIDER
Administrative Judge
Equal Employment Opportunity Commission
1801 L Street, N.W., Suite 100
Washington, D.C.  20507

---

mec

234

APPEARANCES:

On Behalf of the Complainant:

MICHELLE L. PERRY, ESQ.
Kalijarvi, Chuzi & Newman, P.C.
Suite 610
1901 L Street, N.W.
Washington, D.C.  20036
(202) 331-9260

On Behalf of the Agency:

KATHLEEN MURPHY, ESQ.
MELINDA CHANDLER, ESQ.
Department of State
2201 C Street, N.W.
Washington, D.C.  20530
(202) 647-4646

---

mec

235

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matthew McGrath | -- | 237 | 276/287 | 287 |
| Jennifer S. Baker | 291 | 305 | 317 | -- |
| Joanne Armor | 319 | 333 | 340 | 340 |
| Alfred Head | 342 | 349 | -- | -- |
| E. Montgomery | 351 | 356 | 359 | -- |
| Kathryn Wainscott | 361 | 379 | 401 | 406 |
| Deborah Chapman | 410 | 419 | -- | -- |
| LaFaye Proctor | 428 | 442 | -- | -- |
| Van Samuel Wunder | 445 | 514 | 546 | -- |
| Leanne Mella | 555 | 559 | -- | -- |
| Matthew McGrath | 569 | 603 | -- | -- |

E X H I B I T S

| COMPLAINANT'S | IDENTIFIED | RECEIVED |
|---|---|---|
| No. 39 | (Previously) | 550 |
| No. 20 | (Previously) | 589 |

| AGENCY'S | | |
|---|---|---|
| No. K | (Previously) | 303 |
| No. O | (Previously) | 333 |
| No. A | (Previously) | 452 |
| No. B | (Previously) | 456 |
| No. C | (Previously) | 461 |
| No. Q | (Previously) | 468 |
| No. I | (Previously) | 484 |
| No. R | (Previously) | 490 |
| No. L | (Previously) | 495 |
| No. M | (Previously) | 502 |
| No. N | (Previously) | 512 |
| No. J | (Previously) | 558 |

---

mec

236

1          P R O C E E D I N G S

2                                    [8:48 a.m.]

3          ADMIN. JUDGE SCHNEIDER:  We are back on

4   the record.  Today is March 16, 2005.  This is the

5   second day of the administrative EEOC hearing in

6   the discrimination complaint filed by Matthew

7   McGrath, the complainant, EEOC Number

8   100-2003-08249X, and Agency Number 02-38.

9          We are resuming this morning with the

10  complainant as witness, and I believe we are

11  picking up with agency's cross-examination; is that

12  correct?

13          MS. MURPHY:  Yes.

14          MS. PERRY:  Yes, Your Honor.

15          [Off the record.]

16          ADMIN. JUDGE SCHNEIDER:  Okay.  Let's go

17  back on.

18          Mr. McGrath, you were sworn in yesterday

19  and you are still under oath.

20          THE WITNESS:  Okay.

21          ADMIN. JUDGE SCHNEIDER:  Agency.

22  Whereupon,

mec                                                              237

1          MATTHEW JOSEPH McGRATH,

2    the complainant, was called for examination by

3    counsel on behalf of the complainant and, having

4    been previously duly sworn, was examined and

5    testified as follows:

6                    CROSS-EXAMINATION

7          BY MS. MURPHY:

8      Q   Mr. McGrath, is it true that your wife was

9    awarded custody of your daughter in July of 1997?

10         MS. PERRY:  Objection.  Relevance.

11         MS. MURPHY:  Your Honor --

12         ADMIN. JUDGE SCHNEIDER:  Overruled.  There

13   was lots of testimony yesterday about family

14   arrangements.

15         THE WITNESS:  Yes.

16         BY MS. MURPHY:

17     Q   Is it true that your wife is in the

18   Foreign Service?

19     A   Yes.

20     Q   Is it true that the District of Columbia

21   Superior Court order granting your wife custody

22   lists your own behavior and attitudes as one of the

mec                                                              238

1    reasons why it would not be appropriate for the

2    court to grant custody of your daughter to you?

3      A   I think there is specific language in

4    there.  That is a little bit broad, that I

5    remember.

6          MS. MURPHY:  Your Honor, we have the court

7    order.  May I show it to the witness?

