# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -

MATTHEW JOSEPH MCGRATH,

    Plaintiff,         Civil Action No:
                             05 2011 (RBW)
  v.

CONDOLEEZZA RICE,
    Secretary of State,

    Defendant.

- - - - - - - - - - - - - - - -

                  Wednesday, July 16, 2008

                  Washington, D.C.

Deposition of:

        VAN SAMUEL WUNDER, III

was called for examination by counsel for the Plaintiff, taken at the Law Offices of Kalijarvi, Chuzi & Newman, 1901 L Street, N.W., Suite 610, Washington, D.C., beginning at 1:00 p.m., before Judith R. Gagliardi, Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 2

```
 1           APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4  GEORGE M. CHUZI, ESQ.
 5  Kalijarvi, Chuzi & Newman
 6  1901 L Street, N.W.
 7  Suite 610
 8  Washington, D.C. 20036
 9  202-331-9260
10
11  ON BEHALF OF THE DEFENDANT:
12  BRIAN HUDAK, ESQ.
13  Assistant U.S. Attorney, D.C.
14  555 Fourth Street, N.W.
15  Washington, D.C. 20530
```

Page 3

```
 1  STEPHEN TOWNLEY, ESQ.
 2  Attorney Adviser
 3  Office of the Legal Advisor
 4  Department of State
 5  2201 E Street, N.W.
 6  Washington, D.C. 20520
 7  202-647-5901
 8  townleysg@state.gov
 9
10
11  Also present:
12  Matthew Joseph McGrath, Plaintiff
13  Marlo Leach, Intern
14  Jessica Karbowski, Intern
```

Page 4

```
 1            CONTENTS
 2  Witness:                         Page:
 3  VAN SAMUEL WUNDER, III
 4    Examination by Mr. Chuzi          5
 5    Examination by Mr. Hudak         ---
 
10            EXHIBITS
11  Marked for Identification:        Page
12  PLAINTIFF'S EXHIBIT:
13    No. 1                            84
```

Page 5

```
 1           PROCEEDINGS
 2            - - - -
 3
 4  Thereupon,
 5       VAN SAMUEL WUNDER, III
 6  was called for examination by counsel for the
 7  Plaintiff and, after being sworn by the Notary,
 8  was examined and testified as follows:
 9              ******
10           EXAMINATION
11       BY MR. CHUZI:
12       Q.  Mr. Wunder, can you just state your
13  full name for the record?
14       A.  My full name is Van Samuel Wunder,
15  V A N, Samuel, W U N D E R, III.
16       Q.  Before I begin, Mr. Hudak and I have
17  reached an agreement that your counsel will
18  reserve all objections except as to the form of
19  the question until such time as we wish to use any
20  of the answers as part of the record.
21       MR. HUDAK:  That's correct.  All
22  objections except as to form are preserved.  I
```

Page 10

1  know it in any great detail but I am just trying
2  to get a flow.
3      A.  I graduated from Miami University in
4  Ohio in 1967 with a degree in Latin American
5  Studies. I immediately got my draft notice, so
6  I then enlisted in the Army and was in the Army
7  for three years -- two years and nine months. And
8  then I got a slightly early release to come to
9  Thunderbird Graduate School to finish a Master's
10 there at Thunderbird.
11         I had taken the Foreign Service exam
12 in 1967. I had an appointment pending that was
13 kept on hold while I was in the Army, and when I
14 got out of graduate school that offer was extended
15 from the U.S. Information Agency and I took that
16 and joined the Foreign Service.
17     Q.  So you started with USIA --
18     A.  USIA, right.
19     Q.  In the Foreign Service?
20     A.  Yes.
21     Q.  What year was that?
22     A.  I believe 1971 is when I started.

Page 11

1      Q.  How long did you remain at USIA?
2      A.  Until the agency was merged with the
3  State Department in 1999.
4      Q.  After the merger, what kind of jobs
5  did you hold?
6      A.  During the merger I was in language
7  training for Russian studies. That job was then
8  cancelled so I came back to ECA, the Bureau of
9  Educational and Cultural Affairs, in 2000 and
10 became the Office Director for the Office of
11 Citizen Exchanges in the summer of 2000 until the
12 summer of 2003.
13     Q.  Now, prior to 2000 I think you said
14 you came back to ECA; is that right?
15     A.  I served overseas until 1997; served
16 in ECA as the Director of the Office of Policy
17 from '97 to '99; then was a year in the Foreign
18 Service Institute studying Russian; then I came
19 back to ECA in 2000.
20     Q.  ECA is?
21     A.  The Bureau of Educational and Cultural
22 Affairs of the Department of State.

Page 12

1      Q.  That bureau reports directly to whom?
2      A.  It reports to an Assistant Secretary.
3      Q.  For?
4      A.  For Educational and Cultural Affairs.
5      Q.  Okay. Are there other bureaus that
6  report to that Assistant Secretary?
7      A.  No.
8      Q.  So the Assistant Secretary is really
9  responsible for that particular bureau?
10     A.  Yes.
11     Q.  And nothing else?
12     A.  During the years I was there the
13 Assistant Secretary was also the Acting Under
14 Secretary for a certain period, I think around
15 2002, 2003, because the Under Secretary for Public
16 Affairs, Public Diplomacy was vacant and so the
17 Assistant Secretary held that job as well.
18     Q.  Now, I think you told me that between
19 2000 and 2003 you were the Director of ECA?
20     A.  No. The Office of Citizen Exchanges.
21 That's one of the offices within the bureau.
22     Q.  Okay. The Office of Citizen

Page 13

1  Exchanges. And to whom did you report? I don't
2  mean the individual but to what office did you
3  report?
4      A.  I reported to a Deputy Assistant
5  Secretary. There are two Deputy Assistant
6  Secretaries in the bureau -- there were. One for
7  Academic Exchanges, one for Professional and
8  Cultural Exchanges, and I reported to the Deputy
9  Assistant Secretary for Professional and Cultural
10 Exchanges.
11     Q.  Did that Deputy Assistant Secretary
12 have any responsibilities beyond your particular
13 office?
14     A.  Yes, that Deputy Assistant Secretary
15 was in charge of the Office of Citizen Exchanges
16 and the Office of International Visitors.
17     Q.  I see. So you were the Office
18 Director?
19     A.  Yes.
20     Q.  There was another Office Director who
21 reported to the same Deputy Assistant Secretary?
22     A.  That's correct.

