# EXHIBIT 4

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 200
Washington, D.C.

| | |
|---|---|
| Matthew McGrath,<br>    Complainant,<br><br>v.<br><br>U.S. Department of the State,<br>    Agency. | EEOC Case No. 100-2003-08249X<br><br>Agency Case No. 02-38<br><br>MAY 19 2005 |

## DECISION

Pursuant to the EEOC's regulations at 29 C.F.R. § 1614.109(i) (2004), I conducted a hearing in the above-captioned complaint on March 15 and 16, 2005. All jurisdictional requirements for this complaint have been met. The record before me includes the Report of Investigation (ROI), the Hearing Transcript (HT), exhibits produced by each party and admitted into evidence at the hearing, and various pleadings and arguments.

The following witnesses were called to testify by the Complainant: Complainant, Dr. Linda Bessett, Deborah Chapman, LaFaye Proctor, E.J. Montgomery, and Alfred Head. Appearing for the Agency were: Complainant, Van Samuel Wunder, Jennifer "Susie" Baker, Leanne Mella, Kathryn Wainscott, and Joanne Armor.

## ISSUES

Whether the Agency discriminated against Complainant on the basis of his race (Caucasian) and in reprisal for his having engaged in prior protected activity and/or for opposing discriminatory practices:

    1)    he was subjected to a hostile environment when a) his supervisor attempted to

1

undermine his authority as Chief, Division of Citizen Exchanges, Office of Cultural Programs, Bureau of Education and Cultural Affairs; b) his supervisor gave him a negative performance evaluation as Chief, Division of Citizen Exchanges, on April 11, 2002 and April 29, 2002; c) he was subjected to an involuntary curtailment of his assignment as Chief, Division of Citizen exchanges, d) Complainant was denied a career-enhancing follow-on assignment; and

2) Complainant was issued a Letter of Admonishment for his alleged nonpayment of his government contractor charge account in a timely manner.[1]

HT, 5-6 (Mar. 15, 2005).

## BACKGROUND

Complainant was employed by the U.S. Department of State as a Foreign Service Officer, FS-01. At the time of the alleged discrimination, Complainant was the Chief of the Cultural Programs Division. Complainant's immediate supervisor was Van Samuel Wunder, Director of the Office of Citizen Exchanges. Complainant's initial second-level supervisor was Deputy Assistant Secretary Brian Sexton; in February of 2002, Mr. Sexton was replaced by Deputy Assistant Secretary Stephen Hart.

Work Environment

Complainant became Chief of the Cultural Programs Division on September 10, 2001. As Chief, Complainant was responsible for supervising six program officers and two administrative assistants in his division. The administrative assistants were Deborah Chapman and LaFaye Proctor. The program officers were Susie Baker, Susan Cohen, Leanne Mella, EJ Montgomery, Sandy Rouse, and Kathryn Wainscott. HT, 105. Complainant was on leave from December 21-January 7 and went on home leave from January 18-February 21. *Id.* at 454. Ms. Wainscott was the senior program officer who was responsible for the

---

[1] The issue appears in the form that it was read into the record and accepted by both parties. Notably, the issue is stated differently in the closing arguments submitted by both parties. The versions contained in the closing arguments are phrased in a way that suggests the incidents should be examined as discrete acts as well as a hostile work environment claim.

2

day-to-day operations in Complainant's absence. *Id.* at 448.

According to many of Complainant's staff, Complainant provided little guidance as supervisor. After becoming Chief, Complainant held approximately four weekly staff meetings. However, according to individuals under his supervision, Complainant discontinued these weekly meetings. *Id.* at 298, 375, 412, 431. The staff tried to hold their own meetings, but Complainant still did not attend. *Id.* at 431, 442. Ms. Wainscott testified that this had an impact on the division because Complainant did not disseminate information to his division. Complainant was supposed to attend the Assistant Secretary's meeting and the division chiefs' meeting and report back. According to Ms. Wainscott, Complainant never did, so his staff had to seek notes from another division chief. *Id.* at 377-378.

