# EXHIBIT 6

mec
JMO
                                                                        233

           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                  WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - x
                                 :
MATTHEW McGRATH,                 :
                                 :
         Complainant,            : EEOC Case No.
                                 : 100-2003-08249X
    v.                           :
                                 : Agency No.
UNITED STATES DEPARTMENT OF      : 02-38
STATE,                           :
                                 :
         Agency.                 :
                                 :
- - - - - - - - - - - - - - - - x

                    Wednesday, March 16, 2005

                    U.S. State Department
                    2201 C Street, N.W.
                    Washington, D.C.  20530

         The above-entitled matter commenced,
pursuant to notice, at 8:48 a.m.
BEFORE:
         HONORABLE RICHARD E. SCHNEIDER
         Administrative Judge
         Equal Employment Opportunity Commission
         1801 L Street, N.W., Suite 100
         Washington, D.C.  20507

                    MILLER REPORTING CO., INC.
                      735 8th STREET, S.E.
                    WASHINGTON, D.C.  20003-2802
                         (202) 546-6666

---

mec                                                                     234

APPEARANCES:

    On Behalf of the Complainant:

         MICHELLE L. PERRY, ESQ.
         Kalijarvi, Chuzi & Newman, P.C.
         Suite 610
         1901 L Street, N.W.
         Washington, D.C.  20036
         (202) 331-9260

    On Behalf of the Agency:

         KATHLEEN MURPHY, ESQ.
         MELINDA CHANDLER, ESQ.
         Department of State
         2201 C Street, N.W.
         Washington, D.C.  20530
         (202) 647-4646

                    MILLER REPORTING CO., INC.
                      735 8th STREET, S.E.
                    WASHINGTON, D.C.  20003-2802
                         (202) 546-6666

---

mec                                                                     235

                        C O N T E N T S

WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS
Matthew McGrath         --       237     276/287       287
Jennifer S. Baker      291       305       317         --
Joanne Armor           319       333       340         340
Alfred Head            342       349        --         --
E. Montgomery          351       356       359         --
Kathryn Wainscott      361       379       401         406
Deborah Chapman        410       419        --         --
LaFaye Proctor         428       442        --         --
Van Samuel Wunder      445       514       546         --
Leanne Mella           555       559        --         --
Matthew McGrath        569       603        --         --

                        E X H I B I T S
COMPLAINANT'S          IDENTIFIED           RECEIVED
No. 39                 (Previously)            550
No. 20                 (Previously)            589
AGENCY'S
No. K                  (Previously)            303
No. O                  (Previously)            333
No. A                  (Previously)            452
No. B                  (Previously)            456
No. C                  (Previously)            461
No. Q                  (Previously)            468
No. I                  (Previously)            484
No. R                  (Previously)            490
No. L                  (Previously)            495
No. M                  (Previously)            502
No. N                  (Previously)            512
No. J                  (Previously)            558

                    MILLER REPORTING CO., INC.
                      735 8th STREET, S.E.
                    WASHINGTON, D.C.  20003-2802
                         (202) 546-6666

---

mec                                                                     236

 1                     P R O C E E D I N G S
 2                                                  [8:48 a.m.]
 3           ADMIN. JUDGE SCHNEIDER:  We are back on
 4  the record.  Today is March 16, 2005.  This is the
 5  second day of the administrative EEOC hearing in
 6  the discrimination complaint filed by Matthew
 7  McGrath, the complainant, EEOC Number
 8  100-2003-08249X, and Agency Number 02-38.
 9           We are resuming this morning with the
10  complainant as witness, and I believe we are
11  picking up with agency's cross-examination; is that
12  correct?
13           MS. MURPHY:  Yes.
14           MS. PERRY:  Yes, Your Honor.
15           [Off the record.]
16           ADMIN. JUDGE SCHNEIDER:  Okay.  Let's go
17  back on.
18           Mr. McGrath, you were sworn in yesterday
19  and you are still under oath.
20           THE WITNESS:  Okay.
21           ADMIN. JUDGE SCHNEIDER:  Agency.
22  Whereupon,

