# EXHIBIT
# 7

mec

JMO

233

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - x
               :

MATTHEW McGRATH,       :

    Complainant,    : EEOC Case No.
               : 100-2003-08249X

    v.           :
               : Agency No.

UNITED STATES DEPARTMENT OF : 02-38
STATE,            :

    Agency.      :
- - - - - - - - - - - - - x

Wednesday, March 16, 2005

U.S. State Department
2201 C Street, N.W.
Washington, L.C.  20530

The above-entitled matter commenced,

pursuant to notice, at 8:48 a.m.

BEFORE:

    HONORABLE RICHARD E. SCHNEIDER
    Administrative Judge
    Equal Employment Opportunity Commission
    1801 L Street, N.W., Suite 100
    Washington, D.C.  20507

---

mec

234

APPEARANCES:

On Behalf of the Complainant:

    MICHELLE L. PERRY, ESQ.
    Kalijarvi, Chuzi & Newman, P.C.
    Suite 610
    1901 L Street, N.W.
    Washington, D.C.  20036
    (202) 331-9260

On Behalf of the Agency:

    KATHLEEN MURPHY, ESQ.
    MELINDA CHANDLER, ESQ.
    Department of State
    2201 C Street, N.W.
    Washington, D.C.  20530
    (202) 647-4646

---

mec

235

## C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matthew McGrath | -- | 237 | 276/287 | 287 |
| Jennifer S. Baker | 291 | 305 | 317 | -- |
| Joanne Armor | 319 | 333 | 340 | 340 |
| Alfred Head | 342 | 349 | -- | -- |
| E. Montgomery | 351 | 356 | 359 | -- |
| Kathryn Wainscott | 361 | 379 | 401 | 406 |
| Deborah Chapman | 410 | 419 | -- | -- |
| LaFaye Proctor | 428 | 442 | -- | -- |
| Van Samuel Wunder | 445 | 514 | 546 | -- |
| Leanne Mella | 555 | 559 | -- | -- |
| Matthew McGrath | 569 | 603 | -- | -- |

## E X H I B I T S

| COMPLAINANT'S | IDENTIFIED | RECEIVED |
|---|---|---|
| No. 39 | (Previously) | 550 |
| No. 20 | (Previously) | 589 |
| AGENCY'S | | |
| No. K | (Previously) | 303 |
| No. O | (Previously) | 333 |
| No. A | (Previously) | 452 |
| No. B | (Previously) | 456 |
| No. C | (Previously) | 461 |
| No. Q | (Previously) | 468 |
| No. I | (Previously) | 484 |
| No. R | (Previously) | 490 |
| No. L | (Previously) | 495 |
| No. M | (Previously) | 502 |
| No. N | (Previously) | 512 |
| No. J | (Previously) | 558 |

---

mec

236

1               P R O C E E D I N G S

2                      [8:48 a.m.]

3       ADMIN. JUDGE SCHNEIDER:  We are back on

4 the record.  Today is March 16, 2005.  This is the

5 second day of the administrative EEOC hearing in

6 the discrimination complaint filed by Matthew

7 McGrath, the complainant, EEOC Number

8 100-2003-08249X, and Agency Number 02-38.

9       We are resuming this morning with the

10 complainant as witness, and I believe we are

11 picking up with agency's cross-examination; is that

12 correct?

13       MS. MURPHY:  Yes.

14       MS. PERRY:  Yes, Your Honor.

15       [Off the record.]

16       ADMIN. JUDGE SCHNEIDER:  Okay.  Let's go

17 back on.

18       Mr. McGrath, you were sworn in yesterday

19 and you are still under oath.

20       THE WITNESS:  Okay.

21       ADMIN. JUDGE SCHNEIDER:  Agency.

22 Whereupon,

mec                                                             357

1    Q    And that was later in that same year?

2    A    Yes.

3    Q    Did Mr. Wunder approve that travel?

4    A    I believe he had to approve all travel.

5    Q    In 2002, were you provided with software

6    which was intended to assist you in working your

7    computer?

8    A    Yes.

9    Q    Was Mr. Wunder responsible for getting you

10   the software?

11   A    He suggested it.

12   Q    Was your employment ever terminated by Mr.

13   Wunder?

14   A    No.

15   Q    Was your employment ever terminated by

16   anyone?

