# EXHIBIT 16

JMO

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - x

MATTHEW McGRATH,

Complainant, : EEOC Case No. 100-2003-08249X

v.

UNITED STATES DEPARTMENT OF STATE, : Agency No. 02-38

Agency.

- - - - - - - - - - - - - - x

Wednesday, March 16, 2005

U.S. State Department
2201 C Street, N.W.
Washington, D.C. 20530

The above-entitled matter commenced, pursuant to notice, at 8:48 a.m.

BEFORE:

HONORABLE RICHARD E. SCHNEIDER
Administrative Judge
Equal Employment Opportunity Commission
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

APPEARANCES:

On Behalf of the Complainant:

MICHELLE L. PERRY, ESQ.
Kalijarvi, Chuzi & Newman, P.C.
Suite 610
1901 L Street, N.W.
Washington, D.C. 20036
(202) 331-9260

On Behalf of the Agency:

KATHLEEN MURPHY, ESQ.
MELINDA CHANDLER, ESQ.
Department of State
2201 C Street, N.W.
Washington, D.C. 20530
(202) 647-4646

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matthew McGrath | -- | 237 | 276/287 | 287 |
| Jennifer S. Baker | 291 | 305 | 317 | -- |
| Joanne Armor | 319 | 333 | 340 | 340 |
| Alfred Head | 342 | 349 | -- | -- |
| E. Montgomery | 351 | 356 | 359 | -- |
| Kathryn Wainscott | 361 | 379 | 401 | 406 |
| Deborah Chapman | 410 | 419 | -- | -- |
| LaFaye Proctor | 428 | 442 | -- | -- |
| Van Samuel Wunder | 445 | 514 | 546 | -- |
| Leanne Mella | 555 | 559 | -- | -- |
| Matthew McGrath | 569 | 603 | -- | -- |

E X H I B I T S

| COMPLAINANT'S | IDENTIFIED | RECEIVED |
|---|---|---|
| No. 39 | (Previously) | 550 |
| No. 20 | (Previously) | 589 |
| AGENCY'S | | |
| No. K | (Previously) | 303 |
| No. O | (Previously) | 333 |
| No. A | (Previously) | 452 |
| No. B | (Previously) | 456 |
| No. C | (Previously) | 461 |
| No. Q | (Previously) | 468 |
| No. I | (Previously) | 484 |
| No. R | (Previously) | 490 |
| No. L | (Previously) | 495 |
| No. M | (Previously) | 502 |
| No. N | (Previously) | 512 |
| No. J | (Previously) | 558 |

P R O C E E D I N G S

[8:48 a.m.]

ADMIN. JUDGE SCHNEIDER: We are back on the record. Today is March 16, 2005. This is the second day of the administrative EEOC hearing in the discrimination complaint filed by Matthew McGrath, the complainant, EEOC Number 100-2003-08249X, and Agency Number 02-38.

We are resuming this morning with the complainant as witness, and I believe we are picking up with agency's cross-examination; is that correct?

MS. MURPHY: Yes.

MS. PERRY: Yes, Your Honor.

[Off the record.]

ADMIN. JUDGE SCHNEIDER: Okay. Let's go back on.

Mr. McGrath, you were sworn in yesterday and you are still under oath.

THE WITNESS: Okay.

ADMIN. JUDGE SCHNEIDER: Agency.

Whereupon,

mec 445

A F T E R N O O N S E S S I O N

[1:35 p.m.]

ADMIN. JUDGE SCHNEIDER: We're back on the record after our lunch break. Our next witness is Mr. Van Wunder.

Do you go by Wunder or Van Wunder?

MR. WUNDER: The name is Van Samuel Wunder, so I go by Sam.

ADMIN. JUDGE SCHNEIDER: Or Mr. --

THE WITNESS: Or Mr. Wunder.

ADMIN. JUDGE SCHNEIDER: Okay. Thank you.

Whereupon,

VAN SAMUEL WUNDER,

the witness, was called for examination by counsel on behalf of the agency and, having been first duly sworn, was examined and testified as follows:

ADMIN. JUDGE SCHNEIDER: After your testimony today, please do not discuss your testimony with anyone else. Thank you.

DIRECT EXAMINATION

BY MS. MURPHY:

Q Thank you, Mr. Wunder.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 446

Please state your full name for the record and spell it for the court reporter.

A My full name is Van Samuel Wunder III. Last name is W-u-n-d-e-r.

Q Are you a member of the Foreign Service?

A Yes.

Q How long have you been in the Foreign Service?

A Thirty-four years, since 1971.

Q What is your current position with the Department of State?

A I am currently a senior advisor in the Bureau of Educational and Cultural Affairs.

Q And how long have you been in your current position?

A Approximately 18 months.

Q And prior to that?

A Prior to that, from the summer of 2000 to summer of 2003, I was the director of the Office of Citizen Exchanges in the Bureau of Educational and Cultural Affairs.

Q When did you first become acquainted with

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 447

Mr. McGrath?

A I actually met Mr. McGrath in early September 2001. I believe we spoke once on the telephone before he was assigned to the office in the summer of 2001, but we actually met -- I believe it was just before 9/11, around September 8th.

Q And when did you become Mr. McGrath's first-line supervisor?

A At that same time.

Q Okay. For how long was the position of Cultural Programs division chief vacant before Mr. McGrath reported to that position?

A I believe it was vacant for about a month. His predecessor had, I believe, left around July, although he was still -- he was in language training at the Foreign Service Institute and was still checking in on various issues throughout August, cleaning up a couple of issues. But essentially he had left to start language training in August.

Q And language training was part of

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 448

preparations for a new assignment?

A Yes. He was assigned as PAO, Vietnam, and was studying Vietnamese.

Q And who served as the acting division chief during that time period?

A The senior program officer was Kathryn Wainscott, who would normally take over the day-to-day activities in the absence of the division chief, and I was also working with her at that time.

Q Did you interact with the Cultural Programs staff once Mr. McGrath became the division chief?

A Yes. We had -- immediately after 9/11, we had two large cultural programs that started up in response to 9/11. One was a large photographic exhibit called After 9/11 which was from Ground Zero. The other was program with the Smithsonian Institution in the summer of 2002. I dealt with Mr. McGrath's staff on both of those.

I also had to deal with his staff while Mr. McGrath was on leave over Christmas and on the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 449

delayed home leave in February, January, February.

Q So you were having regular conversations with Mr. McGrath's staff while he was division chief.

A With some members of his staff, yes.

