# EXHIBIT 17

## DECLARATION OF (NAME OF WITNESS)    VAN SAMUEL WUNDER III

1

2

3    In accordance with the provision of Title 28, United States Code, Section

4    1746, I, Van S. Wunder, make the following declaration to Betty L. Cox who has

5    identified herself to me as an EEO Investigator, Southwind Enterprises, Inc. assigned

6    by the US Department of State to perform this investigation, knowing that this

7    statement may be used in evidence.  I understand that this statement is not

8    confidential and may be shown to any party who must have access to this

9    information in order to carry out his or her official duties.

10    This statement is given in relation to a complaint of discrimination filed by

11    Matthew J. McGrath .

12    *The investigator advises me through the following of the accepted claims in this*

13    *complaint.  Mr. McGrath alleges that because of his race (Caucasian) and as reprisal for his*

14    *having engaged in prior protected activity and/or for opposing discriminatory practices, he*

15    *was discriminated against and subjected to a hostile work environment when:*

16    *a)    His supervisor attempted to undermine his authority as Chief, Division of Citizen*

17    *Exchanges, Office of Cultural Programs, Bureau of Educational and Cultural*

18    *Affairs;*

19    *b)    his supervisor gave him a negative performance evaluation as Chief, Division of*

20    *Citizen Exchanges, on 4/11/02 and 4/29/02;*

21    *c)    he was subjected to an involuntary curtailment of his assignment as Chief, Division*

22    *of Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and*

23    *Cultural Affairs; and*

24    *d)    the discriminatory curtailment had the result of denying Complainant a career-*

25    *enhancing follow-on assignment.*

26    Q    Please state your full name.

27    A    Van Samuel Wunder III

28

Exhibit __6__

Initials *[signature]*

Page 1 of __51__

1   Q   Please state your title and grade, the name of the agency by which you are
2       employed, the organizational unit to which you are assigned, and the
3       address of your duty station.

4   A   Director, Office of Citizen Exchanges (ECA/PE/C), Bureau of Educational
5       and Cultural Affairs, Department of State- FE-OC- Building SA-44, 301
6       Fourth St. Southwest, Washington, DC 20547 – tel. 202-619-5348

7   Q   Please state your organizational work relationship to Matthew McGrath at
8       the present time.

9   A   None

10  Q   Please state your work relationship to Mr. McGrath at the time of the matters
11      at issue in his complaint.  From what date to what date did you supervise
12      Mr. McGrath?

A
13      Direct Supervisor from o/a September 10, 2001 to o/a June 9, 2002

14  Q   Please state your work relationship to Stephen Hart at the present time, and
15      if different, at the time of the matters at issue in Mr. McGrath's complaint.

16  A   Deputy Assistant Secretary Stephen Hart is my direct supervisor.  He became
17      my direct supervisor when he reported for duty in his current position on
18      February 11, 2002.

19  Q   Please state your race.

20  A   Caucasian

21  Q   Are you aware of the Department of State's policy on harassment?  Have you
22      received training in that policy?

23  A   Yes; and yes, I have attended the Department's EEO course.

24  Q   Did Mr. McGrath raise concerns to you that he believed you were subjecting
25      him to a hostile work environment? If so, when and what did he indicate to
26      you?

27  A   During our discussion of his performance evaluation on April 18, 2002, Mr.
28      McGrath commented that he viewed my evaluation of his performance as
29      "punitive."   He did not directly raise the issue of a hostile work environment
30      during that conversation or at any earlier time that I can recall.

Initials 

1    Q    To your knowledge, did Mr. McGrath raise concerns about a hostile work

2          environment to any manager over you in the chain of command? If so, to

3          whom did he raise these concerns, and with what result, to your knowledge?

4    A    DAS Hart told me in April 2002 that Mr. McGrath had discussed with him

5          complaints about his (McGrath's) relationship with me.    DAS Hart and I

6          discussed my relationship with Mr. McGrath and my appraisal of Mr.

7          McGrath's performance.

8    Q    Please state the names and titles of the managers and/or supervisors you

9          supervised during the period you supervised Mr. McGrath as a division

10         chief.

11    A    During the period September 10, 2001 and June 9, 2002, I also supervised

12         Robert Persiko, Chief, Youth Programs Division (ECA/PE/C/PY);

13         Raymond Harvey, Chief, East Asia-Western Hemisphere Affairs Division

14         (ECA/PE/C/EAP-WHA); Curtis Huff, Chief, Africa-Near East-South Asia

15         Division    (ECA/PE/C/AF-NEA-SA),and;    Chris    Miner,    Chief,

16         Europe/Eurasia Division (ECA/PE/C/EUR).

17    *a)*    *his supervisor attempted to undermine his authority as Chief, Division of*

18         *Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and*

19         *Cultural Affairs*

20    Q    Mr. McGrath alleges that you attempted to have him dismiss from

21          employment Evangeline "EJ" Montgomery. He contends you told him to

22          document problems in her performance with the view to using that

23          information to terminate her employment. He also contends that at one time

24          supervised Ms Montgomery but did not document and terminate her

25          employment. Did you tell Mr. McGrath to document Ms Montgomery's

26          performance and either say or suggest that he do so in order to use this

27          information to terminate her employment? Please explain.

28    A    I did not instruct Mr. McGrath to document Ms. Montgomery's performance

29          for the purposes of possible termination. O/A late December 2001 or early

1    January 2002, I had a conversation with Mr. McGrath concerning his staff.

2    Mr. McGrath raised the issue of limitations he perceived in the performance

3    of various members of his staff, and noted that one of these limitations

4    concerned Ms. Montgomery, who suffers from Parkinson's disease. This

5    medical condition makes it difficult for Ms. Montgomery to type, which

6    means that it is difficult for her to prepare the many written communications

7    that Program Officers must complete. Since most communication with field

8    posts and other staff is done through e-mails, this can also limit

9    communication through that medium. I advised Mr. McGrath that EEO

10   regulations require that appropriate compensation be made for employees

11   with disabilities, but that if performance after compensation has been made

12   is still not adequate, then it was the duty of the supervisor to deal with the

13   situation. I noted that EEO regulations do not require that an employee be

14   kept in the same position if that employee cannot perform at an acceptable

15   level after compensatory steps have been taken. My message to Mr. McGrath

16   was that EEO regulations, as I understand them, require that supervisors

17   work with employees with disabilities and identify compensatory steps that

18   can help the employee perform at the fully required level, but do not require

19   that sub-standard performance simply be accepted.

20   My purpose in reviewing these points was to emphasize to Mr. McGrath that

21   he was the supervisor and was responsible for organizing the work of his

22   division, and that he was responsible for applying EEO regulations. If Ms.

23   Montgomery was indeed limited in her performance, then Mr. McGrath had

24   the first line of responsibility for working with her to identify compensatory

25   steps that could respond to her physical condition. I mentioned such

26   examples as providing voice-recognition software to assist her in drafting

27   correspondence or shifting duties within the Cultural Programs Division to

28   lessen the correspondence requirements on Ms. Montgomery.



