# EXHIBIT 18

1                  **DECLARATION OF MATTHEW J. MCGRATH**

2

3           In accordance with the provision of Title 28, United States Code, Section 1746,

4 I, Matthew J. McGrath, make the following declaration to Betty L. Cox who has

5 identified herself to me as an EEO Investigator, Southwind Enterprises, Inc. assigned

6 by the US Department of State to perform this investigation, knowing that this

7 statement may be used in evidence.  I understand that this statement is not

8 confidential and may be shown to any party who must have access to this

9 information in order to carry out his or her official duties.

10

11          This statement is given in relation to a complaint of discrimination I filed.

12

13          *I am aware that the accepted claims in this complaint are that because of my race*

14 *(Caucasian) and as reprisal for my having engaged in prior protected activity and/or for*

15 *opposing discriminatory practices, I was discriminated against and subjected to a hostile*

16 *work environment when:*

17 *a)*     *my supervisor attempted to undermine my authority as Chief, Division of Citizen*

18           *Exchanges, Office of Cultural Programs, Bureau of Educational and Cultural*

19           *Affairs;*

20 *b)*     *my supervisor gave me a negative performance evaluation as Chief, Division of*

21           *Citizen Exchanges, on 4/11/02 and 4/29/02;*

22 *c)*     *I was subjected to an involuntary curtailment of my assignment as Chief, Division of*

23           *Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and Cultural*

24           *Affairs; and*

25 *d)*     *the discriminatory curtailment had the result of denying me a career-enhancing*

26           *follow-on assignment.*

27

28 Q     Please state your full name.

29 A     Matthew Joseph McGrath

30

31 Q     Please state your title and grade, the name of the agency by which you are

32         employed, the organizational unit to which you are assigned, and the

33         address of your duty station.

34 A     Foreign Service Officer (no title/over complement in HR), grade one, U.S.

35         Department of State, over complement in the Office of Human Resources,

36         Room 2332, Department of State, Washington, D.C. 20520

37

38 Q     Please state your organizational work relationship to Van S. Wunder at the

39         present time.

40 A     No current relationship.  I was involuntarily curtailed as Chief of the Office of

41         Cultural Programs in June 2002.

42

Exhibit __5__

| | | |
|---|---|---|
| 1 | Q | Please state your work relationship to Mr. Wunder at the time of the matters |
| 2 | | at issue in your complaint. |
| 3 | A | I was then Chief, Office of Cultural Programs.  As Director, Office of Citizen |
| 4 | | Exchanges, Mr. Wunder was my immediate supervisor and rating officer. |
| 5 | | |
| 6 | Q | Please state your work relationship to Steve Hart at the present time, and if |
| 7 | | different, at the time of the matters at issue in your complaint. |
| 8 | A | No current relationship.    I was involuntarily curtailed in June 2002.  As |
| 9 | | Deputy Assistant Secretary of State since February 2002, he was Mr. |
| 10 | | Wunder's direct supervisor and rating officer and my reviewing officer. |
| 11 | | |
| 12 | Q | Please state your race. |
| 13 | A | Caucasian/white |
| 14 | | |
| 15 | Q | Who are the management officials you contend took reprisal actions against |
| 16 | | you? |
| 17 | A | Mr. Wunder, Mr. Hart, and others in the Bureau of Educational and Cultural |
| 18 | | Affairs (ECA), including Mr. Dave Whitten, ECA executive officer, through |
| 19 | | ECA/HR's Ms. Jackie Hill |
| 20 | | |
| 21 | Q | What do you believe to be the act or acts on your part that resulted in these |
| 22 | | management officials taking reprisal actions against you?  When did each of |
| 23 | | these acts on your part occur, and when do you believe each of these |
| 24 | | management officials became aware of these acts? |
| 25 | A | My continuing and repeated refusal, starting in the fall of 2001 and |
| 26 | | concluding with my involuntarily curtailment in June 2002, to take steps to |
| 27 | | dismiss a member of my Cultural Programs staff, Evangeline (EJ) |
| 28 | | Montgomery, a 72 year old African-American woman handicapped with |
| 29 | | Parkinson's who I considered to be a staff member in good standing.  My |
| 30 | | reporting of an EEO violation to ECA/HR's Ms. Jackie Hill (and through her |
| 31 | | to ECA executive officer David Whitten) in March 2002 and my reporting of |
| 32 | | the EEO Complaint to DAS Steve Hart in April 2002 |
| 33 | | |
| 34 | Q | Are you aware of the Department of State's policy on harassment? |
| 35 | A | In general.  I recall occasionally seeing e-mail announcements and memo |
| 36 | | announcements |
| 37 | | |
| 38 | Q | Did you raise your concerns about being subjected to a hostile work |
| 39 | | environment to any management official above Mr. Wunder?  If so, to whom, |
| 40 | | when and with what result?  If not, why? |
| 41 | A | I first raised my concerns in March 2002 with a Ms. Jackie Hill in the Office of |
| 42 | | Human Resources after being informed by a member of the CP staff, Ms. |
| 43 | | Deborah Chapman that Ms. Hill was an EEO counselor and as such was the |

Initials mfr

1  first step concerning EEO issues.  Ms. Hill and I agreed that she would
2  discuss the matter with ECA's Executive Officer, Mr. David Whitten and get
3  back to me.  After some time had passed, and on my initiative and not hers,
4  she informed me that she had indeed held discussions with Mr. Whitten, but
5  with no resolution. Mr. Whitten never approached me at any time thereafter.
6  I raised my concerns with Mr. Hart beginning in April 2002.    Shortly
7  thereafter I was asked and then ordered to take an involuntary curtailment
8  from my position.    I was also informed shortly thereafter by Ms. Hattie
9  Baldwin in the Office of Civil Rights that Mr. Whitten had in the past not
10  been helpful in resolving EEO issues in the past.
11
12  Q    Please state the names and titles of the persons you supervised while division
13      chief.
14  A    Program Managers--Ms. Sandra Rouse, Ms. Leanne Mella, Ms. Kathryn
15      Wainscott, Ms. Susan Baker, Ms. Susan Cohen, Ms. Evangeline Montgomery.
16      Administrative Assistants—Ms. Deborah Chapman, Ms. Lafaye Proctor.
17
18  Q    Were there other division chiefs under Mr. Wunder's supervision at that
19      time?  If so, please state their names and titles.
20  A    Curt Huff, Ray Harvey, Chris Miner, Bob Persiko, Linda Tressa Barker.
21
22  Specific Claims:
23
24  a)   *My supervisor attempted to undermine my authority as Chief, Division of*
25      *Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and*
26      *Cultural Affairs;*
27
28  Q    In the June 3, 2002, memorandum you sent to Hattie Baldwin, you contend
29      that your then supervisor Van S. Wunder attempted to have you dismiss
30      from employment Evangeline "EJ" Montgomery.  What specific statements
31      and actions on the part of Mr. Wunder led you to conclude he intended that
32      Ms Montgomery's employment be terminated?
33  A    He told me repeatedly starting in the fall of 2001 that I should begin
34      documenting her shortcomings with the goal of forcing her either to retire or
35      be dismissed.  He rejected all of my arguments that she was a valuable
36      member of the Cultural Programs staff.  On two occasions he cited his
37      success in doing just that to someone he had previously supervised, a man he
38      identified as "that Cuban" Mo Garcia, and told me that I could do the same.
39      When he could not use his implied threats to persuade me to dismiss Ms.
40      Montgomery, he threatened me directly on at least two occasions (Jan. and
41      March 2002) that if I did not take such steps, it would be reflected in my
42      evaluation report.
43

