# EXHIBIT 22

1     <u>**DECLARATION OF STEPHEN HART**</u>

2

3     In accordance with the provision of Title 28, United States Code, Section 1746,

4     I, Stephen Hart, make the following declaration to Betty L. Cox who has identified

5     herself to me as an EEO Investigator, Southwind Enterprises, Inc. assigned by the US

6     Department of State to perform this investigation, knowing that this statement may

7     be used in evidence. I understand that this statement is not confidential and may be

8     shown to any party who must have access to this information in order to carry out

9     his or her official duties.

10     This statement is given in relation to a complaint of discrimination filed by

11     Matthew J. McGrath.

12     *I am aware that the accepted claims in this complaint are that because of his race*

13     *(Caucasian) and as reprisal for his having engaged in prior protected activity and/or for*

14     *opposing discriminatory practices, he was discriminated against and subjected to a hostile*

15     *work environment when:*

16

17     *a)*    *His supervisor attempted to undermine his authority as Chief, Division of Citizen*

18          *Exchanges, Office of Cultural Programs, Bureau of Educational and Cultural*

19          *Affairs;*

20

21     *b)*    *his supervisor gave him a negative performance evaluation as Chief, Division of*

22          *Citizen Exchanges, on 4/11/02 and 4/29/02;*

23

24     *c)*    *he was subjected to an involuntary curtailment of his assignment as Chief, Division*

25          *of Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and*

26          *Cultural Affairs; and*

27

28     *d)*    *the discriminatory curtailment had the result of denying Complainant a career-*

29          *enhancing follow-on assignment.*

Initials _____

Exhibit ___7___

Page 1 of **20**

1

2

3

4    Q    Please state your full name.

5    A    Stephen Theron Hart

6    Q    Please state your title and grade, the name of the agency by which you are

7         employed, the organizational unit to which you are assigned, and the

8         address of your duty station.

9    A    Deputy   Assistant   Secretary   for   Professional   Exchanges,   Bureau   of

10        Educational and Cultural Affairs, the U. S. Department of State.   301 4th

11        Street, Southwest, Suite 220, Washington, DC 20547

12   Q    Please state your organizational work relationship to Matthew McGrath at

13        the present time.

14   A    Mr. McGrath was the Division Chief in charge of the Cultural Affairs office in

15        the Office of Citizen Exchanges.  In that position he reported directly to Mr.

16        Wunder, Director of the Office of Citizen Exchanges.  Mr. Wunder is one of

17        two directors who report directly to me.

18   Q    Please state your work relationship to Mr. McGrath at the time of the matters

19        at issue in his complaint.  From what date to what date did you supervise Mr.

20        McGrath?

21   A    I joined the Department on February 11, 2002.  As mentioned above Mr.

22        McGrath's direct supervisor was Mr. Wunder and as such I relied on Mr.

23        Wunder to supervise Mr. McGrath.  Mr. Wunder discussed Mr. McGrath and

24        the other division chiefs with me regularly.

25   Q    Please state your work relationship to Van S. Wunder at the present time,

26        and if different, at the time of the matters at issue in Mr. McGrath's

27        complaint.

Initials

1    A    As referenced above, Mr. Wunder is one of two Office Directors who report
2         directly to me. He supervises five division chiefs who oversee a staff of
3         approximately 50.

4    Q    Please state your race.

5    A    Caucasian.

6    Q    Are you aware of the Department of State's policy on harassment? Have you
7         received training in that policy?

8    A    Yes.

9    Q    Did Mr. McGrath raise concerns to you that he believed Mr. Wunder was
10        subjecting him to a hostile work environment? If so, when and what did he
11        indicate to you?

12   A    No.    At some point (I'm uncertain of the specific day) following his
13        evaluation conference with Mr. Wunder he asserted that Mr. Wunder and he
14        had words. At no point did he indicate that he felt he was being subjected to
15        a "hostile work environment".

16   Q    If Mr. McGrath raise concerns to you that he believed Mr. Wunder was
17        subjecting him to a hostile work environment, what actions did you take in
18        response?

