# EXHIBIT 26

MEMO

DATE: June 11, 2002

FROM: Matthew J. McGrath, ECA

TO: Barbara Pope, OCR

SUBJECT: A Preliminary EEO Complaint

Summary: Since shortly after my assuming my current position as Chief of the Office of Cultural Programs in September 2001, my supervisor, Mr. Van S. Wunder, Director of the Office of Citizen Exchanges, has attempted, at first by indirect means and then finally by direct means to have me dismiss a member in good standing of my staff, a 72 year old African-American woman handicapped by Parkinson's disease, Ms. Evangeline "EJ" Montgomery. I have ignored and resisted his various methods, entreaties and instructions, as I believe that his objective is both unethical and illegal. I finally outright refused to carrying out his orders and continued to do so even after he threatened me with retaliation, including his making direct references to my evaluation report. Combined with other attitudes and actions that Mr. Wunder exhibited or took during this period which I believe to be racially and ethnically insensitive, I was forced to conclude that he has been behaving in a biased and prejudiced manner. It should be noted that Mr. Wunder not only recently occupied my current position, but also has been the supervisor of this position for some extended time before my arrival, is familiar with the issues of my office and did not and would not take himself the very same actions he has instructed me to take. End summary.

A Fundamental Racial Insensitivity

Shortly after my arrival in the fall of 2001, Mr. Wunder attempted to convince me that I should begin to "document" the poor performance of Ms. Evangeline, "EJ", Montgomery. Though it was early in my tenure, I knew that, like all of us, myself included, Ms. Montgomery had her strengths and her limitations. I had also concluded, and time has only reinforced that conclusion, that Ms. Montgomery's strengths far outweighed her limitations. Mr. Wunder was particularly upset that a certain few members of my staff would, from time to time assist Ms. Montgomery in her work, something that I saw as being accommodating and completely acceptable. I was disturbed by his forceful statements repeated to me that it was my job to "manage" the office with the objective of maximizing performance and that he expected me to do so. The implications of what he said did not escape me, though at first I hoped that he didn't really mean to say what he was saying and attempted to deflect his intentions with the hope that they would disappear. I did note to him that he had been around long before my recent arrival, had reached these conclusions based on his own experiences and asked why he had not taken these steps himself if he felt these steps were necessary. Obviously flustered and angered, he either could not or would not respond.

I had observed during my first weeks in the job that Mr. Wunder's supervisory style concerning my office centered on his identification and use of a few "favorite" staffers in my office to spy and report to him. I also observed that his favorites did not include any of the three African-Americans on my staff, which, of course, included Ms. Montgomery. I decided to test this observation by selectively raising an issue I had pending with the Department of State in front of one of his favorites in my office, an issue that had nothing to do with my office or our division. To my amazement, Mr. Wunder called me in and raised the issue with me. On at least three occasions over these few months, he brought up an issue involving two members of my staff, one of his "favorites", a white woman and one of the African-American women, the knowledge of which he could have gotten only from his "favorite". I explained that I believed that there was, among other things, an issue of racial sensitivity involved and that taking sides over it would be racially insensitive as well as unproductive. The fact that he raised it a second and a third time was disturbing.

My office manages a grant that I have tried to reform because I feel that it is racially and ethnically biased toward white and developed countries and is, therefore, not as balanced and effective as it could be. As I understand the intent of the Congress for a geographically balanced worldwide program (the Congress and I appear to share the same concern), this grant also does not come close to meeting Congress' intent. This grant is managed by one of Mr. Wunder's favorites (the favorite who I referred to above concerning an internal office dispute with another staffer). Mr. Wunder has steadfastly refused to allow me to initiate these reforms, taken it upon himself to delay taking them up himself and diluted any additional efforts to implement them.

In another program, Mr. Wunder, again in support of another one of his favorites, authorized over my objections, the granting of DOS funds to an art festival in Western Europe that the Department had never given money to before, while at the same time unabashedly acknowledging the fact that there had been criticism of the program for spending a disproportionate share of its funds at the Venice festival and Western Europe. I argued that those funds could have been used more effectively in other art festivals in other regions of the world.