8          ADMIN. JUDGE SCHNEIDER:  Yes.  Is this

9    like to refresh his memory?

10         MS. MURPHY:  Exactly.  And I would be

11   happy to read the sentence into the record.

12         ADMIN. JUDGE SCHNEIDER:  I'm sorry.  Would

13   you --

14         ADMIN. JUDGE SCHNEIDER:  Your Honor, the

15   sentence that I wanted to read into the record --

16   the court order states on page 2, "Mr. McGrath --

17         BY MS. MURPHY:

18     Q   Is it true, Mr. McGrath, that it states on

19   page 2, "Mr. McGrath appears not to recognize that

20   his own behavior and attitudes have created some

21   ambivalence in Kimberly with regard to visitation

22   with him.  In these circumstances, it would not be

mec                                                              239

1    appropriate for custody to be awarded to Mr.

2    McGrath."

3      A   That's what it says, yes.

4      Q   Yes.

5          Is it true that in August of 1997 and

6    again in January of 1998, you wrote to Senator Mack

7    to complain that your daughter traveled with your

8    wife when your wife was posted overseas?

9      A   I wrote Senator Mack, yes, and there was

10   -- I don't remember all the contents right now,

11   that was some time ago, but I did write Senator

12   Mack, yes.

13     Q   And you wrote to him two times.

14     A   Twice, yes.

15     Q   Twice.  Is it true that in August 2001,

16   you filed a grievance against the department for

17   listing your daughter as a dependent on your former

18   wife's travel orders?

19     A   Yes.  August 2001?

20     Q   Yes.

21     A   Yes.

22     Q   Is it true that your August 2001 grievance

mec                                                              240

1    was denied as not being meritorious?

2      A   I understand that's correct as well.

3      Q   Is it true that you met with Dr. Harlen

4    Wadley, a department psychiatrist, at least twice

5    during your posting in South Africa?

6      A   At his request, yes.

7      Q   Is it true that a January 23rd, 2001, note

8    prepared by Dr. Wadley of an interview with you

9    states that, "Aspects of this struggle, including

10   its protracted nature and Matt's singular

11   obsessive/rage suggests to me his perspective and

12   ability to resolve issues may be distorted and

13   impaired due to narcissistic injury, and the

14   exploration of backing away from his aggressive and

15   adversarial stance, perhaps even pulling back from

16   visitation demands, finds this suggestion for Matt

17   unacceptable.

18         "I am concerned continuing to press will

19   only keep all embroiled and perhaps alienate him

20   from his daughter even further.  We struggled over

21   this as I countered his rationalizations to justify

22   his litigious behavior.  He seems to be fighting

mec                                                          265

1         If you had a disagreement with what the

2    reviewer or the rater said -- we're talking about

3    the descriptions on page 4 -- wasn't that your

4    opportunity to say then what you are wanting to

5    say now?

6         THE WITNESS: Let me just see the dates

7    here. If I remember correctly -- oh, yes, it was

8    June 2000. As I testified yesterday, there was a

9    family visitation argument going on at this time,

10   and I didn't feel capable at this time to write

11   anything, and I intended to write something when

12   things were resolved.

13        By that time, it seemed like a better

14   course of action for me to wait to write, as I said

15   yesterday, an end-of-tour report, which is in this

16   block, for the next in the sequence of ratings. So

17   by the time that thing was settled, I decided I

18   would wait and write something at length describing

19   the tour. So that's my statement.

20        BY MS. MURPHY:

21        Q    And turning to Exhibit 29, Complainant's

22   Exhibit 29, which was entered into evidence

---

mec                                                          266

1    yesterday. We had page 5.

2         A    Yes.

3         Q    And is it true that the fourth paragraph

4    states that you need to be more consistent in the

5    timely submission of program evaluations. Several

6    international visitor program evaluations are long

7    overdue.

8         A    I was tardy on some, and some there was a

9    dispute whether they were required.

10        Q    Thank you.

11        A    And some I did on time.

12        Q    Is it true that you reported to the

13   Cultural Division in September 2001 directly upon

14   your return from South Africa?

15        A    Yes, I reported directly.

16        Q    Is it true that Mr. Wunder permitted you

17   to take annual leave and home leave in the

18   timeframe of December 2001 and January and February

19   of 2002?