Page 14

1  Q. And then was there a third Office
2  Director who reported to the other Deputy
3  Assistant Secretary?
4  A. Yes, there were several. Under the
5  Deputy Assistant Secretary for Academic Exchanges
6  there were several offices that reported to that
7  person.
8  Q. Now, when you arrived in ECA in 2000
9  as the Director of that office, who was the
10 individual who you reported to?
11 A. Brian Sexton, who was the Deputy
12 Assistant Secretary.
13 Q. And he was already there when you
14 got there?
15 A. Yes. He had been the Deputy
16 Assistant Secretary for that, I think, during
17 the transition. He had been working with USIA
18 previously and then he was the Deputy Assistant
19 Secretary when that job was created.
20     All of these jobs were created when
21 the bureau was brought into the State Department.
22 Q. I see. I understand that there came a

Page 15

1  point in time when Mr. Sexton left his position;
2  is that right?
3  A. Yes.
4  Q. Who replaced him?
5  A. He was replaced by Steve Hart, Steven
6  Hart.
7  Q. H A R T?
8  A. Yes.
9  Q. What date was that, do you remember?
10 A. I believe, to the best of my
11 recollection, it was around February, mid to
12 late February 2002.
13 Q. 2002?
14 A. Yes.
15 Q. Do you remember when Mr. Sexton left?
16 A. He left in -- well, he left that job
17 around, the best I can recall, around mid-February
18 and was moved into the job of Acting Deputy
19 Assistant Secretary for Academic Exchanges in the
20 same bureau.
21 Q. So, as I understand you, and tell me
22 if I'm wrong, Mr. Sexton left the position as your

Page 16

1  supervisor, I guess --
2  A. Yes.
3  Q. -- in approximately February of 2002?
4  A. The best -- when Mr. Hart was coming
5  in to take his job, there was an overlap period
6  and since Mr. Sexton was staying in the bureau
7  they were physically close together, the offices
8  were close, and there was a period of transition,
9  and I think that started in February. I'm not
10 sure what date officially the bureau would list as
11 Mr. Sexton actually leaving the job and Mr. Hart
12 taking the job, but it was around that period of
13 February, early March 2002.
14 Q. Is it fair to characterize that
15 transition as fairly seamless? I mean, Mr. Sexton
16 was there and then there was an overlap and then
17 Mr. Hart arrived and then Mr. Sexton just gave up
18 the duties altogether; is that the way you
19 remember it?
20 A. Yes, except that Mr. Sexton kept --
21 he had been assigned certain projects by the
22 Assistant Secretary and so he kept an oversight

Page 17

1  of certain projects during the transition. And
2  this was in the post-9/11 period when we had
3  certain special projects that were moving ahead.
4  Q. Now, you indicated that you held your
5  Office Director position until 2003?
6  A. The summer of 2003, right.
7  Q. And then what were you assigned to at
8  that point?
9  A. I was assigned to a job as a Senior
10 Advisor to the Bureau of Educational and Cultural
11 Affairs. I handled special projects for the
12 Principal Deputy Assistant Secretary and during my
13 last year, which was 2004-2005 -- these are all
14 from the summer, August to August, when we do
15 rotations -- I was also the Acting Office Director
16 for one of the offices under the Deputy Assistant
17 Secretary for Academic Exchanges.
18 Q. In your capacity as a Special Advisor,
19 did you supervise anybody?
20 A. Not directly. In my last year,
21 2004-2005, I did supervise an office, the Office
22 of Global Academic Programs. I also ran a

Page 18

1  bureau-wide project, which was studying the IT,
2  the information technology set-up of the bureau
3  and I had to run a team that included people from
4  throughout the bureau, but I directly supervised
5  during that last year one office.
6      Q.   Now, when you say that last year --
7      A.   2004-2005.
8      Q.   Okay. What happened in 2005?
9      A.   I was then transferred overseas to
10 Peru, Lima, Peru, as counselor for Public Affairs.
11     Q.   How long did you hold that position?
12     A.   Until just July 4th of this year, of
13 2008. I just came back.
14     Q.   What is your position now?
15     A.   Right now I'm assigned to the Bureau
16 of -- it's called International Information
17 Programs, IIP, as the head of an office, the
18 Office of U.S. Society and Values. It's one
19 of the offices in that section of the State
20 Department.
21     Q.   Is that going to be an office head
22 position similar to the position that you held in

Page 19

1  the ECA?
2      A.   It's a smaller office. As I
3  understand, it's about eight program officers and
4  one or two support staff.
5          I expect to be there just one more
6  year. I will retire next year.
7      Q.   Okay. Now, you know Mr. McGrath; is
8  that correct?
9      A.   Yes.
10     Q.   I am going to refer to him, I think
11 because it's easier for me, I am going to refer to
12 him as the Plaintiff, but when I use the word
13 Plaintiff, I'm talking about Mr. McGrath.
14     A.   Yes.
15     Q.   If you forget that, just let me know
16 and I'll remind you.
17         Did you know the Plaintiff prior to
18 supervising him?
19     A.   No.
20     Q.   Can you explain, based on your
21 understanding, of how you came to supervise the
22 Plaintiff?