Complainant claims that he stopped holding staff meetings because he did not think they accomplished anything. Complainant testified that instead of holding staff meetings, he met with his staff individually. *Id.* at 160-161. Ms. Chapman and Ms. Proctor, the administrative staff, stated that Complainant met with them whenever they approached him. *Id.* at 412, 432. However, many of the program officers offered contrary testimony. Ms. Baker testified that she had trouble meeting with Complainant. She also noted that Complainant did not respond to her e-mails or notes. HT, 318; Agency Ex. K. Ms. Baker stated that at one point, she prepared fact sheets about her programs for Complainant, but Complainant just threw them back across the desk and said that he was not interested. HT, 297. Ms. Wainscott and Ms. Mella echoed many of the same concerns, pointing out that Complainant did not meet with them individually and often did not respond to their written requests. HT, 372-375, 556-557; Agency Ex. J. Mr. Wunder, Complainant's supervisor, experienced similar problems. HT, 461, 483-484, 488, 494-496; Agency Ex. C, I, L, R.

According to Complainant, his ability to supervise was inhibited by Mr. Wunder's

3

micromanagement. Ms. Chapman and Ms. Proctor stated that Mr. Wunder attempted to micromanage the Office of Cultural Affairs; but they testified that this also occurred with prior and subsequent Chiefs of that division. HT, 422-6, 436. Complainant testified that throughout his time as Chief, Mr. Wunder communicated directly with Complainant's staff. Complainant stated that Mr. Wunder often worked with Ms. Wainscott, especially on the Arts International Project. *Id.* at 110-112. Ms. Wainscott acknowledged that she had to work with Mr. Wunder; she pointed out that he had been designated as "Partner" for the State Department on the project. *Id.* at 370-373. Ms. Baker also had to work directly with one of Complainant's supervisors because she was handling a Carnegie Hall project with which Mr. Sexton was involved. *Id.* at 305-306.

Complainant also asserted that beginning in Fall 2001 and again in January 2002, Mr. Wunder asked Complainant to document Ms. Montgomery's performance for the purpose of terminating her. Complainant stated that Mr. Wunder denied travel for Ms. Montgomery and assigned Ms. Montgomery additional work while Complainant was gone in order to fluster Ms. Montgomery. *Id.* at 191-200. Nevertheless, Ms. Montgomery still works for the Office of Cultural Affairs. Ms. Montgomery received a rating of excellent on her EER from Mr. Wunder for the time period at issue. Also, Ms. Montgomery testified that Mr. Wunder secured voice recognition software for her. Ms. Montgomery acknowledged that while Mr. Wunder denied her travel to Philadelphia, he did approve her travel to Chicago for a work-related program. Ms. Montgomery does not recall Mr. Wunder assigning her a big work load while Complainant was on leave. *Id.* at 354-358.

Complainant also claimed that his attempts to become involved in some projects were rebuffed. Complainant testified that he tried to reform the Arts International program, which received funding from the "festival fund." This was an informal partnership among four partners, the State Department, the

4

National Endowment for the Arts, the Rockefeller Foundation and the Pew Charitable Trust. Complainant stated that he made several verbal proposals in Fall of 2001. *Id.* at 112-114, 471. Mr Wunder asked Complainant to create proposed guidelines and come up with something concrete. However, Complainant did not present the requested proposals. Complainant also did not attend the Partners meeting for the fund. *Id.* at 475-478.

Agency witnesses testified that while Complainant achieved success with a couple of projects such as the 9/11 front-page exhibit and the Thelonious Monk project, Complainant had trouble completing his work and performing some of his responsibilities.

One major example of this failing occurred in early 2002. According to Mr. Wunder, in preparation for Complainant's home leave, he and Complainant met on January 17 to discuss any pending projects. Complainant told him that he did not have anything pending. On January 18, Mr. Wunder discovered that Complainant had left an unfinished project involving a certificate of appreciation from the Secretary of State to Dr. Billy Taylor, which was to be presented on January 21 at a special event at the John F. Kennedy Center for the Performing Arts. According to Mr. Wunder, the Secretary's office called looking for it. Mr. Wunder stated that he contacted the staff designer, but the designer said that he did not have a certificate designed or ready. Mr. Wunder also talked with Complainant's staff, but no one knew about the project. *Id.* at 456-458. Complainant claimed that he initiated a design, but did not finish the project because he knew that Dr. Taylor was sick and the Secretary was out of the country. *Id.* at 152. There is no evidence that Complainant discussed this or the possibility of alternate plans with anyone in the Secretary's office. According to Mr. Wunder, the Secretary's wife, Mrs. Powell, presented a blank certificate to Dr. Taylor's daughter on stage at the Kennedy Center. *Id.* at 458.