                    MILLER REPORTING CO., INC.
                      735 8th STREET, S.E.
                    WASHINGTON, D.C.  20003-2802
                         (202) 546-6666

mec                                                     289

1  situation, as I said, and the like, the normal
2  stuff. My predecessor had described the position
3  as basically being clerical -- in other words,
4  signing paperwork -- and he was frustrated. That's
5  why he curtailed. But we had more trouble because
6  of 9/11, so I was more involved.
7       Q    I'm sorry. I still don't understand.
8  Involved in what way?
9       A    Well, in consulting on -- for example, for
10 the whole fall, from when I arrived -- at least for
11 the whole fall, we had people in the field that had
12 to be contacted, sometimes there was communication,
13 people that were nervous and wanted to come back
14 early, people that were about to go that we had to
15 cancel and postpone and make arrangements because
16 monies had already been advanced. The Jazz
17 Ambassadors was a big part of that. But we had
18 several speakers and specialists who were out there
19 and who were about to go. It froze a lot of stuff.
20 Bands had to be negotiated with and the like.
21      Q    So you were running programs? I mean,
22 we're talking about your duties.

mec                                                     290

1       A    Normally I wouldn't be running programs,
2  but because of 9/11 and because of the issues
3  surrounding 9/11 and the importance of programs, I
4  had to prioritize decisions. But there had to be
5  more hands-on.
6            For example, in the Jazz Ambassadors, the
7  woman in question is a part-timer with a bad back
8  and needed more assistance, especially the
9  troubleshooting with this, and generally, if she
10 got any assistance, it was from outside the office,
11 and so I plugged in more than would normally be
12 acceptable.
13           MS. MURPHY: Thank you.
14           ADMIN. JUDGE SCHNEIDER: Thank you very
15 much for your time.
16           THE WITNESS: Can I ask a question now?
17           ADMIN. JUDGE SCHNEIDER: No. And we will
18 go off the record while we get our next witness.
19           [Witness excused.]
20           [Recess.]
21           ADMIN. JUDGE SCHNEIDER: We are back on
22 the record.

mec                                                     291

1            Our next witness is Ms. Susie Baker.
2  Whereupon,
3                 JENNIFER SUSIE BAKER,
4  the witness, was called for examination by counsel
5  on behalf of the agency and, having been first duly
6  sworn, was examined and testified as follows:
7                   DIRECT EXAMINATION
8       BY MS. MURPHY:
9       Q    Good morning, Ms. Baker.
10      A    Good morning.
11      Q    Please state your name for the record and
12 spell it for the court reporter.
13      A    Jennifer Susie Baker, J-e-n-n-i-f-e-r
14 S-u-s-i-e B-a-k-e-r.
15      Q    What was your position in the Department
16 of State in September 2001?
17      A    I was a program officer in the Office of
18 Citizen Exchanges, Cultural Programs Division.
19      Q    Approximately how long were you in that
20 position?
21      A    Almost two years.
22      Q    Did your responsibilities include serving

mec                                                     292

1  as a program officer for Intercultural
2  Public/Private Fellows Program?
3       A    Yes.
4       Q    Can you briefly describe that program.
5       A    It was -- or it may still be -- a grant
6  award program for organizations to submit proposals
7  to us to carry out cultural exchanges.
8       Q    And how did that grant work?
9       A    We would do the normal open competition
10 process, which included a request for proposals --
11 that was published in the Federal Register -- and
12 then we would get proposals in from organizations
13 and then conduct bureau-wide in-house State
14 Department grant review panels.
15      Q    So part of your job was to assemble the
16 grant review panel?
17      A    Yes. I had done many grant reviews before
18 and I had always -- that had always been a part of
19 my job.
20      Q    Was there something about this program
21 that involved a congressional mandate?
22      A    I don't know if I'm confusing this with

293

1  something else, but I know -- I remember that -- I
2  think Carnegie Hall had gotten some sort of
3  earmark, but I don't know if it was attached to
4  this program or not.
5      Q  Do you know anything about a $1.6 million
6  budget limit?
7      A  I knew there was a budget limit. There
8  was some confusion about -- at least in my mind --
9  about what the limit actually was.
10     Q  Thank you.
11        When did you first become acquainted with
12 Mr. McGrath?
13     A  When he arrived as our division chief.
14     Q  So that would have been the fall of 2001?
15     A  Uh-huh. Yes.
16     Q  And how long did Mr. McGrath serve as your
17 supervisor?
18     A  Until he left. I don't remember exactly
19 when that was.
20     Q  What was Mr. McGrath's involvement in the
21 Intercultural Public/Private Fellows Program that
22 you described to us?