17   A    No.

18   Q    You continue to be employed by the

19   department.

20   A    Yes.

21        MS. MURPHY:  Thank you.

22        ADMIN. JUDGE SCHNEIDER:  You said you

---

mec                                                             358

1    heard rumors that you yourself and two others were

2    being talked about for termination?

3        THE WITNESS:  Termination or something.

4        ADMIN. JUDGE SCHNEIDER:  Do you know who

5    the other two people were?

6        THE WITNESS:  Yes.  A part-time employee,

7    Sandy Rouse, and Susan Stern -- Susan Cohen,

8    rather.

9        ADMIN. JUDGE SCHNEIDER:  And do you know

10   the races of each of them; or either of them?

11       THE WITNESS:  Yes.

12       ADMIN. JUDGE SCHNEIDER:  Can you tell us?

13       THE WITNESS:  They are Caucasian.

14       ADMIN. JUDGE SCHNEIDER:  And do you know

15   the ages of either one, or both?

16       THE WITNESS:  No.

17       ADMIN. JUDGE SCHNEIDER:  Approximately?  I

18   mean, young? middle-age? old?

19       THE WITNESS:  Middle-age.

20       ADMIN. JUDGE SCHNEIDER:  Okay.  And do you

21   know --

22       THE WITNESS:  Fiftyish.

---

mec                                                             359

1        ADMIN. JUDGE SCHNEIDER:  -- if either one

2    had any disability?

3        THE WITNESS:  I don't know.

4        ADMIN. JUDGE SCHNEIDER:  Nothing apparent?

5        THE WITNESS:  Well, they had illnesses,

6    but I don't know exactly how they are classed.

7        ADMIN. JUDGE SCHNEIDER:  Okay.  Any follow

8    up to my questions or redirect?

9        MS. PERRY:  Yes, Your Honor.

10       REDIRECT EXAMINATION

11   BY MS. PERRY:

12   Q    Ms. Montgomery, the travel to Chicago,

13   that was after June of 2002; is that correct?

14   A    I believe so.

15   Q    And the software that Mr. Wunder --

16   A    The travel to Chicago had to do with one

17   of my projects.

18   Q    Okay.  The software that Mr. Wunder

19   suggested for you, he never raised that suggestion

20   prior to April of 2002; is that correct?

21   A    I don't know what date it was, but no, not

22   prior to the time that I received --

---

mec                                                             360

1    Q    That you actually received it.  So his

2    suggestion that you receive the software and your

3    actual receipt of the software, was that a fairly

4    close in time event?

5    A    No.  It took a considerable length of

6    time, and then much longer to have it hooked up.

7    Q    So when did you actually receive the

8    software?

9    A    I couldn't tell you the date.

10   Q    Okay.

11       MS. PERRY:  I have no further questions.

12       ADMIN. JUDGE SCHNEIDER:  Any recross?

13       Okay.  Thank you very much, Ms.

14   Montgomery.  We appreciate you coming today.  Thank

15   you for your time.

16       [Witness excused.]

17       [Off the record.]

18       ADMIN. JUDGE SCHNEIDER:  We are back on

19   the record.  Our next witness is Ms. Kathryn

20   Wainscott.

21   Whereupon,

22       KATHRYN WAINSCOTT,

mec                                                      373

1       A    Well, this is the strange part about it.
2   There is a list that we get of all of the grantee
3   organizations, American performing artists, the
4   countries they are going to, the amount of the
5   grants, and that's a list that was shared with Mr.
6   McGrath and shared with, obviously, Mr. Wunder.
7            I don't know if Mr. Wunder and Mr. McGrath
8   had a conversation, but again, I'm looking for
9   management to tell me -- actually. Sam Wunder had
10  already approved as the partner, so, again, I don't
11  know if Mr. McGrath and Mr. Wunder had a
12  discussion, but Mr. McGrath was not happy that we
13  were giving certain festivals to certain
14  individuals and organizations.
15           But the other thing you have to remember
16  is the grant cycle is cyclical. You have -- since
17  we had three different panels, we convened three
18  different panels, festivals are taking place all
19  over the world at different times, and usually
20  artists are sending in applications within like a
21  three- to six-month period wrapped around when
22  these festivals are taking place, and we would have