Q Okay. And do you recall receiving a request from Mr. McGrath for annual leave to be taken during December 2001 and January 2002?

A Yes.

Q Do you recall if you approved all or part of this request?

A I approved part of it. We discussed his request. It included both his annual leave in December, around Christmas, and his delayed home leave, which would follow.

When I looked at the total request, it would have been in the 13 weeks of December, January, February. He would have been out about over eight weeks, and so we discussed what would be a reasonable time to be off. I think I approved about ten days' leave of Christmas and 20 days of home leave, which I thought was a reasonable



mec 450

accommodation for his needs.

Also at this time, because of the national emergency after 9/11, we had been issued instructions that anyone needing to carry over leave -- that is, not forfeit leave -- that ECA would be considered as working at the exigencies of the Federal Government and that these requests for carry over of leave would be considered leniently.

Many of us did carry over leave that we could not use into 2002.

Q So your decision to not give Mr. McGrath all the leave he requested in your view would not result in his suffering any forfeiture.

A No. In my understanding, I gave -- in fact, I gave him a formal memorandum in early December turning down part of his leave for the purpose of -- so that he could use that to request carryover, reinstatement of any forfeited leave.

Q Mr. Wunder, I'm going to show you what is marked Agency Exhibit A and ask if you can identify that exhibit.

A That's my memo -- this is my memo from



mec 451

December 3 to Mr. McGrath stating that given the pressure of coming to agreement on the 9/11 exhibit and other business, I was denying part of his annual leave, and I said I hoped that he could reschedule this in the next year.

Q Okay.

MS. MURPHY: Do you have the exhibit, Your Honor?

ADMIN. JUDGE SCHNEIDER: I'm not there yet.

MS. MURPHY: Okay. We will wait.

[Pause.]

ADMIN. JUDGE SCHNEIDER: A? Got it.

MS. MURPHY: A. Yes.

ADMIN. JUDGE SCHNEIDER: One page.

MS. MURPHY: That's correct.

ADMIN. JUDGE SCHNEIDER: Okay. Are you moving it?

MS. MURPHY: Yes, I am going to move to ask that it be entered into evidence.

ADMIN. JUDGE SCHNEIDER: Any objections?

MS. PERRY: No objection.



mec 452

BY MS. MURPHY:

Q When did Mr. McGrath --

ADMIN. JUDGE SCHNEIDER: Wait, wait.

MS. MURPHY: Sorry. I beg your pardon.

ADMIN. JUDGE SCHNEIDER: Okay. Agency's Exhibit A, which is a memorandum from Mr. Wunder to complainant concerning your annual leave request, dated December 3, 2001, is admitted into evidence.

[Agency's Exhibit A was received in evidence.]

BY MS. MURPHY:

Q Mr. Wunder, when did Mr. McGrath provide you with his work requirements for his employee evaluation report?

A He did not.

Q Never?

A No.

Q Do you recall receiving a request --

MS. MURPHY: Excuse me, Your Honor. Let me rephrase.

BY MS. MURPHY:

Q Did you meet with Mr. McGrath on January

mec

17th before he went on home leave?

A It's my recollection that we did meet, yes.

Q Okay. And do you recall what you discussed?

A We reviewed a number of programs that he had been involved with before he went on home leave, and I asked the status of those and we reviewed where they were just so I could be aware of them while he was on home leave.

ADMIN. JUDGE SCHNEIDER: I need to interrupt because I'm lost. We were talking a few minutes ago about the total request of leave. You approved 20 days all together?

THE WITNESS: That was delayed home leave, which I believe Mr. McGrath -- it's work days that started on January 18th and then went to February 21st. He was off --

ADMIN. JUDGE SCHNEIDER: Was that during Christmas?

THE WITNESS: Yes.

ADMIN. JUDGE SCHNEIDER: December, January

mec

--

THE WITNESS: December 21, I believe, until January -- Monday, January 7th, he came back. So he was back in the office for about nine days and then went on home leave until February 21.

ADMIN. JUDGE SCHNEIDER: Okay. Thank you.

BY MS. MURPHY:

Q So you met with Mr. McGrath on January 17th.

A Yes.

Q And the purpose of the meeting was?

A The purpose of the meeting was to review pending programs so that I could be up to date on programs that needed attention during his home leave.

Q And did you ask Mr. McGrath whether he had any pending projects?

A Yes.

Q And what was his reply?

A He replied that we had reviewed everything and there were no other pending projects.

Q There were no pending projects?

mec

A That there were no other pending projects other than those that we had discussed.

Q Did he give you a point of contact to reach him if necessary while he was away for his four weeks of home leave?

A He provided a hotmail address, e-mail address.

Q I'm going to show you what is marked as Agency Exhibit B and ask you if you can identify it.

A This is an e-mail from Mr. McGrath to his staff and information to me as well stating that his home leave would be from Friday, January 18, until Thursday, February 21, that Kathryn Wainscott would be acting, providing his hotmail address. The e-mail is dated January 17th.

Q Right. Does he give a phone number?

A No, no phone number.

Q Okay.

A He says that, in fact, since he will be moving quite a bit, an e-mail would be the best way to contact him.

mec

Q Okay. Thank you.

MS. MURPHY: Your Honor, I would like to move that Agency Exhibit B be entered into evidence.

ADMIN. JUDGE SCHNEIDER: Any objection?

MS. PERRY: No objection.

ADMIN. JUDGE SCHNEIDER: Agency's Exhibit B is a memorandum from complainant to, first name is Sandy Roused, dated Thursday, January 17, 2002. It's admitted into evidence.

[Agency's Exhibit B was received in evidence.]

BY MS. MURPHY:

Q Mr. Wunder, what happened on January 18th, which would have been the first day that Mr. McGrath was on his home leave?

A On January 18th, one of the programs that was pending for Mr. McGrath and his staff was background material for the presentation of a certificate of appreciation to Billy Taylor at the Kennedy Center. We had had a longstanding relationship with the Kennedy Center through our

jazz program, and the idea had come up in December to present Dr. Taylor with certificate of appreciate signed by the secretary.

When I arrived, this was one of the packages I was expecting from Mr. McGrath, that it would be provided complete, ready to go to the secretary for signature and for use that weekend. The presentation was scheduled for the Sunday -- I believe that was the 21st of January. What I received was a partial draft memo left on my chair with kind of some sticky notes on it saying "This has to be completed. The certificate isn't ready yet and this has to be run over to the secretary's office today."