1    Mr. McGrath stated that he felt uncomfortable raising the need for

2    compensatory steps with a long-time and respected employee such as Ms.

3    Montgomery. He protested that he had should not have to deal with a

4    situation that had been obvious for some time. I stressed that he was the

5    supervisor and had to take responsibility for dealing with his staff.

6    (Although the language in line 24 of page 3 above is unclear, I think it states

7    that at one time I supervised Ms. Montgomery but did not document her

8    performance. I supervised the Cultural Programs Division on an interim

9    basis for about 4 weeks in August 2000, in a temporary capacity before taking

10   my current position. Ms. Montgomery was absent on medical leave during

11   that time.)

12   Q   What was Ms Montgomery's job title and grade at that time?

13   A   Program Officer, GS-13.

14   Q   What were Ms Montgomery's major job responsibilities at that time?

15   A   To my knowledge, Ms. Montgomery's major responsibilities were to work

16   with Department overseas missions to organize cultural programs, including

17   visual arts touring exhibits and American Cultural Specialists (ACULSPECS)

18   programs. ACULSPECs are American cultural experts who travel overseas

19   to work with foreign audiences. The projects are proposed by the Public

20   Affairs Sections of U.S. Embassies and require the partnership of foreign

21   cultural institutions. She also supervised a competitive grant-based

22   exchange program on cultural tourism development in Africa.

23   Q   To your direct knowledge, were there areas of Ms Montgomery's major job

24   responsibilities that she was unable to perform or was not proficient at

25   performing? If so, please identify these job responsibilities and whether they

26   were major duties of Ms Montgomery's position. To your knowledge, did

27   others assume these job responsibilities in order to assure they were fulfilled

28   in a timely and efficient manner?



1   A    To my direct knowledge, there were no major duties that Ms. Montgomery

2        was not proficient at performing. During my one conversation in late

3        December 2001-early January 2002 with Mr. McGrath, I noted to him that I

4        had received relatively little e-mail communication from Ms. Montgomery

5        about her programs and saw little written reporting generated by her. I

6        recall that Mr. McGrath mentioned during our conversation that occasionally

7        colleagues of Ms. Montgomery's would prepare written materials for her to

8        obviate the need for her to type the items.

9   Q    If you have direct knowledge, what percentage of Ms Montgomery's major

10       job responsibilities was she able to perform in a timely manner and without

11       assistance?

12  A    I was not in a position to directly observe Ms. Montgomery's performance.

13       For one program, a touring photography exhibit for Latin America, I did

14       request update reports on two occasions and received short e-mail responses.

15  Q    If to your knowledge others assisted Ms Montgomery in completion of major

16       duties of her position, what was the impact of this assistance on the ability of

17       those staff members to accomplish their own job responsibilities? Did

18       anyone who assisted Ms Montgomery in the completion of the major duties

19       of her position fall behind in his or her own work, miss any deadlines, or

20       have any difficulty in meeting his or her own work goals in a timely and

21       effective manner? If so, state who and what the problems were, to your

22       knowledge.

23  A    I am not aware of any colleague of Ms. Montgomery's falling behind or

24       missing deadlines because of assisting her with her responsibilities.

25  Q    Mr. McGrath alleges that, because he protested your directions in regard to

26       documenting Ms Montgomery's performance with the view to discharging

27       her as he viewed your direction to be based on her race and disability, you

28       retaliated against him in each of the claims to this complaint, including this

29       claim, that you attempted to undermine his authority as division chief. Did

Initials *[handwritten initials]*

1         you give any directions to Mr. McGrath regarding Ms Montgomery based on

2         a desire on your part to terminate her employment because of her race or

3         because she has a disability? If so, please explain.

4   A   I gave no instructions to Mr. McGrath to document Ms. Montgomery's

5         performance for the purposes of terminating her employment, nor did I

6         retaliate against him for not documenting her performance. As I note above

7         in the response beginning on Line 28 of page 3, during our one conversation

8         on this issue, I attempted to focus my comments on Mr. McGrath's

9         responsibilities as a supervisor. I had no further discussion with Mr.

10       McGrath concerning Ms. Montgomery's performance after our one

11       discussion. Mr. McGrath did not raise the issue with me further, nor did he

12       seek any clarification of what he might have perceived as instructions from

13       me.

14  Q   Did Mr. McGrath state to you that he considered your direction that he

15       document Ms Montgomery's performance to be based on her race or

16       disability?

17  A   No. During our one discussion, Mr. McGrath observed that he was

18       uncomfortable dealing with compensatory steps for a physical disability for

19       an employee of Ms. Montgomery's long experience.

20  Q   Did you understand Mr. McGrath's reluctance or refusal to document Ms

21       Montgomery's performance problems or to consider termination of her

22       employment based on performance problems to be a protestation against

23       alleged discriminatory bias on your part toward Ms Montgomery because of

24       her race or disability?

25  A   No. In our one conversation on the issue of Ms. Montgomery's performance,

26       Mr. McGrath mentioned that he was uncomfortable trying to identify

27       compensatory steps for Ms. Montgomery because she was a long-time

28       employee and he did not accept that he had to deal with long-standing

| | | |
|---|---|---|
| 1 | | performance issues since they had not been dealt with by previous |
| 2 | | supervisors. |
| 3 | Q | Did Mr. McGrath tell you that he considered Ms Montgomery to have |
| 4 | | strengths that offset her weaknesses?  If so, what did he tell you?  Did you |
| 5 | | agree?  Please explain your reasoning. |
| 6 | A | Yes.  Mr. McGrath noted that Ms. Montgomery was a highly regarded visual |
| 7 | | artist in her own right and highly experienced and respected in dealing with |
| 8 | | American artists, especially the African-American art community in |
| 9 | | Washington DC. |
| 10 | Q | Mr. McGrath alleges that, on January 7, you insisted that he document all of |
| 11 | | Ms Montgomery's deficiencies with the goal of dismissing her.  Did you do |
| 12 | | so?  Please explain. |
| 13 | A | No.  During my one conversation with Mr. McGrath regarding the |
| 14 | | performance of his staff, including Ms. Montgomery, I did not instruct Mr. |
| 15 | | McGrath to document Ms. Montgomery's deficiencies with the goal of |
| 16 | | dismissing her.  As noted in my response beginning on Line 28 on page 3, I |
| 17 | | reviewed with Mr. McGrath his duties as a supervisor in terms of dealing |
| 18 | | with personnel performance issues. |
| 19 | Q | Mr. McGrath alleges that, because he refused to do this, you retaliated by |
| 20 | | reducing his scheduled home leave from 25 to 20 work days.  Did you reduce |
| 21 | | the number of work days in Mr. McGrath's home leave?  If so, why?  Please |
| 22 | | be explicit. |
| 23 | A | I asked Mr. McGrath to take the statutory number of home leave days |
| 24 | | authorized upon returning from an overseas assignment to a domestic |
| 25 | | assignment (20 work days).  I did not take this step in retaliation for |
| 26 | | anything.  I did this because he had already been away from his division for |
| 27 | | two weeks over the Christmas and New Year's holidays on annual leave, and |
| 28 | | because his division and the Office of Citizen Exchanges faced a very heavy |
| 29 | | workload.  Among other programs, his division was in the midst of |