| | | |
|---|---|---|
| 1 | Q | What was Ms Montgomery's job title and grade at that time? |
| 2 | A | Program Manager, Grade GS-13 |
| 3 | | |
| 4 | Q | What were Ms Montgomery's major job responsibilities at that time? |
| 5 | A | Plan and implement visual arts exhibitions and paper/poster shows; |
| 6 | | program American Cultural Specialists in the visual arts. |
| 7 | | |
| 8 | Q | Were there areas of Ms Montgomery's major job responsibilities that she was |
| 9 | | unable to perform or was not proficient at performing? If so, please identify |
| 10 | | these job responsibilities, whether they were major duties of Ms |
| 11 | | Montgomery's position, and explain what actions you or others took, if any, |
| 12 | | to assure that these job responsibilities were fulfilled in a timely and efficient |
| 13 | | manner? |
| 14 | A | She was a slow typist, but this was not a major duty of hers. If there was a |
| 15 | | deadline quickly looming, either of the two Administrative Assistants, Ms. |
| 16 | | Chapman or Ms. Proctor might on occasion have to assist her, or Ms. Rouse, |
| 17 | | a program Manager, might help, with my support and approval. However, |
| 18 | | these individuals, unlike others on the staff, often pitched in to assist each |
| 19 | | other when there was a lot of work to be done quickly. |
| 20 | | |
| 21 | Q | What percentage of Ms Montgomery's major job responsibilities was she able |
| 22 | | to perform in a timely manner and without assistance? |
| 23 | A | 98% |
| 24 | | |
| 25 | Q | If others assisted Ms Montgomery in completion of major duties of her |
| 26 | | position, please name those individuals and their job titles, indicate what |
| 27 | | duties they performed that were Ms Montgomery's responsibilities, and how |
| 28 | | much of their time they devoted to assisting Ms Montgomery. |
| 29 | A | None of her major duties. See above. Mostly typing. Perhaps 1 hour per |
| 30 | | week on average shared by the three staffers listed above. |
| 31 | | |
| 32 | Q | Did anyone who assisted Ms Montgomery in the completion of the major |
| 33 | | duties of her position fall behind in his or her own work, miss any deadlines, |
| 34 | | or have any difficulty in meeting his or her own work goals in a timely and |
| 35 | | effective manner? If so, state who and what the problems were. |
| 36 | A | No |
| 37 | | |
| 38 | Q | What are the strengths you believe Ms Montgomery to have that offset any |
| 39 | | weaknesses? |
| 40 | A | Extensive institutional memory, sound judgment, extensive knowledge of the |
| 41 | | issues and the artists in the American art community in general and in the |
| 42 | | African-American Art community in particular, well known and respected in |
| 43 | | the art, gallery and museum world. |

| | | |
|---|---|---|
| 1 | | |
| 2 | Q | In your memo to Ms Baldwin, you state that on January 7, Mr. Wunder |
| 3 | | insisted that you document any and all of Ms Montgomery's deficiencies |
| 4 | | with the goal of dismissing her. You contend that in retaliation for your |
| 5 | | refusal to do this, Mr. Wunder cut your Home leave from 25 work days to 20 |
| 6 | | workdays. What leads you to conclude the shortening of your home leave by |
| 7 | | five workdays was retaliatory? |
| 8 | A | We had previously agreed on 25 days. My arguments in opposition to his |
| 9 | | instructions concerning Ms. Montgomery in early January 2002 and his |
| 10 | | threats that it would reflect negatively on me if I did not do as instructed |
| 11 | | clearly disturbed and annoyed him at the time. He reduced my home leave |
| 12 | | shortly thereafter. |
| 13 | | |
| 14 | Q | What reason, if any, did Mr. Wunder give you for reducing your home leave |
| 15 | | by five workdays? |
| 16 | A | That work required me to be back in the office. I argued that there was no |
| 17 | | work that someone acting in my place could not manage. |
| 18 | | |
| 19 | Q | What leads you to conclude this action was taken to create a hostile work |
| 20 | | environment for you? |
| 21 | A | The conversations we had just before and just after the Christmas holidays |
| 22 | | were argumentative - with him rejecting almost all of my comments and |
| 23 | | conclusions concerning the office. As a result, he became obviously more |
| 24 | | and more irritated and angry with me, creating an increasingly tense and |
| 25 | | hostile setting. He had already pointedly demonstrated his willingness to |
| 26 | | retaliate against me. Just before the Christmas holidays he had already cut |
| 27 | | and rescheduled 10 days of my "use-or-loose" annual leave shortly after a |
| 28 | | general conversation about Ms. Montgomery's dismissal. |
| 29 | | |
| 30 | Q | What leads you to conclude Mr. Wunder took this action because of your |
| 31 | | race? |
| 32 | A | He took action because of the race, gender, age and handicap of Ms. |
| 33 | | Montgomery and because he felt that as a fellow white I would be |
| 34 | | sympathetic to his position. |
| 35 | | |
| 36 | Q | According to your memo to Ms Baldwin, you approved Ms Montgomery to |
| 37 | | attend two national conferences in Philadelphia and indicated that this was |
| 38 | | to be at government expense (administrative leave and paid travel). Please |
| 39 | | state the name of the organizations holding these conferences and the nature |
| 40 | | of each conference; i.e., the subject matter that would be presented. What |
| 41 | | was the relationship of these conferences to Ms Montgomery's job at the State |
| 42 | | Department? |

Initials _MJ_                                                                        Page 5 of 26

1   A    The College Art Association and the Women's Art Caucus. These are
2          organizations/conferences with some of the most important organizations
3          and institutions, artists and administrators that the State Department needs
4          to work with to maximize its visual arts programs overseas as members.
5

6   Q    How was Ms Montgomery's attendance at these conferences important to the
7          office?
8   A    It would enable to increase the number of her contacts as well as enhance and
9          expand those she already had at one time and in one place in a gathering of
10         organizations and individuals from all around the country.
11

12   Q   Did you authorize anyone else on your staff to attend any conferences at
13        government expense? If so, who and what is the race of each such person?
14        Did Mr. Wunder interfere with such persons attending the conference(s) you
15        approved?
16   A   I approved a few and don't remember denying any. Mr. Wunder directly
17        approved the travel of Ms. Leanne Mella, without my approval, for a
18        politically sensitive cultural program he was managing directly himself. All
19        of the program managers except Ms. Montgomery are white. I considered
20        that particular program, and Ms. Mella's associated travel, to be excessively
21        expensive and somewhat politically motivated. Mr. Wunder was well aware
22        of my position, and he, therefore, decided to directly manage it himself. As
23        far as I know, he did not interfere with any travel that I had approved until
24        Ms. Montgomery's. He may have denied travel after I made an issue of Ms.
25        Montgomery's travel when I returned from home leave in March 2002.
26

27   Q   You contend Mr. Wunder approved two White persons on your staff to
28        attend conferences in Sao Paolo, Brazil and in New York. Please identify the
29        staff persons, their job titles, the nature of the conferences they were
30        authorized to attend, whether you approved their travel and participation in
31        these conferences and forwarded this information to Mr. Wunder for his
32        concurrence, and the relationship of these conferences to the jobs of the
33        individuals you alleged were treated more favorably than Ms Montgomery.
34   A   Mr. Wunder allowed and approved the travel of program managers Kathryn
35        Wainscott and Leanne Mella. I do not remember if I approved the travel
36        before I departed for home leave on January 18. I may or may not have in
37        either or both cases. I would have seen the relevance to the work of the
38        Department and to the managers in question, though the Brazil trip would
39        have been placed in jeopardy if funds were not available for such an
40        expensive trip and because Ms. Mella had not conducted herself favorable
41        during an earlier trip to Germany. Neither of these trips in my judgment was
42        more important than Ms. Montgomery's and both were more expensive.
43

Initials [signature]                        

1  Q    You state in your memorandum to Ms Baldwin that Mr. Wunder gave Ms
2        Montgomery a large amount of special work to be done in a short amount of
3        time and this was work she would not normally be given. What was the
4        nature of the work; that is, what types of effort (development, writing,
5        typing, filing, copying, assembling, etc.) did it require to complete? What
6        constituted a "large amount"? What was the time frame allowed for the
7        performance of this work? To whom is it your contention this work should
8        have been given instead of Ms Montgomery?