19   A    Mr. Wunder had previously made me aware of the afore mentioned
20        conversation. Following Mr. McGrath's reference to his conversation with
21        Mr. Wunder, I spoke to Mr. Wunder again.  He reiterated what he'd
22        previously told me of the conversation, stating that he'd never in all his years
23        as a foreign service officer experienced a fellow officer whose work ethic was
24        as poor as Mr. McGrath's. He expressed that nothing he'd tried had work to
25        motivate Mr. McGrath. I counseled that he keep trying to work with Mr.
26        McGrath with the hope that his efforts would bear fruit. Further, I counseled
27        that he continue to document Mr. McGrath's actions.

28

|     |     |     |
| --- | --- | --- |
| 1   | a)  | *his supervisor attempted to undermine his authority as Chief, Division of* |
| 2   |     | *Citizen Exchanges, Office of Cultural Programs, Bureau of Educational and* |
| 3   |     | *Cultural Affairs* |

4   Q   Mr. McGrath alleges that Mr. Wunder attempted to have him dismiss from

5         employment Evangeline "EJ" Montgomery.   He contends Mr. Wunder told

6         him to document problems in her performance with the view to using that

7         information to terminate her employment.  He also contends that at one time

8         Mr. Wunder supervised Ms Montgomery but did not document and

9         terminate her employment.  Did you have any discussions with Mr. McGrath

10        and/or Mr. Wunder in regard to Ms Montgomery's performance?  If so,

11        please describe the gist of the conversations.

12   A   Mr. Wunder summarized a conversation in which, in response to his

13        notifying Mr. McGrath that his work was below standard and needed

14        improvement, Mr. McGrath complained that his problems stemmed from the

15        abilities of his staff.  According to Mr. Wunder, it was Mr. McGrath who in

16        detailing the shortcomings of his staff and mentioned Ms. Montgomery's

17        inability to type specifically.  In return Mr. Wunder told Mr. McGrath that it

18        was his responsibility as a manager to manage and address any problems he

19        had with the staff accordingly.  Mr. Wunder told me that he asked Mr.

20        McGrath in response to his reference about Mr. Montgomery whether he'd

21        looked into dictation software.  (I later learned that Mr. McGrath never did,

22        so I purchased the software for Ms. Montgomery.)  Further, with regard to

23        Ms. Montgomery, Mr. Wunder said he suggested to Mr. McGrath that if

24        indeed because of her illness she could no longer perform her duties it was

25        his responsibility to seek counsel within the Department on how to deal with

26        such a situation.

27

28        At no time did Mr. Wunder indicate that he'd suggested Ms. Montgomery's

29        termination.  I first heard of this from Mr. McGrath in the days following his

Initials

1        performance review with Mr. Wunder when he let me know that he was

2        considering the filing of an EEOC complaint against Mr. Wunder on Ms.

3        Montgomery's behalf.  At that point I revisited my previous conversation

4        with Mr. Wunder regarding the discussion of Ms. Montgomery, and in

5        response to Mr. McGrath's request kept his conversation with me regarding

6        his consideration of an EEOC filing to myself for some time.

7   Q    Mr. McGrath alleges that, because he protested Mr. Wunder's directions in

8        regard to documenting Ms Montgomery's performance with the view to

9        discharging her as he viewed the alleged directions to be based on her race

10       and disability, Mr. Wunder retaliated against him in each of the claims to this

11       complaint, including this claim that Mr. Wunder attempted to undermine his

12       authority as division chief.  Did Mr. McGrath tell you that he considered Mr.

13       Wunder to be trying to force him to document Ms Montgomery's performance

14       in order to terminate her employment and that this was because of her race or

15       because she has a disability?  If so, please explain.

16   A    Mr. McGrath referred to his conversation with Mr. Wunder regarding Ms.

17        Montgomery — which had occurred prior to his performance evaluation in

18        which he received poor ranking — only after Mr. Wunder had given Mr

19        McGrath his performance evaluation.  This was done verbally, as is part of

20        the standard evaluation process.  Only after having received this notification

21        did Mr. McGrath suggest that Mr. Wunder had, in his view, suggested that

22        he terminate Ms. Montgomery.  He did assert his suspicion that Mr.

23        Wunder's purported suggestion was possibly racial in nature.  He did not

24        suggest that it might be due to her disability.  I was suspicious of the timing

25        of his allegation given that I was aware of the evaluation just given him by

26        Mr. Wunder.  Mr. Wunder had consulted me on the evaluation and I

27        concurred in it.