Perhaps the most publicly revealing example of Mr. Wunder's insensitivities involved his opposition to my request that the Secretary of State host a reception in honor of the Thelonious Monk Institute and the winner of its prestigious international jazz competition. Pointing out to Mr. Wunder that this was a very important African-American cultural organization with a who's who of important African-American cultural figures involved in it, that many of these figures would be attending and/or performing at the reception, that this would be taking place in February, Black History Month, and even having to point out that the current Secretary of State was an African-American, did not move him. Though he steadfastly and repeatedly argued against it, my request went through, was enthusiastically supported by the Secretary who indeed hosted the reception. In attendance, were not only some of America's greatest jazz artists and performers, but members of the Black Caucus, other Congresspersons and Senators, the diplomatic corps, the Chairman of the Joint Chiefs of Staff (the General actually

volunteered and participated in the competition as well), the Chairman of the Federal Reserve and several important media figures. Though my steadfast resolve on the matter was more than vindicated by the obvious good time enjoyed by the Powell's and their guests and the credit ECA received, Mr. Wunder's was obvious embarrassed on having his insensitivity and poor professional judgment revealed for all to see. On March 8, even after its successful conclusion, he continued to angrily defend his original position to me.

The Montgomery Matter Comes To A Head

Matters on Ms. Montgomery escalated after the Christmas/New Year's holidays. On my first day back to work (Monday, Jan. 7), Mr. Wunder, stating that based on reports (clearly from his favorites on my staff) while I was away, made his demands clearer. My hopes that the matter would go away were dashed. He insisted that I take steps to document any and all of Ms. Montgomery's limitations with the goal of dismissing her. With more force and with more knowledge than earlier, I continued to remind him that all of us have both strengths and limitations, outlined what I considered to be Ms. Montgomery's strengths and that any limitations she had were not so serious that they could not be managed without taking such a step. Again, he told me that it was my job to manage and that he expected that I would begin taking immediate action. He said if I would not, he would take "note" of it and that I should leave my position in the division. He also told me a story, (apparently this was his way to motivate me), of how he had successfully done the very same thing and dismissed a civil servant, a "Cuban" as Mr. Wunder identified him, named Mo Garcia when Mr. Wunder had worked in the "I" Bureau. Please note that Mr. Wunder has never worked in the "I" Bureau. He had worked in the "P" Bureau, the "I" Bureau's antecedent pre-1994. I had worked in the "I" Bureau which I do not believe Mr. Wunder knew or remembered. I had been a colleague of Mr. Garcia's in the years just before his retirement and knew that Mr. Wunder had not dismissed Mr. Garcia, whatever their relationship might have been years before in the "P" Bureau. I was stunned to conclude that Mr. Wunder was prepared to lie to me to get me to do something. After unsuccessfully trying to reason with him on the matter of Ms. Montgomery, I still continued to ignore his unethical and illegal instructions. In retaliation to my obvious opposition, Mr. Wunder cut my deferred Home Leave from our previous agreed upon 25 working days back to 20 days. The message was clear, but I chose to continue to ignore him still hoping reason would eventually prevail. I would just accept this retaliation for the moment.

I was only scheduled to be back in the office for nine working days before I was to begin my Home Leave. On the eve of my departure for Home Leave on Friday, January 18, I signed an authorization for Ms. Montgomery to attend two national conferences in Philadelphia. These were two important conferences by two major national organizations. Ms. Montgomery was a member of long-standing and just two or three years previously she had be awarded their woman of the year award, an award USIA had publicized to its renown. Shortly after I returned from my shortened Home Leave on February 21, I discovered several troubling developments. One, Mr. Wunder rescinded my authorization for Ms. Montgomery to go to Philadelphia; despite the fact that it was a

relatively and obviously inexpensive trip and that Ms. Montgomery was even refused the authorization to take administrative leave to attend. Because it was important to her to attend, and I believe important to the office or I would not have authorized the trip to begin with, she opted to both fund her trip personally and take annual leave as the only way she could make the trip and attend. At the same time Mr. Wunder was overruling my authorization of Ms. Montgomery's trip, he authorized the trips of two of his favorites, both of course white to New York and Sao Paolo, Brazil

I also discovered that Mr. Wunder chose to give Ms. Montgomery a large amount of special work to be done in a short amount of time, work that she would not normally be given under normal circumstances, instead of giving some of it if not all of it to other staffers. However, that would have meant giving it to one of his favorites. He informed me later on March 8) that it was clear to him that the work clearly flustered Ms. Montgomery. I heard from others that he was quite upset and angry that others on staff were helping her with the work. His meaning was clear. He gave her special work he knew might fluster her, baiting her to prove to me she could not do the work and prove to me his course was the right one.