20        A    He permitted me to take some annual leave

21   with some documented to be reinstated because it

22   was forfeiture.

---

mec                                                          267

1         Q    But you were permitted to take --

2         A    Some.

3         Q    -- annual leave and home leave in that

4    timeframe.

5         A    Some. I had use it or lose it, and he

6    permitted me to take some of that.

7         Q    Is it true that Mr. Wunder invited you to

8    voluntarily curtail from your Cultural Division

9    assignment?

10        A    As I understood it from Mr. Bigart.

11        Q    Is it true that the department agreed to

12   reduce the proposed two-day suspension for

13   nonpayment of your government credit card to a

14   letter of admonishment?

15        A    Correct.

16        Q    Is it true that you used the card that

17   January in New York?

18        A    Yes.

19        Q    And is it true that you knew, then, that

20   charges existed on the credit card?

21        A    I was aware of the -- I was aware of the

22   charges, but in May. I mean, I was aware of the

---

mec                                                          268

1    bill.

2         Q    When you charged -- when you used the

3    charge card, you understood you were incurring a

4    bill.

5         A    Yes, because I had done it the previous

6    couple of months.

7         Q    Is it true that your litigation against

8    your wife with regard to your daughter continued

9    after your 1998 divorce?

10        A    We continued in custody litigation.

11        Q    Is it true that you brought suit against

12   your wife in the Fairfax County Juvenile and

13   Domestic Relations District Court contending that

14   your wife had engaged in parental alienation and

15   child abuse?

16        A    Could you repeat that? I mean, it sounds

17   sort of right, but I didn't quite --

18        Q    Is it true that you brought suit against

19   your wife in the Fairfax County Juvenile and

20   Domestic Relations District Court contending that

21   your wife had engaged in parental alienation and

22   child abuse?

mec                                                                 269

1    A    Yes.  In May of -- May through October of

2  2003, was it?  It happened; I'm just trying to

3  figure out when it happened.  Yes, it was -- it was

4  2003, 2004.  2003, 2004, yes.  It was done over the

5  summer.

6    Q    So the child abuse that you contested --

7  you assert happened in the summer of 2003?  Is that

8  what you're saying?

9    A    No.  I contended that the child abuse

10  began in the fall of 1989 and was the cause of our

11  split.

12    Q    Is it true that in the same suit, you --

13    ADMIN. JUDGE SCHNEIDER:  Excuse me.  What

14  year?

15    THE WITNESS:  Eighty-nine.

16    BY MS. MURPHY:

17    Q    Is it true that in the same suit, you

18  contend that your wife, an alleged member of a drug

19  cartel family, endangered your daughter by taking

20  her on her Foreign Service assignment to Cairo, but

21    A    I don't remember quite those words, but

22  the gist of that is correct.

---

mec                                                                 270

1    Q    Is it true that the court's October --

2    A    I'm sorry.  Where is that quote from?  I'm

3  sorry.

4    Q    It's from the judge's order.

5    A    Oh, okay.

6    Q    Is it true that the court's October 2nd,

7  2003, order in your suit against your wife

8  describes your evidence as failing utterly on all

9  points?

10    A    Yes.  I didn't -- I didn't retain some of

11  that, but that sounds about right.

12    Q    Is it true that the court's October 2nd,

13  2003, order states that, quote, "The evidence also

14  strongly indicates that he lacks insight as to the

15  true cause of the damaged relationship he shares

16  with his daughter.  He is, in fact, pushing a

17  well-adjusted child away from him," unquote.

18    A    Did the judge write that, you said?

19    Q    He wrote that.

20    A    It sounds right, but I just want to know

21  what you are reading from.

22    Q    Okay.  Do you agree that that's what this

---

mec                                                                 271

1  document says?  I will be happy to point it out to

2  you if you are not seeing it.

3    MS. MURPHY:  Your Honor, I'm reading from

4  the document -- Mr. McGrath, right there.

5    THE WITNESS:  In the middle of that

6  paragraph?

7    MS. MURPHY:  Right.

8    "He is, in fact, pushing a well-adjusted

9  child away from him."

10    THE WITNESS:  That's what it says.

11    MS. MURPHY:  Okay.  Thank you.

12    BY MS. MURPHY:

13    Q    Is it true that the court's October 2nd,

14  2003, order in your suit against your wife twice

15  describes your behavior over the years as, quote,

16  "outrageous"?