Page 20

1      A.   The position of Chief of the Division
2  of Cultural Programs, which was one of the
3  divisions within the Office of Citizen Exchanges,
4  was supervised by a Foreign Service Officer. The
5  Foreign Service system within the State Department
6  rotates assignments and this position was
7  advertised because the incumbent was departing
8  for language training for a hard-to-fill position
9  overseas, in Vietnam. And so the position was
10 vacant. And Mr. McGrath was one of the bidders
11 who bid on the position and we selected him as the
12 candidate to take the position.
13     Q.   When you say we, who are you referring
14 to?
15     A.   Well, I made the recommendation based
16 on looking at the bidders and the information
17 about the bidders and cleared that with the Deputy
18 Assistant Secretary, and with the Principal Deputy
19 Assistant Secretary.
20     Q.   The information that you had regarding
21 each of the bidders for the vacant Division Chief
22 for Cultural Programs -- is that --

Page 21

1      A.   Yes.
2      Q.   What kind of information was that?
3      A.   I don't remember exactly. I don't
4  remember whether I talked to the Plaintiff by
5  phone beforehand. That's sometimes the practice
6  to do.
7          It was based generally on the
8  information provided by the Plaintiff's career
9  counselor who was familiar with the bidder's
10 background and makes the case for a bidder taking
11 a job.
12     Q.   The record that I've seen includes
13 several of the Plaintiff's previous performance
14 evaluations.
15     A.   A supervisor doesn't see performance
16 evaluations.
17     Q.   Even a Selecting Official?
18     A.   No. You don't see those.
19     Q.   Have you ever seen them?
20     A.   I've seen them. I worked in USIA in
21 the Office of Personnel and in Foreign Service
22 Assignments in 1982, 1983, and 1984 so I was


## Page 22

1  familiar with what performance evaluations look
2  like.
3    Q.  Okay. That wasn't my question,
4  though. My question was had you ever seen the
5  Plaintiff's performance evaluation?
6    A.  No.
7    Q.  Even up until today?
8    A.  No.
9    MR. HUDAK:  Except for the ones,
10  obviously, that he participated in.
11    THE WITNESS:  Well, the one I wrote,
12  yes.
13    BY MR. CHUZI:
14    Q.  Right. Do you remember more or less,
15  and I'm not trying to pin you down on a number,
16  but do you remember more or less how many bidders
17  there were for the Division Chief of Cultural
18  Programs position at the time you were making the
19  selection?
20    A.  There were not many. I don't remember
21  exactly but it was not more than two or three.
22    Q.  Is it fair to say that based on the

## Page 23

1  Career Counselor's memos and the information
2  provided by the applicants that the Plaintiff's
3  application was the best of the lot?
4    A.  It was, yes, it was. Again, I don't
5  remember exactly how many bidders were there, but
6  it was a sufficient file to accept the person, the
7  person described in that file, into the job, yes.
8    Q.  Not having participated in this
9  before, what is the role of the Career Counselor
10  in the selection process? I mean, what kind of
11  information does the Career Counselor -- that's a
12  compound question. What are you given by the
13  Career Counselor that helps or --
14    MR. HUDAK:  You're asking on a
15  general basis, just in general?
16    MR. CHUZI:  Yes.
17    THE WITNESS:  In general, the person
18  would say they have a bidder for this position,
19  the bidder has the following history, background,
20  has had the following kinds of jobs, is at a
21  certain rank, has been doing this kind of a job
22  for the past X number of years overseas, fits the

## Page 24

1  profile of the kind of person, bidder, you would
2  like to have for that job, and that's it.
3    The Plaintiff was not known to me, not
4  known to many people, frankly, around the bureau,
5  so there was no way to get any kind of a reading
6  of him specifically in terms of his background.
7    I think he was -- Mr. Carmichael had
8  been his predecessor. I think they knew each
9  other when he came in and Mr. Carmichael said,
10  yes, I know him, and he's a good guy, we came in
11  together. That's the kind of information you can
12  get.
13    But, no, we wanted and needed a
14  Foreign Service Officer of Class 1, which is the
15  senior level, to run that office and the Plaintiff
16  was a bidder.
17    Q.  But if you're looking at --
18    A.  And I should say, let me just add that
19  for domestic positions in the Foreign Service,
20  especially in the Bureau of Educational and
21  Cultural Affairs, there were often not a lot
22  of bidders, and we wanted to keep certain jobs

## Page 25

1  with Foreign Service experience so we wanted to
2  have a Foreign Service person in those positions.
3    Q.  When you're looking at a number of
4  candidates for a position such as the Division
5  Chief of Cultural Programs, is there any
6  evaluative information that you are given?
7  I mean, in addition to the Career Counselor saying
8  that the candidate has this kind of background,
9  which might help, right? Is there anything that
10  says and his previous record was good or something
11  like that?
12    MR. HUDAK:  On a general basis, are
13  we talking?
14    MR. CHUZI:  Yes.
15    MR. HUDAK:  Okay. Just on a general
16  basis, not specifically in this case.
17    MR. CHUZI:  Right.
18    MR. HUDAK:  Okay.
19    THE WITNESS:  On a general basis, the
20  bidder would send in their background, would send
21  in as much as they want to share in terms of their
22  assignment history, awards they might have

Page 26

1  received, languages they've studied, a narrative
2  that they would write themselves. They'd send it
3  by e-mail of what they had done that would qualify
4  them for the position.
5          On the specifics, I can't remember
6  whether the Plaintiff did that or not. But that
7  is the general pattern is that bidders will
8  provide as much information as they can.
9  Sometimes even to their standard kind of officer
10 profile, which is standard to everyone, with
11 certain bits of information deleted to show who
12 they are when they're bidding on a position.
13         BY MR. CHUZI:
14    Q.   But not --
15    A.   The evaluative, no, other than
16 what's called corridor reputation, you know,
17 other people who have worked with the person or
18 know the person. You don't look at the person's
19 performance file and say, well, this fits. Those
20 files are not available.
21    Q.   Are you allowed to rely on corridor
22 reputation?