Complainant also failed to discuss the budget for individual projects with his staff. During Complain-

5

ant's home leave, Mr. Wunder, Mr. Hart, and Ms. Wainscott reviewed the budget for the division and discovered that the Warhol project was over budget by 400%. Agency Ex. Q. When Mr. Wunder began questioning Complainant's staff, he discovered that Complainant had not discussed their individual budgets with them. HT, 464. Complainant testified that he did not handle the budget for the Warhol project. He said that he just signed off on it. *Id.* at 163.

After returning from home leave, Complainant missed a division chiefs' meeting on March 6, 2002. Complainant also missed a meeting on March 7, phoning in a last minute excuse. Agency Ex. Q.

On March 8, 2002, Mr. Wunder prepared a memo advising Complainant of the deficiencies in his performance, including failure to complete projects and failure to communicate with his staff. Agency Ex. Q. Also on this date, Mr. Wunder met with Complainant to discuss the memo. HT, 466. Following this meeting, Complainant still did not hold staff meetings. *Id.* During this time, Complainant also failed to communicate with Ms. Baker regarding a crucial and timely project. Ms. Baker repeatedly asked Complainant for an update regarding panelists for the Intercultural Public/Private Fellows Program (ICPP) grant. HT, 294-295. This would have normally been Ms. Baker's responsibility, but Complainant had requested the responsibility of finding the panelists. Weeks went by without Mr. McGrath updating Ms. Baker. HT, 294; Agency Ex. L. Ms. Baker noted that Complainant eventually got the panelists, but that the program was barely completed in time. HT, 310-311.

On April 15, 2002, Mr. Wunder issued an EER for Complainant. Mr. Wunder filled out the portions of the EER which could be completed by the rater. This EER did not contain a review statement because Assistant Secretary Sexton, the reviewer, had moved to a new position. HT, 482; Cp. Ex. 4. Mr. Wunder also could not complete the specific job goals and objectives section because Complainant had failed to supply information. HT, 482. The EER from April 15, 2002 highlighted the same problems listed

6

in the March 8, 2002 counseling memo.[2] Mr. Wunder rated Complainant's work as unsatisfactory. Cp. Ex. 4. Mr. Wunder met with Complainant on April 18 to discuss the EER. Mr. Wunder asked Complainant if he wished to comment on the EER, but Complainant refused. HT, 482.

After the meeting on April 18, the Human Resources Office told Mr. Wunder that there had to be a review statement. Mr. Wunder received this review statement from Mr. Sexton, and on April 24, Mr. Wunder e-mailed Complainant requesting that Complainant come by his office to sign the EER and provide comments. Complainant did not come to sign the EER. On April 28, Mr. Wunder again e-mailed Complainant and placed the EER on Complainant's chair. HT, 482-484; Agency Ex. I. Complainant signed the EER on the following day but did not provide comments in the space provided. ROI, Ex. 20.

Following these EERs, Complainant still had trouble responding to his staff. On May 2, 2002, Ms. Mella asked Complainant to submit a list of the critical elements for her employment file. Ms. Mella also pointed out that her file did not contain an informal evaluation. Complainant did not respond to this e-mail. On May 8, 2002, Ms. Mella re-sent the e-mail, again emphasizing the importance of responding. HT, 557-558; Agency Ex. J. Ms. Baker also sought a response from Complainant around this time but received no response. Agency Ex. K, L.