294

1      A  He said that he would get the grant
2  panelists for it, and as the division chief, just
3  would be overseeing it in general.
4      Q  He said he would -- I'm sorry -- he would
5  get the panel members?
6      A  He would get the grant panel members, yes.
7      Q  Was it customary for somebody in Mr.
8  McGrath's position to get the panel members?
9      A  Usually not.
10     Q  Who usually would do that?
11     A  Usually the program officer would do that.
12     Q  So you usually would do it.
13     A  Yes.
14     Q  Why did Mr. McGrath want to do it?
15     A  I don't know. I mean, I -- I don't know.
16     Q  When Mr. McGrath did it, what did he do?
17     A  Well, he initially said that he would get
18 the grant panelists, but then weeks and weeks and
19 weeks went by and we weren't getting panelists and
20 I was getting nervous and frustrated.
21     Q  And what did you do when you were nervous
22 and frustrated?

295

1      A  I asked him in a variety of means for
2  status, updates on the grant panelists, if we were
3  getting them, when we were getting them, who any of
4  them might be, through verbal means, e-mails,
5  leaving notes in his office.
6      Q  Thank you.
7         Do you know Mr. Sam Wunder?
8      A  Yes.
9      Q  How do you know Mr. Sam Wunder?
10     A  He was the officer director for Citizen
11 Exchanges, and he was the officer director before I
12 moved to cultural programs from Europe Eurasia
13 division, and I knew him before that. He was -- I
14 forget his title, but he was in the office of
15 Policy and Evaluation before that.
16     Q  So you had worked for Mr. Wunder.
17     A  Yes.
18     Q  How would you describe Mr. Wunder's work
19 style?
20     A  He is very organized, very linear, nose to
21 the grindstone kind of person.
22     Q  And what was his management style?

296

1      A  He was interested and engaged. He -- I
2  didn't feel that he was too involved in what I was
3  doing. He made sure that things were going as they
4  needed to go, but I never felt that he micromanaged
5  me.
6      Q  To what extent did you interact with Mr.
7  Wunder when Mr. McGrath was your supervisor?
8      A  In a couple different ways. Sometimes I
9  would just see him when I was down on the second
10 floor where I used to work, where his office was,
11 and I would just give him a quick update on how
12 things were going.
13        As we were in the Intercultural
14 Public/Private Fellows Program process and I was
15 starting to get frustrated and nervous and upset, I
16 went to him for guidance on what I should do
17 because I had a schedule to follow and it was
18 something that I didn't know what to do other than
19 to go to him for guidance.
20     Q  And why didn't you know what to do?
21     A  Because I didn't get guidance from our
22 division chief.

297

1  Q  And that division chief was Mr. McGrath.
2  A  Yes.
3  Q  How did Mr. McGrath work with you as a
4  supervisor?
5  A  Not very much. It was almost
6  non-existent.
7  Q  And when you say non-existent, what do you
8  mean?
9  A  Well, from the very beginning, I remember
10 that I tried to inform him about three programs
11 that I was managing and I created fact sheets for
12 them and brought them into the office, and he said
13 he wasn't interested in those, that he was just
14 interested in the end of the fiscal year, and he
15 threw my fact sheets across the desk and said if it
16 didn't have anything to do with the end of the
17 fiscal year, he didn't need it. So that was one
18 example. That was from the beginning.
19     After that, when I was trying to get
20 guidance and help, you know -- well, he said he was
21 going to get the panelists and wasn't. I felt like
22 there was no relationship there.