mec                                                      374

1   more festival applications to review from Latin
2   America in September. We would probably have more
3   from western Europe -- excuse me -- all of Europe,
4   because it's all of Europe, it's not just western
5   Europe -- in January, and then there was another
6   panel that was convened in July.
7            I don't think he was looking at -- he was
8   looking at the number of grants, but he wasn't
9   looking at the size of the money, because we would
10  give small grants to western Europe -- again,
11  you've got different partners in here -- and the
12  largest grants that we gave were to Africa because
13  festivals in Africa don't have a lot of money and a
14  lot of, you know, support. So by far, I mean, we
15  would -- it was very extraordinary for us to give a
16  $20,000 grant, but we would give it to a group
17  going to Africa depending on the size of the group.
18      Q    And so you organized the cables by
19  geographic region?
20      A    I normally did. I have to look at this.
21  It depends how many grants we had. But in the
22  January, which was really in March, and the July,

mec                                                      375

1   we had three-day panels; these are two-day panels.
2   So yes, I think I did do them geographically. It
3   was just easier for everybody to see because, as
4   you can see, there's a pretty long list.
5       Q    Thank you.
6            When Mr. McGrath was your supervisor, did
7   he hold regular weekly staff meetings?
8       A    He held I think three staff meetings, and
9   then no.
10      Q    And the three staff meetings were --
11      A    Right after he came to work.
12      Q    Right after he came.
13      A    Yes.
14      Q    Did Mr. McGrath meet with you individually
15  to review your projects?
16      A    No.
17      Q    Did he meet with you individually to
18  review budgets and plans?
19      A    No.
20      Q    Did Mr. McGrath continue throughout his
21  tenure to work with you as your supervisor?
22      A    He was there. I mean, he was engaged

mec                                                      376

1   probably for the first three months while he was
2   there, and I really can't put my finger on what
3   happened or why it happened, but after that, I had
4   -- I didn't have a lot of contact with him. I
5   mean, I -- he didn't really have an open-door
6   policy as far as a manager is concerned. He wasn't
7   open to brainstorming. And that was a very
8   critical time in our division and, obviously, at
9   the State Department, but no.
10      Q    How would you describe Mr. McGrath's
11  performance as a manager?
12      A    Again, I would have to go back to he did
13  not have an open-door policy, and I -- I found him
14  difficult to work with as a manager, and, again, I
15  have been with the government for 30 years.
16      Q    And what do you mean when you say he did
17  not have an open-door policy?
18      A    Well, you really couldn't go in or make
19  arrangements for times to discuss problems with
20  him. I mean, I know that he -- he did not like the
21  festival fund for a number of different reasons,
22  but it was very difficult to sit down and actually

mec                                                                 377

1  talk with him about how we could make the process
2  better because he would go to Sam, and then -- we
3  never -- like never sat down just to brainstorm
4  what we can do and how we can do it about the
5  festival fund.  It was frustrating, I have to tell
6  you, it was frustrating.
7      Q    Did you and others on the office staff
8  discuss Mr. McGrath's performance as a supervisor?
9      A    Yes.  It was discussed a lot.
10     Q    And what is your recollection of those
11 discussions?
12     A    My recollection is people would just come
13 into my office -- I can't remember when they came,
14 dates, or things that were said, but we were all
15 frustrated that we -- information wasn't filtering
16 down.  Senior management -- the assistant secretary
17 has a meeting, had a meeting every week; then the
18 division chiefs; and what is the normal thing to
19 have happen is the division chief goes to those
20 meetings, goes to the assistant secretary meeting
21 and also to the division chiefs meeting, and then
22 they hold their meeting to discuss what happened

mec                                                                 378

1  and how they impact on our programs and how we can
2  focus on programs that will support the State
3  Department.
4          We would get notes from another division
5  chief because he knew we were not getting the
6  information, so he was kind enough to take notes
7  and then he would send it to us by e-mail so we
8  would at least know what was going on.
9      Q    So Mr. McGrath did not share that
10 information with you?
11     A    No.
12     Q    Did you ever say of Mr. McGrath, "He may
13 be white, but he acts black"?
14     A    No.  And I want to be very clear on this.
15 I never said those words, and those words would
16 never have crossed my mind.  I don't even know what
17 that is in reference to.  No, I never said that.
18     Q    Are those words you have ever used with
19 respect to any other person?
20     A    Absolutely not.
21     Q    Thank you.
22     A    Definitely not.