So I immediately looked at this. I knew this was going to be difficult to finish within one day, and we -- "we" being the deputy assistant secretary and I -- started working to try to get it ready.

Q And how did you get it ready?

A Well, frankly, when we looked at it, I called around to Mr. McGrath's staff; they were not

aware of the project. We checked with the one designer on our staff and he did not have a certificate designed or ready.

So at that point, the secretary's office began to call to say, "Is this ready?" This was about mid-morning on a Friday morning. At that point, the deputy assistant secretary, Mr. Sexton, decided to take this -- I was working on other programs -- take this and complete it.

We determined that the secretary was traveling, he would not be able to sign the certificate, that Dr. Taylor was sick and would not be at the presentation on Sunday night but his daughter would be there; Mrs. Powell would make the presentation. So we worked out an arrangement in which we framed a blank certificate of appreciate and the deputy assistant secretary had to write talking points for Mrs. Powell, clear them with the secretary's office, and the presentation was made on the stage of the Kennedy Center with a blank certificate. We later filled in the certificate and had the secretary sign it and mailed it to Dr.

Taylor.

So it came off well, although the deputy assistant secretary had to spend virtually the whole afternoon writing the scenario and writing the talking points.

Q Did you attempt to contact Mr. McGrath about the issue of Billy Taylor's certificate?

A Yes. I sent him an e-mail to the hotmail address noting that this was an unpleasant, unwelcome surprise that this had not been finished and was not in the full package ready to go into the secretary's office and sent that to him and asked him to please contact me to try to determine whether there were any other programs that were outstanding that we would have to act on.

Q I'm going to show you what is marked as Agency Exhibit C and ask you if you can identify that.

A Yes. This is an e-mail from me to Mr. McGrath at his e-mail address, his hotmail address, from January 18, 2002, in which I said that the Taylor package was an unwelcome, unpleasant

surprise. I said that while working on this project, we found that there might be another similar certificate out there and we didn't know the status of that. I said it reflected badly on our office and asked him to please call me as soon as possible, please get back in touch with me, please let me know -- give me phone numbers of where he could be reached during his annual -- his home leave.

Q Thank you.

MS. MURPHY: Your Honor, I would like to move that Agency Exhibit C be admitted into evidence.

MS. PERRY: No objection.

ADMIN. JUDGE SCHNEIDER: Agency Exhibit C, which is an e-mail from Mr. Wunder to -- that's complainant?

THE WITNESS: That's the hotmail address, yes.

ADMIN. JUDGE SCHNEIDER: Okay. Dated Friday, January 18, 2002, is admitted into evidence.

mec 461

[Agency's Exhibit C was received in evidence.]

BY MS. MURPHY:

Q Did you get a response to your January 18th e-mail to Mr. McGrath's hotmail account?

A No, I didn't.

Q He did not send you an e-mail?

A No.

Q And he did not call you?

A No.

Q Did Mr. McGrath contact you when he returned at the end of February from his home leave?

A Not directly. We met at a reception in this building on the 8th floor on the 26th of February, said hello; I introduced him to my wife. But then we did not meet again until -- I believe it was March 8th after he had come back from home leave in the office.

Mr. McGrath's office and his division were located three floors above mine and at the other end of the building where we are located. We

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 462

normally have a Wednesday staff meeting of division chiefs we had at that time, and we did not have one on the 27th of February since we were doing a major event with the secretary that night -- that afternoon. Mr. McGrath did not attend the division chiefs meeting the next week, so we finally met again on March 8th.

Q Are you familiar with something called the Warhol project?

A Yes.

Q Did Mr. McGrath have any involvement with the Warhol project?

A The Warhol project was a major exhibit of Warhol paintings in circulation for the millennium in Eurasia, Russia, and Central Europe. It was still in circulation; it was one of the projects that was part of the portfolio of projects in the Cultural Division at the time Mr. McGrath took over the division.

Q Do you recall a problem with the budget for the Warhol project?

A While Mr. McGrath was on home leave, we

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 463

were asked to do the reprogramming calculations for our budget for Congress, and we were looking at the cultural budget trying to determine the budget, and we -- "we" being the new deputy assistant secretary, Mr. Hart, and myself and Mr. McGrath's staff -- we found that the line item for the Warhol exhibit was set at about $10,000.

This was actually set I think in the original draft budget by Mr. McGrath's predecessor, but when we looked more closely -- and when you are doing a reprogramming letter, you really have to check each line and make sure that this is the budget you can live with when you're going back to your appropriators -- and began to talk to his staff, we discovered that that was way low for the year and that to make it through FY 2002 to support that exhibit would probably take at least $100,000 and probably much more into the next following year.

So we had to adjust that figure and, in fact, come to an agreement with our budget chief that we could tap other cultural programs later in

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 464

the year if we needed to to take care of the Warhol bills.

Q Is that something you would have expected an officer of Mr. McGrath's experience to have spotted?

A Yes. Also we learned -- it was more concern to me that we learned when we were trying to do this calculation that Mr. McGrath's staff said they were not familiar with the budget, that they were not familiar with their budget lines or the budgets that had been set for their programs, and acted as if they were seeing the overall budget for the first time, so we had to work with Ms. Wainscott and others to really go over it in detail to make sure that everyone was certain of what their program lines would look like in the various cultural programs.

Q What was your overall budget for the office in 2001?

A For the Cultural Division?

Q Yes.

A The appropriations staff in their

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

reprogramming letter for several years had set a limit, actually mentioned it in our reprogramming letter, and they had set a limit I believe at about $1.5 or $1.6 million. However, after 9/11, the bureau immediately put together a response package to 9/11, including cultural response.

We also had the millennium projects in circulation and those had been funded in addition to our normal cultural budget. So our actual full cultural budget was finally set at $2.5 million and taken back by our budget director to the appropriations, House appropriations subcommittee staff and they approved that level.

Q So your budget ceilings were always done in coordination with the Hill.

A Yes.

Q Back to Mr. McGrath and when he returned from his home leave, did you talk with him after he got back about his performance?

A Yes. Finally, since he had not come by, not said hello, not come back to check in until March 8th, I finally just put what was on my mind

down in a memo and we had a meeting on -- as I remember it -- on March 8th and I went over the memo with him, gave it to him, pointed out my concern and displeasure about the Billy Taylor incident and asked him to -- and also the concern that I had learned dealing with his staff while he was on home leave that they were not aware of the budget, didn't seem to be happy or pleased with the level of communication, the type of communication they were having with him, and so I asked that he start having weekly staff meetings and really sit down and meet with his staff and listen to their concerns and familiarize them with the program and with the budget.