Initials *Vkew*

| | | |
|---|---|---|
| 1 | | preparing for the launch of a major photography exhibit documenting the |
| 2 | | aftermath of the September 11, 2002 terrorist attacks on the New York World |
| 3 | | Trade Center.   That launch was set for February 27, 2002, and Mr. McGrath |
| 4 | | only returned from home leave (after 20 work days) o/a Feb. 18, 2002. |
| 5 | Q | Mr. McGrath alleges that you intended to create a hostile work environment |
| 6 | | for him by undermining his authority with staff and by reducing his home |
| 7 | | leave by five work days.   Please respond. |
| 8 | A | I did not take any steps that undermined Mr. McGrath's authority with his |
| 9 | | staff.  Authorizing the statutorily required 20 work days of home leave |
| 10 | | following return from overseas to a domestic assignment had nothing |
| 11 | | whatsoever to do with Mr. McGrath's performance.  During his |
| 12 | | Christmas/New Year's vacation and home leave, I had to deal directly with |
| 13 | | his staff on several projects.  During that time, several of the employees of |
| 14 | | the Cultural Division volunteered to me that they felt that they had little or |
| 15 | | no substantive contact with Mr. McGrath and received little guidance from |
| 16 | | him.  When Mr. McGrath returned from his home leave o/a February 18, |
| 17 | | 2002, I urged him to meet more often with his staff and take more direct |
| 18 | | involvement in supervising the work of his division. |
| 19 | Q | Mr. McGrath states he approved Ms Montgomery to attend to national |
| 20 | | conferences in Philadelphia apparently at government expense |
| 21 | | (administrative leave and travel costs).  He alleges you would not approve |
| 22 | | this.  Did you in fact disapprove her attendance at these conferences?  If so, |
| 23 | | why? |
| 24 | A | During February-March 2002, newly arrived DAS Hart asked that all travel |
| 25 | | requests be reviewed before approval.  This was at a time that I was engaged |
| 26 | | in exceptionally heavy program management duties.  I do not recall the |
| 27 | | details of the travel requested for Ms. Montgomery, but I believe |
| 28 | | consideration of this request was held up because of the review of all travel |
| 29 | | requests, and because of the press of other program business.  I cannot recall |

Initials [signature]

| | | |
|---|---|---|
| 1 | | Ms. Montgomery or anyone else raising the issue of this travel request with |
| 2 | | me as a high-priority matter until after the requested travel dates had passed. |
| 3 | Q | Mr. McGrath alleges you approved to White persons on your staff to attend |
| 4 | | conferences in Sao Paolo, Brazil, and in New York. Did you approve staff to |
| 5 | | attend these conferences? If so, please identify the staff persons, their job |
| 6 | | titles, the conferences they attended, and the relationship of these |
| 7 | | conferences to the job responsibilities of these staff persons. |
| 8 | A | I approved travel for Program Officer Leanne Mella to travel to Sao Paulo in |
| 9 | | March 2002 to oversee implementation of a major program for which she was |
| 10 | | directly responsible, the visit to Sao Paulo of a U.S. artist representing the |
| 11 | | United States at the Sao Paulo art biennale. I also approved travel of |
| 12 | | Program Officer Kathryn Wainscott to travel to New York in March 2002 for |
| 13 | | a routine meeting of the Fund for U.S. Artists at International Festivals and |
| 14 | | Exhibitions, a major program supported by the Cultural Programs Division. |
| 15 | | Both Ms. Wainscott and Ms. Mella are white. |
| 16 | Q | Was their travel and time at government expense? Please explain the |
| 17 | | difference between their situations and that of Ms Montgomery. Please be |
| 18 | | specific. |
| 19 | A | Their travel was at government expense. Their travel was required for the |
| 20 | | effective management of the programs for which they are responsible. I do |
| 21 | | not recall the exact details of Ms. Montgomery's request to travel to |
| 22 | | Philadelphia. Ms. Montgomery did travel in July 2002 to Chicago at |
| 23 | | government expense for discussions related to a program for which she is |
| 24 | | responsible. |
| 25 | Q | Mr. McGrath alleges you gave Ms Montgomery a large amount of special |
| 26 | | work to be done in a short amount of time and this was work she would not |
| 27 | | normally be given. Did you give Ms Montgomery special work? If so, what |
| 28 | | was the nature of the work; that is, what types of effort (development, |
| 29 | | writing, typing, filing, copying, assembling, etc.) did it require to complete? |

Initials _Vym_

1       Was it a "large amount"? What was the time frame allowed for the

2       performance of this work? Is this work that would normally be assigned to

3       Ms Montgomery? If not, why was it assigned to her?

4   A   I asked Ms. Montgomery and one of her colleagues to assist in arranging the

5       travel overseas for three speakers for the overseas openings of the

6       photographic exhibit "After September 11: Images from Ground Zero." This

7       work consisted of arranging for US experts on the exhibit to travel to

8       overseas to US diplomatic posts to speak at the exhibit openings. One

9       colleague also arranged for the editing, reproduction and distribution of a

10      video to accompany the exhibition.

11      The work Ms. Montgomery carried out was very similar, if not identical, to

12      that which she carries out for the American Cultural Specialists Program

13      (ACULSPECs), which is a routine part of Ms. Montgomery's work. The

14      work, which consisted of arranging international air flights, had to be carried

15      out expeditiously to meet overseas opening dates. As I recall, Ms.

16      Montgomery handled travel arrangements for two of these speakers.

17   Q   Did others assist Ms Montgomery in the performance of this work? If so,

18      who and in what way? Over what period of time was this work done?

19   A   Program Officer Sandy Rouse also handled travel for speakers. Both Ms.

20      Rouse and Ms. Montgomery were assisted by the Program Coordinator for

21      the Cultural Programs Division, Deborah Chapman. The work was carried

22      out during the period of about February 18 to March 8, 2002.

23   Q   Did you give this work to Ms Montgomery to "fluster" her or to put her in a

24      position where she could not perform adequately, thus giving a documented

25      reason to use in an attempt to terminate her employment?

26   A   No. I asked Ms. Montgomery and Ms. Rouse to take on these air flight

27      arrangements because they both are highly experienced in this type of

28      program management, the project was clearly a cultural project that

29      belonged in the Cultural Programs Division, and the work was virtually

1    identical to that of arranging air flights for ACULSPECs, a normal part of the

2    work of Program Officers in the Cultural Programs Division. To the best of

3    my knowledge, Ms. Montgomery did not become flustered. She arranged

4    the air travel she was asked to handle skillfully and on time.

5    Q    Another example Mr. McGrath gave involved a program under his area of

6    responsibility, the FILL IN NAME. He contends he wanted to "reform" this

7    grant because it is racially and ethnically biased toward White and

8    developed countries. Did Mr. McGrath indicate to you he wanted to make

9    changes to this grant? If so, what changes did he indicate he wanted to make

10    and what reasons did he give you for wanting to make these changes?