9  A    I was on home leave for most of this incident and heard about it on my return
10       from Ms. Rouse, Ms. Chapman, Ms. Proctor and Ms. Montgomery.  I
11       considered these people to be reliable and Mr. Wunder's behavior to be
12       consistent with our previous conversations as well as his attitude and
13       behavior. The program was politically sensitive and, though it involved
14       visual arts, it did not require Ms. Montgomery or anyone to use any special
15       skills. The specialists had been identified and their itineraries scheduled by
16       others. Somewhat less than routine, it involved minor coordination and
17       some administration. There were several of these speakers that needed to be
18       administered at about the same time. If it was such an important and rushed,
19       though routine job, it could and should have been divided up among the
20       three program managers, Ms. Wainscott, Ms. Baker and Ms. Cohen as well as
21       Ms. Montgomery and Ms. Rouse, that were not otherwise involved in the
22       project to spread the work out and get it down more quickly. Indeed, Ms.
23       Rouse, as a specialist in the performing arts, was no better qualified to do this
24       than any one else except that Ms. Wainscott and Ms. Baker were two of Mr.
25       Wunder's favorites and it appeared that he spared them getting involved to
26       further his goals of giving a lot of work to Ms. Montgomery.
27

28 Q    Who assisted Ms Montgomery in performing this work? Over what period
29       of time was the work done?

30 A    Ms. Rouse, a program manager and Ms. Chapman and Ms. Proctor, as office
31       administrative assistants, worked as a team with Ms. Montgomery to get the
32       project completed.
33

34 Q    Did it take time from these staff persons' own assignments to assist Ms
35       Montgomery in performing this work?

36 A    Very little.
37

38 Q    Do you perceive your problems with Mr. Wunder attempting to undermine
39       your authority to have begun when you initially declined to document Ms
40       Montgomery's performance with the view to terminating her employment?
41       If not, please state when you believe it to have begun and cite the first specific
42       instance in which you believe an attempt to undermine you was made.

Initials *mj.*

1   A    Mr. Wunder has a poor management style and perceives any disagreement
2        with him as a threat. I had heard and then quickly saw that he interfered
3        with the operations of the staff and had his favorites on the staff. As a result,
4        the staff was split between his favorites and his non-favorites. I note that his
5        favorites were all white and all three of the African-Americans on his staff
6        were not his favorites. It was clear from the beginning that his attitude
7        toward programming involving the third world and minorities is at best
8        highly insensitive and at worst prejudicial.
9   Q    Was Ms Montgomery's employment been terminated after you were no
10       longer her supervisor?
11  A    Not to my knowledge. I believe my EEO Complaint scared off any such
12       action.
13
14  Q    In your memorandum to Ms Baldwin, you contend Mr. Wunder refused to
15       allow you to reform a grant that you managed. You contend the grant is
16       ethnically and racially biased toward White and developed countries. What
17       is the grant you contend you were not allowed to reform?
18  A    It is the Festival Fund grant given to Arts International of New York
19
20  Q    Is it your position that other supervisors under Mr. Wunder's management
21       were allowed to change the terms and conditions of grants while you were
22       not allowed to change the terms of this particular grant? If so, please identify
23       the grant you contend was revised and the name, title, and race of the
24       supervisor allowed by Mr. Wunder to make these revisions.
25  A    I don't know if any such reform actions were taken. I do know that it is
26       routine to make improvements with grant proposals before they are
27       implemented. The grant in question was up for renewal or reissue. There
28       was a terrible problem, involving the Inspector General, with a grant in the
29       Office of Youth Exchanges that demonstrated ongoing poor administration,
30       among other problems. The Chief of Youth Exchanges is white. I was
31       attempting to reform the Festival Fund grant to ensure both proper
32       administration and maximum effective programming. The grant was a sole
33       source grant that was up for renewal, a perfect time to make reforms.
34
35  Q    What are the specific reforms you wanted to make to the grant you have
36       identified above? Did you discuss your desire to make these changes with
37       Mr. Wunder? What was his response? If any of this interaction was in
38       writing, please provide a copy of those documents.
39  A    I wanted to make the grant a competitive one and not a sole source grant so
40       as to avoid favoritism, demonstrating fairness to other potential grantees,
41       and to stop taking the Department for granted attitude that I observed on the
42       part of Arts International. I wanted the Department to have a direct vote,
43       and not just an advisory one, in the selection process. I wanted to ensure

Initials ᵐ ℒ·ᵐ

| | | |
|---|---|---|
| 1 | | world geographical balance by ranking applicants by region, allocating |
| 2 | | general quotas per region and by involving the regional offices and the posts |
| 3 | | more fully in the process. I wanted to formalize and ensure the participation |
| 4 | | of any successful applicants in any public diplomacy activities an embassy |
| 5 | | might want to engage in. I also wanted to take steps to eliminate the conflict |
| 6 | | that this grant created with the office's Visual Arts Festival program. |
| 7 | | |
| 8 | Q | Who is the "favorite" staff person who managed this grant? |
| 9 | A | Program manager Kathryn Wainscott |
| 10 | | |
| 11 | Q | Were there any other grants that you wanted to reform? If so, were you |
| 12 | | allowed to reform those grants? If so, what was the difference between those |
| 13 | | grants and the one you were not allowed to reform? |
| 14 | A | This was the only grant that the office had at the time, except for a grant that |
| 15 | | was not funded by the Office at the time but was administered by Ms. Baker |
| 16 | | in the Office on behalf of Mr. Wunder. I was thwarted in my attempt to |
| 17 | | develop grants for the office's two most successful programs, while at the |
| 18 | | same time a new grant for new expensive program that I believed were |
| 19 | | injurious to our two most successful programs were being developed by Mr. |
| 20 | | Wunder over my concerns for openness, balance and merit. |
| 21 | | |
| 22 | Q | What leads you to conclude this action by Mr. Wunder was intended by him |
| 23 | | to create a hostile work environment for you because of your race? |
| 24 | A | Not because of my race, but because of the races of our audience in Africa |
| 25 | | and the rest of the third world. |
| 26 | | |
| 27 | Q | What leads you to conclude this action by Mr. Wunder was intended by him |
| 28 | | to create a hostile work environment for you because of your protestation |
| 29 | | against what you considered to be discriminatory acts by him? |
| 30 | A | To ensure that his bias would prevail, Mr. Wunder would call meetings with |
| 31 | | members of my staff or engage in e-mail exchanges with all of us, particularly |
| 32 | | with those he considered favorites, with the intention of overruling my |
| 33 | | suggestions and objections and humiliating me. He would not allow me to |
| 34 | | attempt to make any reforms or to work with other interested offices in the |
| 35 | | Department, particularly the regional offices, to make those reforms. His |
| 36 | | steps isolated me more and more. |
| 37 | | |
| 38 | Q | You state in your memorandum to Ms Baldwin that Mr. Wunder authorized |
| 39 | | the granting of funds to an art festival in Western Europe and did so over |
| 40 | | your objections. Was this project one of those under your area of |
| 41 | | responsibility? |
| 42 | A | Yes. |
| 43 | | |