Initials

1    Q    Do you have reason to any believe Mr. Wunder was racially biased against
2         Ms Montgomery or that he was biased against her because of any disabling
3         condition? Please explain.
4    A    None whatsoever.
5    Q    Did Mr. Wunder discuss with you any concerns he may have had about Ms
6         Montgomery's medical condition affecting her ability to perform her job?
7         What was the gist of any such discussions?
8    A    He referenced her condition in the course of briefing me about his entire staff
9         when I took my current position.  Further, when Mr. McGrath failed to take
10        action on his recommendation, he counseled me on the purchase of dictation
11        software and training.
12   Q    If Mr. McGrath raised any of this to your attention, did you understand Mr.
13        McGrath was telling your that his reluctance or refusal to document Ms
14        Montgomery's performance problems or to consider termination of her
15        employment based on performance problems to be a protestation against
16        alleged discriminatory bias on Mr. Wunder's part toward Ms Montgomery
17        because of her race or disability?
18   A    No.
19   Q    Mr. McGrath alleges that, because he refused to do document Ms
20        Montgomery's performance with the view of terminating her employment,
21        Mr. Wunder retaliated by reducing his scheduled home leave from 25 to 20
22        work days.  To your direct knowledge, was the number of work days in Mr.
23        McGrath's home leave reduced?  If so, why?  Please be explicit.
24   A    I don't recall this specifically.  I do recall that Mr. McGrath left for leave
25        without having completed tasks that were due within the next two days,
26        leaving those around him to pick up the pieces.  He offered no forewarning
27        that tasks needed doing, instead leaving his unfinished work on Mr.
28        Wunder's chair to be discovered after his departure on leave.

Initials

| | | |
|---|---|---|
| 1 | Q | Mr. McGrath alleges that Mr. Wunder intended to create a hostile work |
| 2 | | environment for him by undermining his authority with staff and by |
| 3 | | reducing his home leave by five work days.   Do you have any reason to |
| 4 | | believe this is a correct assessment?  Please explain. |
| 5 | A | None.  Frankly, Mr. McGrath undermined his own authority with his staff |
| 6 | | through lack of leadership and availability.  Regardless of his presence most |
| 7 | | of his staff came to Mr. Wunder and me for the guidance and leadership he |
| 8 | | did not provide. |
| 9 | Q | Mr. McGrath states he approved Ms. Montgomery to attend to national |
| 10 | | conferences in Philadelphia apparently at government expense |
| 11 | | (administrative leave and travel costs).  He alleges Mr. Wunder would not |
| 12 | | approve this.  Do you have any direct knowledge of this allegation?  If so, |
| 13 | | please describe your knowledge and explain how you come by it. |
| 14 | A | Mr. McGrath brought that up when he notified me that he was considering |
| 15 | | filing a complaint on Ms. Montgomery's request.  I later discussed this with |
| 16 | | Mr. Wunder who denied the travel because it was not directly related to |
| 17 | | matters upon which Ms. Montgomery was working. |
| 18 | Q | Mr. McGrath alleges Mr. Wunder approved to White persons on the staff to |
| 19 | | attend conferences in Sao Paolo, Brazil, and in New York.  To your |
| 20 | | knowledge, did Mr. Wunder approve staff to attend these conferences?  Do |
| 21 | | you have any reason to conclude that the decision to approve their travel and |
| 22 | | attendance at these conferences was based on their races? |
| 23 | A | Yes, Mr. Wunder did approve travel by members of the Office of Cultural |
| 24 | | Affairs staff to these destinations.  And yes, these staff members are White. |
| 25 | | He approved their travel because the travel was directly related to the jobs of |
| 26 | | the individuals.  Mr. McGrath could have raised issue regarding this travel at |
| 27 | | the time were he concerned, but, to my knowledge, he did not. |
| 28 | Q | Was their travel and time at government expense, to your direct knowledge? |
| 29 | | If you have direct knowledge of this matter, please state your understanding |