I was angry and knew that what I had suspected for some time and naively wished would go away was in fact the truth--Mr. Van S. Wunder was racially insensitive in a profound way. I, therefore, delayed discussing matters with him while I cooled off, while I was investigating what all had happened during my Home Leave, while the reception mentioned above that Secretary Powell was scheduled to host concluded, the event Mr. Wunder had so strongly opposed. I also had the experience of the first day back after Christmas and expected even worse from him after his recent behavior. He summoned me to a meeting on March 8 whereupon he gave me a written memo critical of my job performance and verbal orders to begin documenting Ms. Montgomery's performance. He did not write in the memo what he expected me to do about Ms. Montgomery, but it was the focus of his long lecture to me. Again, he cited his having dismissed that "Cuban" Mo Garcia and extolled me to do the same. This time, having been convinced that reason would not prevail and that I was truly dealing with someone with a serious racial insensitivity, I, in no uncertain terms, refused to follow his orders. Mr. Wunder was so infuriated by my open refusal that he informed me that if I did not follow his orders, I could expect a negative EER.

I immediately began inquiring about an EEO Complaint. I attempted to see an EEO counselor and, after some investigation and a week's scheduling delay, had a meeting with Ms. Jackie Hill, someone who I was led to believe to be an EEO counselor for ECA, on Monday, March 18. When I initially asked Ms. Hill if she was an EEO counselor, she told me she was, Ms. Hill informed me she would check with her supervisor, ECA/EX David Whitten, and get back to me. I did not hear anything back from Ms Hill for some time. I finally got a hold of her later and she informed me that she did in fact report to Mr. Whitten. Later, I also found out from the Office of Civil Rights that Ms. Hill was not an EEO counselor and should not have gone to Mr. Whitten, but to Bob Healy in ECA's Office of Civil Rights, the chain of authority concerning EEO counseling and complaints. From almost that moment on, Mr. Wunder stopped discussing personnel issues in general

and Ms. Montgomery in particular with me, and I have concluded that because the EEO chain had not been honored, Mr. Wunder had been informed about my pending EEO Complaint from this early stage in the process by Mr. Whitten, Ms. Hill or someone else in HR or EX.

When my concerns were not being addressed in a timely manner by Ms. Hill, I sought guidance from OCR at the Department of State. I have subsequently met OCR DAS Hattie Baldwin on April 16 and 23 and on May 13. She informed me that she would be my EEO counselor

On April 11 I was given a copy of my EER. I consider the negative nature of the EER to be retaliation against me for my refusal to follow Mr. Wunder's unethical and illegal orders. On April 18 Mr. Wunder requested a meeting with me to discuss the Evaluation. It was only then that I read my EER, which I had correctly identified as being negative. Mr. Wunder clearly did not intend the meeting to be a dialogue for it began again with a long lecture from him. It was clearly meant to intimidate me. I informed him that I considered him to be both unfair and punitive in his evaluation of me. He defended his position vociferously and attempted to solicit from me my written rated officer's comments and, when I refused, he became very angry. He offered and I agreed that it would not be necessary for the departed DAS to write a reviewing statement (the DAS had departed over 2 months before the end of the short rating period. For awhile then Mr. Wunder did not attempt any more meetings, indeed was mostly pleasant, when we cannot avoid each other, and has gone out of his way to be nice to Ms. Montgomery once or twice, showing her his concern and offering assistance.