17    A    I don't remember that.

18    Q    Okay, Mr. McGrath.  Right here.  I will

19  read you this --

20    A    Oh, it's just above there?

21    Q    No, it's right where I pointed my finger.

22    A    Yes.

---

mec                                                                 272

1    Q    Okay.  And does it also --

2    A    Are these in my personnel file?

3    Q    "Outrageous," right there, the second

4  mention of the word "outrageous" at the top of the

5  handwritten notation.

6    A    Uh-huh.

7    Q    It contains the word "outrageous"

8  describing your behavior?

9    A    He uses the word "outrageous," yes.

10    Q    Yes, he does?

11    A    Uh-huh.

12    Q    I'm sorry, you have to say yes.

13    A    Yes.  Well, I got this here.

14    Q    Okay.  But "uh-huh" isn't --

15    A    Oh.

16    Q    Okay.  Is it true that the court's order

17  in your suit against your wife found your case to

18  be without substantial evidence?

19    A    That's what he said.

20    Q    Is it true that the court's order in your

21  suit against your wife ordered you to pay your

22  wife's $23,890 in attorney's fees within 90 days.

mec                                                                        273

1      A    Correct.

2      Q    Is it true that despite your involuntary

3  curtailment, you continued to be employed by the

4  Department of State and continued to receive your

5  pay as a Foreign Service Officer 1?

6      A    From the date of the involuntary --

7      Q    When you were involuntarily curtailed, --

8      A    Yes.

9      Q    -- despite the curtailment, you remained

10  employed and you continued to receive your FSO1

11  pay.

12     A    That's right.

13     Q    Is it true that you were paid as an FSO1

14  for the entire time you were unassigned?

15     A    Yes.

16     Q    Is it --

17         ADMIN. JUDGE SCHNEIDER:  Excuse me.  Is

18  that the regular rate of pay?

19         THE WITNESS:  The grade is --

20         MS. MURPHY:  Your Honor, Foreign Service

21  officers carry their rank in person, and they as a

22  result are paid the same regardless of where they

mec                                                                        274

1  are assigned.

2         ADMIN. JUDGE SCHNEIDER:  Okay.  My

3  question was, when you asked for confirmation of

4  that pay, what you are asking is that throughout

5  all these phases of his employment and assignments,

6  his pay never changed, never went down.

7         MS. MURPHY:  That's exactly right, Your

8  Honor.

9         ADMIN. JUDGE SCHNEIDER:  Okay.  That's

10  what I'm trying to understand.

11         MS. MURPHY:  So that yesterday when he

12  stated that his curtailment was the equivalent of a

13  firing, he continued to be employed and to receive

14  his paycheck.

15         BY MS. MURPHY:

16     Q    Is it true you were paid as an FSO1 for

17  the entire time you were in a down-stretch

18  assignment?

19     A    Yes.

20     Q    Is it true that you were paid as an FSO1

21  for the entire time when you were involuntarily

22  curtailed in June of 2002 until November 30th,

mec                                                                        275

1  2004?

2      A    The first date?  I'm sorry, I missed the

3  first date you said.

4      Q    Is it true you were paid as an FSO1 for

5  the entire time from when you were involuntarily

6  curtailed in June of 2002 until November 30th,

7  2004?

8      A    That's what I was going to clarify

9  earlier, but yes.

10     Q    Is it true that you appealed your

11  separation from federal service to the Foreign

12  Service Grievance Board?

13     A    Yes.

14     Q    Is it true that your appeal contests the

15  FSB's reliance upon your 2001-2002 EER?

16     A    Yes.

17         MS. MURPHY:  I have no further questions,

18  Your Honor.

19         Thank you, Mr. McGrath.

20         ADMIN. JUDGE SCHNEIDER:  Any redirect?

21         THE WITNESS:  Can we have a moment to

22  talk, sir?

mec                                                                        276

1         ADMIN. JUDGE SCHNEIDER:  No.  It doesn't

2  work that way.

3         THE WITNESS:  Okay.

4         REDIRECT EXAMINATION

5         BY MS. PERRY:

6      Q    Mr. McGrath, looking at Agency Exhibit 8

7  -- do you still have that in front of you?