Page 27

1         MR. HUDAK: I'll object to the form
2  of the question.
3         MR. CHUZI: Okay.
4         THE WITNESS: Allowed to? Sometimes
5  it's the only information that you have about a
6  person, so you -- it's there. People will mention
7  I know the person, I've worked with the person,
8  but you try to find out -- in fact, now,
9  currently, for most positions, most bureaus ask
10 for a 360 evaluation, which means the bidder must
11 provide the names of a person or persons they have
12 supervised, they have worked with as peers and who
13 have supervised them and have those people send in
14 their own evaluations to get a 360 picture for any
15 key position. That was not the case in 2001.
16        BY MR. CHUZI:
17    Q.   Prior to the Plaintiff's reporting to
18 your office, did you talk to anyone in South
19 Africa about him?
20    A.   I don't remember talking to anyone in
21 South Africa. I got e-mails from the assignment
22 officer about when the Plaintiff would be

Page 28

1  available to report for duty, but I can't remember
2  speaking to anyone in South Africa.
3          I can't remember whether I spoke to
4  the Plaintiff or not either. I don't remember
5  that phase of 2001.
6     Q.   In your experience, is it common for a
7  Foreign Service Officer such as the Plaintiff to
8  report to an assignment cold without having any
9  discussions with his future supervisor?
10         MR. HUDAK: I'll object to the form
11 of the question.
12         THE WITNESS: It depends on the
13 bidder and on the officer.
14         BY MR. CHUZI:
15    Q.   Well, in your experience.
16         MR. HUDAK: The same objection.
17         THE WITNESS: Again, it depends on
18 the interest of the officer and how much they want
19 to know about the position.
20         Again, I'm not sure, I just can't
21 remember whether I had a conversation with the
22 Plaintiff by telephone or e-mails or not. I don't

Page 29

1  remember that phase of the assignment.
2          BY MR. CHUZI:
3     Q.   Do you remember approximately when the
4  Plaintiff arrived in your office?
5     A.   Early September, I think just before
6  9/11 occurred, 2001.
7     Q.   Early September 2001?
8     A.   Yes.
9     Q.   And you had been there for a year
10 previous, is that right, more or less?
11    A.   Yes.
12    Q.   Was that the only year you had been in
13 ECA?
14    A.   No. I started in ECA in 1997, served
15 until 1999, and then returned in 2000.
16    Q.   So from '97 to '99, what was your
17 position?
18    A.   Director of the Office of Policy and
19 Evaluation.
20    Q.   Was that office still there when the
21 Plaintiff reported to you?
22    A.   Yes.

Page 54

1  Cultural Specialists who were Americans recruited
2  to speak about cultural issues or appear at
3  exhibit openings or appear with another program to
4  put it into context.
5      Q.   As you recall it today based on your
6  recollection and whatever you reviewed, what
7  you've studied in conjunction with your testimony
8  today, do you have a sense of when this
9  conversation occurred?
10     A.   My recollection is that it was early
11 January.
12     Q.   Of 2002?
13     A.   Yes.
14     Q.   Do you have a current recollection of
15 the portion of that conversation in which Ms.
16 Montgomery's name arose?
17     A.   Yes.
18     Q.   What can you tell me?
19     A.   My recollection of the conversation
20 is that the Plaintiff came in after Christmas
21 vacation, and this was in a period between his
22 Christmas vacation and he was going on home leave,

Page 55

1  and we just had a conversation about how he was
2  adjusting to the bureau, working in the office.
3  This was about four months after he arrived. And
4  it was generally about his feelings about working
5  in the office. And he raised the issue, and this
6  is a very distinct memory in my mind, he raised
7  the issue of difficulties he was having working
8  with the staff and he said, you know the kind of
9  people that I have to work with, and one of them
10 is people like Ms. Montgomery who has limitations
11 in terms of what she can do. And that's how the
12 name came up in the conversation.
13     Q.   What did he tell you about Ms.
14 Montgomery?
15     A.   Well, he said that she's limited
16 because of her physical condition in terms of how
17 quickly she can respond and how much she can do in
18 terms of programmer. He raised it in the context
19 of the difficulty because of so many different
20 personalities in that office, that was one of the
21 peculiarities that he had to deal with in a
22 personality, of someone who was limited by just a

Page 56

1  physical issue.
2          And it was in the context of, again,
3  the Plaintiff saying look what I have to deal with
4  to manage this kind of a group.
5          I should say that the Cultural
6  Division as a group, from its previous
7  supervisors, was known as a group of individuals
8  that was challenging to deal with.
9          So that's how her name came up in the
10 conversation.
11     Q.   Now, here you've used the word
12 physical limitations or --
13     A.   Well, that's when he -- when the
14 Plaintiff raised this, my recollection is he
15 raised it as well, you know, Ms. Montgomery just
16 cannot respond quickly and carry through programs
17 as quickly as the other program officers do.
18         That was how I understood him raising
19 the issue in the conversation. So, in other
20 words, he might have six program officers but one
21 of them was less capable than the others.
22     Q.   Now, Ms. Montgomery has Parkinson's

Page 57

1  disease; is that correct?
2      A.   Yes.
3      Q.   During your meeting with the
4  Plaintiff, did he tell that to you or did you
5  tell that to him?
6      A.   No. I knew that from Ms. Montgomery
7  herself. She and I had been in a seminar on
8  buying long-term life insurance and at some point
9  I'm not sure, but before this point when she
10 had asked in the seminar about long-term life
11 insurance coverage for someone with Parkinson's.
12 And she had also been on sick leave at various
13 times and so it was known that she was -- and
14 she talked about it, she was dealing with
15 Parkinson's.
16     Q.   Was this seminar that you attended
17 with Ms. Montgomery, this life insurance seminar
18 was that the first point at which you knew that
19 she had Parkinson's disease?
20     A.   As far as I can remember, yes. When
21 I came in -- and I'm trying to remember -- in 2000
22 when I was there in that section temporarily, I