On May 20, 2002, Mr. Wunder sent Complainant a memo which requested an update on the pending issues, including his specific work goals, Ms. Mella's critical elements, the ICPP panelists, and the scheduling of weekly staff meetings. Agency Ex. R. On May 22, 2002, Mr. Wunder sent Complainant

---

[2] Notably, similar comments regarding his managerial skills and ability to complete work in a timely manner were present in an earlier EER. Complainant's EER from South Africa dated October 1, 1999-April 15, 2000 noted that Mr. McGrath needed to improve his managerial skills. According to his reviewer, Mr. Thomas Hull, Complainant failed to complete documentation and evaluations in a timely manner. In one case, he submitted the paperwork a year late. In another instance, he submitted it six months late. Complainant was even tardy in submitting several international visitor program evaluations. The reviewer also commented on Complainant's weak team work. Cp. Ex. 28; HT, 261-266.

7

another memo–this time requesting that Complainant voluntarily curtail[3] from his position. The memo noted that Mr. Wunder had discussed curtailment with Complainant on two prior occasions. This memo also informed Complainant that he must voluntarily curtail by May 24, 2002 or Human Resources would begin the involuntary curtailment process. Complainant signed the memo acknowledging receipt. HT, 498; Agency Ex. M.

After refusing to voluntarily curtail, Complainant was involuntarily curtailed on June 10, 2002. Agency Ex. M. While Complainant continued to receive pay as a FS-01, he was not immediately reassigned following his curtailment. In February 2003, he was involuntarily assigned to the position of examiner at the Board of Examiners. HT, 58.

Failure to Pay Government-issued Credit Card

On January 15, 2002, Complainant used his government-issued credit card to pay for a hotel stay while on government business. Complainant does not recall receiving a bill for the charges. On May 10, 2002, Complainant received a letter from Citibank informing him that his payment was overdue. According to Complainant, he called Citibank and attempted to pay the bill over the phone. It appears that the payment did not go through. On July 8, 2002 and August 28, 2002, the Financial Oversight and Coordination Office sent Mr. McGrath letters regarding his credit card balance. However, Complainant testified that he did not hear anything about it until September 10, 2002 when he received a letter from a collection agency. Complainant then submitted another payment for the bill. HT, 220-225; Cp. Ex. 23, 42.

On October 23, 2002, the Office of Employee Relations sent Complainant a proposed letter of suspension for failure to pay his credit card bill. Cp. Ex. 5. According to Joanne Armor, an employee

---

[3] "Curtail" is not clearly defined in the record. From its context, and documents in the ROI, it appears to be a reassignment of an employee's position, and may be requested by the employee or imposed by management. Curtailment is not a disciplinary action. See generally, ROI, tab 18, and specifically ¶18 at 8 of 15.

8

relations specialist, suspensions are standard for credit card garnishment cases. HT, 323. Complainant responded orally and in writing to the proposal letter. At the oral presentation, Complainant's representative presented evidence that Complainant had attempted to pay the bill. As a result, Deputy Assistant Secretary John Campbell reduced the proposed suspension to a Letter of Admonishment. HT, 327-328. Ms. Armor testified that a letter of admonishment is not considered a disciplinary action by the department. The letter of admonishment does not go into the employee's official file. HT, 328-329.

## ANALYSIS

<u>Hostile Work Environment and Discrimination Claims</u>

Complainant claims that he was subjected to a hostile work environment on the basis of his race and in reprisal for protected activities. In order to establish a claim of hostile work environment, the Complainant must show that (1) he belongs to a protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) the harassment was based on the protected class; and (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment. *Perillo v. Dep't of the* Treasury, EEOC Appeal No. 01A22958 (Sept. 22, 2003) (citing *Humphrey v. United States Postal Serv.*, EEOC Appeal No. 01965238 (Oct. 16, 1998)). The harassment must be sufficiently severe and pervasive so as to alter the conditions of employment or create an abusive environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

While Complainant has established that he is a member of a protected class (white, prior EEO activity, and opposition to alleged acts of discrimination), Complainant has not established that he was subjected to harassment based on these protected bases. In fact, the evidence shows that each of the

9

incidents contributing to the alleged hostile work environment were caused by complainant's management deficiencies, and were merely reasonable management responses to workplace issues. Whereas the Agency has presented both testimonial and documentary evidence that show problems with Complainant's management, Complainant has not presented any evidence, other than his own statements, that these incidents were tied to discriminatory animus. As a result, Complainant has failed to establish a case of hostile work environment.