298

1  Q  Did Mr. McGrath hold regular weekly staff
2  meetings?
3  A  At the beginning, he did.
4  Q  Did he continue with those staff meetings?
5  A  No.
6  Q  Do you recall approximately when he
7  stopped the staff meetings?
8  A  I don't recall exactly when. It was not
9  for a very long period of time.
10 Q  I'm sorry?
11 A  It was not a very long period of time.
12 Q  That he held the staff meetings.
13 A  Yes.
14 Q  So he only held the staff meetings for a
15 short period of time?
16 A  Uh-huh.
17 Q  Do you recall one particular staff meeting
18 with the staff sought clarification on some taskers
19 that had been sent to the office?
20 A  Yes, I do.
21 Q  Can you describe that staff meeting.
22 A  It was in his office, and we were all

299

1  sitting in there, and apparently there were two
2  taskers that we were talking about in the office
3  and there was some confusion about how these
4  taskers were different. I guess, to some people,
5  they seemed very similar. And I remember that
6  there was a long and frustrating conversation about
7  these taskers, about what they were and how they
8  were different.
9      At, I guess, some point, Mr. McGrath
10 appeared to get exasperated with this conversation
11 and swirled his chair around -- well, said, "This
12 meeting is over" and swirled his chair around, and
13 we all kind of just looked at each other, and he
14 had his back to us and we just kind of filed out
15 silently. I mean, we didn't know what to do.
16 Q  So he had his back to you; he was facing
17 his computer?
18 A  I don't know what he was facing. I just
19 felt -- I recall that it was just -- he was in a
20 swivel chair and he swivelled around, and we were
21 all looking at each other, like "What now?"
22 Q  And that was the end of it?

300

1  A  That was it. We filed out.
2  Q  Did Mr. McGrath meet with you individually
3  to review your projects?
4  A  No, not by setting up meetings. I mean,
5  you know, we would try to give him updates
6  informally. Nothing formal.
7  Q  Did he meet with you about your budgets?
8  A  I don't remember.
9  Q  Did he meet with you about plans you had
10 for running your programs?
11 A  I don't remember in terms of like
12 programs, overall programs. Regarding the one we
13 spoke about earlier, the Public/Private Fellows
14 Program, there was a schedule that goes along with
15 every grant process. Every individual grant
16 process has a schedule that is connected with the
17 packet that goes up to the Assistant Secretary. So
18 there was a schedule involved with that, and I
19 don't -- I mean, he -- I'm assuming he was aware of
20 it. I don't recall the moment that I might have
21 shown him that piece of paper.
22 Q  Okay. Ms. Baker, I am going to show you

mec                                                                 301

1  Department Exhibit K and ask you if you can
2  identify that exhibit.
3      A   Yes.
4      Q   Can you tell us what this is?
5      A   Yes. That is an e-mail I had sent asking
6  for information that I needed before I could move
7  forward, and it is one that I printed off and then
8  wrote another note on and put on his chair, I
9  think, which I thought was -- it was urgent.
10     Q   What is the date on the e-mail?
11     A   The date on the e-mail is Wednesday, May
12 8, and the date on the handwritten note is May 9th.
13     Q   And does this refer to a period of time in
14 May when it was particularly difficult to get
15 guidance from Mr. McGrath?
16     A   Yes.
17     Q   What was your objective in sending him the
18 e-mail and writing him the note?
19     A   I was trying to get information about
20 which of our staff members would be writing the
21 proposal analysis for the grant panels because
22 these things need to go out to the panelists in

mec                                                                 302

1  enough time in advance for them to read the
2  proposals and the analyses and then participate
3  fully in the grant panel.
4      Q   What was Mr. McGrath's response to your
5  note and your e-mail?
6      A   I didn't get responses.
7      Q   You didn't get a response to it.
8      A   Yes. It was -- this was the point where I
9  had gotten no response for so often that I was
10 trying new ways by printing out the e-mail and
11 writing on it and leaving it on his chair.
12         MS. MURPHY: Your Honor, the agency would
13 like to move to enter Exhibit K into evidence.
14         ADMIN. JUDGE SCHNEIDER: Any objections?
15         MS. PERRY: No objections.
16         ADMIN. JUDGE SCHNEIDER: Okay. Just a
17 moment.
18         [Pause.]
19         ADMIN. JUDGE SCHNEIDER: Agency Exhibit K,
20 which is basically an e-mail from Susie Baker sent
21 Wednesday, May 8, 2002, with hand notations on it,
22 without objection is admitted into evidence.