mec                                                                 379

1      MS. MURPHY:  Thank you, Ms. Wainscott.
2      ADMIN. JUDGE SCHNEIDER:
3  Cross-examination.
4              CROSS-EXAMINATION
5      BY MS. PERRY:
6      Q    Ms. Wainscott, Mr. McGrath spoke to you on
7  more than one occasion about his concerns about the
8  Arts International grant; isn't that correct?
9      A    On a number of occasions?  We had several
10 discussions about them where he was telling me
11 basically what he wanted to see happen, yes.
12     Q    And it's true, isn't it, that Mr. McGrath
13 informed you that the grant should not be renewed
14 when it came up for renewal in the fall of 2001?
15     A    It was already -- you have to be very
16 clear about this.  That proposal had already been
17 paneled, the assistant secretary signed off on it,
18 and it had gone to the Hill.  You don't -- I don't
19 -- I can't pull and he couldn't pull a grant back
20 that the assistant secretary signed that was on
21 Capitol Hill.  Certainly I couldn't do that.  I
22 didn't have the authority.  He would have to go to

mec                                                                 380

1  the assistant secretary and request that.  He
2  couldn't request that of me.
3      Q    It's true, isn't it, that Mr. McGrath
4  suggested to you that in his opinion, it should not
5  be renewed; is that correct?
6      A    It was already renewed.  How could --
7      Q    My question isn't whether it could be
8  done; my question is whether or not Mr. McGrath
9  said it should not be done.
10     A    Yes, he did.
11     Q    Mr. McGrath told you it should not be a
12 sole-source grant; isn't that correct?
13     A    I don't remember that.  I don't -- I
14 really don't remember that.
15     Q    And Mr. McGrath told you that he believed
16 the Arts International grant program was skewed
17 toward western Europe; isn't that correct?
18     A    I think he believed that, yes.
19     Q    Mr. --
20     A    Can I say something on this?
21     Q    No.
22     A    Okay.

mec                                                             381

1       Q    Mr. McGrath also told you it should be

2   changed to allow Cultural Affairs to have more of a

3   vote in the program; isn't that correct?

4       A    I don't remember that.

5       Q    And Mr. McGrath suggested that the

6   definition of what type of programs would be

7   accepted should be changed as well; isn't that

8   correct?

9       A    I don't understand your question.

10      Q    Okay.  Mr. McGrath suggested that the

11  definition of what type of festivals were at issue

12  should be changed; is that correct?

13      A    No, I don't remember that.

14      Q    Okay.  And you stated that in October

15  2001, you attended a meeting in New York regarding

16  the Arts International fund?

17      A    You said when?

18      Q    October 2001.

19      A    Uh-huh.

20      Q    And that Mr. McGrath was with you during

21  that trip?

22      A    He was.

mec                                                             382

1       Q    Following the panel meetings of that day,

2   you and Mr. McGrath went to dinner with another

3   individual; isn't that correct?

4       A    We went with two individuals.

5       Q    And one of those individuals was a

6   representative of the NEA; isn't that correct?

7       A    Yes.

8       Q    And during that dinner, Mr. McGrath also

9   informed the NEA partner of what his concerns were

10  with the grant; isn't that correct?

11      A    I don't remember specifically.  We were

12  also there with a choreographer, so I'm sure that

13  -- he might have said something to her.  I don't

14  think he would have said that.  It wouldn't have

15  been the place for him to discuss that with a

16  choreographer who also could have benefited from

17  the festival fund.  I think he had a conversation

18  with Ms. Ohada, and I was talking to the

19  choreographer, so what was discussed, I don't know.

20      Q    Okay.  And Mr. McGrath expressed his

21  concerns regarding the Arts International fund to

22  Mr. Wunder in your presence; isn't that correct?

mec                                                             383

1       A    Uh-huh.  I remember that.  We were having

2   a meeting.

3       Q    In April 2002, did you attend a meeting

4   with Ms. Mella, Mr. Wunder, and Mr. McGrath

5   regarding an upcoming meeting of the partners of

6   Arts International?

7       A    That's probably -- yes, we would have done

8   that.