Q I am going to show you what is labelled Agency Exhibit Q, and I'm going to ask if you can identify the last two pages.

A The last two pages are my memorandum of March 8th to Mr. McGrath.

Q That you --

A That I presented to Mr. McGrath on March 8th at a counseling session, and I made this an

official counseling session because I simply thought that one was needed.

Q And then can you identify the document -- the first two pages?

A The first two pages is a standard form in the State Department that can be used to document a counseling session that is given to an employee to begin to put on the record that we've had a discussion, that we have gone over an employee's performance.

Q And you had two specific requests in your March 8th memo to Mr. McGrath.

A Yes.

Q And those were?

A Begin regular weekly staff meetings with your staff and take time to meet with each member of your staff individually and review their projects, plans, and budget.

Q Thank you.

MS. MURPHY: Your Honor, the agency moves to admit Exhibit Q into evidence.

ADMIN. JUDGE SCHNEIDER: Is this a total

of four pages?

MS. MURPHY: It is a total of four pages.

ADMIN. JUDGE SCHNEIDER: Any objections?

MS. PERRY: No objection.

BY MS. MURPHY:

Q To your knowledge --

ADMIN. JUDGE SCHNEIDER: Wait, wait.

MS. MURPHY: I beg your pardon.

ADMIN. JUDGE SCHNEIDER: Okay. Agency Exhibit 2 consists of four pages, two pages of counseling certification, and attached to it a memorandum to complainant from Mr. Wunder dated March 8, 2002. That is admitted into evidence.

[Agency's Exhibit Q was received in evidence.]

BY MS. MURPHY:

Q To your knowledge, Mr. Wunder, did Mr. McGrath begin to hold the weekly staff meetings that you requested?

A Not to my knowledge.

Q To your knowledge, did Mr. McGrath meet with each staff member individually as you

requested?

A Not to my knowledge. I'm not sure. I'm sure he must have seen his staff. I'm not sure whether he had the kind of meeting that I was asking for.

Q So you don't believe he had the kind of meeting that you were asking for.

A No, I'm not aware of it. I don't think so.

Q Okay. In your view as Mr. McGrath's supervisor, did Mr. McGrath at this point begin to assert the leadership and management roles appropriate to his position as division chief?

A No, not to my satisfaction.

Q Okay. And at this point, were members of his staff talking with you about his performance?

A Later in March and into early April, I began to hear from at least one member of his staff, and possibly others, about large projects that were underway -- these were large competitions for grants, large in our scale of operations. One was for a program called the Intercultural

Public/Private Fellows, the other was the Jazz Ambassadors, and the other was preparation for a festivals fund board meeting in which -- especially with the Intercultural Public/Private Fellows, I had heard from Ms. Baker that she was trying to get action from Mr. McGrath, to have him take action or approve actions, to set up a review panel for this competition, and she simply could not get a response. So finally, she simply came to me and said, you know, "How should we proceed?"

There were a couple of other actions going on, cables that needed to be cleared that Mr. McGrath did not clear in which Ms. Wainscott came to me and said, "What should I do? How do I get this cable cleared?"

These were actions that normally the division chief would take, they were his responsibility, and the staff is simply not getting any responsive feedback.

Q Okay. We will get to those in just a moment, but before we move, can I just ask a question with regard to the festival fund. Can you

briefly explain Arts International's role in the festival fund.

A The festivals fund was an informal partnership among four partners: the State Department, the National Endowment for the Arts, the Rockefeller Foundation, and the Pew Charitable Trust. It handled both performing arts, American performing artists going overseas to attend, to perform at festivals, international festivals, and visual arts festivals.

Arts International was a grantee, it's a non-profit organization in New York and had been selected as a grantee by the partners specifically to run the performing arts operation of the festivals fund. We had a grant with Arts International, Rockefeller Foundation, and Pew had a grant with them, and I believe the NEA had a grant with them as well, to handle the administration of the performing arts side of the fund. They also did some administrative work on the visual arts side.

Q Did the department have a sole-source

relationship with Arts International?

A The department had a grant relationship. I can't -- I don't remember exactly the type of competition that was done to close out the grant in FY 2002. It could well have been a sole-source because they had been doing it for several years.

Q Okay. Did Mr. McGrath raise concerns with you regarding the administration of the festival fund?

A Yes. After his arrival, we looked at the fund. He also attended a board meeting of the fund, a partners meeting of the fund in New York in the fall of 2001, and he raised with me his feelings about the fund, that it was not running properly, that it was eurocentric and so forth.

I told him I agree, that that was well known among the fund partners, but that that was one of the problems of the way the fund was structured. It was reactive. It was designed to respond to American performing artists who had been invited to an international festival, and the way it was set up is we would then, through the State

Department, go to our embassy and get an evaluation of that festival, bring it to a panel that was arranged by Arts International, an artistic panel to rate the artists who had applied artistically, and then we together -- the partners together with Arts International would look at the festivals and the rated artists and decide which would merit support. So Arts International handled all of that activity for us.

Q I am going to show you what is labelled Agency Exhibit D, and I'm going to ask you if you can identify it.

A This is an exchange of e-mails based on a memo from the Arts International program director, the director of Arts International who worked with the partners on the performing arts side of the fund to the fund partners asking for our approval or clearance of the recommended support grants for a list of performing arts festivals. This would have been the result of -- usually there were three of these review panels annually. And it's e-mails dated March 21 from Kathryn Wainscott to Mr.

McGrath and to myself asking for our views on these recommendations. I looked at them. I noted that it looked fairly typical. There seemed to be some duplicate groups getting double awards going to China and Germany. I asked Mr. McGrath what he thought; he thought it was typical. He said it was -- he lodged criticisms and complaints of the package. This was also March 25. He criticized that there were way too many New York groups and so forth. He said he thought that his entreaties and suggestions to improve the program had fallen on deaf ears and said he was going on the record now for the future saying that this was clearly not right.

This was an issue that we had discussed several times and I had pointed out to him that in order to change the operation of the fund and to avoid this kind of imbalance, we were going to have to address with the partners the actual operation of the fund, and that meant sitting down with three other partners and really discussing fund operations, not simply lodging complaints about

selections or recommendations which we knew were coming from the way the fund operated as it was.

MS. MURPHY: Your Honor, the agency understands that our Exhibit D is identical to one of the exhibits that you admitted yesterday.

MS. PERRY: Exhibit 32.