11    A    I assume that this refers to the performing arts program of ECA's

12    cooperation with the Fund for U.S. Artists at International Festivals and

13    Exhibitions. The "Fund" is a partnership of ECA with the National

14    Endowment for the Arts, the Pew Charitable Trusts and the Rockefeller

15    Foundation. The Fund supports US visual and performing artists in

16    representing the US at international festivals and exhibitions. The

17    ECA/PE/C/CU grant in support of the Fund is to Arts International (AI), a

18    non-profit organization in New York City. The Fund itself is an informal

19    partnership, and each of the partners maintains its own grant arrangement

20    with AI. The functioning of the Fund partnership is separate from these

21    grants, although all Fund partners depend on AI to carry out the

22    administrative work of the Fund.

23    Mr. McGrath raised concerns about the performing arts segment of this

24    partnership, noting that the majority of support grants are awarded to

25    groups going to festivals in the developed countries, especially Western

26    Europe. Mr. McGrath indicated that he wanted to change the operating

27    procedures of the Fund to focus more attention on the developing countries.

28    He also wanted to limit the granting of support to more than one US artist or

Initials *Wm*

1        group for any one festival, and limit the granting of more than one grant to

2        the same US artist or group in the same fiscal year.

3   Q   Did you agree that he should be allowed to make these "reforms" to this

4        grant? Why? Please be specific in explaining your rationale.

5   A   I told Mr. McGrath that he should propose "reforms" to me that he would

6        like to see raised with the Fund partners. He did not propose any reforms

7        directly to me, although he did protest continuing Fund support for US

8        artists at festivals in the developed countries. He did discuss with his staff

9        possible reforms, such as changing the Fund guidelines under which

10      multiple support grants would be provided to the same US artist or group in

11      the same fiscal year, or multiple grants would be provided for any one

12      festival. I raised the issues that Mr. McGrath proposed with the Fund

13      partners and the guidelines have been changed along the lines Mr. McGrath

14      proposed.

15      I told Mr. McGrath that the Fund partners were well aware of the program

16      geographic imbalance, and that he should provide detailed proposals for

17      how to deal with the issue. I stressed that any steps to refocus the

18      performing arts programs would have to be negotiated with the other

19      partners, which provide over two-thirds of the total funding for such

20      programs. Also, I noted that the single most significant limitation on

21      supporting more US performing artists at festivals in the developing

22      countries was simply the lack of such festivals. The Fund is designed to

23      respond to US artists who have been invited to international festivals. If

24      there is no festival, then the Fund as currently structured cannot get involved

25      with US performing artists who want to travel overseas. I observed to Mr.

26      McGrath that expanding the Fund's activities to the developing countries

27      would mean devising a structure for the Fund to assist such countries in first

28      organizing festivals, or would mean shifting the Fund's focus away from

29      festivals to ad hoc performances. Both of these steps would have to be

1    negotiated with the other partners since they could mean an increased
2    investment in the Fund.  I also noted to Mr. McGrath that many of the
3    festivals in "Europe" to which he objected were in fact in Central Europe,
4    Russia, the Balkans and Eurasia, regions of high policy interest to the
5    Department of State.  I also noted that the Festival Fund was one of the only
6    cultural programs available to the Office of Citizen Exchanges to reach key
7    audiences in Europe and Eurasia.  Since the Cultural Programs Division's
8    grant to the Fund for performing arts programs amounted to only about
9    $150,000 annually, and the Division already invests much more for
10   performing arts programs in the developing countries through other
11   programs such as the Jazz Ambassadors and the new Intercultural Public-
12   Private Fellows, I observed that the amount of time and effort put into
13   reforming the Fund should be commensurate with the level of budget
14   support that we provided.

15  Q  Have any other managers under your supervision in the past two years
16     addressed with you changes they may have wanted to make to grants under
17     their supervision?  If so, please identify any such managers, the race of the
18     individual, the changes desired, whether you agreed or disagreed, and if you
19     disagreed, your rationale.

20  A  The Office of Citizen Exchanges awards over 200 grants annually from all of
21     its divisions.  All grants and amendments are sent through me for review
22     and recommendation to DAS Stephen Hart and the ECA Assistant Secretary.
23     I cannot recall any on-going grant that has needed detailed changes similar
24     in scope to those that Mr. McGrath wanted to make in the Festival Fund
25     operations.

26  Q  Did Mr. McGrath suggest to you changes he wanted to make in any other
27     grants, and did you agree to those changes?  Please explain.

28  A  I cannot recall Mr. McGrath raising any other grants with me.

Initials  _____

1  Q   Mr. McGrath alleges that you authorized the granting of funds to an art
2      festival in Western Europe IDENTIFY over his objections. Do you recall Mr.
3      McGrath objecting to funds being granted to a Western Europe art festival?
4      Did you authorize the funds over his objections? If so, why?
5  A   The normal functioning of the Festival Fund in the area of the performing
6      arts is for a grantee non-profit organization (Arts International) to gather
7      applications from US artists and groups invited to attend foreign festivals
8      and then arrange a peer review process of tapes of the performances of the
9      groups or individuals. The Cultural Programs Division also queries US
10     missions overseas for an evaluation of the festivals involved before support
11     grants are decided. After the peer review ranks the individuals and groups
12     applying for support by artistic merit, a management panel consisting of
13     representatives of all the Fund partner organizations meets and reviews the
14     US applicants and the festivals for which they have applied for funding. The
15     management panel establishes recommendations for awards based on the
16     artistic ranking of the US artists or groups, the significance of the festival as
17     reported by US Missions overseas and the amount of funding requested by
18     the individuals or groups.
19     The management panel reviews are held three times a year. For one such
20     recommended listing of support grants, Mr. McGrath objected because the
21     majority of recommended grants would have gone to groups for
22     performances in Western Europe, Central Europe, Russia and Eurasia. I
23     reviewed the recommendations, and tried to identify individual artists or
24     groups that had applied for festivals in developing countries that could
25     perhaps replace those recommended for Europe/Russia/Eurasia. In fact,
26     there were no individual performers or groups with sufficiently high artistic
27     rankings who had applied for festivals in developing countries to replace
28     those already recommended. After my review, I approved the
29     recommendations from the Fund management panel.

Initials _Wujt_

1   Q   Have you authorized granting of funds to any other project during the past
2       two years over the objection of the division chief under whose authority the
3       project was assigned? If so, please identify the project, the division chief, the
4       race of the division chief, and whether to your knowledge the division chief
5       had participated in the EEO process or had protested alleged discriminatory
6       acts.

7   A   No. No other division chief has participated in the EEO process or protested
8       alleged discriminatory acts.

9   Q   Had you concurred in Mr. McGrath's decisions on other projects during the
10      same time frame as the approval for this project, either to fund or not fund?
11      If so, please identify the projects and the approximate time frame.