Initials [signature]

| | | |
|---|---|---|
| 1 | Q | Who is the "favorite" staffer who supported this grant? Was that person |
| 2 | | under your supervision? |
| 3 | A | Leanne Mella. Yes. |
| 4 | | |
| 5 | Q | What reason did Mr. Wunder give you for supporting the funding? |
| 6 | A | The festival was in Germany and he pointed out that he had just recently |
| 7 | | served in Germany. |
| 8 | | |
| 9 | Q | Is it your contention that Mr. Wunder treated you differently than others |
| 10 | | under his supervision when he supported this funding? If so, what leads you |
| 11 | | to conclude he did not similarly support funding for projects under the |
| 12 | | supervision of others under him organizationally? |
| 13 | A | Yes. I administered an office that was much more flexible as to |
| 14 | | administration and funding. The other offices were more formally and |
| 15 | | rigorously organized and determined by the regulations governing the grant |
| 16 | | process. The Office of Cultural Programs was a separate operation |
| 17 | | traditionally governed by other regulations and procedures that had only |
| 18 | | recently been assigned to Citizen Exchanges and, as such, susceptible to |
| 19 | | manipulation and politicization. |
| 20 | | |
| 21 | Q | What leads you to conclude this action by Mr. Wunder was intended by him |
| 22 | | to create a hostile work environment for you because of your race? |
| 23 | A | The race of that part of the world I was defending and that of the one he was |
| 24 | | defending. My continuing opposition to dismissing Ms. Montgomery (a |
| 25 | | black woman) and the fact the festival and region having its |
| 26 | | disproportionately small allotment reduced further was Africa (black) and |
| 27 | | while the region that was already receiving a disproportionately large |
| 28 | | allotment was Western Europe (white). |
| 29 | | |
| 30 | Q | What leads you to conclude this action by Mr. Wunder was intended by him |
| 31 | | to create a hostile work environment for you because of your protestation |
| 32 | | against what you considered to be discriminatory acts by him? |
| 33 | A | He would conduct meetings and exchange e-mails with members of my staff |
| 34 | | who agreed with him so that he could and would overrule my positions and |
| 35 | | prevent me from working with the regional offices. |
| 36 | | |
| 37 | Q | You contend that Mr. Wunder opposed your request that the Secretary of |
| 38 | | State host a reception in honor of the Thelonius Monk Institute and the |
| 39 | | winner of its international jazz competition. To whom did Mr. Wunder |
| 40 | | oppose your request? |
| 41 | A | To me. I understand from my conversations with him that Ray Harvey knew |
| 42 | | of Mr. Wunder's position as well. |
| 43 | | |

Initials ___

1    Q     What reasons did Mr. Wunder give you for opposing the reception?

2    A     That our office hadn't worked with Monk Institute for some time, though I
3          pointed out that others in the Department recently had and that our office
4          had been working with some of Monk's members and should be working
5          with them more.   Also, he said that it was going to be a lot of work, though I
6          pointed out that Monk had hired an experienced professional event planner
7          that would do 90% of the work.  Finally, when I mentioned that it would
8          make a great Black History Month event made even more appropriate
9          because of our African-American Secretary, he grimaced
10

11    Q     You state in your memorandum to Ms Baldwin that Mr. Wunder was
12          "obviously embarrassed on having his insensitivity and poor professional
13          judgment revealed for all to see." How was his "insensitivity and poor
14          professional judgment" revealed?  What leads you to conclude he was
15          embarrassed?

16    A     He defended his opposition to the program to me not only before but even
17          after the program was a huge success.  When I did raise its success with him
18          in March, he became very angry and defensive.  Otherwise he avoided the
19          subject.  He did not even credit me with the event in my EER.  Several
20          colleagues in the office independently knew of his opposition to the program,
21          including Mr. Harvey and Ms. Rouse.
22

23    Q     According to a March 8, 2002, memorandum from Mr. Wunder to you, you
24          went on home leave on January 18, 2002, without having drafted, cleared,
25          and had the Secretary of State sign a Certificate of Appreciation for Billy
26          Taylor that was to be presented to Mr. Taylor on January 20, 2002.  Mr.
27          Wunder's memo states you left on his chair an unfinished memo containing
28          factual errors and typos, saying the memo had to be approved and signed by
29          the Secretary that same day and the certificate had to be printed, signed and
30          framed.  Mr. Wunder's memo states there was no certificate and no one on
31          your staff was aware of any certificate design.  Further, the Secretary was
32          traveling out of the country on that date.  What is your response?

33    A     It was on my initiative that this project became active.  Ms. Rouse knew of the
34          project in general.  I had known for days that Billy Taylor was ill and would
35          not be attending and for weeks that the Secretary, and perhaps his wife,
36          would be traveling and not be attending.  I did not know whether there
37          would be a ceremony or whether anyone would be representing the
38          Secretary.  The Certificate had been ready for several days but had been
39          objected to by the administrative section, despite my protests and both my
40          approval as well as the Kennedy Center's approval.  Responsible for printing
41          it, the section, though it had the wording in its possession, would not do so.  I
42          left the memo with Mr. Wunder when I concluded, working late on several
43          matters on my last day before my departure that there was a small chance

Initials _____

1   something might still transpire. I had expected that if nothing happened,
2   there would be nothing to do, and if something did happen, he would have
3   the resources to deal with it. Again, my initiative in getting this project going
4   has gone unaccredited in my EER or elsewhere.
5
6   Q   Mr. Wunder's memo indicates he had asked you on January 17 if there were
7       any pending projects on your agenda, to which you replied no. Further,
8       when he tried to contact you by e-mail, you did not respond. What is your
9       response to these statements?
10  A   As far as I was concerned, when he questioned me earlier on January 17,
11      everything was taken care. It was only late in the day when I considered
12      everything one last time that the possibility that something might still
13      happen, though very small, still existed. Again, I initiated the Taylor project.
14      Mr. Wunder knew of its existence. I did not have ready access to e-mail
15      during my leave until very near the end.
16
17  Q   Are there any witnesses whom you would care to name who have direct
18      knowledge of these matters?
19  A   I consulted with Ms. Rouse who knew of the project in general, i.e. the event,
20      the Certificate and its wording, the Secretary's travel and Taylor's illness, but
21      I maintained the action throughout. The administrative section had the
22      wording of the Certificate for almost two weeks before my departure.
23
24  Q   Is there anything you would like to add to your statement on this claim?
25  A   Mr. Wunder also had a general knowledge of this project and was at best
26      indifferent to it. His indifference and/or opposition were similar to that of
27      the Monk event and I further concluded it was based on his racial
28      insensitivity.
29
30      Since the beginning of my EEO issues, I have been told by several African-
31      American colleagues, in the Department in general and in ECA in particular,
32      of institutional racism. ECA had a reputation of being the worse offender of
33      all the offices and bureaus in this regard. I have received much
34      encouragement from these colleagues and have been told that, where the
35      complaints of Africa-Americans are often dismissed as their attempting to
36      use their skin color for advancement, perhaps the fact that I am white will
37      regretably make the discussion and their concerns more credible.
38
39      b)      *my supervisor gave me a negative performance evaluation as Chief,*
40      *Division of Citizen Exchanges, on 4/11/02 and 4/29/02;*
41
42  Q   What leads you to conclude the negative performance rating was based on
43      your race?