Initials: _____

| | | |
|---|---|---|
| 1 | | of why the travel and attendance for these individuals was approved while |
| 2 | | Ms. Montgomery's was not. |
| 3 | A | As stated above, Ms. Montgomery's travel was not approved because it was |
| 4 | | not directly related to her work. The travel of the others was approved |
| 5 | | because it was directly related to their work. |
| 6 | Q | Mr. McGrath alleges Mr. Wunder gave Ms Montgomery a large amount of |
| 7 | | special work to be done in a short amount of time and this was work she |
| 8 | | would not normally be given. Did either Mr. McGrath or Mr. Wunder |
| 9 | | discuss this matter with you? If so, what is your understanding of the |
| 10 | | reason why this work was assigned to Ms Montgomery, if in fact this |
| 11 | | occurred? |
| 12 | A | No. |
| 13 | Q | Mr. McGrath alleges Mr. Wunder gave this work to Ms Montgomery to |
| 14 | | "fluster" her or to put her in a position where she could not perform |
| 15 | | adequately, thus giving a documented reason to use in an attempt to |
| 16 | | terminate her employment. Do you have any reason to conclude this was |
| 17 | | Mr. Wunder's purpose in giving this assignment to Ms Montgomery? Please |
| 18 | | explain. |
| 19 | A | I know of no such incident and have no reason to believe that Mr. Wunder |
| 20 | | would conduct himself in this manner. To the contrary, my experience |
| 21 | | working with Mr. Wunder has informed me of his nature and management |
| 22 | | style and suggests that such action would be completely out of character. On |
| 23 | | the other hand, my experience with Mr. McGrath informs me that making |
| 24 | | such an allegation IS reflective of his character. |
| 25 | Q | Another example Mr. McGrath gave involved a program under his area of |
| 26 | | responsibility. He contends he wanted to "reform" this grant because it is |
| 27 | | racially and ethnically biased toward White and developed countries. Did |
| 28 | | Mr. McGrath indicate to you he wanted to make changes to this grant? If so, |
| 29 | | what changes did he indicate he wanted to make and what reasons did he |

Initials ___

1        give for wanting to make these changes? Did Mr. McGrath tell you that Mr.

2        Wunder would not allow him to make these changes? If you were aware of

3        this matter, what is your understanding of the reason Mr. Wunder would not

4        approve the changes Mr. McGrath wanted to make to this grant?

5    A    No, Mr. McGrath did not indicate this to me. Mr. Wunder brought Mr.

6        McGrath's concerns to my attention. Mr. Wunder stated that Mr. McGrath

7        would not sign paperwork needed to move the grant forward because he felt

8        too much program money was going to Europe and not enough elsewhere.

9        How funds are dispensed under this program is not a matter for Mr.

10      McGrath, Mr. Wunder or myself to decide by personal fiat. Mr. Wunder

11      suggested that Mr. McGrath work with our private sector partners in the

12      program to address his concerns. This was the reasonable course and one I

13      approved of, but Mr. McGrath decided not to pursue the matter, refused to

14      do his job by signing the grant and left the paperwork to Mr. Wunder and

15      me. The issue of racial bias was never part of the discussion.

16    Q    Do you have any reason to believe Mr. Wunder would not approve Mr.

17      McGrath's desired changes to this grant, if any, in order to undermine

18      McGrath's authority with subordinates in his division?

19    A    No. To the contrary, Mr. Wunder urged Mr. McGrath to address his

20      concerns through a standard process with our private sector partners – to

21      work within a longstanding system for managing the relationship. Mr.

22      McGrath would have nothing to do with it and took no further action.

23    Q    To your knowledge, have there been instances with other managers under

24      Mr. Wunder's supervision with whom Mr. Wunder did not approve changes

25      to one or more grants? If so, please describe your knowledge and explain

26      how you come by it.

27    A    Yes. Mr. Wunder's office writes as many as 200 grants a year and oversees as

28      many as 600 grantees on an ongoing basis. Reviewing, recommending and

29      editing of grant proposals and solicitations are a large part of his job, and he

Initials

1          does so in regular consultation with other division chiefs. He is also

2          responsible for assuring that his office remain within budget and in many

3          cases must decide which grants receive funding an which do not. We

4          approve about a third of the grants requests we receive annually due to

5          budget constraints. All activities in Mr. Wunder's office are my

6          responsibility and as such I am privy to and consulted on most such

7          decisions.

8    Q     To your knowledge, did Mr. McGrath suggest to Mr. Wunder changes he

9          wanted to make in any other grants, and did Mr. Wunder agree to those

10        changes? If so, please describe your knowledge and explain how you come

11        by it.