Thinking it might resolve the situation, I decided to meet, on advice from OCR, with Mr. Wunder's supervisor and rating officer, Deputy Assistant Secretary of State Steve Hart, on two occasions April 15 and April 29 to give him a briefing on what was happening. He seemed concerned on the first occasion, but less so on the second. Both times he asked me to keep him informed, but he has not shared any suggestions or informed me of anything he might have done or would do. He may have been the senior ECA official who contacted Human Resources and asked for my curtailment and have contributed to what appears to be general, if not specific, knowledge of my complaint around the division (see below).

On April 29 I unexpectedly received a second EER, this time including a reviewing statement from the departed DAS that was equally negative. I consider the second EER, after my agreement with Mr. Wunder that a reviewing statement was not necessary, an example of Mr. Wunder's going further out of his way to retaliate against me.

Under Siege

On April 25 I was contacted by my Career Counselor in Human Resources, Mr. Jim Bigart, and told that I had to meet with him immediately that day at his office in the main building of the Department. I changed my schedule and traveled to main State to meet with Mr. Bigart that afternoon. He informed me that Mr. Wunder and someone in ECA

senior to him (Mr. Bigart would not name the individual or individuals but I suspect that it was DAS Hart) had asked that I curtail my current assignment in ECA for an assignment outside DCA. Mr. Bigart repeatedly attempted to convince me that it would be the right course of action for me. I informed Mr. Bigart that I considered our meeting a form of retaliation for my EEO Complaint, told him of the advice I had received from OCR/DAS Baldwin not to curtail or other wise be intimidated and that I would report our conversation to OCR/DAS Baldwin. Mr. Bigart then softened his position about curtailment and told me that in the future I did not need to treat any of his phone calls as a summons. I, of course, reported our conversation to OCR/DAS Baldwin on May 13 after she returned from her leave.

On May 2 I was unexpectedly stopped by an African-American female colleague from another section in the division and informed by her that she thought Mr. Wunder had a problem with "women and blacks". The unsolicited nature of the exchange caught me quite off guard and I attempted to be both sympathetic but noncommittal. On May 13, after she returned from leave, I reported the exchange to OCR/DAS Baldwin. On May 15 I asked the colleague why she had approached me on May 2 and she confirmed that she had heard the rumor about my Complaint and was expressing support.

On May 16 Mr. Wunder suddenly appeared at my office (we are three floors apart) while I was just finishing an earlier draft of this preliminary EEO Complaint. He quickly became quite curious concerning this memo and what I had been working on. He demanded to have answers to questions about an upcoming grant panel in which there was a pending proposal that he was inappropriately supporting. When he did not like the answers I provided, he became quite abusive and attempted to intimidate me. He called me a "zero", and cursed me using the Lord's name, "God damn you".

On Friday, May 17 I sent an e-mail to DAS Hart, Mr. Wunder, Mr. M. Weider and Mr. M. Graham outlining some of Mr. Wunder's questionable statements to me concerning an upcoming grant's panel involving my office. These statements, I concluded, appeared to have the objective of negatively influencing the grant's panel procedures.

On Thursday, May 23 DAS Hart summoned me to a meeting at 3 p.m. At the meeting were Mr. Wunder and ECA/HR's Deborah Hunsley. I was given a memo, which I was told I had to sign receipt of, and told that I had 48 hours to voluntarily request a curtailment of my current assignment or I would be involuntarily curtailed. DAS Hart told me that the Director General had cleared this procedure. I pointed out that the 48 hours would expire on Tuesday, May 28 and that I, as they were aware, was scheduled for two days of sick leave and two of annual leave for the four days of the Memorial Day week to travel to Chicago and so would not be in DC starting Saturday morning, May 25. I phoned OCR/DAS Baldwin to report the development. She informed me that she intended to hold discussions on the matter with the DG. I gave her permission to show the DG an earlier draft of this memo as my current statement on the matter.

On Friday, May 24 at about 10 a.m. ECA/HR's Deborah Hunsley paid me an unannounced call at my office to inform me that my CDO, Jim Bigart, would be leaving

for the holiday weekend early that afternoon (1 p.m.) if I desired to talk to him. Though she offered her assistance, my strong impression was that her visit was intended to elicit information from me about what I intended to do so as to report to the other meeting participants. I told her I would do nothing until I had received all of the proper advice and that I only had that day before my leave and the holiday weekend started.