8      A    No.  I gave it back.

9         MS. PERRY:  Can you give him back a copy?

10         THE WITNESS:  Okay.

11         ADMIN. JUDGE SCHNEIDER:  I need to get it.

12         BY MS. PERRY:

13     Q    Do you have that in front of you now?

14     A    Yes.

15         MS. PERRY:  Your Honor, just let me know

16  when you have it.

17         [Pause.]

18         THE WITNESS:  Are we waiting for the

19  judge?

20         ADMIN. JUDGE SCHNEIDER:  I'm sorry.  I

21  have it.

22         MS. PERRY:  I'm sorry.

mec                                                                    569

1   Whereupon,

2                    MATTHEW McGRATH;

3   the complainant, was called for examination by

4   counsel on behalf of the complainant and, having

5   been previously duly sworn, was further examined

6   and testified as follows:

7                    DIRECT EXAMINATION

8        BY MS. PERRY:  .

9        Q   Mr. McGrath, did you ask Ms. Wainscott to

10  prepare a global cable regarding Arts

11  International?

12       A   When she submitted to me the five or six

13  regional cables, I said -- verbally I told her to

14  roll them into one, which I don't think is much

15  work, and I would clear it then -- in other words,

16  I think I might have said before you give your

17  input or what it requires to clear the cable, and

18  then you go do it.

19       Q   And how long did it take you to respond to

20  Ms. Wainscott's proposal for a regional cable by

21  indicating to her that you wanted a global cable?

22       A   I must have told her within two or three

---

mec                                                                    570

1   days.  It's not a -- it doesn't have immediate

2   precedence, I don't think.  I looked at it before.

3   It shouldn't have.  It would be an abuse.  But

4   "immediate precedence" means it has to go out right

5   away.

6        Q   So does that mean the cable -- approval of

7   the cable was not considered time sensitive?

8        A   Unless -- there's several categories.

9   Something that's really -- well, there's an

10  absolute, but immediate is the most time sensitive

11  without going crazy.  We have a category that we

12  will wake people up.

13       Q   And had you previously refused to approve

14  cables for Ms. Wainscott?

15       A   No, I don't remember any other before

16  that.

17       Q   Was it unusual to take several days to get

18  back to an employee about a cable?

19       A   Not if it wasn't immediate or a greater

20  one.  And "refusal" is a strong term.  It means it

21  needs touching up before I will agree to clear it;

22  it's not a refusal.

---

mec                                                                    571

1        Q   Did you ever brainstorm with staff

2   regarding aspects of their programs?

3        A   Brainstorm, troubleshooting, whatever you

4   want to call it -- on a more ad hoc need basis

5   because of certain time restrictions and because of

6   the post-9/11 environment.

7        Q   Did you do those ad hoc brainstorming or

8   troubleshooting sessions throughout your time as

9   the chief of the Cultural Affairs program?

10       A   I've done that forever.  I'm like one of

11  my former ambassadors where you could often find an

12  ambassador with his feet up on a chair in the most

13  junior officer's office because he wanted to get

14  into something, and that was -- early on, that

15  reinforced my similar style.

16       Q   Did you provide staff with information

17  from other divisions?

18       A   Oh, I gave them the information that was

19  related to ours.  If I was at a senior staff

20  meeting and there were all kinds of information

21  about things that didn't affect us, I didn't often

22  share that, although sometimes I did.  But if it

---

mec                                                                    572

1   was an administrative thing that affected us, if it

2   was a program, when I reported the feedback I got

3   back from my report, then I would do that.

4        Q   Did Mr. Wunder ever raise with you the

5   idea of purchasing voice recognition software for

6   Ms. Montgomery prior to April of 2002?

7        A   I don't recall it before April.  April was

8   a contentious month.  I heard him say January, but

9   we didn't -- we didn't get into the specifics about

10  E.J. or really anyone to the extent that he was

11  relating.

12       Q   Did you, in fact, complain about Ms.

13  Montgomery's performance in a meeting with Mr.

14  Wunder in January of 2002?

15       A   The discussion was like any discussion --

16  I mean, first of all, it happened right on return,

17  and he raised the staff, and my recollection is I

18  singled out no one.  I talked about the strengths

19  and weaknesses of everybody, and I think it started

20  with, you know, this is tiresome, to have them

21  running to him all the time and having to react to

22  everything that they said and having him take