Page 58

1  think she was on sick leave at that point dealing
2  with the problem. And it was later, between 2000
3  and 2001 when I went to the seminar. So it was
4  known with all of her colleagues that she was
5  dealing with Parkinson's then.
6      Q.  Did Mr. Carmichael know that?
7      A.  Yes, as far as I know.
8      Q.  I mean, you and Mr. Carmichael talked
9  about that?
10     A.  Well, no, but we knew it. We knew
11 that she was dealing with Parkinson's, yes,
12 because she had been on sick leave at various
13 points.
14     Q.  You've been in the government for a
15 long time, people go on sick leave.
16     A.  Yes.
17     Q.  Do you remember Mr. Carmichael and
18 you -- I take that back. How do you know that
19 Mr. Carmichael knew that Ms. Montgomery had
20 Parkinson's?
21     A.  Well, I don't. I'm assuming that
22 because it was known to all of her colleagues at

Page 59

1  that point that he did know.
2      Q.  And you're confident as you sit
3  here today that the fact of Ms. Montgomery's
4  Parkinson's was well-known to her colleagues?
5      A.  Yes.
6      Q.  Is it your understanding that one of
7  the characteristics of Parkinson's is that it
8  affects muscular control?
9      A.  Yes.
10     Q.  When you were describing Ms.
11 Montgomery's Parkinson's, and I'll just try to
12 paint a picture for the record, but you had your
13 hands out in front of you as spread out. Were you
14 referring at that point to typing? Is that what
15 you were referring to?
16         MR. HUDAK:  I'll object. I didn't
17 see that.
18         THE WITNESS:  As I remember, and this
19 is six years ago or more, in the discussion with
20 the Plaintiff when he mentioned the fact that he
21 had someone like Ms. Montgomery that he had to
22 supervise and deal with, the issue came up of

Page 60

1  whether she could handle e-mails because much of
2  the office works on e-mail, extensive e-mail,
3  dozens a day, and whether her Parkinson's would
4  limit the ability of her to deal with e-mails.
5  And I proposed at that point that maybe one way of
6  accommodating her to help her would be voice
7  recognition software that would help her deal with
8  the flow of e-mail traffic that she would be
9  getting from overseas, because she was managing
10 visual exhibits that travel around the world and
11 so she's getting messages from overseas
12 constantly.
13         BY MR. CHUZI:
14     Q.  When Mr. McGrath said to you that Ms.
15 Montgomery was having difficulty handling her
16 e-mails and responding to her e-mails, did you
17 infer from that statement that Mr. McGrath was
18 referring to Ms. Montgomery's typing ability as
19 opposed to anything else?
20     A.  My recollection is that it was much
21 more focused on her physical difficulties with
22 Parkinson's and simply responding. She also had,

Page 61

1  as I remember from that period, difficulties
2  speaking quickly or clearly. She could speak but
3  she had just difficulties expressing herself, and
4  I think that was also a part of the Parkinson's.
5  As I remember the discussion, the Plaintiff was
6  saying look at the kind of person I have to deal
7  with, I have to supervise. And so, obviously,
8  this kind of a person is not going to be able to
9  perform at the level of the other program
10 officers.
11         I was trying to make a point to the
12 Plaintiff that as a manager he had to deal with
13 that, he had to work with the person, and if it
14 was really an issue, it had to be addressed
15 through accommodation or through something like
16 voice software that would help her do her job.
17 That's how that came up. That's my recollection
18 of the discussion.
19     Q.  And --
20     A.  I should say that one of the other
21 section chiefs, the Section Chief for Youth
22 Programs was using voice recognition software

Page 62

1  himself and found it very effective and very
2  useful, so I knew the software was available
3  within the bureau.
4      Q.   And did you recommend to Mr. McGrath
5  the idea of voice recognition software because you
6  believed that voice recognition software would
7  alleviate Ms. Montgomery's problems with typing?
8  Is that why you recommended it?
9      A.   Well, yes.
10         MR. HUDAK:  Can we take a break?
11         MR. CHUZI:  Yes.
12         (Brief recess.)
13         BY MR. CHUZI:
14     Q.   To the best of your knowledge, how
15  long did Ms. Montgomery have Parkinson's before
16  Mr. McGrath reported?
17     A.   To the best of my knowledge, at least
18  2000. That's when I remember becoming aware of
19  it. I wasn't that familiar with that office until
20  about summer of 2000.
21     Q.   Did you ever discuss Ms. Montgomery's
22  condition with her?

Page 63

1      A.   Well, yes, at one point, yes. That
2  was in June of 2002 when she asked to come to see
3  me because of all the rumors flying around about
4  the fact that I wanted her fired. So she asked to
5  come to talk to me and that was in June of 2002.
6      Q.   So you learned about Ms. Montgomery's
7  Parkinson's you think sometime in 2000 when you
8  went to that life insurance seminar?
9      A.   Yes.
10     Q.   But between then and 2002, as I
11  understand it, you didn't actually discuss her
12  condition with her; is that correct?
13     A.   That's my recollection.
14     Q.   As best you can recollect, did you
15  ever discuss with Mr. Carmichael Ms. Montgomery's
16  condition?
17     A.   I cannot -- I don't remember a
18  specific conversation about it, no.
19     Q.   You testified earlier that Mr.
20  Carmichael had discussed with you various
21  personnel and, I guess I'll use my word,
22  personality issues going on in the office that