As the issue was presented by both parties in their closing arguments, it appears that Complainant also alleges discrete acts of discrimination based on his race and in reprisal for protected activities. In order to prevail on an EEO complaint alleging discrete acts of discrimination under Title VII,[4] a Complainant must produce evidence demonstrating, by a preponderance of the evidence, that he was subjected to an adverse personnel action on the basis of prohibited factors (*e.g.*, race, reprisal). One way Complainant could satisfy his burden of proof would be to present direct evidence of discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Absent direct evidence, in order to establish a *prima facie* case of disparate treatment, a Complainant must demonstrate that he was treated less favorably than a similarly situated employee outside his protected group. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). In the absence of comparative data, Complainant may also establish a *prima facie* case by setting forth sufficient evidence to create an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

If a *prima facie* case is established, the burden shifts to the Agency to articulate a legitimate,

---

[4] 42 U.S.C.A. §§ 2000e et seq.

non-discriminatory reason for the challenged action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *McDonnell Douglas*, 411 U.S. at 802. Complainant may then show that the explanation offered by the Agency was not the true reason, but a pretext for discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of persuading the trier of fact that the Agency discriminated against the Complainant always remains with the Complainant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

This order of analysis need not be followed in instances where the Agency has already articulated a legitimate, nondiscriminatory reason for the personnel action. In these instances, the analysis can proceed directly to the third step of the *McDonnell Douglas* analysis--that is, the ultimate issue of whether Complainant has shown by a preponderance of the evidence that the agency's actions were a pretext for discrimination. *Aikens*, 460 U.S. at 713-714; *Mattia v. U.S. Postal Serv.*, EEOC Appeal No. 01A03458 (May 15, 2003). In this case, even assuming that the Complainant established a *prima facie* case of discrimination, he has failed to show discrimination because he has not presented evidence that the Agency's stated reasons were pretextual. The Agency asserted that Complainant received a negative performance evaluation, was curtailed, and was not given a career-enhancing follow-up assignment because he was unsuccessful at managing his office. The evidence at hearing demonstrated that Complainant failed to communicate with his staff and neglected a number of other responsibilities. Complainant failed to present credible evidence that these reasons were pretextual.

Discrimination and Letter of Admonishment

Absent direct evidence, in order to establish a *prima facie* case of disparate treatment, a Complainant must demonstrate that he was treated less favorably than a similarly situated employee outside

11

his protected group. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). Complainant has not established that he was disciplined more harshly than employees outside his protected group who failed to pay their government-issued credit card on time. Testimony from Ms. Armor demonstrated that suspensions were the standard discipline for credit card garnishments. Ms. Armor also testified that the decision to reduce the suspension to a letter of admonishment was made without regard to Complainant's race or prior protected activity.[5] Complainant did not present any testimony or documentation that showed the Agency treated credit card garnishments differently for people outside of Complainant's protected groups. Accordingly, *prima facie* cases of race and retaliation discrimination with regard to the Letter of Admonishment were not established.

## CONCLUSION

Based on a careful analysis of the record, and after hearing and assessing the credibility of the witnesses at that hearing, I conclude that the Complainant failed to demonstrate, by a preponderance of the evidence, that the Agency's actions were motivated by a discriminatory animus. Therefore, judgment for the Agency is appropriate.

_____
Richard E. Schneider
Administrative Judge

---

[5] I find Ms. Armor's testimony credible, especially in light of the Complainant's failure to present any evidence to the contrary.

To:

Michelle Perry, Esq.
Kalijarvi, Chuzi & Newman, P.C.
1901 L Street, N.W.
Suite 610
Washington, D.C. 20036

Kathleen Murphy, Esq.
L/EMP Room 5425
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Ms. Barbara Pope
Office of EEO and Civil Rights
Department of State
2201 C Street, N.W., Room 4216
Washington, D.C. 20520