mec                                                                 303

1              [Agency's Exhibit K was
2              received in evidence.]
3          BY MS. MURPHY:
4      Q   Ms. Baker, did Mr. McGrath volunteer
5  personal information about himself to you?
6      A   It was more like in the office out in the
7  hall, not like directly to me during a meeting or
8  anything like that.
9      Q   What kinds of things did he say to you?
10     A   In my presence, he talked about his
11 divorce, about his daughter's psychiatric visits,
12 things like that, things I didn't want to know.
13     Q   Do you know Kathryn Wainscott?
14     A   Yes.
15     Q   Did you ever hear Ms. Wainscott tell you
16 that Mr. McGrath may be white but he acts black?
17     A   I don't remember that at all.
18     Q   Are those words you have ever heard Ms.
19 Wainscott use with regard to any person?
20     A   No.
21     Q   Did you and others on your staff -- the
22 office staff discuss Mr. McGrath's performance as a

mec                                                                 304

1  supervisor?
2      A   Yes.
3      Q   And what is your recollection of those
4  discussions?
5      A   I don't remember the exact words, but we
6  were finding an outlet for our frustration, and it
7  was every member of the office.
8      Q   Everyone in the office.
9      A   Everyone in the office expressed their
10 frustration and -- well, I can't speak to how other
11 people were feeling, but we were all talking about
12 it.
13     Q   Do you recall discussions of how the
14 office was, quote, "like the Berlin Wall"?
15     A   No. I never have heard that phrase.
16     Q   And how would you describe the staff's
17 reaction to Mr. McGrath's supervision?
18     A   Sort of perplexed and lacking guidance. I
19 mean, we just didn't know what to do. It was
20 frustrating.
21         MS. MURPHY: Thank you. I have no further
22 questions, Your Honor.

305

```
 1    ADMIN. JUDGE SCHNEIDER:
 2  Cross-examination.
 3                CROSS-EXAMINATION
 4    BY MS. PERRY:
 5    Q    Ms. Baker, where were you located prior to
 6  joining the Cultural Affairs office?
 7    A    I was in the Europe Eurasia Division of
 8  the Office of Citizen Exchanges.
 9    Q    And it's true, isn't it, that you were
10  moved from that office into Cultural Affairs
11  because of your poor performance?
12    A    No.  I applied for an open position and it
13  was a promotion.
14    Q    Okay.  You were receiving directions
15  directly from Mr. Sexton while you were employed in
16  the Cultural Affairs office; is that correct?
17    A    Yes.  Among others.
18    Q    Mr. Sexton was your third-line supervisor
19  at that point in time?
20    A    I guess so.
21    Q    In fact, you were working directly on a
22  program with Mr. Sexton while you were in the
```

306

```
 1  Cultural Affairs office; is that correct?
 2    A    Yes.  Yes.
 3    Q    And that was the Carnegie Hall program?
 4    A    Uh-huh.
 5    Q    Is that correct?
 6    A    Yes.  I have vague recollections of this,
 7  yes.  I mean, yes, I remember the program, but I
 8  don't remember like timeframes or anything like
 9  that.
10    Q    That program was set in eastern Europe; is
11  that correct?
12    A    It was an exchange program, and --
13    Q    Was it set in the Balkans?
14    A    I'm trying to remember.  I had one that
15  went to the Balkans, but I thought that was Jazz
16  Ambassadors.  No, that wasn't Carnegie Hall.
17    Q    Okay.
18    A    I don't recall.
19    Q    Outside of that, you didn't have a
20  portfolio of your own; is that correct?
21    A    We were developing the grant process in
22  that office, and so my portfolio was -- well, I did
```