9       Q    And that meeting was scheduled to occur on

10  April 9th of 2002; is that correct?

11      A    If you have -- that's probably correct.

12      Q    And Mr. McGrath raised his concerns again

13  about the grant program during that meeting; is

14  that correct?

15      A    You don't -- you just want me to say yes

16  and no?  You don't want me to say anything other

17  than that?

18      Q    Whatever your answer is to the question.

19      A    Matt had two specific areas that he wanted

20  to see changed, and that's where the guidelines

21  came in, and Sam agreed to having these changes.

22  So that's what I remember out of those meetings.

mec                                                             384

1   He made the proposal and Sam Wunder agreed.

2       Q    So Mr. McGrath made some concrete

3   suggestions for actual changes.

4       A    He made -- yes.  He made two suggestions

5   that needed to have guidelines written for them to

6   present to the partners.

7       Q    Okay.  And Mr. McGrath was not allowed to

8   actually attend that partners meeting; is that

9   correct?

10      A    Why not?  Of course he was.  Why wouldn't

11  he?

12      Q    If you look in the binder in front of you

13  at Tab 22, have you seen these e-mails before

14  today, Ms. Wainscott?  I believe, if you look at

15  page 2 of Tab 22, you are one of the individuals

16  participating in the e-mails.

17      A    Page 27  Wait a minute.  I don't remember

18  seeing the first page.

19      Q    Ms. Wainscott, if you look at the first

20  page, at the top of the page, that e-mail is from

21  Mr. Wunder to Mr. McGrath.  The first sentence of

22  that states, "Matt, given your views, I think it

mec                                                                385

1   would be better if you do not attend the meeting
2   next week."  Do you see that sentence?
3       A   I'm sorry.  Is that on page number 1 right
4   after 22?
5       Q   Yes.  Page 1, top e-mail.
6       A   "Given your views, I think it would be
7   better if -- I didn't -- I was not aware of that.
8   I know he didn't attend the meeting, and I was
9   surprised that he didn't attend the meeting.
10      Q   So Mr. Wunder didn't inform you that Mr.
11  McGrath was not permitted to attend the meeting?
12      A   No, because that's when we were going to
13  present the guidelines for the two areas that Matt
14  was very influential about getting started.  I was
15  surprised.  No, I didn't know that.
16      Q   Okay.  And despite his repeated repetition
17  of his concerns regarding this grant, Mr. McGrath
18  never refused to actually participate in the work
19  regarding the grant; is that correct?
20      A   Yes, he did.  Definitely did.
21      Q   And what work is it he refused to
22  participate in?

mec                                                                386

1       A   Well, because he was the one, at a
2   management team meeting -- we had a team --
3   management -- with the National Endowment for the
4   Arts, Pew and Rockefeller were represented by Arts
5   International, and then with the State Department
6   -- he made the two recommendations that Sam agreed
7   to, but then we needed to write guidelines, and I
8   asked him if he would give me information on
9   guidelines, what did he want to see, how did he
10  want us to progress, and he said, "I don't want
11  anything to do with it."
12      Q   And when did this meeting occur?
13      A   I don't remember times.  I mean, you're
14  talking -- it had to be prior to the time -- it was
15  after a management team meeting and prior to a
16  partner meeting.
17      Q   So the partner meeting was April 9th or a
18  management team meeting was April 9th?
19      A   I don't remember.  I honestly don't
20  remember.  I didn't -- I don't remember.  What can
21  I say?  I mean, we had a management team meeting in
22  Washington prior to the partner meeting sort of

mec                                                                387

1   setting the groundwork for the partner meeting,
2   what was to be discussed and the work that needed
3   to be done and who was going to do the meeting --
4   you know, who was going to do the work.
5           So of course the management team turns to
6   me and they say, "State Department, you are making
7   these recommendations.  We agree to have them
8   presented to the partners, but you have to present
9   it, you have to come up with the ideas and the
10  guidelines."
11      Q   So is it possible that the April 9th,
12  2002, meeting that Mr. McGrath was not permitted to
13  go to was a management team meeting?
14      A   No.  He attended the management team
15  meeting.  It was the partner meeting.  He was at
16  the management team meeting.  He was there.  I
17  remember where he sat; he was sort of sitting just
18  where he is now, across from me.  And all of this,
19  you could check -- I could go back to minutes if
20  you want me to because we had minutes for all of
21  the partner meetings and all of the management team
22  meetings, which are kept.