MS. MURPHY: Complainant's Exhibit 32. So we will not move to admit ours into evidence to save you --

ADMIN. JUDGE SCHNEIDER: Thank you.

MS. MURPHY: -- having duplicate exhibits.

THE WITNESS: I should say this was coming at a time -- I believe March 25; this was about when we were preparing also for a fund partners meeting in early April.

BY MS. MURPHY:

Q So you listened to Mr. McGrath's concerns. Did Mr. McGrath ever present to you an actual plan to change the festival fund?

A No. He presented two reforms and procedural reforms that we took up at the April 9th fund meeting. When he first brought this up in the

fall of 2001, we had a discussion about it and I told him that, in my view, we had to keep several points in mind.

The first that this is a partnership -- was a partnership. There were three other powerful partners who had their own views about performing arts and visual arts and their own focus on different parts of the world, and that if he wanted to change the procedures of the operations of the fund, we would have to work it out with them carefully, prepare that, and really come up with a plan for how the procedures would change.

I also pointed out that our involvement in the fund was, I believe, $320,000 over two years, so it was not a large financial involvement; that there were other much larger cultural programs we were running that were covering the rest of the world, the non-European part of the world, the Jazz Ambassadors, the Intercultural Fellows; and that we had to consider also that, in fact, even though many of these grants did go to performances in western Europe, that many of them went to central

Europe, Russia, the Balkans, the Baltics, regions that were very -- of importance, policy importance to us even though they were called Europe. And as it was becoming clear also after 9/11, even western Europe had a considerable amount of policy interest as well.

So that if we were going to change and wanted to change the operations of the fund, I wanted to see a package of proposed procedural changes, how the fund would change from being reactive to being proactive.

One of the biggest limitations of the fund is that it responded to international festivals, and there are many more international festivals in Europe than there are in any other part of the world, and so if we were going to become proactive, we would also have to include our regional bureaus, our embassy colleagues, and work out a system in which we would actually identify a venue overseas and then recruit American artists to go to that venue. That would have been a totally different operational procedure than the one we were

following in the fund at that time, and that could not be done by simply saying "Change the procedure today or tomorrow."

ADMIN. JUDGE SCHNEIDER: Okay. Let me interrupt on two points. First of all, as I told Ms. Perry earlier, way too much detail on this whole funding thing because I'm not going to be making any rulings as to whether what we department did was a good thing to do or bad thing to do. You know, whether it was good policy or bad policy, that's just nowhere near anywhere I'm going to go.

MS. MURPHY: Okay.

ADMIN. JUDGE SCHNEIDER: Second of all, Agency D is not the same as Complainant 32. The attachments seem to be different.

MS. CHANDLER: They are in a different order, Your Honor.

ADMIN. JUDGE SCHNEIDER: That's what I was trying to sort out.

MS. PERRY: I think 32 has a -- the attachment is in a different font, so it didn't print in the same kind of size.

ADMIN. JUDGE SCHNEIDER: Okay. That's fine, then. So D and 32 are the same thing. They look different.

Okay. Please continue.

MS. MURPHY: Okay. Your Honor, we won't bog down on the fund, but what I would like to do is talk about the relationship -- the working relationship on fund issues between Mr. Wunder and Mr. McGrath, and my next set of questions are going to that issue. So if you will bear with us?

ADMIN. JUDGE SCHNEIDER: Yes.

BY MS. MURPHY:

Q Mr. McGrath did not respond to your request as a supervisor, and so what was your reaction as his supervisor?

A Specifically to the fund?

Q When he didn't do as you asked him: produce a package of materials.

A Well, there was a fund partners meeting coming up on April 9th here in Washington chaired by the National Endowment for the Arts. We had a meeting to plan the agenda for that session. At

that session, we were going to present a couple of our reforms based on what Mr. McGrath had been asking for.

Q Right.

A We had a meeting in my office I think on April 4th to try to plan that strategy, and at that point Mr. McGrath said he had been -- he had been humiliated by that meeting because we didn't accept his request to completely change the operation of the fund and that he did not want to attend the fund partners meeting.

Q I'm going to show you Agency Exhibit G and ask you just quickly if you can identify it, which is the same as Complainant's Exhibit 23.

A This is an exchange of e-mails starting on March 27, Kathryn Wainscott to Mr. McGrath, copied to me, asking for a meeting to plan the agenda for the -- and our participation in the fund meeting, partners meeting.

Q Okay. And this is --

A I asked -- excuse.

Q Excuse me. This is where he states that

he does not personally and professionally want to be part of it?

A Yes. After we had the meeting on the 4th, he left the meeting, went back to his office, sent me an e-mail saying, "I do not appreciate being humiliated. I do not intend to attend this meeting or be further humiliated." I said I did not accept his views, that he had been overruled, but I thought, given his views and his feelings, it would be better if he did not attend the meeting.

Q Okay. Do you recall asking him to meet with the Korean Embassy?

A Yes.

Q And do you recall --

A I asked him to contact a gentleman at the Korean Embassy.

Q And to your knowledge, did he follow your instructions?

A To my knowledge, no.

Q Okay. He did not.

Did you complete an annual employee evaluation report for Mr. McGrath in 2002?

A Yes.

Q How did the report get drafted?

A Well, I drafted it. I normally would draft this, I would ask my rated employee, the employee I'm rating, to give me their own views on their own performance, to give me their accomplishments, and then I would write up a draft.

Mr. McGrath did not give me accomplishments, he did not supply any information that I can remember. He had not provided me with any specific job goals or objectives.

I wrote up the draft, I asked him to come in. We went over it I believe around the 18th of April. I gave him a copy, asked him for his feedback, asked him to please comment on it, especially on any language, any examples, anything he didn't agree with. He had no real comments and he didn't provide me with any comments.

Later, then, I was told by the HR office in ECA that there should be a review and that Mr. Sexton, who was still working with ECA at that time, who had been the deputy assistant secretary

until late February, would be the appropriate person to do that review. He was then acting deputy assistant secretary for academic programs, another part of our bureau. So he provided a review statement, which I then --

ADMIN. JUDGE SCHNEIDER: Who was that?

THE WITNESS: Excuse me?

ADMIN. JUDGE SCHNEIDER: Who was that?

THE WITNESS: Brian Sexton, S-e-x-t-o-n. He had been the deputy assistant secretary for professional and cultural exchanges until late February 2002.

BY MS. MURPHY:

Q Okay. I'm going to hand you what is marked as Department Exhibit I and ask if you can identify this.