12  A   I cleared on Mr. McGrath's memos to the Secretary in December proposing
13      that he participate in a reception for the Thelonius Monk Foundation, and I
14      accepted his recommendations in October 2001 on not proceeding to deal
15      with the curators of the "This is New York" exhibit of photographs taken
16      during the aftermath of September 11. I also accepted and proposed to the
17      Fund for US Artists partners the recommendations that he had made
18      concerning tightening the Fund guidelines for awarding multiple grants to
19      the same US artist or group in any one fiscal year, or to any one festival.

20  Q   Mr. McGrath alleges you were opposed to his request that the Secretary host
21      a reception in honor of the Thelonius Monk Institute and the winner of its
22      international jazz competition. Is that accurate? If not, please explain what
23      your concern was.

24  A   That is not accurate. ECA/PE/C was assigned the task by S/S-ES of
25      responding to the request of the Monk Institute to host a reception in the
26      Franklin Room of the Truman Building with the Secretary to host. ECA had
27      no direct program dealings with the Monk Institute, thus the request had to
28      be considered as a request from a private, outside organization for use of the
29      Franklin Room. Mr. McGrath advised me that the Ethics Office of the L

1    Bureau and the Administrative Bureau of the Department had concerns

2    about the request. The Administrative Bureau asked that any action on the

3    request be delayed until they could review and revise the guidelines under

4    which private groups could request use of the formal reception rooms of the

5    Truman Building.   Action on responding to the Monk Institute request was

6    held up until the A Bureau clarified the procedures for an outside group to

7    use the Franklin Room. I advised Mr. McGrath to consult closely with and

8    carefully follow the advice of the A and L Bureaus on this request.   The final

9    recommendation regarding the Monk request was submitted with A and L

10    bureau approval following established guidelines. The final arrangements

11    for the reception were handled by Raymond Harvey, Division Chief for

12    ECA/PE/C/EAP-WHA, while Mr. McGrath was on home leave.

13    Q    Mr. McGrath alleges the Secretary was very pleased with the reception,

14         which Mr. McGrath says was very successful, and that as a result, you were

15         obviously embarrassed on having your "insensitivity and poor professional

16         judgment revealed for all to see."  Was it your perception that the reception

17         was "very successful?"  If so, whom do you consider was responsible for that

18         success?

19    A    The reception was very successful, and the Secretary seemed very pleased to

20         participate. The reception and the Secretary's participation were arranged

21         pursuant to guidance provided by the A and L Bureaus. No one raised with

22         me any issues about the handling of the reception after the event, and I

23         suffered no embarrassment about how it was handled.

24    Q    According to a March 8, 2002, memo from you to Mr. McGrath, you found at

25         least one serious deficiency in his preparations for the reception. Please

26         describe that and any other problems you encountered in regard to bringing

27         the reception to a successful conclusion. Please be specific as to what

28         problems you found and what you did to correct the problem(s).

Initials [signature]

1    A    My March 8, 2002 memo to Mr. McGrath did not refer to the Monk Institute

2           reception.

3    Q    What was your experience with Mr. McGrath in terms of his reporting to you

4           the projects underway in his division, the progress of those projects, and any

5           problems he or his staff was encountering?

6    A    From the beginning of his assignment in ECA in September 2001 until his

7           Christmas leave in December 2001 and his home leave in January-February

8           2002, Mr. McGrath consulted regularly with me on the projects under his

9           supervision. After his return from home leave o/a February 18, 2002, Mr.

10          McGrath became reclusive and non-communicative. He failed to contact me

11          at all for 10 days after his return from home leave. (His office was located

12          three floors above my office and at the opposite end of the building, so I did

13          not routinely encounter Mr. McGrath during the workday.) After returning

14          from home leave, he failed to respond to verbal and e-mail requests for

15          updates on programs under his supervision. He failed to arrange weekly

16          staff meetings with his staff as I instructed him to do in my memo to him of

17          March 8, 2002. He also failed to return telephone messages I left for him.

18          When I did locate him in his office, he failed to respond to verbal requests I

19          left with him.

20    Q    Was this your experience throughout your supervision of Mr. McGrath? If

21          not, when did you begin to encounter these problems? What steps did you

22          take to correct these problems when you encountered them?

23    A    The non-communicative attitude began o/a February 18, 2002, upon Mr.

24          McGrath's return from home leave.

25    Q    Are there any witnesses whom you would care to name who have direct

26          knowledge of this claim? If so, please state the name of each, a contact

27          number, and that to which each person can speak.

| 1 | A | I discussed the problem of Mr. McGrath's lack of communication with DAS |
| 2 | | Hart, who can be reached at 202-619-5348 and with Deborah Hunsley of the |
| 3 | | ECA-IIP/HR office (202-260-0925). |
| 4 | Q | Is there anything you would like to add to your statement on this claim? |
| 5 | A | The question that begins on Line 24 of page 17 appears to refer to an incident |
| 6 | | that I did document in my memo to Mr. McGrath of March 8, 2002. This |
| 7 | | incident involved Mr. McGrath's poor handling of a request from the |
| 8 | | Kennedy Center to prepare a certificate of appreciation signed by the |
| 9 | | Secretary for presentation by the Secretary to Dr. Billy Taylor during an 80th |
| 10 | | birthday program for Dr. Taylor at the Center. In my March 8, 2002 memo, I |
| 11 | | noted: "On January 18, 2002, you left for home leave without having |
| 12 | | completed a major project involving the Secretary and Mrs. Powell. You |
| 13 | | were to have drafted, cleared and have printed and signed by the Secretary a |
| 14 | | Certificate of Appreciation for presentation to jazz artist Billy Taylor on |
| 15 | | January 20. In fact, you left on my chair on the morning of Friday, January |
| 16 | | 18, an unfinished memo, replete with typos and factual errors, with a note |
| 17 | | saying that the memo had to be approved and signed by the Secretary the |
| 18 | | same day and the certificate printed, signed and framed. There was no |
| 19 | | certificate, and I discovered that no one knew of any certificate design. The |
| 20 | | Secretary was traveling out of the country. The situation was saved as far as |
| 21 | | Mr. Taylor was concerned because he was ill and could not appear at the |
| 22 | | event. Through direct intervention of the Secretary's office, his Senior |
| 23 | | Assistant decided to have a blank Certificate presented by Mrs. Powell as |
| 24 | | part of the scheduled program, and arrange to have the certificate signed and |
| 25 | | delivered later. But, the image of ECA fumbling the ball on a major project |
| 26 | | was distinctly made with the Secretary's office." |
| 27 | | While on home leave, Mr. McGrath left no contact telephone number, but he |
| 28 | | did leave a hotmail e-mail address. I immediately e-mailed Mr. McGrath on |
| 29 | | January 18 about my dismay at this poor performance, and asked him to |
| 30 | | contact me to discuss any other projects that he may have left un-finished. |
| 31 | | He failed to contact me throughout his home leave. |
| 32 | b) | **his supervisor gave him a negative performance evaluation as Chief,** |
| 33 | | **Division of Citizen Exchanges, on 4/11/02 and 4/29/02;** |
| 34 | Q | Was this the first time you had rated Mr. McGrath's performance? If not, |
| 35 | | what ratings had you previously given him? |
| 36 | A | This was the first rating I provided an appraisal of Mr. McGrath's |
| 37 | | performance. |
| 38 | Q | Mr. McGrath alleges that, when he told you that he would not document Ms |
| 39 | | Montgomery's performance with the intent of terminating her employment, |