Initials *mym*

| | | |
|---|---|---|
| 1 | A | It was based on the race, gender, age and handicap of Ms. Montgomery and |
| 2 | | my refusal to take a racist, illegal and unethical action against her. It was also |
| 3 | | based on my advocacy for those regions of the world populated by people of |
| 4 | | color. |
| 5 | | |
| 6 | Q | What leads you to conclude the negative performance rating was intended to |
| 7 | | create a hostile work environment for you? |
| 8 | A | Mr. Wunder threatened me with a negative rating indirectly from the fall of |
| 9 | | 2001 and directly from January 2002. |
| 10 | | |
| 11 | Q | What specifically about the EER was negative? Please be specific. |
| 12 | A | Just reading it would tell any reader that it's tone throughout must negate |
| 13 | | what is written. There is nothing positive in it at all. One only has to read |
| 14 | | the EER to determine that it drips with so much venom; malice and prejudice |
| 15 | | that it puts into question everything in it. An AFSA official told me it was the |
| 16 | | worst one he had ever read. I'd have to be twice as bad as the worst officer in |
| 17 | | the Department to warrant such a rating. I'd have to write pages, longer than |
| 18 | | the EER itself to refute so much that is negative, inaccurate, incomplete and |
| 19 | | malicious. |
| 20 | | |
| 21 | Q | What accomplishments did you have for the rating period that you find not |
| 22 | | to have been considered or included in the rating of your performance? |
| 23 | A | My attempts to reform office programming and administration. The Monk |
| 24 | | program. The reprogramming of the Jazz Ambassadors tours in the |
| 25 | | aftermath of 9/11 as well as the 2002 Jazz Ambassadors program. My |
| 26 | | collaboration with the Freedom Forum/Newseum in obtaining a paper show |
| 27 | | on 9/11 and the promise of future collaboration. Mr. Wunder refused to |
| 28 | | allow this show to be distributed and I had to turn it over to another office in |
| 29 | | the Department after I had done 90% of the work. That office distributed |
| 30 | | almost 200 copies of the show to 80 countries and was a huge success for that |
| 31 | | other office and would have been for our office if Mr. Wunder had allowed it |
| 32 | | to go forward. |
| 33 | | |
| 34 | Q | Do you consider the EER to contain inaccuracies? If so, please identify the |
| 35 | | inaccuracies and state what is accurate. |
| 36 | A | Any document that is both entirely negative and incomplete is inaccurate. |
| 37 | | |
| 38 | Q | In your memo to Ms Baldwin, you state that, after you refused to document |
| 39 | | Ms Montgomery's performance with the intent of terminating her |
| 40 | | employment, Mr. Wunder told you that if you did not follow his orders, you |
| 41 | | could expect a negative EER. Was this the first time Mr. Wunder had |
| 42 | | indicated to you that your performance was not at the level he expected for a |
| 43 | | positive EER? |

Initials *[signature]*

| | | |
|---|---|---|
| 1 | A | The two were always linked, either directly or indirectly. He implied it |
| 2 | | starting in the fall of 2001 when he, with a most hostile tone, told me it was |
| 3 | | my job to manage Ms. Montgomery and escalated until January 2002 and |
| 4 | | after, when he began telling me that it reflected negatively on me and would |
| 5 | | continue to do so if I did not do as instructed. |
| 6 | | |
| 7 | Q | What are the specific statements in the EER that you consider both negative |
| 8 | | and an inaccurate reflection of your performance? Please be specific. |
| 9 | A | Again, any document that is entirely negative, that intentionally leaves out |
| 10 | | any positives and that drips with such malice is meant to destroy. |
| 11 | | |
| 12 | Q | In the March 8, 2002, memo from Mr. Wunder to you, he states he heard |
| 13 | | comments "from virtually all of your staff" that you had not held regular |
| 14 | | staff meetings. Did you hold regular staff meetings with your staff prior to |
| 15 | | March 8? Did you hold regular staff meetings with your staff after that date? |
| 16 | A | I did in the first few months of my tenure in the fall of 2001. There was at |
| 17 | | least one member of staff who would disrupt the meetings. When she would |
| 18 | | not stop, I considered it best not to have all of our time wasted and that |
| 19 | | individual meetings would be more constructive for everyone. Those |
| 20 | | individual meetings continued throughout my tenure. The office had a poor |
| 21 | | reputation well before my arrival and I determined a few months after my |
| 22 | | arrival that I would be doing a lot more detail work directly myself because |
| 23 | | of it. Mr. Wunder had previously held my position and had been |
| 24 | | supervising my position for some time. He had done nothing about this |
| 25 | | situation. None of my 3-4 predecessors had finished their tours because of it. |
| 26 | | |
| 27 | Q | Mr. Wunder's memo also states he had been told by staff members that you |
| 28 | | had not "taken time to consult with your staff regarding their program plans |
| 29 | | or even listened to them for more than a few minutes at a time on any issue." |
| 30 | | Had you been consulting with your staff regarding their program plans and |
| 31 | | other work issues? Please explain, giving specific examples. |
| 32 | A | All the time. However, if Mr. Wunder did not interfere with programming |
| 33 | | first, some staffers would go directly to him if they did not like what I was |
| 34 | | contributing. It is those staffers, the favorites, who complained because of |
| 35 | | our differences. Mr. Wunder and my predecessor did not consult with the |
| 36 | | staff on the FY-02 budget that they prepared in July/August 2002. I did so in |
| 37 | | on my arrival in September 2002 and was blamed by them for it. |
| 38 | | |
| 39 | Q | The memo goes on to state you had been openly dismissive of some of the |
| 40 | | staff members' attempts to raise program issues with you. What is your |
| 41 | | response? |
| 42 | A | I may have disagreed, which is my duty as chief, and I often instructed them |
| 43 | | in matters they did not agree with, but I am and was never dismissive. |

1
2  Q    Mr. Wunder's memo states that, during your home leave, he and Steve Hart
3       worked with Kathryn Wainscott to produce a budget report for the divisions
4       for the bureau's reprogramming letter to the House Appropriations
5       Committee. He notes that the Warhol project under your supervision was
6       400% over budget. Were you aware that the project was over budget? If so,
7       what actions had you taken to address the matter?
8  A    I had taken the 2002 budget established by my predecessor, and approved by
9       Mr. Wunder in late August/early September 2001 and having studied it on
10      my arrival in mid-September revised it several times right up until the time
11      frame cited. You may ask Ms. Chapman, our administrative assistant who
12      handled the cuff accounts and budget, for confirmation. I did this because I
13      knew that the office history on this was poor and that, with Mr. Wunder's
14      support, it had repeatedly violated the Congressional mandated limits.
15      The Warhol project is a great example of how poorly projects had been
16      managed in the past, and how Mr. Wunder was and is prepared to use a
17      program he was more responsible for, by virtue of his past and ongoing
18      presence, than me to attack me unfairly. I naturally assumed that that late
19      August/early September budget was, because of how recent it was, accurate.
20      My predecessor, with Mr. Wunder's approval, had set aside $10,000 for the
21      project to finish it up.  I knew that it had been very successful and only had a
22      few months before its completion. The project's manager, Ms. Mella had
23      been on staff for a couple of months before my predecessor and Mr. Wunder
24      had made the budget and, therefore, I assumed there was a sound rationale
25      for the $10,000. A few months later in late 2001, Ms. Chapman informed me
26      that bills exceeding $10,000 had just come in and that, unlike what had been
27      done up until then, she had been informed by administration that our budget
28      would have to absorb the increase. The project was three years old, well
29      before my time, a year 2000 Millennium project. It had been funded out of
30      special funds, not office funds, until that time.  As a result, Ms. Chapman had
31      not been involving the office chief with the process and would submit bills
32      directly to administration for payment. She came right to me when there was
33      a change and the bills were so high. I do not blame her for anything. She
34      was following the procedures she had been given over the three years of the
35      project. I do not blame my predecessor who probably was operating on
36      incomplete information just 3-4 months previously. If anyone was or is to
37      blame it would be Ms. Mella, the project manager, and Mr. Wunder, who had
38      been involved with the project from the beginning.  I had a good handle on
39      the budget and I knew how to adjust the budget for the additional $30,000 to
40      finish the project. I understand that these things happen sometimes. I
41      should be praised for managing this situation, one not of my making, and
42      others criticized if someone thought that necessary.
43