12   A    No.

13   Q    Mr. McGrath alleges that Mr. Wunder authorized the granting of funds to an

14        art festival in Western Europe over his objections. Do you recall Mr.

15        McGrath objecting to funds being granted to a Western Europe art festival?

16        To your knowledge, did Mr. Wunder authorize the funds over McGrath's

17        objections? If so, please describe your knowledge and explain how you come

18        by it.

19   A    Yes. This is the same grant referenced above where Mr. McGrath raised

20        objections because he felt Europe was getting to much funding. This is the

21        same grant where Mr. McGrath refused to work with our private sector

22        partners to raise the issue and the same grant where because of his refusal

23        Mr. Wunder was forced to approve the grant or risk upsetting a longstanding

24        and negotiated relationship with our partners.

25   Q    To your knowledge, has Mr. Wunder authorized granting of funds to any

26        other project during the past two years over the objection of the division chief

27        under whose authority the project was assigned? If so, please describe your

28        knowledge and explain how you come by it.

Initials 

1    A    I'm not aware of a similar instance where a division chief has refused to work

2          with Mr. Wunder to address his concerns. Mr. McGrath's behavior is unique

3          to my knowledge. Discussion over the merits of grant proposals is a constant

4          in Mr. Wunder's office. Division chiefs and Mr. Wunder agree and disagree,

5          but in the end come to terms and proceed as one. And yes, there are

6          occasions where funds are granted and denied over the objections of a

7          division chief. I am the one who authorizes such decisions.

8    Q    To your knowledge, had Mr. Wunder concurred in Mr. McGrath's decisions

9          on other projects during the same time frame as the approval for this project,

10         either to fund or not fund? If so, please describe your knowledge and explain

11         how you come by it.

12    A    Yes. Two instances come to mind. Mr. Wunder concurred on decisions

13         regarding the Jazz Ambassador program and the American Cultural

14         Specialist program. He agreed that administrative functions for the Jazz

15         Ambassador program should be done by a grantee organization. As a result

16         of Mr. Wunder's insistence, we have awarded a grant for just that purpose.

17    Q    Mr. McGrath alleges Mr. Wunder was opposed to his request that the

18         Secretary host a reception in honor of the Thelonius Monk Institute and the

19         winner of its international jazz competition. Is that accurate, to your

20         knowledge? If so, please describe your knowledge and explain how you

21         come by it.

22    A    I know nothing of it.

23    Q    Mr. McGrath alleges the Secretary was very pleased with the reception,

24         which Mr. McGrath says was very successful, and that as a result, Mr.

25         Wunder was obviously embarrassed on having his "insensitivity and poor

26         professional judgement revealed for all to see." Was it your perception that

27         the reception was "very successful?" If so, whom do you consider was

28         responsible for that success?

 Initials

| | | |
|---|---|---|
| 1 | A | Nonsense. I was there too, and Mr. Wunder and his wife were both in |
| 2 | | attendance and by my estimation thoroughly enjoying the evening. |
| 3 | Q | According to a March 8, 2002, memo from Mr. Wunder to Mr. McGrath, he |
| 4 | | found at least one serious deficiency in his preparations for the reception. |
| 5 | | Please describe that and any other problems you and/or Mr. Wunder |
| 6 | | encountered in regard to bringing the reception to a successful conclusion. |
| 7 | | Please be specific as to what problems you found and what was done to |
| 8 | | correct the problem(s). |
| 9 | A | I am not familiar with this matter. |
| 10 | Q | To your knowledge, did Mr. McGrath routinely report to Mr. Wunder the |
| 11 | | progress of projects/grants under his area of responsibility and any problems |
| 12 | | he or members of his staff was encountering? If so, please describe your |
| 13 | | knowledge and explain how you come by it. |
| 14 | A | No. Mr. McGrath routinely did not return phone calls and email. He was |
| 15 | | often out of the office without notification of his whereabouts. I know this |
| 16 | | from my own personal experience with Mr. McGrath. Mr. Wunder regularly |
| 17 | | reported to me regarding Mr. McGrath's lack of reporting, lack of attendance |
| 18 | | at weekly staff meetings, lack of accountability for his whereabouts, and his |
| 19 | | refusal to provide his work schedule. |
| 20 | Q | Was Mr. McGrath's conduct in this regard consistent throughout the period |
| 21 | | he was supervised by Mr. Wunder, to your knowledge? If not, when did Mr. |
| 22 | | Wunder begin to encounter these problems? Did Mr. Wunder or Mr. |
| 23 | | McGrath discuss this problem with you? Please explain. |
| 24 | A | Yes, despite attempts to encourage Mr. McGrath, his conduct remained |
| 25 | | consistently poor. |
| 26 | Q | Are there any witnesses whom you would care to name who have direct |
| 27 | | knowledge of this claim? If so, please state the name of each, a contact |
| 28 | | number, and that to which each person can speak. |
| 29 | A | No. My response should be sufficient. |