That afternoon I talked with OCR/DAS Baldwin who informed me that, unlike what I was told, the DG had not as yet cleared on any procedure for me and that DAS Baldwin and the DG had agreed that an investigation need to be done before any further steps could be taken. DAS Baldwin advised me not to voluntarily curtail at this time. I phoned an attorney who likewise advised me not to voluntarily curtail at this time. I attempted to phone a therapist who I had been having discussions concerning this matter for the last 3 months, but with the holiday upon us, she was not available.

On Monday, June 3, after my return from leave, at about 10:30 a.m. Mr. Sam Wunder paid me an unexpected call at my office. He insisted that I call my CDO, Jim Bigart. Mr. Wunder waited until I phoned Mr. Bigart and got him on the line. Mr. Wunder then left my office, closing the door behind him but waiting just outside my door where he could hear the conversation. Mr. Bigart attempted to repeatedly and forcefully persuade me to curtail. I told Mr. Bigart that I had just returned from leave and that I had not had the time to consult with everyone as yet. He informed me that everything with the DG was now on line to involuntarily curtail me. Mr. Wunder stuck his head back in the office when he obviously heard that the call concluded and instructed me not to attend the grant's panel mentioned above scheduled for the next two days. I then checked with OCR who informed me that no investigation had as yet begun. I phoned my attorney again who again advised me not to voluntarily curtail at this time and made a personal appointment for Wednesday afternoon, June 5. I phoned Mr. Bigart again that afternoon and he informed me that the DG had been on leave since the previous week and would not be back in the office until Wednesday. HR would take up the matter with the DG then. I had already made an appointment for Friday with the therapist, which I confirmed. Mr. Wunder's call at my office was clearly meant to manipulate and intimidate me and to make certain, with the delay that he had not obviously not foreseen, that I would not be at the grant's panel meetings to observe its procedures.

On Thursday morning June 7 I informed OCR Mr. Bob Healy that, based on advice from my attorney, I was requesting mediation as a first step in my EEO Complaint.

As previously agreed upon, I phoned my CDO, Mr. Jim Bigart on Thursday morning, June 6. Mr. Bigart asked me still again if I had not changed my mind and had decided to voluntarily curtail. He informed me that my involuntary curtailment would be signed by the DG that day or the next, Friday. I told him once more that, based on advice I had received from several sources, as well as my own conviction, I would not be voluntarily curtailing. He asked me to vacate my office as soon as the DG signed the involuntary curtailment memo. I told him that, as I was working on my EEO complaint, I would several days to clear out my office. He told me that I had already received two weeks notice, that, if I gave him my home phone number, he would call me on the weekend and

I could clear out my office then. I told him that coming in on the weekend to do that was unacceptable to me and that I would not be giving him my home number. Rather than being given time to work on my Complaint, I was told I would have to move immediately into a new job.

On Friday morning, June 7 I was visited by ECA/HR Deborah Hunsley who told me that Mr. Jim Bigart had phoned her and that she was acting as an inter-mediator. We essentially had the same conversation that I had had the day before with Mr. Bigart, about voluntarily curtailing, about the DG's approval of an involuntary curtailment and about my moving out immediately. She was as unmoved as he concerning giving me any time to move out of my office while I was still working on my Complaint.

Later that morning I met with AFSA attorney Mr. Harry Sizer to discuss my case. He informed me of grievance board precedences involving the abuse of voluntary curtailment requests by supervisors, confirming to me what I already knew, that I was being abused and harassed these many weeks.

At about 4:30 p.m. on Monday, June 10 I was visited by ECA/HR Deborah Hunsley who informed me that the DG had authorized my involuntary curtailment and that I should phone my CDO Mr. Jim Bigart. I phoned Mr. Bigart and was informed that the CG had indeed signed the authorization to involuntarily curtail me. I immediately began to pack my things to move out of my office.

On Tuesday, June 11, while going to lunch after cleaning out my office all morning, I was confronted by Mr. Wunder in the hallway and asked if I had not talked to Mr. Bigart, my CDO. I told him I had. His message to me was clear: get out!!

And So It Goes.