Page 64

1  Mr. Carmichael had discussed with you.
2      A.   Yes.
3      Q.   Do I understand you that among them
4  Ms. Montgomery's condition was not included?
5      A.   It's possible that he mentioned that
6  she was slower than the others but I don't
7  remember an exact -- any specific discussion about
8  Parkinson's with him.
9      Q.   If you recall, and this was one of the
10  things I guess that I forgot to raise in my little
11  introduction in the beginning, I gather from you
12  and I appreciate that you're not trying to guess,
13  that if you don't know something, you're telling
14  me that you don't know or that you don't recall.
15     A.   Yes.
16     Q.   And that's extraordinarily beneficial
17  for the process, because I don't think Mr. Hudak
18  or myself wants you to guess at something just
19  because you think we're looking for an answer.
20         So if you don't remember or you don't
21  know, that's fine, really.
22         MR. HUDAK:  I will join in that

Page 65

1  instruction.
2          MR. CHUZI:  Okay.
3          BY MR. CHUZI:
4      Q.   If you recall at all a conversation
5  with Mr. Carmichael in which he raised the fact
6  that Ms. Montgomery may have been slower typing
7  than everybody else, do you remember anything that
8  you would have asked him about why that would be
9  the case or what Mr. Carmichael was doing about
10  the case or asking -- I've got a compound, but
11  I'm really trying to say did you continue the
12  conversation with Mr. Carmichael at all?
13         MR. HUDAK:  I'll object to the form
14  of the question because I think the preface makes
15  it a speculative question, and the last bit, did
16  you continue the conversation at all --
17         MR. CHUZI:  Yes.
18         MR. HUDAK:  I still think it calls
19  for speculation.
20         Subject to that, the witness may
21  answer.
22         THE WITNESS:  I don't remember a

17 (Pages 62 to 65)

Page 74

1  THE WITNESS: Am I aware that the
2  Plaintiff has alleged that? Yes, I'm aware that
3  he's alleged that.
4  BY MR. CHUZI:
5  Q. How do you know that he's alleged
6  that?
7  MR. HUDAK: I object if -- I don't
8  want you to disclose any conversation you had with
9  counsel about anything.
10  THE WITNESS: I believe it was part
11  of the EEOC complaint.
12  BY MR. CHUZI:
13  Q. Do I understand, Mr. Wunder, and tell
14  me if I'm wrong -- it's not my intent to put words
15  in your mouth here -- but in the course of
16  preparing your affidavit during the investigation
17  of Mr. McGrath's EEO complaint, the particular
18  allegation that I summarized for you earlier, you
19  became aware of it during that time; is that fair
20  to say?
21  A. Yes. Could you repeat the allegation
22  again?

Page 75

1  Q. Sure. Mr. McGrath has alleged that
2  you told him to begin a process of documenting Ms.
3  Montgomery's performance deficiencies with an eye
4  towards removing her.
5  A. I believe that was part of the
6  original EEO complaint which I was first shown
7  in June of 2002.
8  Q. Are you also aware that Mr. McGrath
9  has alleged that thereafter, at some point after
10  he says you told him to begin documenting Ms.
11  Montgomery's performance deficiencies, that you
12  gave Ms. Montgomery additional assignments? Are
13  you aware that he has made that allegation?
14  A. Yes, I believe that's also part of the
15  EEOC record.
16  Q. Now, is it true that following your
17  discussion with Mr. McGrath in January of 2001
18  that at some point thereafter that you gave Ms.
19  Montgomery additional assignments?
20  A. I gave Ms. Montgomery assignments,
21  whether they were additional, I would object to
22  additional. They were similar to, very similar to

Page 76

1  what she would do normally in her duties.
2  Q. Can you explain for me here how it
3  came to pass that you, who is the Director of the
4  office, would give an assignment to a program
5  officer two levels below you?
6  A. Because Mr. McGrath, the Plaintiff,
7  was on leave at that time. We were developing a
8  very large and complex exhibit project called
9  After 9/11, Images from Ground Zero, images taken
10  by Joel Meyerowitz, a photographer in New York.
11  We had produced that in 30 sets, identical sets,
12  and sent it out to 20 cities worldwide to open
13  simultaneously in late February, early March, and
14  we were recruiting Cultural Specialists to go to
15  those openings to speak about the exhibit and
16  speak about the experience of 9/11 in New York.
17  And Ms. Montgomery handled I believe one or two of
18  the Cultural Specialists who traveled to the
19  openings in Africa. Other program officers
20  handled the visits of Cultural Specialists to
21  other parts of the world, to Asia and to South
22  America.

Page 77

1  Q. When you say handled, what do you
2  mean?
3  A. Contacted the people, arranged their
4  travel, advised the Embassy overseas that this
5  person would be available, arrange their per diem
6  and travel. It's what the program officers did
7  when we had Cultural Specialists.
8  Q. And this was by e-mail?
9  A. This would have been done by e-mail,
10  it would have been done by -- predominantly
11  e-mail, sometimes by telegram to actually confirm
12  the arrangements.
13  Q. At the time you made this assignment,
14  you knew because you had discussed it with Mr.
15  McGrath that Ms. Montgomery had difficulties with
16  e-mails; isn't that right?
17  A. Yes.
18  Q. So what led you to give this
19  particular assignment to Ms. Montgomery?
20  A. I gave the assignment to a group of
21  program officers who worked with different regions
22  and Ms. Montgomery was one of that small team to

Page 78

1  handle Africa because she handled programs in
2  Africa routinely, programs, exhibits and Cultural
3  Specialists.
4      Q.  Now, I believe you testified earlier
5  that after 9/11 the workload of the division, ECA
6  -- I'm sorry, Cultural Programs Division --
7      A.  Yes.
8      Q.  That the workload increased because of
9  all the additional activities that you testified
10 to already; is that correct?
11     A.  Yes.
12     Q.  Does that mean, as far as you know,
13 that Ms. Rouse was less available to assist Ms.
14 Montgomery with her typing?
15     A.  At this time in February of 2002 it's
16 very possible that Ms. Rouse was more available
17 because at that time we had stopped many of the
18 Jazz Ambassadors and other programs, we had
19 stopped them to regroup and decide exactly where
20 we could send them because of various threat
21 levels.  So it's very possible that she was -- I
22 don't know exactly whether she was more available