307

```
 1  have a portfolio, actually, now that I think about
 2  it.  I had -- what were those -- what was that
 3  program called?  I'm not recalling the name of the
 4  program.  But they were individuals who would
 5  travel overseas and do cultural exchange.
 6         For example, I had one, I think it was in
 7  Zimbabwe, it was a theater program.  I can't
 8  remember the name of the program.  But I was also
 9  --
10    Q    The Cultural Specialist Program?
11    A    Oh, yes, Cultural Specialist.  That's
12  ACULSPECs.  That's right.
13    Q    Okay.  But the Carnegie Hall program was
14  not considered part of your portfolio; is that
15  correct?
16    A    I don't recall it not being part of my
17  portfolio.  I don't -- I can't remember.
18    Q    And $1.6 million was the ceiling for the
19  Cultural Affairs budget; is that correct?
20    A    I don't know what the actual ceiling was.
21  I know that there was some effort to try to raise
22  it or -- I don't know.  Honestly, it wasn't my
```

308

```
 1  purview to deal with the budget overall like that.
 2    Q    The Carnegie Hall program you were working
 3  on caused the office to exceed the $1.6 million
 4  budget; isn't that correct?
 5    A    I don't know.
 6    Q    And Mr. McGrath spoke to you about his
 7  concern over exceeding that $1.6 million budget;
 8  isn't that correct?
 9    A    There was a lot of conversation about --
10  during that time about this question about the cap
11  and the congressional limitation, but that wasn't
12  my -- I wasn't -- I mean, I was a program officer,
13  I wasn't responsible for the office budget.  That
14  wouldn't have been my -- I mean, I was aware of it,
15  but I had no control over it.
16    Q    Another program you were in was called the
17  ICPP program; is that correct?
18    A    Yes.
19    Q    And this was created when the Carnegie
20  Hall program was stopped; is that correct?
21    A    I think -- what I did with the
22  Intercultural Public/Private Fellows Program was
```

mec
309

1  developed the grant process for it, so I wrote the
2  requests for proposals and ran the competition. I
3  didn't run the program. When successful grantees
4  were selected, they were distributed to the
5  appropriate program officers.
6          In terms of the Carnegie program, that was
7  -- I thought that was a pilot program, and then I
8  don't know -- I think the intention was for it to
9  be a pilot for the Public/Private Fellows' Program.
10 I don't -- I mean, I can't tell you what Brian
11 Sexton had in his mind when he was -- I was doing
12 my job by creating this grant process. I wasn't
13 involved in that kind of decisionmaking.
14    Q   And Mr. McGrath worked with you on the
15 ICPP program from its inception; isn't that
16 correct?
17    A   I don't remember. I can't remember when
18 the inception was.
19    Q   And Mr. McGrath responded to your messages
20 regarding the ICPP program when needed; isn't that
21 correct?
22    A   No.

mec
310

1    Q   You simply disagreed with the contents of
2  Mr. McGrath's messages on many occasions; isn't
3  that correct?
4        MS. MURPHY: Your Honor, objection. Could
5  we have more information on what these messages
6  are?
7        MS. PERRY: I'm talking about the various
8  communications.
9        THE WITNESS: I don't know. I don't know.
10 I don't know. I mean, I don't feel that I got
11 responses, so I don't know what you are talking
12 about, actually.
13       BY MS. PERRY:
14    Q   And Mr. McGrath selected the panel members
15 for the ICPP grant program; isn't that correct?
16    A   Yes, eventually.
17    Q   And he informed you of his selection of
18 panel members once it was completed; is that
19 correct?
20    A   Yes, that's correct.
21    Q   And this was completed in time for the
22 panel to actual meet and complete the grant

mec
311

1  program; is that correct?
2    A   It was completed in time, barely in time
3  to have the panel but not according to the normal
4  operating procedures of the Office of Citizens
5  Exchanges. And I recall that I had to stay late,
6  after hours, to deliver the proposals to people,
7  leaving them on their chairs, because they were
8  already gone for the day, you know, in order to
9  have them delivered to the people in time for the
10 panels.
11    Q   And this was a large panel that was
12 assembled; is that correct?
13    A   I don't -- I think there was more than
14 one, actually. I can't remember exactly how many
15 panels there were.
16    Q   Is it possible that there were three
17 panels convened?
18    A   Yes, it's possible.
19    Q   And you only performed work with the Jazz
20 Ambassadors on a part-time basis; is that correct?
21    A   Yes. I, again, was tasked with creating
22 the grant process for that. I was a grants person.