mec                                                                388

1       Q   And you looked at Exhibit 38 in there,
2   which was your e-mail with a cable attached to it.
3       A   Uh-huh.
4       Q   In that e-mail, the last sentence says, "I
5   have in the past requested clearance from him -- I
6   assume meaning Mr. McGrath -- for these cables but
7   have never received a response."  Do you see that
8   sentence?
9       A   Uh-huh.
10      Q   "In the past" is several days prior to
11  this e-mail; is that correct?
12      A   Right.  I mean, what I must have done, I
13  probably -- again, I'm -- this is a while back.  I
14  probably sent Matt the cables as my division chief
15  waiting for his response before I could go back --
16  before I could send them on to Sam, and then once
17  Mr. McGrath would approve them, then I would get
18  Mr. Wunder's approval, then I would go out to the
19  areas.
20          I'm surmising that I sent them to Matt, he
21  never responded to me, so that's why I'm sending
22  them to Mr. Wunder, and that's why I'm saying I'm

mec                                                                397

BY MS. PERRY:

Q    The third paragraph under supplemental
response states, "Complainant's counsel requested
that Ms. Wainscott be asked to supply additional
information if possible.  The agency contacted Ms.
Wainscott with this request.  Ms. Wainscott stated
that she wished she could provide more details, but
that at the time she was not keeping track of every
conversation she had with other staff members
regarding Mr. McGrath's management."

Do you see that sentence?

A    I do.  I do.

Q    Prior to that, in the previous paragraph,
the agency had stated, "During the time Mr. McGrath
was the manager of the Cultural Programs Division,
almost every member of the staff complained to me
about his lack of management.  I do not have
specific dates."

Do you see that?

A    I do.

Q    What were some of the complaints that you
were receiving from the staff?

mec                                                                398

A    That he was basically a vacant manager.
Programs weren't proceeding, we weren't working as
a team.  There was one point where our deputy
assistant secretary asked the staff, asked Mr.
McGrath to convene a meeting so we can discuss our
projects to come up with a mission statement.  He
didn't convene the meeting.  We convened the
meeting and asked him to attend as our division
chief, and he declined.  So we tried to work our
way through it, but it didn't work.

Q    Mr. Wunder actually attended that meeting
that Mr. McGrath did not attend.

A    No, he was not there.  Mr. Wunder was not
there, no.  It was just the staff.

Q    But you don't know how much Mr. McGrath
actually interacted with the other members of the
Cultural Affairs office, do you?

A    Well, I mean, I wasn't keeping an eye on
it, if that's what you mean.  I can only go by what
people told me at the time.

Q    And you saw Mr. McGrath in the offices of
various individuals in Cultural Affairs on a

mec                                                                399

regular basis; isn't that correct?

A    I can't say that I did.  He had a few
people that he would sit and talk personal things
to.  Basically, 90 percent of what he was talking
about, if not 100, were personal things.

Q    Were you actually participating in those
conversations where you believe it was personal?

A    I would hear about them.

Q    But you weren't actually participating in
those conversations.

A    I was not, no.  But he had a couple of
people that he liked.

Q    So you don't know whether or not there was
also business discussed during those conversations.

A    No, I don't.  I don't.

Q    And you never told Mr. McGrath that anyone
was complaining to you, did you?

A    No.

Q    The Arts International grant doesn't
actually exist anymore; is that correct?

A    The Pew and Rockefeller Foundations, after
15 years decided, which was very unusual for them

mec                                                                400

to be in the fund, that kind of an organization --
and yes, it no longer exists.  I think we're still
trying to work some details out with the National
Endowment for the Arts for the visual arts
component, and we've actually, at the State
Department, initiated a new program.  It's called
the Performing Arts Initiative, that we can give
grants to organizations through the post to fund
American performing artists at festivals.

Q    Did that result in a change in your
duties?

A    No, because the division chief is now
basically the program officer for that.  We are
helping, there are several of those on the staff
that are helping, but I'm not in charge of the
program.

Q    Okay.  Mr. McGrath was one of a number of
supervisors in the Cultural Affairs office that
curtailed early; is that correct?