A Yes. After we put all of this together into these drafts and this material into a form, I asked Mr. McGrath to come by in an e-mail to him on April 24 to just sign the form so that he could then take it and add his statements to it. He did not come by my office, so I took the form to his

office finally on the 28th, on a Sunday, and left it there. I had been looking for him, trying to sit down and talk to him about it, trying to get him to sign the forms, because we were coming up to the deadline of when these were due and could not get in touch with him, and so I left it on his chair in a sealed envelope with a note on it. I sent him an e-mail that said that here it was; it was really up to him then to add his statement and to bring it back to Ms. Hunsley in Personnel so that it could be turned in by the deadline.

Q Okay.

MS. MURPHY: Your Honor, the agency moves to admit Exhibit I into evidence.

ADMIN. JUDGE SCHNEIDER: Objections?

MS. PERRY: No objections.

ADMIN. JUDGE SCHNEIDER: Okay. Agency's Exhibit I, which is an e-mail from Mr. Wunder to Mr. McGrath dated -- sent Sunday, April 28, 2002, is admitted into evidence.

[Agency's Exhibit I was received in evidence.]

ADMIN. JUDGE SCHNEIDER: Before we conclude today, I want to go over everybody's exhibits and make sure that that which you wanted admitted is admitted and so on, or moved and admitted and so on.

Please continue.

BY MS. MURPHY:

Q Mr. Wunder, having Mr. Sexton provide the review -- how did it come about that Mr. Sexton provided the reviewing statement?

A I wasn't sure, frankly, in terms of when we had -- when Mr. McGrath and I had our first discussion on the 18th whether there would be a review or should be a review. I checked with the HR office and they said in their view there should be one. Since Mr. Sexton had been the DAS until the end of February, that was the majority of the time covered by the rating, he was still employed by ECA, he was still at the DAS level, he was the acting DAS for academic programs, he was still available to write that statement, and so I asked him to do the statement.

Now, again -- go ahead.

Q Did writing this statement or having Mr. Sexton write this statement, the decision to have Mr. Sexton write this statement, have anything to do with reprisal against Mr. McGrath?

A No. It was simply to complete the rating with -- a rating should have a review, especially for a Class 1 Foreign Service officer who had been working in an office headed by a deputy assistant secretary.

Q What was Mr. McGrath's response to his EER?

A We had, as I said, the one discussion on the 18th. He had no concrete response or feedback to any of the points. He said he thought just overall it was punitive, and again, I asked him, I said, please look at it, please give me any feedback, let's discuss any of the issues. There was no response. He did say he wanted to add his own comments, so I prepared the form as complete as I could make it and gave it to him to complete.

Q And his performance was of continuing

concern to you?

A Yes. After that point -- there had been enough difficulties trying to communicate and trying to make sure that he was working with his staff, but after that point, frankly it became extremely difficult to get response from Mr. McGrath to the right e-mails or telephone messages.

Q Did you share your concerns with Mr. McGrath?

A I tried to. I think I tried to send him enough messages and ask him to call me and ask him to respond.

MS. MURPHY: Your Honor, I would like to show the witness Agency Exhibit R and ask if he can identify it. I would note that a portion of this is in the ROI, but not all of it.

ADMIN. JUDGE SCHNEIDER: It is part of the supplements, right?

MS. MURPHY: Yes, it is. And we have an extra copy if that's easier for you.

THE WITNESS: After the --

ADMIN. JUDGE SCHNEIDER: Wait, wait.

THE WITNESS: Sorry.

[Pause.]

ADMIN. JUDGE SCHNEIDER: What am I looking at? Because these aren't all clearly marked.

THE WITNESS: It's an e-mail from me to Mr. McGrath with a memorandum.

ADMIN. JUDGE SCHNEIDER: Okay.

THE WITNESS: When finally enough issues had piled up on which I wanted to have responses and wanted to have updates, wanted to have information, I decided to put these down in a memo May 20 and send it to Mr. McGrath on May 20. We had tried -- I tried to set up a meeting with him, but I said I would not be able to make that, but I asked him to please look at this and respond back to me on these various points.

BY MS. MURPHY:

Q What was his response?

A I cannot remember getting any written response. I can't remember, really, whether we -- I don't believe I got a response on most of these points.

Q And did he provide an update on any of the pending issues that you had identified?

A No, not that -- when I request an update with something like this to another division chief, I would either want to sit down and have a meeting or I would want the person to send back a written response to each one, just a short update of where were we on each of these bullets, and I didn't get that.

Q Okay.

MS. MURPHY: Your Honor, the agency moves to admit Exhibit R.

ADMIN. JUDGE SCHNEIDER: Any objections?

MS. PERRY: No objection.

BY MS. MURPHY:

Q Mr. Wunder --

ADMIN. JUDGE SCHNEIDER: Wait.

MS. MURPHY: I beg your pardon.

ADMIN. JUDGE SCHNEIDER: This is actually three pages, right, all together?

THE WITNESS: I believe there's a small piece on the last page.

MS. MURPHY: There is a small piece on the third page.

ADMIN. JUDGE SCHNEIDER: Okay. Agency Exhibit R, which is a memorandum to complainant from Mr. Wunder dated May 20, 2002, is admitted into evidence.

[Agency's Exhibit R was received in evidence.]

BY MS. MURPHY:

Q Mr. Wunder, in a May 16th meeting with Mr. McGrath, did you call him a zero?

A I don't remember calling him a zero. This was a meeting where I had been trying to track down Mr. McGrath to try to get responses to some of these issues, leaving messages, sending him e-mails, and also going to his office and not being able to find him in his office.

I finally found him in his office, closed the door, asked him what was going on, what was the problem. I noted that his computer was off, his telephone message light was blinking. At this point, he made a statement saying that just because

he wasn't responding to his telephone messages did not mean that he wasn't in the office, which I took to mean simply that he didn't think he really had to respond to any of my requests, my e-mails or my questions.

Q Did you swear at him?

A I -- I called -- I think I lost my temper at that point and I called him a piece of crap or something like that.

Q Why did you swear -- why did you call him a piece of crap?

A At that point, I was very frustrated. I had never, frankly, in 30 years in the Foreign Service, encountered a Foreign Service officer who was simply ignoring requests from his supervisor for legitimate information on projects.

Q So you were angry with Mr. McGrath?