Initials VMMD

| | | |
|---|---|---|
| 1 | | you told him that if you did not follow your orders, he could expect a |
| 2 | | negative EER. Is that an accurate assessment of what transpired between the |
| 3 | | two of you? If not, please state your recollection of the interaction. |
| 4 | A | No. During our one discussion that related to Ms. Montgomery, I |
| 5 | | commented on the responsibilities of a supervisor for the management of his |
| 6 | | or her division. I cannot recall any comment I may have made to Mr. |
| 7 | | McGrath that linked his handling of his supervision of Ms. Montgomery |
| 8 | | with a possible negative EER. |
| 9 | Q | When did you first determine that Mr. McGrath's performance as division |
| 10 | | chief was not at the level you expected from that level employee? What led |
| 11 | | you to that conclusion? Please be specific. |
| 12 | A | The Billy Taylor incident described in my response beginning on Line 5 of |
| 13 | | page 19 raised serious doubts in my mind about Mr. McGrath's judgment. |
| 14 | | The comments I had heard during his home leave from his staff about their |
| 15 | | lack of feedback from him, and his non-communicative attitude after return |
| 16 | | from home leave o/a February 18, 2002 further raised my concerns about his |
| 17 | | performance. |
| 18 | Q | In your March 8, 2002, memo to Mr. McGrath, you state that you heard |
| 19 | | comments from "virtually all" of his staff that he had not held regular staff |
| 20 | | meetings. Do other managers under your supervision hold regular staff |
| 21 | | meetings? |
| 22 | A | Other managers under my supervision meet regularly with their staffs. In |
| 23 | | most cases, the managers speak and interact with their staff members on a |
| 24 | | daily basis. |
| 25 | Q | Why do you consider having regular staff meetings important for a division |
| 26 | | chief? |
| 27 | A | A regular staff meeting is only one way of maintaining contact with staff. In |
| 28 | | Mr. McGrath's case, when his staff members volunteered to me that they |
| 29 | | were not clear about his views on program issues, and in fact had not gotten |

|     |   |                                                                                 |
|-----|---|---------------------------------------------------------------------------------|
| 1   |   | responses from him to e-mails, I determined that the only way to ensure          |
| 2   |   | minimal communication was to insist that Mr. McGrath hold a regular staff        |
| 3   |   | meeting.                                                                         |
| 4   | Q | The March 8 memo also said that Mr. McGrath's staff members had also told        |
| 5   |   | you that he had not "taken time to consult with (his) staff) regarding their     |
| 6   |   | program plans or even listened to them for more than a few minutes on any        |
| 7   |   | issue." Which staff members as you recall told you Mr. McGrath had not           |
| 8   |   | consulted with them on program plans or listened to them for more than a         |
| 9   |   | few minutes on any issue?                                                        |
| 10  | A | Program Officers Susan Cohen, Susie Baker, Leanne Mella and Sandy Rouse          |
| 11  |   | all mentioned to me at various times or noted in e-mails that they had not       |
| 12  |   | gotten responses to requests for guidance and were not sure of Mr.              |
| 13  |   | McGrath's views on their programs.                                              |
| 14  | Q | Did you consider this a major problem in Mr. McGrath's management of his          |
| 15  |   | division? What led you to that conclusion?                                       |
| 16  | A | Yes. Division Chiefs are responsible for devising, conceptualizing and           |
| 17  |   | administering all of the programs within their divisions and for the            |
| 18  |   | supervision of their staff. When Program Officers are unaware of the            |
| 19  |   | Division Chief's views on programs, or receive no regular feedback on           |
| 20  |   | program administration from their Division Chief, then the Division Chief is     |
| 21  |   | obviously not carrying out his or her responsibilities.                         |
| 22  | Q | Have you encountered this problem with any other division chief under your       |
| 23  |   | supervision? If so, who, and what action did you take?                          |
| 24  | A | No.                                                                             |
| 25  | Q | The memo also refers to Mr. McGrath being openly dismissive of some of the      |
| 26  |   | staff members' attempts to raise program issues with him. Which staff           |
| 27  |   | members made you aware of this?                                                 |



| | | |
|---|---|---|
| 1 | A | Program Officers Susie Baker, Leanne Mella and Susan Cohen told me that |
| 2 | | they had tried to discuss program ideas with Mr. McGrath and that his |
| 3 | | responses had been dismissive or uninterested. |
| 4 | Q | In regard to the budget report that you, Mr. Hart and Ms Wainscott prepared |
| 5 | | for the divisions reprogramming letter to the House Appropriations |
| 6 | | Committee, what was Mr. McGrath's responsibility in regard to |
| 7 | | accomplishing this task?  When was it due from him to you?  When and how |
| 8 | | did you learn that it had not been prepared?  What timeframe did this allow |
| 9 | | you to accomplish this task? |
| 10 | A | I recall that the response to the re-programming letter was requested by |
| 11 | | ECA's budget office during Mr. McGrath's home leave.  Within a very short |
| 12 | | period (1-2 days), I was required to prepare a final cultural budget for |
| 13 | | FY2002.  If Mr. McGrath had been present, he would have been responsible |
| 14 | | for reviewing that budget with me and DAS Hart. |
| 15 | Q | You expressed concern in your memorandum that the Warhol project was |
| 16 | | 400% over budget.  What was the funding level for the project?  At what |
| 17 | | point in the project did you find it to be 400% over budget; that is, what was |
| 18 | | the time and effort left to completion?  Did the staff person responsible for |
| 19 | | this project have knowledge of the budget allowed for the project?   Was the |
| 20 | | staff person aware the project was over budget? |
| 21 | A | As I recall, my reference to the Warhol budget was based on information |
| 22 | | provided in the reprogramming budget review while Mr. McGrath was on |
| 23 | | home leave.  The review established that the initial budget, set by Mr. |
| 24 | | McGrath's predecessor, was unrealistically low, but had not been adjusted to |
| 25 | | the required, higher level. |
| 26 | Q | Your memo directs Mr. McGrath to hold weekly staff meetings from that |
| 27 | | point forward.  Did he do so, to your knowledge? |
| 28 | A | To my knowledge, no. |