1    Q    The memo indicates Mr. Wunder found your staff to be unfamiliar with the
2         division's budget or with the available funds left for their individual projects.
3         What is your response?
4    A    The staff claimed not to have been involved in the budget for some time
5         when I arrived.  Indeed, as mentioned above, it was I who shared the budget
6         prepared by Mr. Wunder and my predecessor with the staff and not Mr.
7         Wunder or my predecessor.  I believe the budget was traditionally handled
8         poorly so that, in part, higher ups were able to politicize it and prevent the
9         Congress from knowing that its mandated limits were being exceeded.  As
10        mentioned above, special funds had been created and money moved around
11        without much planning.  Mr. Wunder was a party to this.  My getting an
12        increasing handle on the budget over my first months on the job (I was only
13        there 9 months) allowed me to inform the staff of what their individual
14        budgets were while discussing the overall budget.  The biggest problem was
15        their individual jealousies over the individual budgets of their fellow staffers.
16
17   Q    The memo also tells you to begin regular, weekly staff meetings.  Did you do
18        so?
19   A    No, because during our March 8 meeting Mr. Wunder threatened me directly
20        with a negative EER if I did not dismiss Ms. Montgomery.  I had forcefully
21        told him I could not do any such wrong thing.  Because I could not do such a
22        thing, I then began my EEO Complaint that took up more and more of my
23        time and left even less time to do my day-to-day work.  I found individual
24        meetings far more useful than long meetings that staffers would disrupt that
25        I had experienced in my first months.
26
27   Q    The memo tells you to take time to meet with staff members individually and
28        review with them their projects, budgets and plans.  Did you do so?
29   A    I constantly had done so from the beginning of my tenure through receipt of
30        the memo and until my departure.
31
32   Q    Did Mr. Wunder meet with you when he returned from his overseas trip on
33        March 21?  If so, did he address with you any of the matters he raised as
34        concerns in the March 8 memorandum?
35   A    I do not recall.  However, it was about that time that Mr. Wunder could have,
36        and would have, been informed by Mr. Whitten, or others in Administration,
37        of my EEO Complaint.  It is telling that after I began discussing an EEO
38        Complaint, Mr. Wunder never again raised the issue of dismissing Ms.
39        Montgomery.
40
41   Q    In a May 20, 2002, memorandum to you, Mr. Wunder indicates his
42        understanding that you had not developed work requirements for Leanne

|    |   |                                                                                   |
|----|---|-----------------------------------------------------------------------------------|
| 1  |   | Mella. When are work requirements to be established for a staff member?           |
| 2  |   | When did you develop work requirements for Ms Mella?                              |
| 3  | A | Ms. Mella's work requirements should have been agreed to immediately after        |
| 4  |   | she began work in late June/early July. As I didn't arrive in the office until    |
| 5  |   | September 11, it would have been my predecessor's as well as his                  |
| 6  |   | supervisor's, Mr. Wunder, responsibility to do that. I told MS. Mella to draft     |
| 7  |   | her requirements for review. I would have approved any requirements that          |
| 8  |   | she, one of Mr. Wunder's favorites, and he could reasonable come up with. I       |
| 9  |   | never received any draft.                                                         |
| 10 |   |                                                                                   |
| 11 | Q | Mr. Wunder also asked in the May 20 memo for status on a number of items.         |
| 12 |   | Did you provide him the status? If not, why? Were these items on target? If       |
| 13 |   | not, why?                                                                          |
| 14 | A | Considering everything that was happening to me, including Mr. Wunder's           |
| 15 |   | continuing interference and harassment, I considered everything to be as on       |
| 16 |   | track as could be expected. I did not respond in writing because I was so         |
| 17 |   | busy with my EEO complaint and my EER. As I had already been asked by             |
| 18 |   | ECA through my CDO to voluntarily curtail in late April and informed that I       |
| 19 |   | could and probably would be involuntarily curtailed, I judged the memo to         |
| 20 |   | be part of that campaign to get me.                                               |
| 21 |   |                                                                                   |
| 22 | Q | The counseling report contains an email from Mr. Wunder outlining concerns        |
| 23 |   | he had with your performance. It indicates, in part, that on April 7, Mr.         |
| 24 |   | Wunder asked you to meet with a representative of the Korean Embassy who          |
| 25 |   | wanted information on the Department's exhibit programs, but you did not           |
| 26 |   | follow up. What is your response?                                                 |
| 27 | A | I do not recall such a request, but I would normally have held such meetings      |
| 28 |   | and, if I was unavailable, it was my management style to turn such meetings       |
| 29 |   | over to the appropriate staffer.                                                  |
| 30 |   |                                                                                   |
| 31 | Q | The email indicates that Mr. Wunder asked you on April 9 to advise him on         |
| 32 |   | whom from your office should travel to a conference of the American               |
| 33 |   | Association of Museums, a major grantee partner of the Division of Cultural       |
| 34 |   | Programs, but you did not provide him any response. What is your                  |
| 35 |   | recollection of this matter?                                                      |
| 36 | A | My recollection is that I did advise him on who from my office should go, but     |
| 37 |   | we disagreed on who that should be. I felt Ms. Montgomery should attend           |
| 38 |   | and he felt Ms. Mella should attend. Considering that Mr. Wunder had              |
| 39 |   | denied Ms. Montgomery's travel in February, I did not believe it was not          |
| 40 |   | worth fighting about and that he would do whatever he wanted.                     |
| 41 |   |                                                                                   |

| | | |
|---|---|---|
| 1 | Q | Are there any witnesses whom you would care to name who have direct |
| 2 | | knowledge of this claim? If so, please state the name of each and that to |
| 3 | | which each person can speak. |
| 4 | A | For the overall office situation, I refer anyone to Ms. Chapman, Ms. Proctor, |
| 5 | | Ms. Rouse and Ms. Montgomery. Also, Ms. Hattie Baldwin and almost any |
| 6 | | African-American in ECA. |
| 7 | | |
| 8 | Q | Is there anything you would like to add to your response to this claim. |
| 9 | A | I would note that on April 29, shortly after I turned down the request from |
| 10 | | ECA through my CDO On April 25 that I accept a voluntarily curtailment, I |
| 11 | | received a second revised EER from Mr. Wunder. In my discussion with Mr. |
| 12 | | Wunder on April 18 concerning my first EER he raised the issue of there |
| 13 | | being no reviewing statement. I accepted that fact because of the short |
| 14 | | evaluation period made shorter by the departure of the reviewing officer, |
| 15 | | former DAS Brian Sexton, some 2-3 months earlier. I am certain that my |
| 16 | | turning down the voluntary departure request on April 25 was |
| 17 | | communicated back to Mr. Wunder and that he and Mr. Sexton decided to |
| 18 | | pile on a negative reviewing statement on April 29 in revenge for my position |
| 19 | | and despite our April 18 agreement. |
| 20 | | |
| 21 | | c) *I was subjected to an involuntary curtailment of my assignment as Chief,* |
| 22 | | *Division of Citizen Exchanges, Office of Cultural Programs, Bureau of Educational* |
| 23 | | *and Cultural Affairs* |
| 24 | | |
| 25 | Q | The email contained in the counseling report indicates that on May 2, Mr. |
| 26 | | Wunder sent you a request for your guidance on how to proceed with the |
| 27 | | competition on the Intercultural Public-Private Fellows project, a major grant |
| 28 | | competition in the Cultural Programs Division. He indicates that you did not |
| 29 | | respond despite several emails and verbal requests from Mr. Wunder and |
| 30 | | from the Program Officer. What is your response? |
| 31 | A | I note that everything mentioned in this section c took place after my EER |
| 32 | | was written and Mr. Wunder and I argued over it. It also took place after I |
| 33 | | went to Mr. Hart with my complaints. I concluded then, and do so now, that |
| 34 | | I was being set-up so that I could be gotten rid of and that there was nothing |
| 35 | | I could do to prevent that. By this time I was working both on a grievance |
| 36 | | concerning my EER and my EEO Complaint, as I understand is my right. It |
| 37 | | also took place after I had been asked to voluntarily curtail. |
| 38 | | |
| 39 | | I myself selected the six panelists for the two grants panels and reported that |
| 40 | | to Mr. Wunder. Though this project had not been funded by the Office of |
| 41 | | Cultural Programs for the year prior to my arrival, it had been managed by |
| 42 | | Mr. Wunder and Ms. Baker on my staff for that year. The funding was an |
| 43 | | attempt to get around the Congressional prohibition of exceeding a 1.6 |