1    Q    Is there anything you would like to add to your statement on this claim?

2    A    The claim is baseless.

3    *b)*    *his supervisor gave him a negative performance evaluation as Chief,*

4         *Division of Citizen Exchanges, on 4/11/02 and 4/29/02;*

5    Q    Did you serve as the reviewing official for Mr. McGrath's EER?

6    A    No, but I was informed of the grade he was to receive and concurred with it.

7    Q    Mr. McGrath alleges that, when he told Mr. Wunder that he would not

8         document Ms Montgomery's performance with the intent of terminating her

9         employment, Mr. Wunder told him that if he did not follow those orders, he

10        could expect a negative EER.   Did you and Mr. Wunder discuss the rating of

11        Mr. McGrath's performance prior to the document being developed?  If so,

12        what were the reasons Mr. Wunder gave for the rating he saw as appropriate

13        for Mr. McGrath for the rating period?

14   A    Yes.  I was aware of how Mr. Wunder intended to rate Mr. McGrath.  Mr.

15        Wunder sought my counsel as he had never faced rating someone so low and

16        he was uncomfortable with the prospect.  I told him to write the evaluation as

17        the situation dictated, relying only on the merits.  Mr. Wunder discussed the

18        many reasons for his rating – many of which are covered in my previous

19        responses.  Others included the devastating impact Mr. McGrath's lack of

20        leadership was having on the Cultural Affairs staff.  Additionally, his work

21        ethic was so poor that Mr. Wunder and myself took over many of his duties

22        so that we would be assured such tasks were completed.

23   Q    When did Mr. Wunder first raise to your attention that Mr. McGrath's

24        performance as division chief was not at the level he expected from that level

25        employee?  What reasons did he give for that conclusion?  Please be specific.

26   A    As mentioned above, Mr. Wunder upon my arrival at ECA discussed with

27        me personnel issues in all his divisions and Mr. McGrath was part of that

28        briefing.


Initials

1    Q    Did Mr. Wunder discuss with you concerns Mr. McGrath's staff had

2         expressed regarding a lack of regular staff meetings, a failure on Mr.

3         McGrath's part to consult with his staff focus on information his staff

4         regarding their program plans or even listened to them for more than a few

5         minutes on any issue, and/or Mr. McGrath being openly dismissive of some

6         of the staff members' attempts to raise program issues with him.  If so, what

7         was the gist of your discussion with Mr. Wunder?  Did you concur in Mr.

8         Wunder's concerns in regard to these matters?  Please explain.

9    A    I heard this from Mr. Wunder and from members of Mr. McGrath's staff.  All

10        were perplexed.  There was unanimity of opinion regarding his work ethic,

11        leadership skills and willingness to work.  As a result of those discussions

12        Mr. Wunder sent Mr. McGrath specific directives on actions he was to take,

13        in the hope that simple and direct communication would help Mr. McGrath

14        organize himself and his office.

15   Q    To your knowledge, had Mr. Wunder encountered one or more of these

16        problems with any other division chief under his supervision?  If so, who,

17        and what action did Mr. Wunder take, if any, and was the problem

18        corrected?

19   A    Yes.  And similar direct communication accompanied with consultation and

20        monitoring solved the matter.  I will not supply their names.

21   Q    In regard to the budget report that you, Mr. Wunder and Ms Wainscott

22        prepared for the divisions reprogramming letter to the House

23        Appropriations Committee, what was Mr. McGrath's responsibility in regard

24        to accomplishing this task?  When was it due from him to Mr. Wunder?

25        When and how did you learn that it had not been prepared?  What timeframe

26        did this allow you, Mr. Wunder and Ms Wainscott to accomplish this task?

27   A    I was not in my current position at the time and am unfamiliar with the

28        process entirely.