Page 79

1  or less available, but it's possible that she was
2  even more available.
3      Q.  If that's the case, then why didn't
4  you give, instead of Ms. Montgomery, why didn't
5  you give this assignment to Ms. Rouse?
6      A.  I wanted to make up a team of people
7  who were familiar with their regions, familiar
8  with their embassies they dealt with, and familiar
9  with the travel in those regions, and familiar
10 with the specialists who could go to those regions
11 and who could do this one or two extra visitors,
12 extra travelers as part of their normal duties.
13         I didn't want to have to bring in
14 people who were not familiar with those regions or
15 those embassies.
16     Q.  At the time you made this assignment
17 to Ms. Montgomery, was it your expectation that
18 Ms. Rouse would assist her with these extra
19 e-mails?
20     A.  I don't remember thinking that.  Ms.
21 Montgomery was at the meetings.  We planned it.
22 She made no objection, and she, as far as I know,

Page 80

1  handled it well, handled the arrangements without
2  complaint.
3          I think to the African region was sent
4  I think only two speakers.
5      Q.  Do you know whether Ms. Montgomery
6  asked anyone else for assistance with this
7  assignment?
8      A.  I don't know.
9          By late February, by the way, the
10 Plaintiff had returned from vacation so he was
11 back in the division.
12     Q.  Well, he was back in the division
13 after you gave the assignment to Ms. Montgomery.
14     A.  After we started the process of
15 planning the exhibit openings, that's correct.
16     Q.  Well, I thought, tell me if I'm wrong,
17 but I believe I heard you testify that the reason
18 you gave the assignment to Ms. Montgomery was
19 because the Plaintiff was away.
20     A.  That's correct.
21         MR. HUDAK:  I'll object to the form.
22         BY MR. CHUZI:

Page 81

1      Q.  At any time up to today have you
2  reviewed the testimony of any other witness who
3  testified at the EEO hearing on Mr. McGrath's
4  complaint?
5      A.  Yes.
6      Q.  Whose testimony did you review?
7      A.  I've seen the testimony of -- whether
8  it was testimony or statement, I'm not sure, but
9  it was a written document, of Ms. Baker -- I
10 believe just Ms. Baker.  I remember seeing that
11 name with some information.
12     Q.  Are you aware that Lafaye Proctor
13 testified at the hearing?
14     A.  No.  I assume she would but I'm not
15 aware that she did.
16     Q.  Isn't it true that the disagreement
17 between you and the Plaintiff regarding Ms.
18 Montgomery had a profound impact on your
19 relationship with the Plaintiff?
20     A.  I would say no.  I'm thinking about
21 it because, frankly, the relationship with the
22 Plaintiff had begun to be difficult before I

21 (Pages 78 to 81)
cb39a6af-ad59-4132-a3be-05c9678994f2

Page 86

1  Q. And there's nothing in boxes 2, 3 or
2  4, is that correct?
3  A. Yes.
4  Q. Is that because only one discussion
5  was held with Mr. McGrath about his performance?
6  A. Only one that I mentioned here that we
7  put in.
8  Q. Okay. And I want to direct your
9  attention to Page 3.
10  A. We, obviously, had the discussion in
11  early January that touched on his performance as
12  well that we had discussed.
13  Q. On Page 3, do you see that?
14  A. Yes.
15  Q. And down in the last paragraph, the
16  one that begins, Mr. McGrath projects?
17  A. Yes.
18  Q. If you look at the fourth sentence,
19  and I'll read this into the record. It says:
20  During his counseling session with me on March 8,
21  2002, after reviewing these shortcomings, I
22  suggested that he consider curtailing his

Page 87

1  assignment with ECA.
2  Now, you wrote that, is that correct?
3  A. Yes.
4  Q. I mean, nobody else was involved in
5  the drafting of this document?
6  A. No.
7  Q. Okay. So looking at that sentence, is
8  it fair to say that at least in April of 2002 you
9  believed that on March 8th of 2002 you had a
10  counseling session with Mr. McGrath during which
11  you suggested that he consider curtailing his
12  assignment with ECA?
13  MR. HUDAK: I'll object to the form
14  of the question. The document speaks for itself.
15  THE WITNESS: Yes. I mean, that's
16  what I wrote so that's closer, much closer to the
17  date than today, so.
18  BY MR. CHUZI:
19  Q. Okay. Do you accept, having looked at
20  the document I just showed you and the sentence I
21  just showed you, do you accept that on March 8,
22  2002, you suggested to Mr. McGrath that he

Page 88

1  consider curtailing?
2  MR. HUDAK: I'll object to the form
3  of the question, specifically the word accept.
4  THE WITNESS: Well, I wrote it, so
5  yes.
6  BY MR. CHUZI:
7  Q. I'll just ask you this. When you
8  wrote this, were you intending to be truthful?
9  A. Yes.
10  Q. I mean you didn't write this sentence
11  because you were trying to misrepresent anything,
12  were you?
13  A. No.
14  Q. Prior to March 8th of 2002, had you
15  told Mr. McGrath that he should consider
16  curtailing?
17  A. I don't believe so, no.
18  Q. Now, you indicated earlier --
19  A. Could I add?
20  Q. Sure.
21  A. From the time Mr. McGrath returned
22  from home leave, which I think you have the date,