mec
312

1  That's what I was told I would be doing when I was
2  promoted into that office, and so, therefore, I
3  wrote the request for proposals because I was
4  experienced in doing that whereas the program
5  officer who worked on Jazz Ambassadors was not. I
6  guess that's why I was tasked for it.
7    Q   And Jazz Ambassadors was -- the program
8  officer was Sandy Rouse; is that correct?
9    A   Uh-huh.
10   Q   And you don't know how much interaction
11 Mr. McGrath had with Sandy Rouse on the Jazz
12 Ambassadors program; is that correct?
13   A   No.
14   Q   And you don't know how much interaction
15 Mr. McGrath had with Ms. Montgomery on her
16 programs; is that correct?
17   A   No.
18   Q   And you don't know how much interaction
19 Mr. McGrath had with Ms. Wainscott on her programs;
20 is that correct?
21   A   Yes, that's correct. I don't know.
22   Q   In fact, Mr. McGrath would visit various

mec                                                                      313

1  individuals' offices directly; is that correct?
2      A  Yes.
3      Q  And you would see Mr. McGrath in various
4  program officers' offices at intervals throughout
5  the day; is that correct?
6      A  Yes.  I mean, all you have to do is be in
7  the office to see --
8      Q  And Mr. McGrath never refused to meet with
9  you; is that correct?
10     A  Well, it depends on how you define that.
11 I mean, he was barely ever around for a while
12 there, you know.  I would go try to have
13 conversations with him and he wouldn't be there.  I
14 would leave notes on his chair.  I mean, I don't
15 know how you define that.
16     Q  Mr. McGrath was gone for home leave and
17 Christmas leave during the time he supervised you;
18 is that correct?
19     A  I don't know.  I don't remember.
20     Q  Ms. Baker, if you could turn to Tab 34 in
21 those witness exhibits in front of you.
22        ADMIN. JUDGE SCHNEIDER:  Is that one

mec                                                                      314

1  already in?
2         MS. PERRY:  I don't believe this is
3  already in.
4         ADMIN. JUDGE SCHNEIDER:  Thirty-four, an
5  e-mail exchange?
6         MS. PERRY:  Yes.  Is that in?
7         ADMIN. JUDGE SCHNEIDER:  Yes.
8         MS. PERRY:  Okay.
9         BY MS. PERRY:
10     Q  Ms. Baker, do you recognize this document?
11     A  I mean, I guess so, yes.  I mean, now that
12 I'm reading it.  I don't -- I recall it.
13     Q  If you look at the very bottom two e-mails
14 on this first page, you are listed as an either
15 recipient to or an originator from on each of those
16 e-mails; is that correct?
17     A  Yes.
18     Q  And the subject of those e-mails is "Matt
19 wants a meeting"; is that correct?
20     A  Yes.
21     Q  And that reflects the fact that Mr.
22 McGrath was initiating contact with you regarding

mec                                                                      315

1  one of the programs that you were working on; is
2  that correct?
3      A  Yes.
4      Q  Mr. McGrath is one of a number of
5  supervisors you had while in the Cultural Affairs
6  office; is that correct?
7      A  Yes.
8      Q  First-line supervisors.  And Mr. McGrath
9  was not the only chief of that office to curtail
10 early; is that correct?
11     A  Yes.
12     Q  In fact, several supervisors have
13 curtailed early out of the chief position; is that
14 correct?
15     A  I was there only for one other one.
16     Q  And you are not currently any longer in
17 the Cultural Affairs office, are you?
18     A  No.
19     Q  And why is it that you transferred to a
20 new position?
21     A  I was looking for something different.  I
22 wanted to do other things.  I wasn't happy there.