A    Yes.

Q    And are you aware of why the other
supervisors curtailed early?

mec                                                             405

1   of a travel grant to bring musicians here from the

2   Silk Road region.  That he did give me directly.

3        ADMIN. JUDGE SCHNEIDER:  Did that seem

4   unusual?

5        THE WITNESS:  Well, under the

6   circumstances now and the manager that we have now,

7   I would have thought, but under the circumstances

8   then, no, I didn't.

9        ADMIN. JUDGE SCHNEIDER:  Explain.

10       THE WITNESS:  In that this was during a

11  period of time when Matt was not communicating

12  certainly with me and work had to be done.  Why Sam

13  Wunder came directly to me, I can't answer that.  I

14  didn't question it.  He's the director, he asked me

15  to do this, he thought I was competent to do it and

16  capable of doing it, so I just went ahead and did

17  it.  It wasn't a huge assignment.

18       ADMIN. JUDGE SCHNEIDER:  Do you know if

19  Mr. Wunder went to other members of Mr. McGrath's

20  staff and gave them assignments directly?

21       THE WITNESS:  I don't know.  I really

22  don't.

mec                                                             406

1        ADMIN. JUDGE SCHNEIDER:  Did you ever have

2   a sense that Mr. Wunder liked -- the very broad

3   meaning of the word "liked" -- some members of Mr.

4   McGrath's staff more than others?

5        THE WITNESS:  No.  No.  Sam's just not

6   that kind of a person.

7        ADMIN. JUDGE SCHNEIDER:  Any sense that

8   Mr. Wunder treated anybody differently because they

9   were white or black or anything else?

10       THE WITNESS:  Oh, absolutely not.  No.

11  No.  No.  Sam Wunder is a true professional.  No.

12  Absolutely not.

13       ADMIN. JUDGE SCHNEIDER:  Thank you.

14       Any follow up?

15       MS. PERRY:  Yes.

16       RECROSS-EXAMINATION

17       BY MS. PERRY:

18   Q   Ms. Wainscott, you mentioned the fact that

19  Mr. McGrath gave out some personal information.

20  Was Mr. McGrath the only individual in the office

21  to give personal information out? --

22   A   Probably not, no.

mec                                                             407

1    Q   And you also talked about the fact that

2   Mr. McGrath seemed to like the programs that Ms.

3   Rouse and Ms. Cohen were running.  The program Ms.

4   Rouse was running was Jazz Ambassadors program; is

5   that correct?

6    A   Uh-huh.

7    Q   And the Jazz Ambassadors program was in

8   chaos after 9/11; isn't that correct?

9    A   I don't remember that.

10   Q   9/11/2001, all the programs -- all the

11  artists in the Jazz Ambassadors program had to be

12  recalled to the U.S.; isn't that correct?

13   A   Actually, now that you're saying that,

14  yes, they probably -- there were some artists that

15  did not want to travel.  I'm not sure that they

16  were -- I think the artists felt uncomfortable

17  traveling, and, of course, we're in close

18  consultation with the embassies.  But, again, it's

19  not my program, so I can't -- but I do, now that

20  you're reminding me, I do remember that.

21   Q   So there was a lot of extra work going on

22  with the Jazz Ambassadors program starting in

mec                                                             408

1   September 2001; isn't that correct?

2    A   Well, see, I can't remember.  We have a

3   grant and I can't remember whether we had a grant

4   where the Kennedy Center at that time.  And he's

5   saying no.

6        MS. MURPHY:  Your Honor, I object to the

7   fact that Mr. McGrath is contributing to the

8   conversation.

9        THE WITNESS:  I will just go back.  We

10  have a grant and we've had a grant for the last

11  three years.  I don't remember -- maybe we did not

12  have a grant at the time with the Kennedy Center,

13  so Ms. Rouse was probably doing a lot of the

14  programming herself, yes.  But I don't work that

15  closely -- I work closely with her, but I don't

16  know about all of her programs and what she is

17  doing on a daily basis.

18       MS. PERRY:  No further questions, Your

19  Honor.

20       ADMIN. JUDGE SCHNEIDER:  Anything else?

21       MS. MURPHY:  Nothing.  Thank you, Your

22  Honor.