A Yes. Very. In fact, I regret that because it was the one time I lost my temper in this whole encounter with Mr. McGrath -- frankly, one of the few times I have lost my temper in my career. But it really bothered me that someone in

that position, as a Class 1 officer, would simply be ignoring his relationship with a supervisor, ignoring legitimate questions from a supervisor about programs for which he was responsible.

Q And did your anger have anything to do with Mr. McGrath's race?

A No.

Q Did your anger have anything to do with Mr. McGrath's alleged involvement in EEO activities?

A No. In fact, at this time, in May, I had not been told officially about any EEO complaint.

Q Did Mr. McGrath -- in this memo, you also reference a May 21st meeting on the ICCP grant process. Did Mr. McGrath attend that meeting?

A I do not believe so. Again, this was a large -- this was a very large project in which we were very interested in making sure that it came off correctly. I cannot remember whether he -- there were meetings in which he had said that if I was present, he really didn't think he had to be present or he would not want to be present. So I'm

mec 501

June 10 memo to Ms. Davis from Ralph Frank, right?

THE WITNESS: Yes.

ADMIN. JUDGE SCHNEIDER: And I've got another memorandum to Ambassador Davis from Patricia Harrison.

THE WITNESS: Correct.

ADMIN. JUDGE SCHNEIDER: And you want to add onto that a memo dated May 22nd from Mr. McGrath -- excuse me -- to Mr. McGrath from Mr. Wunder.

THE WITNESS: That's right.

ADMIN. JUDGE SCHNEIDER: And I guess this last page is a signature page, May 23rd, Mr. McGrath saying, "I have the right to submit comments."

THE WITNESS: That he has the right to submit comments, yes.

ADMIN. JUDGE SCHNEIDER: Okay. So as just described, Agency's Exhibit M is admitted.

I'm sorry. No objection?

MS. PERRY: No objection.

ADMIN. JUDGE SCHNEIDER: All right.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 502

[Agency's Exhibit M was received in evidence.]

BY MS. MURPHY:

Q What was Mr. McGrath's reaction to your suggestion or your request that he consider voluntary curtailment?

A Well, I believe we gave him 48 hours, and that was over a weekend, and to the best of my knowledge, there was no response. He did not request a voluntary curtailment.

Q Who is Ms. Evangeline Montgomery?

A Ms. Montgomery is a program officer, a senior program officer in the Cultural Programs Division.

Q Did you ask Ms. Montgomery to become involved with making arrangements for the travel portion of the speakers program for the 9/11 exhibit?

A Yes.

Q Why did you do that?

A We had -- they were working through February to set up the first showings of the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 503

exhibit around the world. We had a very heavy schedule in the first two weeks of March for showings of this exhibit. We sent multiple sets of it around the world, and we had recruited speakers to go to the openings in various cities, and I met with several members of the Cultural Programs Division to assist in making the travel arrangements for these speakers.

Ms. Mella was doing the fabrication of exhibit, shipping it, arranging the openings. We had a major opening with the secretary here in this building on February 27th, and these openings were scheduled the first two weeks in March, and I wanted to work with the various people in the Cultural Division who were experienced in making these travel arrangements for speakers.

This kind of a travel arrangement was virtually identical to the arrangements they made for a program that we called at that time the American Cultural Specialists. We did over 40 Americans a year going overseas on cultural visits. So I worked with Ms. Rouse, with Ms. Montgomery, I

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 504

believe obviously with the support staff in the Cultural Programs Division. Ms. Montgomery handled --

ADMIN. JUDGE SCHNEIDER: Excuse me.

THE WITNESS: Excuse me.

ADMIN. JUDGE SCHNEIDER: Why are we talking about this? I'm totally lost.

MS. MURPHY: Because, Your Honor, the point I want to get to is that the tasks that Mr. Wunder asked Ms. Montgomery to do were not in any way extraordinary. They were something that she was comfortable doing, she knew how to do, and it was consistent with the kind of work that she had been doing. There were no unusual tasks that he was giving to her.

THE WITNESS: She made arrangements for a speaker to go to openings in Africa, in Abuja, and she did it very well.

BY MS. MURPHY:

Q And how did she perform?

A Very well. No problems at all.

Q Did you ever have occasion to discuss Ms.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 505

Montgomery's performance with Mr. McGrath?

A Yes.

Q Who raised the issue?

A I believe it was at a meeting on January 7th. It was a chance to see Mr. McGrath after he returned from his Christmas vacation, go over his views of his office and his job after three months on the job. He raised -- in that general discussion made a statement, something about the limitations of his staff, that I knew there were certain limitations on certain people on his staff, and he mentioned Ms. Montgomery as one of the people with limitations. She was an older employee with Parkinson's who had trouble sending e-mails and sending messages.

Q And what did you tell Mr. McGrath to do?

A I was, frankly, focused with Mr. McGrath on his role as a manager, and I told Mr. McGrath at that time that as a manager, as the head of the division, he was going to have to deal with the staff that he had there to deal with, and if she -- if he really thought she had a limitation, he would

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 506

have to confront that, work with her, document if there was really a limitation, and find an accommodation with her to do her job to the full performance level.

She was a very experienced program officer in exhibits, but if she was having trouble with one part of her job or another, that he would have to address that.

Q Thank you.

To your knowledge, was Ms. Montgomery provided with an accommodation to assist in her performance of her work?

A Well, one of the accommodations I mentioned was if -- and I had noticed that she sent relatively few e-mails about her programs -- was that he might want to look at dictation software so that she would not have to type since Parkinson's made it difficult for her to type, and nothing really was done. Later I spoke with her and researched this software in late March, and we did buy a set of the software.

I had learned that one of the office

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 507

directors in ECA was using the software, thought it was very good, very successful, and so I did buy a set and offered it to Ms. Montgomery for her use.

Q Were you trying to get Ms. Montgomery fired?

A No.

Q And were any of your actions to Ms. Montgomery done because she was -- I mean, were you somehow reacting or trying to punish Ms. Montgomery for --

A No.

Q Okay.

A The only reason that Ms. Montgomery was discussed at all was because Mr. McGrath raised her as an example of one of the limitations, one of the employees that he had to deal with in his division, and I simply was trying to make the point that as a manager, as a division chief Class 1 Foreign Service officer, he had to be able to deal with his staff and he had to be able to deal with them -- if they had limitations, we deal with them within the EEO structure and what the law allows you to do.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec 508

Q How did travel change after Deputy Assistant Secretary Hart arrived?