1    Q    Your memo directs Mr. McGrath to take time to meet with staff members
2         individually and review with them their projects, budgets, and plans. Did he
3         do so, to your knowledge?
4    A    To my knowledge, no.   I continued to receive e-mails from some staff
5         members of the Cultural Division noting that Mr. McGrath had not
6         responded to their requests for guidance.
7    Q    Did you meet with Mr. McGrath when you returned from your overseas trip
8         on March 21? If so, what was the gist of that meeting?
9    A    I held weekly Wednesday afternoon Division Chiefs meetings after my
10        return, which Mr. McGrath usually attended. I met with Mr. McGrath and
11        two of his staff members on April 4 to discuss the Festival Fund and met
12        with him on April 18 to discuss his performance evaluation.   I later met
13        with Mr. McGrath again on May 16, after several unsuccessful attempts to
14        reach him by telephone and e-mail.
15   Q    In a May 20 memorandum to Mr. McGrath, you noted that to your
16        knowledge, he had not developed work requirements for Leanne Mella of his
17        staff, although she had been hired some considerable time before. To your
18        knowledge, did Mr. McGrath then develop the work requirements or take
19        any steps toward developing the work requirements?
20   A    No. I learned in May 2002 that Ms. Mella's job elements had not been
21        established despite the fact that she had been hired in August 2001. I asked
22        Mr. McGrath to establish the elements, which he did not do. I asked him a
23        second time to establish the elements, and there was no action. I finally
24        made sure that they were submitted myself.
25   Q    Your May 20 memo asks for status on a number of items. Did he provide
26        you with that status? If so, were the items on target?
27   A    I received no response from Mr. McGrath to my May 20, 2002 e-mailed
28        memo.

Initials 

1  Q  In your email to the EEO counselor outlining concerns with Mr. McGrath's
2     performance, you spoke to asking Mr. McGrath to meet with a representative
3     of the Korean Embassy who wanted information on the Department's exhibit
4     programs. Please describe what you asked Mr. McGrath to do, when you
5     asked him to do it, when the task should have been performed, and how you
6     learned it had not been performed. Did someone else ultimately meet with
7     the representative and deal with the matter? If not, what happened?

8  A  On April 7, 2002, I asked Mr. McGrath in an e-mail to respond to a request
9     from a Mr. Heon of the Korean Embassy for  information on how ECA
10    handled its overseas exhibits. I later learned that Mr. McGrath had not
11    responded to Mr. Heon, and eventually I asked Leanne Mella of the Cultural
12    Programs Division staff to call Mr. Heon and answer his questions.

13 Q  Your email also indicates that you asked Mr. McGrath on April 9 to advise
14    you of whom from his office should travel to a conference of the American
15    Association of Museums, a major grantee partner of the Division of Cultural
16    Programs, but he did not respond. What steps did you take to deal with this
17    matter? Did anyone from the division attend the conference? If no one
18    went, what was the impact on the organization?

19 A  Mr. McGrath did not respond. To my knowledge, no one attended the
20    conference.  The ECA grant to the AAM was not affected since we have
21    close and very cooperative relations with the AAM office in Washington.
22    However, it would have been beneficial for the Program Officer handling the
23    AAM grant to attend the conference to meet museum directors and learn
24    more about current museum management issues.

25 Q  Were these matters addressed in the questions above factors in the rating you
26    gave Mr. McGrath? What led you to conclude these matters were sufficiently
27    serious to warrant a negative rating?

1    A    These matter were symptomatic of Mr. McGrath's management

2          shortcomings and disengagement from his responsibilities as a Division

3          Chief and manager.

4    Q    Have you given anyone else a negative rating within the past two years?  If

5          so, who?  What is the person's race?  Had the person participated in activities

6          protected under Title VII to your knowledge?

7    A    No.

8    Q    Have you given others higher ratings than you gave Mr. McGrath?  Please

9          state the race of such persons.  Had such persons participated in activities

10         protected under Title VII to your knowledge?

11   A    Yes.  Over the past 30 years I have rated Caucasian, African-American, and

12         Hispanic men and women in both the Civil Service and Foreign Service

13         higher than I did Mr. McGrath.  None has participated in activities protected

14         under Title VII to my knowledge.

15   Q    In general, what characterizes the significant difference(s) between Mr.

16         McGrath's performance and those of employees you rated higher than he?

17   A    Mr. McGrath's lack of communication with his staff and with me was

18         exceptional in my experience.  His lack of response to my direct requests for

19         actions or information was unique in my 31-year experience in the Foreign

20         Service.

21   Q    Are there any witnesses whom you would care to name who have direct

22         knowledge of this claim?  If so, please state the name of each and that to

23         which each person can speak.

24   A    Cultural Programs Division Program Officers Susie Baker, Susan Cohen,

25         Leanne Melia, Kathryn Wainscott, EJ Montgomery and Sandy Rouse can

26         speak to their relationships with Mr. McGrath.   DAS Hart observed my

27         attempts to communicate with Mr. McGrath.

28   Q    Is there anything you would like to add to your response to this claim?

29   A    No.



1     *c)*   *he was subjected to an involuntary curtailment of his assignment as Chief, Division*

2            *of Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and*

3            *Cultural Affairs*

4     Q   You sent Mr. McGrath a request on May 2 for his guidance on how to

5            proceed with the competition on the Intercultural Public-Private Fellows

6            project. Did he ever respond to you? What efforts did you make to get a

7            response? If he did not respond, what did you find it necessary to do to

8            address this matter? Were you able to conclude the matter successfully? If

9            not, what was the impact on the organization? What was the impact of his

10           failure to respond in terms of extra effort by others in order to meet the needs

11           in this situation?

12    A   No, Mr. McGrath did not respond to this request. He did take action to

13           identify panelists to review the Intercultural Fellows proposals. But, he did

14           not meet with the Program Officer (Susie Baker) who was handling the panel

15           review and with the other Program Officers who were evaluating the

16           program proposals. After several unsuccessful attempts by the Ms. Baker to

17           obtain clearance of the review procedure (or simply any response to her e-

18           mails) from Mr. McGrath, Ms. Baker came to me to ask how to respond. I

19           approved the process and related paperwork. The panel process finally

20           worked smoothly only because Ms. Baker was persistent in seeking approval

21           from me of the schedule and paperwork that she had developed, and she and

22           her colleagues were diligent in preparing the required proposal evaluations

23           and running the panel review process. Mr. McGrath's failure to respond to

24           Ms. Baker or me required that Ms. Baker send Mr. McGrath several e-mails

25           between April 25 and May 16, to which, to my knowledge, Mr. McGrath

26           responded to none. I was forced to take time from my schedule to deal with

27           what should have been a routine panel scheduling issue normally handled

28           by Division Chiefs.