|  |  |
|---|---|
| 1 | million dollar ceiling on cultural programs.  Mr. Wunder knew that I objected |
| 2 | to that and to it having been a sole source project in its first year.  Since I had |
| 3 | arrived Mr. Wunder and Ms. Baker worked together without involving me |
| 4 | and clearly content to do so.   In addition, when I discussed with Mr. Wunder |
| 5 | the project now becoming competitive, he told me pointedly that there were |
| 6 | ways to ensure a grant was given to a specific organization even though the |
| 7 | process was supposed to be open and competitive.  When also discussing the |
| 8 | project when it became competitive with Ms. Baker it was clear to me that she |
| 9 | was manipulating the application process.  Finally, the funds for the project, |
| 10 | to avoid a conflict with the Congress, now had to be found in the 1.6 million |
| 11 | dollar Cultural Programs budget, something that had not previously been |
| 12 | budgeted for.  I objected to that because that meant a political program |
| 13 | would now have a negative impact on some of our established and successful |
| 14 | programs, something I objected to strenuously.  Indeed, the sole source |
| 15 | grantee of the first year, clearly favored by Mr. Wunder and Ms. Baker, |
| 16 | succeed in the competition.  I concluded that once the project could no longer |
| 17 | violate the Congressional mandate, Mr. Wunder needed my participation, |
| 18 | despite my strong and ethical objections, to make the process appear open |
| 19 | and transparent.  I concluded that I was being brought in at this last minute |
| 20 | to set me up.  I contacted via e-mail the IG in May or June to report this but |
| 21 | the IG did not respond. |
| 22 | |
| 23 | Q |
| 24 |  |
| 25 |  |
| 26 | A |
| 27 |  |
| 28 | |
| 29 | Q |
| 30 |  |
| 31 |  |
| 32 |  |
| 33 | A |
| 34 |  |
| 35 |  |
| 36 |  |
| 37 |  |
| 38 | |
| 39 | Q |
| 40 |  |
| 41 |  |
| 42 |  |

23 Q    The email indicates that you did not respond to a May 15 request from a
24       Program Officer in the Cultural Programs Division to attend a meeting with a grantee
25       of the Cultural Programs Division.  What is your recollection?
26 A    None, but I always met with grantees when I was able and trusted the staff to
27       meet with them if I was not.

29 Q    The email indicates that on May 16, Mr. Wunder directed you to set up a
30       weekly meeting for him with you and your staff and provide him with a
31       weekly preview of your activities and appointments, but you did not arrange
32       a meeting and did not provide a weekly schedule.  What is your response?
33 A    I told Mr. Wunder that I considered this an attempt to formalize his
34       interference with the operations of my staff, to humiliate me and to further
35       his creation of a hostile work environment.  I did not object to his meeting
36       with them, but not in my presence on a regular basis.  I note that my staff and
37       I had met with Mr. Hart only a few weeks before this.

39 Q    The email indicates that on May 16 in the afternoon, Mr. Wunder talked with
40       you in your office and said that you never seemed available to answer
41       telephone calls, did not respond to e-mails and had not returned any
42       telephone messages or e-mails for over two weeks.  Further, Mr. Wunder

|   |   |   |
|---|---|---|
| 1 |   | directed you to return e-mails and phone messages. Did this conversation |
| 2 |   | occur? |
| 3 | A | We had a conversation that included the topic of communication. I told him |
| 4 |   | that because of the nature of the staff and the work that I was forced to be |
| 5 |   | involved in the details of the work to a degree that I shouldn't have been but |
| 6 |   | that I needed to be. I pointed out that his escalating interference with our |
| 7 |   | work and the staff was counterproductive. In other words, I was busy, made |
| 8 |   | more so by his poor management. |
| 9 |   |   |
| 10 | Q | Did you fail to return emails and phone messages? If so, why? |
| 11 | A | If I failed to respond to any communication, it was because of the large |
| 12 |   | number I received, the absence of anyone to assist me, and the large amount |
| 13 |   | of work I had, both the cultural work as well as my EEO Complaint and EER |
| 14 |   | grievance. |
| 15 |   |   |
| 16 | Q | Did you not make yourself available to take telephone calls? If so, why? |
| 17 | A | I took calls and answered voice mails. However, the phone system in our |
| 18 |   | office forced me, the chief, to answer countless routine calls myself to the |
| 19 |   | detriment of the real work of the office. I had to constantly prioritize my calls |
| 20 |   | and some were overtaken by time and events. |
| 21 |   |   |
| 22 | Q | Mr. Wunder's email indicates he sent you a memo on May 20 directing you |
| 23 |   | to provide him an email update on several projects handled by the Cultural |
| 24 |   | Programs Division, but you did not send him the report he requested. What |
| 25 |   | is your response? |
| 26 | A | I talked with Mr. Wunder briefly and gave him a brief verbal report. |
| 27 |   | However, as mentioned above, considering that I was working on my EEO |
| 28 |   | Complaint and EER grievance, that I had already been asked in April to |
| 29 |   | voluntarily curtail and warned that I could be involuntarily curtailed, a |
| 30 |   | warning I judged a threat and considering all the other cultural work I had to |
| 31 |   | do (my real job), I considered a brief verbal response more than adequate at |
| 32 |   | that time. |
| 33 |   |   |
| 34 | Q | The email states that you failed to attend a May 21 meeting of your staff to |
| 35 |   | review proposals and panel preparations of the ISSP competition and when |
| 36 |   | Mr. Wunder directly asked you to attend, you refused, saying that, if Mr. |
| 37 |   | Wunder were there, there was no need for you to be. Did you refuse to |
| 38 |   | attend the meeting? If so, why? If not, what is your recollection of the |
| 39 |   | matter? |
| 40 | A | I declined to attend because at that very moment I was immediately occupied |
| 41 |   | with the drafting of my EEO Complaint (and my EER grievance). In |
| 42 |   | previous meetings Mr. Wunder had gone out of his way to overrule and |
| 43 |   | humiliate me in front of my staff and my priority at that moment were my |

| | | |
|---|---|---|
| 1 | | personnel issues. His pattern of harassment and interference was escalating. |
| 2 | | Again, I had been warned that I would probably be involuntarily curtailed. |
| 3 | | |
| 4 | Q | The email indicates a Program Officer in the Cultural Division asked Mr. |
| 5 | | Wunder to clear a routine cable on a major, ongoing cultural program, telling |
| 6 | | Mr. Wunder that you had failed to respond to her or clear such cables in the |
| 7 | | past. Had you failed to respond to any Program Officer under your |
| 8 | | supervision who had asked you to clear a cable on a cultural program? What |
| 9 | | is your recollection? |
| 10 | A | That this involved the Festival Fund and that I refused to clear the cable until |
| 11 | | my objections to the procedures of the grant and until the involvement of the |
| 12 | | regional offices to begin to reform things were taken into consideration. Mr. |
| 13 | | Wunder had the authority to overrule my objections as he had done for |
| 14 | | months. I wanted to postpone any clearances until the six area offices had all |
| 15 | | been fully informed. I believed that each of the offices were being |
| 16 | | intentionally kept ignorant of the funding levels of the other five areas to |
| 17 | | prevent any criticism or reforms, something Mr. Wunder and the program |
| 18 | | officer involved opposed. I believe that I am ethically bound not to clear a |
| 19 | | cable until it meets professional standards, something I was never given a |
| 20 | | chance to do. |
| 21 | | |
| 22 | Q | When and how were you advised that ECA had requested your involuntary |
| 23 | | curtailment from your duties? |
| 24 | A | I was summoned to DAS Hart's office on May 25, 2002 to a meeting with |
| 25 | | DAS Hart, Mr. Wunder and Ms. Deborah Hunsley of ECA/HR, given a |
| 26 | | memo and told that I had 48 hours to request a voluntary departure. |
| 27 | | Otherwise, I would be involuntarily curtailed. |
| 28 | | |
| 29 | Q | Were you offered the opportunity to choose voluntary curtailment? If so, |
| 30 | | why did you decline to do so? |
| 31 | A | Yes, I was provided the opportunity to voluntarily curtail. I did not think it |
| 32 | | ethical or legal to give in to racism. Ms. Baldwin and my attorney, who |
| 33 | | advised me not to voluntarily curtail, furthered my beliefs also. |
| 34 | | |
| 35 | Q | What would the difference to your record have been, in terms of future |
| 36 | | potential, had you requested voluntary curtailment? |
| 37 | A | I was concluded that my record was damaged either way. Mr. Wunder was |
| 38 | | not interested in an amicable parting and would not have altered his negative |
| 39 | | evaluation in any event. If it had been amicable, he would have offered to |
| 40 | | give me a fair EER along with the offer to depart. Clearly there are negative |
| 41 | | rumors in the hallways when something like that happens. Inquiries for |
| 42 | | future jobs would also result. De facto, it would have been made known that |

1        I had been kicked out of ECA. Mr. Hart had the same opportunity when I
2        went to him in April to arrange something amicable.