Initials

1    Q    Did you encounter any problems in how Mr. McGrath was managing the
2         projects under his supervision in terms of staying within budget and on
3         target? If so, what kinds of problems did you find? What actions were taken
4         in an attempt to correct the problem? Were the actions successful in
5         achieving better management? Please explain.
6    A    Again, my problems with Mr. McGrath revolved around his routine of
7         choosing what he would and would not work on, ignoring all other duties
8         that were his responsibility. He was routinely unreachable by phone and
9         email. He preferred to complain about his staff rather than take actions to
10        address any problems and through lack of action refused to take up the
11        challenges of leadership.
12   Q    In a memorandum to Mr. McGrath, Mr. Wunder directed McGrath to hold
13        weekly staff meetings from that point forward and to take time to meet with
14        staff members individually and review with them their projects, budgets, and
15        plans. Did he do so, to your knowledge? Please describe your knowledge
16        and explain how you come by it.
17   A    No. I continued to be visited by his staff seeking guidance that he should
18        have provided. Mr. Wunder reported that his memo had no affect on Mr.
19        McGrath's actions.
20   Q    Did other problems surface with Mr. McGrath's management of his division
21        after that point, to your knowledge? If so, please describe your knowledge
22        and explain how you come by it.
23   A    Management of the budget was an ongoing problem. I spent a great deal of
24        time going over the budget with Mr. McGrath and that improved his
25        reporting habits and budget discipline. However, despite recommendations
26        that he train, or get training for, his staff on budgeting and grant writing no
27        action was taken.
28   Q    In summary, what led you to concur in the rating Mr. Wunder gave Mr.
29        McGrath?

Initials /X/

| 1 | A | All of the above.  All efforts to cajole, urge, and demand that Mr. McGrath |
| 2 | | engage in managing the office were met with inaction or complaint.  He |
| 3 | | demonstrated none of the qualities necessary to run the office and openly |
| 4 | | ignored guidance and direction on how to lead or amend his behavior. |
| 5 | Q | Are there any witnesses whom you would care to name who have direct |
| 6 | | knowledge of this claim?  If so, please state the name of each and that to |
| 7 | | which each person can speak. |
| 8 | A | No. |
| 9 | Q | Is there anything you would like to add to your response to this claim? |
| 10 | A | Mr. McGrath's performance rating was commensurate with his performance. |
| 11 | | |
| 12 | *c)* | *he was subjected to an involuntary curtailment of his assignment as Chief,* |
| 13 | | *Division of Citizen Exchanges, Office of Cultural Programs, Bureau of* |
| 14 | | *Educational and Cultural Affairs* |
| 15 | Q | Did problems in Mr. McGrath's  management of his division continue after |
| 16 | | the EER was issued? |
| 17 | A | If EER means performance review, then yes and problems actually worsened |
| 18 | | as he devoted himself to the pursuit of the EEOC filing on behalf of Ms. |
| 19 | | Montgomery.  As I've previously mentioned, Mr. McGrath started activities |
| 20 | | related to the EEOC complaint on behalf of Ms. Montgomery only after his |
| 21 | | verbal performance review session with Mr. Wunder and in the period (as I |
| 22 | | understand the process) prior to the final and formal filing of his review. |
| 23 | Q | Did Mr. McGrath come to you about his concerns with the EER?  If so, what |
| 24 | | was the gist of the discussion? |
| 25 | A | He related that he'd met with Mr. Wunder and that the two of them found no |
| 26 | | common ground. |
| 27 | Q | Did you make a concerted effort to get Mr. McGrath to comply with Mr. |
| 28 | | Wunder's direction in terms of being responsive to direction and to provide |