Page 89

1  I don't remember seeing him other than in a social
2  setting until early March. He simply was not
3  available to speak to.
4  Q. Okay. Between February 21st when Mr.
5  McGrath returned, of 2002, and March 8th of 2002,
6  did you hold any counseling sessions with him?
7  MR. HUDAK: I object to the form to
8  the extent it's assuming the fact that he returned
9  on the 21st of February.
10  MR. CHUZI: Okay.
11  THE WITNESS: I don't remember
12  meeting with him, no. In fact, I was waiting for
13  him to come by to say he was back from leave,
14  which he did not do, so we did not have any
15  meetings.
16  BY MR. CHUZI:
17  Q. Between February 21st, 2002, and March
18  8th, 2002, did you send Mr. McGrath any memorandum
19  critical of his performance?
20  A. I remember a memorandum from March 8th
21  which I gave him.
22  Q. Right. My question was --

Page 90

1  A. I sent him -- again, to go back before
2  the February date, after he left on home leave,
3  which is I believe January -- you said 18?
4  Q. Right.
5  A. I sent him an e-mail to his e-mail
6  address he had left with me, a relatively lengthy
7  e-mail about an issue, a problem we had had with
8  his performance just as he was leaving on home
9  leave.
10  Q. The Bill Taylor episode?
11  A. Right, that e-mail. But then there
12  was no response to that e-mail and so I was
13  waiting on him to come back from home leave to sit
14  down and discuss what had happened.
15  Q. So the answer to my question then, and
16  which I am inferring from you -- tell me if you
17  disagree with any of this -- is that with the
18  exception of that e-mail that you sent to Mr.
19  McGrath regarding the Billy Taylor episode, with
20  the exception of that, prior to your March 8th
21  counseling memorandum you didn't send Mr. McGrath
22  any other memorandum criticizing him for his

Page 91

1  performance?
2       MR. HUDAK: I object to the form.
3  Mischaracterizing the testimony.
4       THE WITNESS: I'm not aware of any.
5  I don't know.
6       BY MR. CHUZI:
7  Q. Is it fair to say, Mr. Wunder, that
8  your first written memorandum counseling Mr.
9  McGrath about his performance was accompanied by
10  your suggestion that he curtail his assignment to
11  ECA?
12       MR. HUDAK: I'll object to the form.
13  Mischaracterizes the testimony.
14       THE WITNESS: Yes, per the document.
15       BY MR. CHUZI:
16  Q. Is it fair to say, Mr. Wunder, that by
17  March 8th, 2002, you had made up your mind that
18  Mr. McGrath was going to leave your office
19  voluntarily or involuntarily?
20       MR. HUDAK: I'll object to the form
21  of the question.
22       THE WITNESS: Yes for myself, and in

Page 92

1  fact the new Deputy Assistant Secretary had
2  decided as well.
3       MR. CHUZI: Let me check with my
4  client and I think we'll be done.
5       (Brief recess.)
6       MR. CHUZI: I have no further
7  questions.
8       MR. HUDAK: I have no questions.
9  We'll read and sign.
10
11       (Thereupon, at 2:59 p.m., the
12  deposition was concluded.)
13       (Reading and signature not waived.)

Page 93

1       CERTIFICATE OF NOTARY PUBLIC
2       I, JUDITH R. GAGLIARDI, the officer
3  before whom the foregoing deposition was taken,
4  do hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly sworn
6  by me; that the testimony of said witness was
7  taken by me via audiotape and thereafter reduced
8  to computerized transcription by me; that said
9  deposition is a true record of the testimony given
10  by said witness; that I am neither counsel for,
11  related to, nor employed by any of the parties to
12  the action in which this deposition was taken;
13  and, further, that I am not a relative or employee
14  of any attorney or counsel employed by the parties
15  thereto, nor financially or otherwise interested
16  in the outcome of the action.
17
18
19       JUDITH R. GAGLIARDI
       Notary Public in and for
       the District of Columbia
20
My Commission expires:
21  February 28, 2009
22

24 (Pages 90 to 93)
cb39a6af-ad59-4132-a3be-05c9678994f2

Page 94

1    READING AND SIGNING PROCEDURE
2
3        The Deposition of VAN SAMUEL WUNDER,
4    III, was taken in the matter, on the date, and at
5    the time and place set out on the title page
6    hereof.
7        It was requested that the deposition
8    be taken by the reporter and that same be reduced
9    to typewritten form.
10        It was agreed by and between counsel
11    and/or the parties and/or the Deponent that the
12    Deponent will read and sign the transcript of said
13    deposition.
14
15
16
17
18
19
20
21
22

Page 95

1    C E R T I F I C A T E
2
3    STATE OF _____ :
4    COUNTY/CITY OF _____ :
5
6        Before me, this day, personally
7    appeared VAN SAMUEL WUNDER, III, who, being duly
8    sworn, states that the foregoing transcript of
9    his/her Deposition, taken in the matter, on the
10   date, and at the time and place set out on the
11   title page hereof, constitutes a true and accurate
12   transcript of said deposition.
13
14        _____
15
16   SUBSCRIBED and SWORN to before me this
17   _____ day of _____,
18   2008, in the jurisdiction aforesaid.
19
20
21   _____    _____
22   My Commission Expires        Notary Public

Page 96

1    DEPOSITION ERRATA SHEET
2
3    CASE CAPTION: McGrath v. Rice
4    DEPONENT: VAN SAMUEL WUNDER, III
5    DEPOSITION DATE: July 16, 2008
6        I have read the entire transcript of
7    my Deposition taken in the captioned matter or the
8    same has been read to me. I request that the
9    changes noted on the following errata sheet be
10   entered upon the record for the reasons indicated.
11       I have signed my name to the Errata
12   Sheet and the appropriate Certificate and
13   authorize you to attach both to the original
14   transcript.
15
16   PAGE/LINE    CHANGE       REASON
17   _____
18   _____
19   _____
20   _____
21   SIGNATURE:_____ DATE:_____
22       VAN SAMUEL WUNDER, III

Page 97

1    PAGE/LINE    CHANGE       REASON
2    _____
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   SIGNATURE:_____ DATE:_____
22       VAN SAMUEL WUNDER, III