mec                                                                      316

1      Q  And when did you transfer out of Cultural
2  Affairs?
3      A  I think it was in August of 2002.
4      Q  And, Ms. Baker, why were you unhappy as of
5  August 2002 in the Cultural Affairs office?
6      A  It was a difficult place to work.  It
7  wasn't interesting to me.  I wanted to work in
8  non-proliferation, which was where I went.
9         MS. PERRY:  Can you indulge me for just a
10 second, Your Honor?
11        [Pause.]
12        MS. PERRY:  I have no further questions.
13        ADMIN. JUDGE SCHNEIDER:  I have a
14 question.  It has been suggested that Mr. Wunder
15 had favorites in the office, in the cultural
16 office.  Did you ever sense that?
17        THE WITNESS:  Never.  I was very surprised
18 to see that as one of the questions.
19        ADMIN. JUDGE SCHNEIDER:  Any sense that
20 Mr. Wunder played favorites with different people
21 for any reason?
22        THE WITNESS:  No.  He's just not that kind

mec                                                             317

1  of a person.
2          ADMIN. JUDGE SCHNEIDER:  Any sense that he
3  treated people differently if they were white or
4  not white?
5          THE WITNESS:  No.
6          ADMIN. JUDGE SCHNEIDER:  Okay.  Any follow
7  up to my questions?
8          MS. MURPHY:  I had a couple follow ups to
9  Ms. Perry's questions, if I may, Your Honor.
10         ADMIN. JUDGE SCHNEIDER:  Yes.
11              REDIRECT EXAMINATION
12         BY MS. MURPHY:
13     Q   Ms. Baker, did Mr. McGrath visit you
14  office directly?
15     A   I just don't remember.  I mean, he must
16  have.  I don't know.
17     Q   Did he do it frequently?
18     A   No.
19     Q   When you saw him in other people's
20  offices, could you hear what they were saying and
21  listen to what they were saying?
22     A   I suppose it wouldn't be hard, yes.  I

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

mec                                                             318

1  mean, you could hear anything anyone was saying
2  pretty much unless the door was shut.
3      Q   When you saw him in other people's
4  offices, could you hear that they were talking
5  about business?  Did you hear that they were
6  talking about business?
7      A   I don't remember.  I mean, of course they
8  were probably talking about business sometimes and
9  maybe not others.  I just don't remember these
10 conversations at all.
11     Q   And with regard to Exhibit 4, to the
12 extent that it's a request from Mr. McGrath for a
13 meeting, would you describe it as characteristic of
14 his management?
15     A   No, I wouldn't.  I mean, as I mentioned
16 before, I had great difficulty in interacting with
17 him in terms of getting face time or responses to
18 my e-mails.
19     Q   Thank you, Ms. Baker.
20         ADMIN. JUDGE SCHNEIDER:  Any recross?
21         MS. PERRY:  No, Your Honor.
22         ADMIN. JUDGE SCHNEIDER:  All right.  Thank

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

mec                                                             319

1  you very much.  Thank you for coming today, and
2  please do not discuss your testimony with anyone
3  else.
4          THE WITNESS:  I won't.
5          ADMIN. JUDGE SCHNEIDER:  Okay.
6          [Witness excused.]
7          ADMIN. JUDGE SCHNEIDER:  We will go off
8  the record while we get our next witness.
9          [Off the record.]
10         ADMIN. JUDGE SCHNEIDER:  We are on the
11 record with our next witness, Ms. Joanne Armor.
12 Whereupon,
13              JOANNE ARMOR,
14 the witness, was called for examination by counsel
15 on behalf of the agency and, having been first duly
16 sworn, was examined and testified as follows:
17         ADMIN. JUDGE SCHNEIDER:  And after your
18 testimony, please do not discuss your testimony
19 with anyone else.
20         MS. CHANDLER:  Thank you, Your Honor.
21              DIRECT EXAMINATION
22         BY MS. CHANDLER:

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

mec                                                             320

1      Q   Ms. Armor, would you please state your
2  full name for the record?
3      A   Joanne Armor.
4      Q   What is your current position?
5      A   Employee relations specialist.
6      Q   How long have you been in that position?
7      A   In this current position, eight years in
8  June.
9      Q   What are your duties?
10     A   To review, analyze, and prepare proposals
11 for all disciplinary cases.
12     Q   I would like to ask you about credit card
13 cases in a moment, but would you first please
14 describe how discipline is proposed and decided in
15 the Department of State?
16     A   We get the case, the case officer gets the
17 case assigned to us on our supervisor, we review it
18 and analyze it, review it for similar type cases,
19 similar type misconduct, prepare a proposal, send
20 it through for clearances and signature by our
21 director.
22     Q   And what is the capacity of your director?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666