A The travel budget, frankly, is one of the few budgets that the deputy assistant secretary in ECA can control directly, and when he came in in late February and March, he asked to review all travel requests to get an idea of the flow of travel, the type of travel requests we were approving, the type of travel our staff did, and the costs of the various trips. So at that point, virtually all -- he was looking at all travel requests.

Q So there was an overall review of the travel budget.

A Yes.

Q And were you involved in travel Ms. Montgomery wanted to undertake in the February/March timeframe of 2002?

A I had made approval -- I approved virtually all travel requests, but I cannot remember her specific request in March or April. As I said, I traveled for ten days in March; Mr.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

A That's right.

Q And in that e-mail, Mr. McGrath in the first paragraph indicates that he had talked with IPAM and MAM regarding a grant program; isn't that correct?

A Yes.

Q You earlier talked about purchasing voice recognition software for Ms. Montgomery. It's correct, isn't it, that you did not raise the idea of purchasing voice recognition software for Ms. Montgomery until April 2004?

A No. I remember raising it as an option in the first discussion with Mr. McGrath as a possible way to deal with this. In fact, I think I had had a discussion with Ms. Montgomery herself in March and I had -- because I had asked one of our technicians, one of our people in the IT section, to check out what kind of software this was and how effective it was and how useful it was.

Q Do you recall providing an e-mail to Ms. Pope on June 11th, 2002, entitled "McGrath Counseling Background"?

A Yes.

Q And do you recall that you included in there an extract from the record that you had kept of your dealings with Mr. McGrath?

A I included in there an attempt at a timetable that I, in fact, wrote later just to try to get it straight in my mind when various things were happening.

Q And this is located --

MS. MURPHY: Excuse me, Your Honor. Where are we?

MS. PERRY: I will tell you where it is. This is located in the report of investigation, tab 2, starting at page 16 and continuing on page 17.

THE WITNESS: I'm sorry. Is it in this book?

MS. MURPHY: No, it's not.

MS. PERRY: No.

ADMIN. JUDGE SCHNEIDER: Do you want to show it to the witness?

MS. PERRY: Actually, I just want to ask him a question.

ADMIN. JUDGE SCHNEIDER: Okay.

BY MS. PERRY:

Q Mr. Wunder, this has a chronological itinerary you provided to Ms. Pope.

A Yes.

Q And in this, the first time you mentioned the idea of raising voice recognition software for Ms. Montgomery is dated April 4th, 2002. Does that sound like a correct date to you?

A That sounds like a date when -- again, I don't have that chronology in front of me, but it sounds like the date when I actually decided to purchase it after checking it out through March.

MS. MURPHY: Your Honor, may I show the witness the exhibit?

ADMIN. JUDGE SCHNEIDER: It's up to Ms. Perry.

BY MS. PERRY:

Q In this chronological order, the first time you mentioned talking to Ms. Montgomery is April 8, 2002. Does that sound like a correct date to you?

A It's possible. I thought I had -- again, I tried to create that itinerary, that chronology later in the process. I believe it was when I was trying to get it straight in my mind to provide something to Ms. Pope and others who were asking about this, so I decided to go back and try to recreate the chronology of this whole event.

Q On June 3rd, you instructed Mr. McGrath to not attend a grant panel meeting scheduled to begin the next day; is that correct?

A Yes.

Q And you testified on direct that you, in the March 8, 2002, meeting with Mr. McGrath, you spoke to him regarding his managerial performance, I believe is the word you used.

A Uh-huh.

Q You also, during that meeting with Mr. McGrath on March 8, 2002, brought up the idea of dealing with employees who have disabilities; isn't that correct?

A I -- I put that into my notes. Frankly, when I was thinking back on it, I know we discussed

mec

545

don't remember him raising it in the context that this was discriminatory.

Q You testified earlier that you had worked with Leanne Mella on some projects; is that correct?

A Well, I worked with her specifically on the 9/11 exhibit project very intensively.

Q And had one of the grantees with Arts International complained to you about Ms. Mella's performance?

A Yes. Ms. Mella started her job in August of 2001, and, in fact, at that time, that was the first time that we were really fully staffed in the Cultural Division in several years with a visual arts person dealing with the fund and the visual arts with a division chief.

She immediately began to deal with Arts International, and, frankly, our relationship with Arts International in terms of the visual arts festivals was not well defined, and Arts International protested in the way that we were trying to define our relationship in handling

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec

546

visual arts festivals. That was handled differently from the performing arts festivals.

I don't want to get into a lot of detail, but it got into really the relationship of how we dealt with Arts International as they represented the other partners for the large visual arts festivals. These were usually much more expensive, there were fewer of them, and they were much more visible.

Q One final thing. You talked about the budget and the Warhol project being over budget. That was a budget that was set by Mr. McGrath's predecessor; isn't that correct?

A Yes. Yes. I think I stated that.

Q And that line item was one line time in a very large budget; isn't that correct?

A That's correct.

MS. PERRY: I have no further questions.

MS. MURPHY: Your Honor, I just have a few things, if I may.

REDIRECT EXAMINATION

BY MS. MURPHY:

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec

547

Q Mr. Wunder, is it true that there were different travel budgets and different considerations that went into considering whether or not travel requests were approved?

A Yes. The office had two travel budgets. Since we were managing well over $70 million worth of money that was transferred to us from the Freedom Support Act that was handled by the European Bureau of the department, that money had its own travel budget. Then we had a separate travel budget for programs that were funded through our normal what was called our ECE -- educational and cultural exchange -- line item in the State Department's regular budget.

Q So when you were considering -- or when travel requests were being considered, the considerations included where the money was coming from, what the nature of the program was, and things like that.

A Yes.

Q Okay. The two -- in reference to the documents in ROI, why don't you take a minute and

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

mec

548

review -- I believe Ms. Perry raised with you the April 4th annotation and the April 8th annotation. I think it's on the preceding page.

ADMIN. JUDGE SCHNEIDER: You are refreshing his memory?

MS. MURPHY: Pardon me?

ADMIN. JUDGE SCHNEIDER: You are enabling him to refresh his memory?

MS. MURPHY: I am enabling him to refresh his memory. Thank you, Your Honor.

THE WITNESS: Yes. Again, I --

ADMIN. JUDGE SCHNEIDER: Is your memory refreshed?

THE WITNESS: Yes. I created this later.

ADMIN. JUDGE SCHNEIDER: Close the book.

THE WITNESS: Oh, I have to close the book now? Okay.

MS. MURPHY: One last question.

BY MS. MURPHY:

Q In your text in the EER, were there substantive changes between the first and second EER drafts?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666