| | | |
|---|---|---|
| 1 | Q | According to your email, Mr. McGrath did not respond to a Program |
| 2 | | Officer's May 15 request to attend a meeting with a grantee of the Cultural |
| 3 | | Programs Division. What was the impact of his failure to attend? What |
| 4 | | effort had to be made to address the matter so that it did not reflect |
| 5 | | negatively on the organization, if any? |
| 6 | A | The request was to meet with a grantee who had done interesting work with |
| 7 | | cultural presenting organizations in China, and who only rarely visited |
| 8 | | Washington. Mr. McGrath's failure to participate in the meeting meant that |
| 9 | | he missed an opportunity to learn the details of one of the few programs his |
| 10 | | division had had in China. The grantee met with the Program Officer. |
| 11 | Q | You directed Mr. McGrath to set up a weekly meeting for you with McGrath |
| 12 | | and his staff and to provide you with a weekly preview of his appointments |
| 13 | | and activities. Why did you consider this weekly meeting important? The |
| 14 | | weekly preview? Did he follow through on either of these? If not, what |
| 15 | | action did you take? |
| 16 | A | Since I was receiving no feedback from Mr. McGrath, and members of his |
| 17 | | staff were approaching me for guidance, I deemed it necessary to have a |
| 18 | | weekly meeting with Mr. McGrath and his staff. Mr. McGrath took no action |
| 19 | | to arrange such a meeting, and refused to attend the meetings that I did |
| 20 | | have. I requested a weekly schedule of Mr. McGrath's whereabouts since I |
| 21 | | had had difficulty locating him in his office or getting him to respond to e- |
| 22 | | mails or telephone messages.  The one other Division Chief who shares the |
| 23 | | same office suite with Mr. McGrath (three floors removed from my office) |
| 24 | | regularly submits weekly preview e-mails that his staff and I find very |
| 25 | | helpful. |
| 26 | Q | Your email indicates that you had a conversation with Mr. McGrath on May |
| 27 | | 16 in which you noted he never seemed available to answer telephone calls, |
| 28 | | did not respond to emails, and had not returned any telephone messages or |
| 29 | | emails for over two weeks. Were these calls and attempts at contact only |

| | | |
|---|---|---|
| 1 | | from you or from others as well?  You directed Mr. McGrath to return phone |
| 2 | | calls and emails.  Did he do so from that point forward? |
| 3 | A | DAS Hart also commented to me that Mr. McGrath did not return his calls. |
| 4 | | There was no change in Mr. McGrath's pattern of ignoring my e-mails and |
| 5 | | phone messages after May 16. |
| 6 | Q | Your email to Mr. McGrath indicates you directed him to provide you an |
| 7 | | update on several projects handled by the Cultural Programs Division.  Did |
| 8 | | he ever provide you with that information? |
| 9 | A | No. |
| 10 | Q | Please describe the matter of the May 21 meeting of Mr. McGrath's staff with |
| 11 | | you to review proposals and panel preparations for the ISSP competition. |
| 12 | | Why was it important Mr. McGrath attend?  What happened when you |
| 13 | | asked him to attend? |
| 14 | A | The Intercultural Public-Private Fellows program (ICPP) was a unique, new |
| 15 | | departure for the Cultural Programs Division, involving proposals from |
| 16 | | major US cultural institutions to carry out exchange programs overseas.  It |
| 17 | | was essential that the Program Officers involved with the proposal review |
| 18 | | process understand the process and their roles in it.  Ms. Baker, the Program |
| 19 | | Officer responsible for the grant review process, had attempted on several |
| 20 | | occasions to schedule a meeting with Mr. McGrath and other Program |
| 21 | | Officers involved in evaluating grant proposals to review the entire panel |
| 22 | | process.  Mr. McGrath had not responded to her e-mails and he did not |
| 23 | | attend the May 21 meeting. |
| 24 | Q | Please describe the instance in which a Program Officer under Mr. McGrath's |
| 25 | | supervision asked you to clear a routine cable on a major, ongoing cultural |
| 26 | | program.  Who was the Program Officer?  What was Mr. McGrath's role in |
| 27 | | clearing such cables for his staff?  Did it create a problem that he was not |
| 28 | | fulfilling a responsibility in clearing cables? |

Initials _[signature]_

1  A    The outgoing telegram was a routine telegram to European posts asking for

2       their evaluations of festivals in their countries for which US performing

3       artists and groups had requested Festival Fund support.  The Program

4       Officer, Kathryn Wainscott, asked for my clearance and noted that she had

5       approached me directly since Mr. McGrath had refused to respond to such

6       requests for cable clearances in the past.   Normally, Mr. McGrath should

7       have cleared the cable and then I would have approved it for release.   Mr.

8       McGrath's failure to clear such cables (or provide constructive guidance on

9       how to edit the telegram) underscored to me his lack of support for and

10      involvement in the Fund program and his lack of communication with his

11      staff.

12 Q    What led you to conclude it was necessary to curtail Mr. McGrath's

13      assignment as division chief?  Did anyone participate in the decision with

14      you?  If so, who?  What was the gist of discussions you had with this person?

15      Was it necessary to obtain approval from your supervisor Mr. Hart to take

16      this action?

17 A    With Mr. McGrath refusing to respond to guidance or assignments and

18      apparently not interacting with his staff, it became obvious to DAS Hart and

19      me that he could not continue in the Division Chief position.   The workload

20      of the Cultural Programs Division was increasing and we could not function

21      properly as an office without a fully contributing Chief of the Cultural

22      Programs Division.   DAS Hart and Deborah Hunsley of ECA-IIP/HR

23      discussed with me the proper procedure for requesting a curtailment of a

24      Foreign Service domestic assignment.  DAS Hart asked me to draft a memo

25      from the Assistant Secretary of ECA to the Director General of the Foreign

26      Service requesting that Mr. McGrath's assignment be curtailed, which I did.

27      DAS Hart, Assistant Secretary Patricia Harrison and the Human Resources

28      Office of ECA approved the request for curtailment and the Assistant



1        Secretary submitted a memo based on my draft to the Director General. The

2        Director General later approved the curtailment.

3   Q    Are there any witnesses whom you would care to name who have direct

4        knowledge of this claim? If so, please state the name of each and that to

5        which each person can speak.

6   A    Deborah Hunsley of the ECA-IIP Human Resources office advised DAS Hart

7        and me on the proper procedures for requesting a curtailment, and she met

8        privately with Mr. McGrath and discussed the request for curtailment with

9        him. DAS Hart also met with Mr. McGrath privately before the curtailment

10       was requested.

11  Q    Is there anything you would like to add to your response to this claim?

12  A    No.

13  d)   **the discriminatory curtailment had the result of denying Complainant a**

14       **career-enhancing follow-on assignment.**

15  Q    Did you offer Mr. McGrath the opportunity to seek a voluntary curtailment?

16  A    Yes, in a meeting with him, DAS Hart and Deborah Hunsley on May 23,

17       2002, and in a memo presented to him at that meeting.

18  Q    What would the difference have been to Mr. McGrath's record and his ability

19       to obtain a career enhancing follow-on assignment had he chosen to request

20       voluntary curtailment?

21  A    That is an issue for M/DGHR/CDA. Any response on my part would be

22       speculation.

23  Q    Mr. McGrath alleges the involuntary curtailment resulted in denying him a

24       career-enhancing follow-on assignment. What is your response?

25  A    That is an issue for M/DGHR/CDA. Any response on my part would be

26       speculation.

27       I declare under penalty of perjury that the foregoing is true and correct.

28       Executed on this day, ___SEPTEMBER  3___, 2002

29

Initials                                          Page 30 of 3 /

1   _____

2      Van S. Wunder III