3

4   Q   What leads you to conclude the involuntary curtailment was because of your
5       race?

6   A   It was because of Ms. Montgomery's race, gender, age and handicap and my
7       refusal to take racist, illegal and unethical orders. It was also because I was
8       championing those regions of the world populated by people of color.

9

10  Q   What leads you to conclude the involuntary curtailment was because of your
11      protestation of alleged discriminatory practices?

12  A   It happened after I talked with Mr. Hart at least twice and Ms. Hill in
13      Human Resources at least three times. It also happened after I refused my
14      CDO's insistence that I request a voluntary departure in April with my stated
15      reasons that it was because of those practices.

16

17  Q   What leads you to conclude the involuntary curtailment was intended to
18      create a hostile work environment for you?

19  A   Because such actions always result in rumor and discussion and would come
20      out when I inquired about any possible future job from any future supervisor
21      as well as in Human Resources.

22

23  Q   Did you raise any concerns you may have had about a hostile work
24      environment caused by the curtailment to any management official above
25      Mr. Wunder? If so, to whom, when, and with what result?

26  A   Mr. Hart in my April 29 meeting with him and Ms. Hunsley a few times in
27      the aftermath of our May 23 involuntarily curtailment meeting. Also, I
28      discussed this on several occasions with my CDO, Mr. Jim Bigart, starting
29      with the April 25th meeting when he requested that I voluntarily curtail and
30      warned me that I probably would be involuntarily curtailed. There was no
31      result. All were insensitive and dismissive of the issue.

32

33  Q   Are there any witnesses whom you would care to name who have direct
34      knowledge of this claim? If so, please state the name of each and that to
35      which each person can speak.

36  A   None, other than Ms. Rouse, Ms. Chapman, Ms. Proctor and Ms.
37      Montgomery who I confided in from time to time over those months. I
38      would also refer to ECA's Ms. Laverne Johnson about Mr. Wunder's attitude
39      towards blacks and woman and former ECA officer Mary Johnson who could
40      address issues of race in ECA.

41

42  Q   Is there anything you would like to add to your statement on this claim?
43  A   No

1
2  *d)*  *The discriminatory curtailment had the result of denying me a career-*
3       *enhancing follow-on assignment.*
4
5  Q   In what way did the curtailment result in denying you a career-enhancing
6       follow-on assignment?
7  A   The curtailment was done abruptly in the early summer of 2002 when almost
8       all of the positions for the fall of 2002 were filled.  The reasons for the
9       involuntary curtailment would have to come out and raise questions in any
10      future supervisor's mind.
11
12 Q   Is there a specific career-enhancing assignment you believe you would have
13      be given had your not been curtailed?
14 A   I do not think that there was one even available at the time.  The two
15      positions I was asked to interview for were below my grade and I was asked
16      to sign a statement that I was voluntarily accepting a below grade non career-
17      enhancing assignment.  The first of these positions was as a staffer in an
18      office that I used to direct. I believe that these efforts were not only intended
19      to create another hostile environment but also to humiliate me.  I was even
20      asked to lie to prospective supervisors in my interviews about the
21      distractions I have.  This so-called corridor reputation that I would have
22      developed will follow me for years.  Indeed, though this curtailment was
23      supposed to be private, my ex-spouse somehow found out about it at the
24      Department. With so many white officers conflicted about race, I think that it
25      will be particularly bad for a white officer such as myself to be given an
26      assignment where I would be supervised by a white officer in a multi-racial
27      office.
28
29 Q   Did you raise to the attention of anyone in upper management your concerns
30      about being subjected to a hostile work environment in not being offered a
31      career-enhancing follow-on assignment?  If so, to whom, when, and with
32      what result? If not, why?
33 A   As mentioned above, Mr. Hart and Ms. Hunsely in ECA and my CDO Mr.
34      Bigart in HR.  No result except in their being insensitive and dismissive of the
35      issue.
36
37 Q   Are there any witnesses whom you would care to name who have direct
38      knowledge of this claim?  If so, please state the name of each and that to
39      which each person can speak.
40 A   No
41
42 Q   Is there anything you would like to add to your statement?

| | | |
|---|---|---|
| 1 | A | I have been seeing a therapist concerning the hostile work environment |
| 2 | | created by Mr. Wunder, Mr. Hart and the others, as well as my EEO |
| 3 | | Complaint, since early March 2002. |
| 4 | | |
| 5 | | I had phoned and e-mailed the Department of State's Office of the Inspector |
| 6 | | General my professional concerns over the problems in the Office of Cultural |
| 7 | | Programs in May but have not received a response to date. |
| 8 | | |
| 9 | | Despite several requests, I have not been given an office and a computer with |
| 10 | | which to pursue this Complaint. |
| 11 | | |
| 12 | | Early on, at least from January 2002, I understood, both by his implication |
| 13 | | and direct statements, that Mr. Wunder would do to me exactly what he had |
| 14 | | claimed to have done to Mr. Garcia and what he wanted me to do to Ms. |
| 15 | | Montgomery if I did not follow his instructions. The memos, the EER, the e- |
| 16 | | mails, the meetings involving me were all designed to accomplish his goal of |
| 17 | | punishing me and removing me from ECA. I am sure that if I was the kind of |
| 18 | | person that was able to follow his lead, I could have satisfied him and gotten |
| 19 | | rid of Ms. Montgomery. Mr. Wunder has proved that once more with the |
| 20 | | position he has placed me in now. Thankfully, whatever the professional and |
| 21 | | personal cost, I am not that kind of person. |
| 22 | | |
| 23 | Q | What do you seek in relief, should you prevail in this complaint? |
| 24 | A | I am seeking the following: |
| 25 | | --The immediate removal of Mr. Wunder, Mr. Hart and Mr. Sexton from their |
| 26 | | current positions and ECA; |
| 27 | | --A letter of reprimand to be placed in Mr. Wunder's, Mr. Hart's and Mr. |
| 28 | | Sexton's performance files concerning the success of my EEO Complaint |
| 29 | | against them; |
| 30 | | --My immediate reinstatement in my former position as Chief, Office of |
| 31 | | Cultural Programs; |
| 32 | | --The removal of my 2001-2002 EER from my performance file; |
| 33 | | --A superior honor award from ECA including a 1,000 cash award; |
| 34 | | --My immediate promotion; |
| 35 | | --Compensatory and equitable damages, including the reinstatement of all |
| 36 | | home leave, annual leave and sick leave associated with this claim as well as |
| 37 | | authorization, with air fare, to take a second home leave within the next six |
| 38 | | months; and reimbursement of all financial expenses, including attorneys' |
| 39 | | fees and costs and medical expenses; |
| 40 | | --Mandatory EEO training session for all ECA managers to be conducted as a |
| 41 | | special group; and |

1    --Establishment of a committee to reform cultural programming to include
2    me, representatives from ECA and the six regional bureaus and to be co-
3    chaired by ECA and the bureaus.
4
5

1         I declare under penalty of perjury that the foregoing is true and

2     correct. Executed on this day, _____N O V._____6_____, 2002.

3

4    _____

5    Matthew J. McGrath

6