Initials

|  |  |  |
|---|---|---|
| 1 |  | closer and more effective supervision to subordinate staff? If so, were your |
| 2 |  | efforts successful? Please explain. |
| 3 | A | Yes, I reiterated Mr. Wunder's direction and told them both that I expected |
| 4 |  | them to work out their differences and that he -- Mr. McGrath needed to |
| 5 |  | manage his staff. Aside from improvements in budget record keeping and |
| 6 |  | reporting, there was no change in Mr. McGrath's behavior. |
| 7 | Q | What was your role in the decision to curtail Mr. McGrath involuntarily from |
| 8 |  | the assignment as Chief, Division of Citizen Exchanges? |
| 9 | A | It was my decision. |
| 10 | Q | What led you to conclude it was necessary to curtail Mr. McGrath's |
| 11 |  | assignment as division chief? Did Mr. Wunder suggest this to you or was |
| 12 |  | this primarily your decision based on your experiences directly with Mr. |
| 13 |  | McGrath? |
| 14 | A | All of the above. |
| 15 | Q | Have you found it necessary to curtail anyone else involuntarily from an |
| 16 |  | assignment? If so, what is the race of such persons? To your knowledge, had |
| 17 |  | such persons participated in activities protected under Title VII of the Civil |
| 18 |  | Rights Act of 1964, as amended? |
| 19 | A | I have not found it necessary to involuntary curtail anyone else. |
| 20 | Q | Are there any witnesses whom you would care to name who have direct |
| 21 |  | knowledge of this claim? If so, please state the name of each and that to |
| 22 |  | which each person can speak. |
| 23 | A | Mr. Wunder and Deborah Hunsley. |
| 24 | Q | Is there anything you would like to add to your response to this claim? |
| 25 | A | In my opinion, this is a hollow and baseless attempt by Mr. McGrath to |
| 26 |  | salvage his career. The simple truth is that Mr. McGrath was an |
| 27 |  | extraordinarily poor employee who routinely avoided responsibility, dodged |
| 28 |  | assignments, and failed to meet deadlines. He took little of the counsel |
| 29 |  | offered by Mr. Wunder or me, and ignored our advice, counsel and entreaties |

Initials

1        to act in a manner commensurate with his position. He received the lowest

2        possible performance rating because it was warranted. Involuntary

3        separation was not the only alternative available to me. However, it was the

4        least punitive.

5

6    *d)*    *the discriminatory curtailment had the result of denying Complainant a*

7        *career-enhancing follow-on assignment.*

8    Q    Did you or Mr. Wunder offer Mr. McGrath the opportunity to seek a

9        voluntary curtailment?

10   A    I asked Mr. Wunder to suggest this course of action in his performance

11       review with Mr. McGrath. Mr. Wunder, confirmed immediately following

12       that review that he'd urged its consideration. I also recall that Mr. McGrath

13       had the option to voluntarily curtail following my meeting with him in which

14       I disclosed my decision. Mr. Wunder and Ms. Hunsley were both present.

15       Ms. Hunsley was there to look out for Mr. McGrath and make sure that he

16       was fully aware of all options available to him in advance of the involuntary

17       curtailment becoming formal. (She can best relate these specifics. I recall that

18       he had a window of a matter of days to take action to make the curtailment

19       voluntary, and did not.)

20   Q    What would the difference have been to Mr. McGrath's record and his ability

21       to obtain a career enhancing follow-on assignment had he chosen to request

22       voluntary curtailment?

23   A    I am not a member of the foreign service, but I must believe that it would

24       have been the preferable course of action on his part.

25   Q    Mr. McGrath alleges the involuntary curtailment resulted in denying him a

26       career-enhancing follow-on assignment. What is your response?

27   A    I would think so. However, it is the logical consequence of his actions, the

28       choices he made while at ECA, and how he conducted himself as an

29       employee and manager. There is nothing Mr. McGrath did during his tenure

Initials

1               that would warrant career-enhancement and it would be irresponsible of me

2               to let any future employer think otherwise.

3    Q      Are there any witnesses whom you would care to name who have direct

4               knowledge of the matters at issue in this claim?  If so, please state the name of

5               each and that to which each person can speak.

6    A      No.

7    Q      Is there anything you would like to add to your statement?

8    A      I hope that this review finds what I deeply believe to be the case -- that the

9               allegations of Mr. McGrath as represented in this document are entirely

10            baseless and without standing.  To find otherwise would do harm to a

11            needed and meritorious system that is in place to correct genuine wrong-

12            doing and provide needed protection to government employees who suffer

13            true discrimination.  This system must not become a safe haven for people

14            seeking to avoid the appropriate consequences of their own actions.

15            Allowing such manipulation does an injustice to those in real need of

16            adjudication.  Mr. McGrath is not such an individual.

17

Initials

1

2    I declare under penalty of perjury that the foregoing is true and correct.  Executed on

3    this day, _August 29_____, 2002.

4

5    _____

6    Steve Hart

7