UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW J. MCGRATH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-2011 (RBW) |
| | ) |
| CONDOLEEZZA RICE, Secretary, | ) |
| United States Department of State, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Civil Rule 7(h), Defendant Condoleezza Rice ("Defendant"), Secretary, United States Department of States ("Agency" or "State"), by and through her undersigned counsel, respectfully submits this statement of material facts as to which there exists no genuine issue:

1.      Plaintiff, Matthew McGrath ("Plaintiff"), is a white, Caucasian male.  *See* Compl. at ¶ 1.

2.      Plaintiff was employed by State, and a predecessor agency, in the Foreign Service as a Foreign Service Officer ("FSO") from June 10, 1984, through November 30, 2004.  *See* Compl. at ¶ 3.

3.      From September 2001 to June 10, 2002, Plaintiff served as Chief of the Division of Cultural Programs (the "Assignment"), which is located within Office of Citizen Exchanges in the Bureau of Educational and Cultural Affairs ("ECA").  *See* Compl. at ¶ 13; McGrath Dep. Tr. at 21, attached hereto as Ex. 1 ("Attached Ex. 1").

4.      In sum, Plaintiff's Assignment was to supervise and lead a staff of program officers in implementing various visual and performing art programs utilizing funds allocated by the government and provided through certain partnerships with private industry while adhering to certain usage guidelines.  *See* McGrath EEO Tr. at 99-101, Attached Ex. 2.

5.      In his Assignment, Plaintiff was responsible for certain substantive duties, budgetary responsibilities, and supervising a staff of program officers and support personnel. *See id.* at 99-102.

6.      In his Assignment, Plaintiff was responsible for supervising two program / administrative assistants (Mses. LaFaye Proctor and Deborah Chapman) and six program officers (Mses. Sandy Rouse, Leanne Mella, E.J. Montgomery, Kathryn Wainscott, Susie Baker, and Susan Cohen).  *See* McGrath EEO Tr. at 104-105, Attached. Ex. 2.

7.      Of his eight subordinates, three were black, African-American women (Mses. Proctor, Chapman, and Montgomery); and the remainder were white, Caucasian women.  *See id.*

8.      Additionally, Ms. Montgomery, who is a well-known figure in the visual art and other cultural communities, has Parkinson's disease, a fact which is publically known.  *See* McGrath EEO Tr. at 106, Attached Ex. 2; Biography of Ms. Montgomery, http://www.thehistorymakers.com/biography/biography.asp?bioindex=1000   (Last   Checked: Sept. 13, 2008).

9.      From September 2001 to June 10, 2002, Plaintiff's first-line supervisor was Mr. Van Samuel Wunder, the then Office Director for the Office of Citizen Exchanges.  *See* Compl. at ¶ 13; McGrath Dep. Tr. at 40, Attached Ex. 1.

10.      From September 2001 to late-February or early-March 2002, Plaintiff's second-line supervisor was Mr. Brian Sexton, the then Deputy Assistant Secretary for Professional and

Cultural Exchanges.  *See* McGrath Dep. Tr. at 40, Attached Ex. 1; Wunder Dep. Tr. at 13-15, Attached Ex. 3.

11.    In or about late-February 2002 or early-March 2002, Mr. Steven Hart replaced Mr. Sexton as Plaintiff's second-line supervisor, and remained in that role until Plaintiff was involuntarily curtailed from his Assignment on June 10, 2002.  *See* Wunder Dep. Tr. at 15-17, Attached Ex. 3.

12.    The term "curtail" generally means to leave one's assignment within the Foreign Service, while remaining a FSO.  *See* EEOC AJ Decision at 8, Attached Ex. 4.

13.    A curtailment can be voluntary (*i.e.*, initiated by the FSO) or involuntary (*i.e.*, initiated by management).  *See id.*

14.    A "curtailment," however, is not synonymous with termination, as the FSO remains with the Foreign Service and, thereafter, is reassigned to a different assignment.  *See id.*

15.    Plaintiff's involuntary curtailment did not affect his pay or other compensation as an FSO.  *See* McGrath Dep. Tr. at 21-22, Attached Ex. 1.

16.    Pursuant to State Department policy, a "curtailment does not constitute a disciplinary action."  *See* State Curtail Policy at 8, Attached Ex. 5.

17.    In mid-September 2001, Plaintiff joined ECA.  *See* McGrath Dep. Tr. at 21, Attached Ex. 1.

18.    At least one of his subordinates, Ms. Baker, has testified that almost from the very beginning of Plaintiff's time with ECA, he was essentially non-existent as a supervisor.  *See* Baker EEO Tr. at 297, Attached. Ex. 6; *see also* Wainscott EEO Tr. at 375-76, Attached Ex. 7 (Plaintiff was engaged for the first few months "but after that . . . I didn't have a lot of contact

with him. . . . I found him difficult to work with as a manager, and again, I have been with the government for 30 years.").

19.    Plaintiff started to have disagreements with his boss, Mr. Wunder, within the first few months after being assigned to ECA.  *See* McGrath Dep. Tr. at 63, Attached. Ex. 1.

20.    Plaintiff was unhappy, in part, because his subordinates felt that they could "go around" Plaintiff, to complain to Mr. Wunder about Plaintiff's performance and other matters. *See* McGrath Dep. Tr. at 63-66, Attached Ex. 1 ("Q: Were your subordinates going around you to him to complain about you during this period of time?  A: To complain . . . about me and . . . other things in the office.").

21.    Plaintiff believes that at least three of the six program officers that he supervised had complained to Mr. Wunder during this period of time.  *See id.* at 68 ("Do you know who was going around you at this point in time?  A: Yes . . . It was Susie Baker, Kathy Wainscott, LeAnn (sic) Mella.  It was at least those three.").

22.    In the first few weeks after joining ECA, Plaintiff held regular weekly staff meetings.  *See* Baker EEO Tr. at 298, Attached Ex. 6; Wainscott EEO Tr. at 375, Attached Ex. 7; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9.

23.    Plaintiff agrees that it is important for a manager to have regular staff meetings. *See* McGrath Dep. Tr. at 59, Attached Ex. 1.

24.    After only three or four group staff meetings, Plaintiff ceased having them.  *See* Baker EEO Tr. at 298, Attached Ex. 6; Wainscott EEO Tr. at 375, Attached Ex. 7; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9; Rouse EEO Decl. at 5, Attached Ex. 10; Cohen EEO Decl. ar 6, Attached Ex. 11.

25.     In November 2001, when Plaintiff had been in his Assignment with ECA for less than two months, Plaintiff proposed to take (a) annual leave on November 23 and 30, 2001 (2 days), (b) annual leave from December 13, 2001, through January 4, 2002 (three weeks and 2 days); and (c) residual home leave from January 18, 2002, through February 27, 2002 (six weeks less a day).  *See* Email from McGrath to Wunder of 11/09/2001, Attached Ex. 12.

26.     Plaintiff's supervisor Mr. Wunder generally approved these leave requests.  *See* Memo from Wunder to McGrath of 12/03/2001, Attached Ex. 13; Email from McGrath to Wunder of 01/17/2002, Attached Ex. 14.

27.     Due to the pressing demands of the office, including a September 11th exhibition and a program called the Jazz Ambassadors, Mr. Wunder explained that he could only approve Plaintiff for annual leave from December 21, 2001, to January 4, 2002.  *See* Memo from Wunder to McGrath of 12/03/2001, Attached Ex. 13.

28.     Plaintiff's home leave was similarly reduced by six days.  *See* Email from McGrath to Wunder of 01/17/2002, Attached Ex. 14.

29.     Plaintiff was authorized and took 35 business days of leave from November 2001 through February 2002.  *See* McGrath EEO Tr. at 266-67, Attached Ex. 2.

30.     Plaintiff was able to recoup certain annual leave days that Mr. Wunder had not approved in the following year.  *See* McGrath EEO Tr. at 266-67, Attached Ex. 2.

31.     In January 2002, during the seven business days between Plaintiff's annual leave and home leave, Plaintiff was tasked with planning a program to honor a jazz musician named Billy Taylor as part of an event at the Kennedy Center coincident to the office's aforementioned Jazz Ambassador program.  *See* McGrath EEO Tr. at 151, Attached Ex. 2.

32.     One of tasks assigned to Plaintiff was to draft and coordinate the approval and printing of a Certificate of Appreciation signed by the Secretary of State (who at the time was Hon. Colin Powell) and to compile a package containing the certificate and talking points for the Secretary.  *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15; Wunder EEO Tr. at 456-60, Attached Ex. 16.

33.     The ceremony where Mr. Taylor was to receive the certificate from Secretary Powell was scheduled for Sunday, January 20, 2002 -- the Sunday after Plaintiff left for home leave.  *See* McGrath EEO Tr. at 151, Attached Ex. 2; Wunder EEO Tr. at 456-60, Attached Ex. 16.

34.     Plaintiff was assigned the responsibility to coordinate the Billy Taylor ceremony. *See* McGrath EEO Tr. at 151-59, Attached Ex. 2.

35.     Plaintiff did not have a certificate and talking points finalized when he departed the office on January 17, 2002, for his extended home leave.  *See* McGrath EEO Tr. at 151-59, Attached Ex. 2.

36.     When Plaintiff left for home leave, he knew that the Kennedy Center event was going forward and was still scheduled to occur on January 20, 2002.  *See* McGrath EEO Tr. at 153, Attached Ex. 2.

37.     Prior to departing for his home leave, Plaintiff knew (a) that Secretary Powell's wife often filled in for her husband when he was absent, and (b) that Mrs. Powell was on the board of directors for the Kennedy Center and was likely to attend the event.  *See id.* at 156-57.

38.     Plaintiff testified that it just "slipped [his] mind" that Mrs. Powell might conduct the presentation in Secretary Powell's absence.  *See* McGrath EEO Tr. at 157, Attached Ex. 2.

39.     Appropriate officials at the State Department had not cleared the certificate for printing due to problems with the wording of Plaintiff's draft certificate prior to Plaintiff departing for home leave.  *See id.* at 159.

40.     Plaintiff specifically informed Mr. Wunder prior to taking home leave that "there were no pending projects" that required Mr. Wunder's attention during Plaintiff's home leave.  *See* McGrath Dep. Tr. at 148-49, Attached Ex. 1; Wunder EEO Tr. at 454-55, Attached Ex. 16.

41.     Plaintiff left Mr. Wunder a post-it note attached to a draft certificate on Mr. Wunder's chair, which said in substance that the certificate had not yet been finalized and was not complete.  *See* Wunder EEO Tr. at 456-57, Attached Ex. 16; McGrath EEO Tr. at 155-56, Attached Ex. 2.

42.     When Mr. Wunder discovered Plaintiff's post-it note, Mr. Wunder scrambled to remedy Plaintiff's oversight.  *See* Wunder EEO Tr. at 457-59, Attached Ex. 16.

43.     After discovering Plaintiff's note, Mr. Wunder asked Mr. McGrath's staff if they knew about the project; none did.  *See id.*

44.     After discovering Plaintiff's note, Mr. Wunder checked with a designer on staff, and learned that a certificate had not yet been graphically designed.  *See id.*

45.     After discovering Plaintiff's note, Secretary Powell's office began to call and ask whether the Billy Taylor package was finished, at which point Mr. Wunder's supervisor, Mr. Sexton, took over the project.  *See id.*

46.     On or about January 17, 2008, Mrs. Powell was prepared to make the Billy Taylor presentation at the Kennedy Center event.  *See id.*

47.     Through the efforts of Messrs. Wunder and Sexton, the ceremony occurred with Mrs. Powell handing a blank certificate to Billy Taylor's daughter.  *See id.*

48.     Subsequently, Secretary Powell signed and shipped a finalized certificate to Dr. Taylor.  *See id.*

49.     Plaintiff left his "hotmail.com" address as the only means to reach him during his home leave.  *See* Email from McGrath to Wunder of 01/17/2002.

50.      Plaintiff did not have access to such email address until the very end of his extended home leave period.  *See* McGrath EEO Decl. at 12, Attached Ex. 18.

51.     After the Billy Taylor ceremony, Mr. Wunder wrote an email to the email address left by Plaintiff explaining the situation, his displeasure with Plaintiff's performance, and asking Plaintiff to contact him to determine whether there were any other similar programs that required Mr. Wunder's attention.  *See* Wunder EEO Tr. at 459, Attached Ex. 16; Wunder Dep. Tr. at 90, Attached Ex. 3; Wunder EEO Decl. at 19, Attached Ex. 17.

52.     Plaintiff never responded to Mr. Wunder's email.  *See* Wunder EEO Tr. at 459, Attached Ex. 16; Wunder Dep. Tr. at 90, Attached Ex. 3; Wunder EEO Decl. at 19, Attached Ex. 17.

53.     Mr. Wunder heard from several of Plaintiff's subordinates during Plaintiff's home leave that Plaintiff (a) was not having regular staff meetings; (b) had not allotted time to properly supervising their work; and (c) had been openly dismissive of some of their attempts to raise problems with Plaintiff.  *See* Memo from Wunder to McGrath of 03/08/2002 at 2, Attached Ex. 15.

54.     Mses. Baker, Waiscott and Mella, each confirmed that Plaintiff was noticeably absent or "non-existent" in his supervisory role and that they were frustrated working for him because he gave them no guidance or information.  *See* Baker EEO Tr. at 297, 303-04, Attached

Ex. 6; Wainscott EEO Tr. 376-78, 397-98, Attached Ex. 7; Mella EEO Tr. at 559-60, Attached Ex. 19.

55.     A number of Plaintiff's subordinates have testified that Plaintiff was not a good manager.  *See* Cohen EEO Decl. at 7, Attached Ex. 11; Mella EEO Decl. at 5, Attached Ex. 2; Wainscott EEO Decl. at 5-7, Attached Ex. 21.

56.     During Plaintiff's home leave, when working to review the prior year's budget and propose a new budget for the following year, Mr. Wunder discovered (with the assistance of Ms. Wainscott and Mr. Hart) that one of Plaintiff's programs was significantly over budget.  *See* Memo from Wunder to McGrath at 03/08/2002 at 2, Attached Ex. 15.

57.     Mr. Wunder learned that Plaintiff had authorized expenditures of $40,000 on the Warhol project, when it was budgeted for only $10,000.  *See id.*; Wunder EEO Tr. at 546, Attached Ex. 16.

58.     Plaintiff spent 400% more on the Warhol program than budgeted.  *See* McGrath EEO Tr. at 163-65, Attached Ex. 2.

59.     Plaintiff failed to inform Mr. Wunder of this modification.  *See* McGrath EEO Tr. at 163-65, Attached Ex. 2.

60.     Plaintiff believed that the amount of money involved in this modification was "chump change."  *See id.* at 164.

61.     A number of Plaintiff's subordinates, who were principally responsible for certain ECA programs, were often left in the dark as to budgeting details of their own projects, as Plaintiff did not meet with them to review budgets and plans.  *See* Wainscott EEO Decl. at 5-6, Attached Ex. 21; Wainscott EEO Tr. at 375, Attached Ex. 7; Cohen EEO Decl. at 6, Attached

Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 300, Attached Ex. 6; *see also* Wunder EEO Tr. at 464, Attached Ex. 16; Hart EEO Decl. at 15, Attached Ex. 22.

62.    After Plaintiff returned from home leave, at the end of February 2002, Plaintiff did not let Mr. Wunder know that he had returned to the office.  *See* Wunder Dep. Tr. at 88-89, Attached Ex. 3.

63.    In early-March 2002, Plaintiff missed two meetings that Mr. Wunder had instructed Plaintiff to attend: (i) a meeting with a group of Foreign Service National Employees; and (ii) Mr. Wunder's regularly scheduled Division Chiefs meeting.  *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15.

64.    Plaintiff believes it was important to attend meetings that Mr. Wunder instructed him to attend.  *See* McGrath Dep. Tr. at 58-59, Attached Ex. 1.

65.    Plaintiff does not recall if he gave Mr. Wunder advance notice that he was going to miss the two early-March meetings.  *See* McGrath Dep. Tr. at 146-48, Attached Ex. 1.

66.    At least one of Plaintiff's subordinates complained that Mr. McGrath was not conveying any information from Mr. Wunder's regularly scheduled Division Chiefs meetings, and sought notes from another Division Chief to learn what was going on in the office.  *See* Wainscott EEO Tr. at 377-78, Attached Ex. 7.

67.    At a counseling session in early-March 2002, Mr. Wunder gave Plaintiff a memorandum detailing what he perceived to be "sub-standard performance."  *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15; Wunder EEO Tr. at 466-67, Attached Ex. 16; Counseling Form with Memo attached, Attached Ex. 23.

68.    In that memorandum, Mr. Wunder highlighted his dissatisfaction with Plaintiff's performance, specifically: (a) Plaintiff's failure to attend the two early-March meetings; (b)

Plaintiff's failure to contact Mr. Wunder after returning from home leave; (c) Plaintiff's gross delinquencies regarding the Billy Taylor ceremony; (d) Plaintiff's generally problematic managerial conduct; and (e) the Warhol project's budgetary issue. *See* Memo from Wunder to McGrath of 03/08/2002, Attached Ex. 15.

69.    In that memorandum, Mr. Wunder specifically directed Plaintiff to (i) begin weekly staff meetings with his subordinates, which he viewed as important to properly managing a staff within ECA; and (ii) take time to meet with each of his subordinates individually regarding their projects. *See id*; Wunder EEO Decl. at 20-22, Attached Ex. 17.

70.    When Mr. Wunder presented his memorandum to Plaintiff, Mr. Wunder for the first time suggested that Plaintiff might consider voluntarily curtailing his Assignment with ECA. *See* Finalized EER at 3, Attached Ex. 24.

71.    Plaintiff did not comply with Mr. Wunder's directions in the March 8, 2002, memorandum and continued his detached, "non-existent" management style. *See* Wunder EEO Tr. at 468-70, Attached Ex. 16; Hart EEO Decl. at 12, Attached Ex. 22.

72.    Plaintiff did not resume staff meetings after March 8, 2002, in response to Mr. Wunder's direction. *See* Wainscott EEO Decl. at 7, Attached Ex. 21; Rouse EEO Decl. at 6, Attached Ex. 10; Cohen EEO Decl. at 7, Attached Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 298, Attached Ex. 6; Chapman EEO Tr. at 412, Attached Ex. 8; Proctor EEO Tr. at 431, Attached Ex. 9; *see also* McGrath EEO Decl. at 16, Attached. Ex. 18.

73.    A number of Plaintiff's program officers believe that Plaintiff also did not take time to meet with them individually in response to Mr. Wunder's direction of March 8, 2002. *See* Wainscott EEO Decl. at 7, Attached Ex. 21; Cohen EEO Decl. at 7-8, Attached Ex. 11; Mella EEO Decl. at 6, Attached Ex. 20; Baker EEO Tr. at 313, Attached Ex. 6.

74.     The Festival Fund is a public / private partnership fund operated by four entities (State, the National Endowment of the Arts, the Rockefeller Foundation, and the Pew Charitable Trust) that provided monies to send American performing and visual artists to overseas festivals. *See* Wunder EEO Tr. at 470-71, Attached Ex. 16.

75.     Plaintiff routinely objected to the manner in which the Festival Fund was operated and how its monies were dispensed, arguing that the fund was skewed toward Western European events.  *See* Wunder EEO Tr. at 472-73, Attached Ex. 16.

76.      In late-March and early-April when Mr. Wunder gave Plaintiff the opportunity to prepare a package for the fund's partners suggesting certain modifications, Plaintiff refused.  *See id.* at 480; Wainscott EEO Tr. at 385-87, Attached Ex. 7.

77.     When Mr. Wunder told Plaintiff that the State Department was going to be presenting a couple of the modifications to the Festival Fund that Plaintiff had proposed, Plaintiff refused to participate because State was not willing to advocate a complete change in the operation of the fund.  *See* Wunder EEO Tr. at 480-81, Attached Ex. 16; Wainscott EEO Tr. at 385-87, Attached Ex. 7; Hart EEO Decl. at 10, Attached Ex. 22.

78.     In March and/or April 2002, Plaintiff failed to communicate with Ms. Baker, one of his staff, regarding a crucial and timely program with the Intercultural Public/Private Fellow Program.  *See* Baker EEO Tr. at 293-95, Attached Ex. 6.

79.     Ms. Baker repeatedly asked Plaintiff for an update regarding panelists for the program because booking panelists for the program would have ordinarily been Ms. Baker's responsibility.  *See id.*

80.     Plaintiff told Ms. Baker that he would take care of the panelists.  *See id.*

81.    After Plaintiff's indication that he would take care of the panelists, weeks went by without Plaintiff updating Ms. Baker, who still remained principally responsible for the program. *See id.*

82.    Plaintiff eventually booked panelists for the program barely in time to have the panel and his delays caused Ms. Baker to work excessively long hours in order for the panel to occur. *See id.* at 310-11; *see also generally* Wunder EEO Decl. at 26, Attached Ex. 17.

83.    During this early-April 2002 timeframe, Plaintiff also failed to respond to Mr. Wunder's request for the names of Plaintiff's staff who should be authorized to attend a conference of the American Association of Museums, a major grantee partner of ECA. *See* Email from Wunder of 06/11/2002 at 2, Attached Ex. 25; Wunder EEO Decl. at 24, Attached Ex. 17.

84.    Plaintiff failed to respond to Mr. Wunder's request to contact an individual at the Korean Embassy regarding a cultural program. *See* McGrath EEO Tr. at 171-72, Attached Ex. 2; Email from Wunder of 06/11/2002 at 2, Attached Ex. 25; Wunder EEO Tr. at 481, Attached Ex. 16.

85.    Over a month after Mr. Wunder informed Plaintiff of his performance deficiencies on March 8, 2002, Mr. Wunder issued Plaintiff an Employee Evaluation Report ("EER") -- *i.e.*, a performance evaluation -- on or about April 11, 2002. *See* McGrath EEO Tr. at 173, Attached Ex. 2; EEO Compl. at 5, Attached Ex. 26; Compl. at ¶ 28.

86.    In the EER presented to Plaintiff on April 11, 2002, Mr. Wunder reiterated a number of the concerns he expressed in his March 8, 2002, memorandum, including Plaintiff's substantial deficiencies in his management skills and his inability to complete his work,

regardless of his interest level, in a timely and professional manner. *See* 04/11/2002 EER at 3, Attached Ex. 27.

87.     In the EER presented to Plaintiff on April 11, 2002, Mr. Wunder reiterated his concerns (a) that Plaintiff's staff members were not receiving proper leadership or direction from Plaintiff; (b) that Plaintiff missed scheduled meetings with Mr. Wunder; and (c) that Plaintiff 's performance regarding the Billy Taylor ceremony was unacceptable. *See id.* at 4.

88.     In the EER presented to Plaintiff on April 11, 2002, Mr. Wunder noted that Plaintiff had raised "some important issues on how are cultural programs are designed and run, but [had] consistently failed to move on to the next steps of proposing solution and innovations to address these issues." *See id.*

89.     In the EER presented to Plaintiff on April 11, 2002, Mr. Wunder specifically noted that although Plaintiff had raised concerns that the Festival Fund "was skewed toward events in Western Europe," when he was asked "to develop a plan to convince the other partners to alter the operation of the Fund to address this imbalance, [Plaintiff] provided only additional critiques and eventually refused to work with the Program Officer for Performing Arts in his division responsible for the program." *See id.* at 3.

90.     Subsequent to receiving the EER on April 11, 2002, Mr. McGrath met with Mr. Wunder to discuss Mr. Wunder's rating on April 18, 2002. *See* McGrath EEO Tr. at 174-75, Attached Ex. 2.

91.     Plaintiff did not submit a statement concerning his performance rating or indicating any inaccuracies in Mr. Wunder's narrative. *See* 04/11/2002 EER at 6, Attached Ex. 27; Finalized EER at 6, Attached Ex. 24.

92.    In conjunction with Plaintiff's 2002 EER, Mr. Wunder again suggested that Plaintiff should consider curtailing his assignment with ECA, given his apparent lack of interest in managing his staff and in the work of ECA.  *See* Finalized EER at 3, Attached Ex. 24; Hart EEO Decl. at 18, Attached Ex. 22.

93.    Plaintiff subsequently argued that Mr. Wunder's rating in the 2002 EER was "negative and incomplete."  *See* McGrath EEO Decl. at 13, Attached Ex. 18.

94.    When asked the direct questions, (a) "Do you consider the EER to contain inaccuracies?  If so, please identify the inaccuracies and state what is accurate;" and (b) "What are the specific statements in the EER that you consider both negative and an inaccurate reflection of your performance?  Please be specific," Plaintiff failed to articulate anything specifically inaccurate about Mr. Wudner's EER narrative or rating.  *See* McGrath EEO Decl. at 13, Attached Ex. 18.

95.    When Mr. Wunder first presented the EER to Plaintiff, he did not believe that a review statement by Plaintiff's second-line supervisor was necessary, as Mr. Sexton (who filled that role through February 2002) had departed ECA, and Mr. Hart (who filled the role following February 2002) had just been Plaintiff's second-line supervisor for a couple of months.  *See* Compl. at ¶ 28; McGrath EEO Tr. at 174-75, Attached Ex. 2.

96.    Subsequent to meeting with Mr. McGrath regarding his EER, Mr. Wunder was informed by human resources that a review statement by Mr. Sexton was necessary and appropriate.  *See* Wunder EEO Tr. at 481-83, 485-86, Attached Ex. 16; Email from Wunder to McGrath of 04/24/2002, Attached Ex. 28.

97.     Mr. Wunder solicited a review statement from Mr. Sexton and, thereafter, finalized Plaintiff's 2002 EER, which he presented to Plaintiff on April 29, 2002.  *See* Wunder EEO Tr. at 481-83, 485-86, Attached Ex. 16.

98.     Mr. Sexton's review, which spans only four paragraphs, largely focuses on his involvement with the Billy Taylor ceremony, which was necessitated by Plaintiff's delinquency and unsatisfactory performance as noted above.  *See* Finalized EER at 5, Attached Ex. 24.

99.     Mr. Wunder's rating and narrative included on the finalized EER were identical to those included on the EER presented to him on April 11, 2002, and the only substantive change before Plaintiff's EER was finalized was the addition of Mr. Sexton's review.  *See* McGrath Dep. Tr. at 161-63, Attached Ex. 1; *see also* Wunder EEO Tr. at 485-86, Attached. Ex. 16.

100.    Despite being offered a second chance to submit a statement, once again Plaintiff chose to not submit a statement challenging the substance of Mr. Wunder's rating or Mr. Sexton's review.  *See* Wunder EEO Tr. at 486, Attached Ex. 16; Finalized EER at 6, Attached Ex. 24.

101.    After Plaintiff received his EER, instead of taking steps to improve his performance, Plaintiff's performance worsened.

102.    As Mr. Wunder testified, after Plaintiff received his EER, "frankly it became extremely difficult to get response from Mr. McGrath to the right e-mails or telephone messages."  Wunder EEO Tr. at 487, Attached. Ex. 16; *see also* Hart EEO Decl. at 12, Attached Ex. 22.

103.    Plaintiff himself confirms that he did not respond to certain telephone calls after his EER.  *See* McGrath EEO Decl. at 20, Attached Ex. 17.

104.    As Mr. Wunder detailed in an email to Assistant Secretary Barbara S. Pope, Plaintiff ignored a significant number of assignments given to him during this time.   *See* Email from Wunder of 06/11/2002, Attached. Ex. 25.

105.    Ms. Baker testified that Plaintiff became so absent that she attempted different avenues of communication, including printing out emails and leaving them with handwritten notes on Plaintiff's office chair.  *See* Baker EEO Tr. at 313, Attached Ex. 6.

106.    Ms. Baker wrote a note on the face of a May 8, 2002, email she sent to Plaintiff stating, in part, "Matt -- I can't move forward without your action.  Could you please review these emails?"  *See* Email from Baker to McGrath of 05/08/2002 (with handwriting), Attached Ex. 29.

107.    During the period of time immediately before Mr. Hart proposed Plaintiff's involuntary curtailment, other emails from Ms. Baker to Plaintiff also went unanswered.  *See* Email from Hart to Wunder of 05/20/2002 (attaching email chain containing Ms. Baker's emails), Attached Ex. 30.

108.    On or about May 20, 2002, Mr. Wunder sent Plaintiff a memorandum asking for Plaintiff's responses to a significant number of outstanding items.  *See* Wunder EEO Tr. at 488, Attached Ex. 16; Memo from Wunder to McGrath of 05/20/2002, Attached Ex. 31.

109.    Plaintiff did not respond to Mr. Wunder's memorandum.  *See* McGrath EEO Tr. at 204-05, Attached Ex. 2; Wunder EEO Tr. at 488-89, Attached Ex. 16.

110.    Plaintiff believed that Mr. Wunder was interfering with his work and that he was not going to respond to Mr. Wunder's inquiries because "I was busy, made more so by [Mr. Wunder's] poor management."  *See* McGrath EEO Decl. at 19-20, Attached Ex. 18.

111.    Plaintiff refused to attend a meeting with his staff on May 21, 2002, to discuss proposals and other items.  *See id.* at 20-21.

112.    On or about May 22, 2002, Mr. Wunder and Mr. Hart confronted Plaintiff and told Plaintiff that he could either voluntarily curtail his assignment with ECA or Messrs. Wunder and Hart would propose his involuntary curtailment.  *See* McGrath EEO Decl. at 21, Attached Ex. 18; Wunder EEO Tr. at 502, Attached Ex. 16.

113.    Plaintiff chose not to voluntarily curtail his assignment, and Messrs. Wunder and Hart proposed his involuntary curtailment.  *See* Action Memo of 05/22/2002, Attached Ex. 32.

114.    On June 10, 2002, based upon Assistant Secretary Patricia Harrison's request, Plaintiff was curtailed from his Assignment with ECA.  *See* Memo of 06/10/2002, Attached Ex. 33.

115.    While remaining a FSO, Plaintiff was moved to unassigned status after he was curtailed from his Assignment with ECA.  *See* McGrath Dep. Tr. at 21, Attached Ex. 1.

116.    Subsequently, in February 2003, after Mr. McGrath did not voluntarily obtain another assignment, Mr. McGrath was involuntarily assigned to the State Department's declassification unit.  *See* McGrath Dep. Tr. at 22-23, Attached Ex. 1.

117.    FSOs are assigned to positions largely based upon a competitive bidding process. *See* McGrath Dep. Tr. at 60, Attached Ex. 1; Wunder Dep. Tr. at 19-27, Attached Ex. 3.

118.    Plaintiff cannot identify who he claims was retaliating against him in allegedly preventing him from finding another assignment within the Foreign Service.  McGrath Dep. Tr. at 41, Attached Ex. 1.

119.    It is mere "speculation" whether Plaintiff was not selected for suitably desirable post-curtailment assignments because of his EEO activity.  *See id.* at 48.

120.    The 2003 Foreign Service Selection SFS-V Board ("Selection Board") "low ranked" Plaintiff and referred him to the Performance Standards Board ("PSB") for possible "selection-out" of the Foreign Service.  *See* Low Ranking Stmt, Attached Ex. 35.

121.    On April 21, 2004, Plaintiff was notified that he was being selected out of the Foreign Service by the PSB due to his history of poor performance.  *See* Letter to McGrath of 04/21/2004 (attaching Designation of Separation), Attached Ex. 36.

122.    Messrs. Wunder, Sexton or Hart had no involvement with the Selection Board or PSB.  *See generally* Compl.

123.    In his 1999 EER, which was given to him while he was stationed in South Africa, his then supervisor noted concerns that Plaintiff was ignoring instructions from his supervisors, which he repeatedly did during his time with ECA.  *See* 1999 EER at 4, Attached Ex. 37 ("I am concerned by the example which Mr. McGrath set through his unauthorized use of USIS vehicles for home-to-office transportation and other personnel use.  In addition to ignoring repeated memos from our Executive Officer to cease, he has not reimbursed the U.S. government for this unauthorized use.").

124.    On the cover of Plaintiff's 2000 EER, the review panel noted that Plaintiff's EER was untimely submitted due to Plaintiff's conduct.  *See* 2000 EER at 1, Attached. Ex. 38.

125.    The review panel for Plaintiff's 2000 EER noted that Plaintiff failed to appear for a scheduled meeting with his then reviewer.  *See id.*

126.    Plaintiff's rating official on his 2000 EER noted in his narrative that Plaintiff's management style "sparked low morale among a majority of his existing staff."  *See* 2000 EER at 3, Attached Ex. 38.

127.    Both the rating and reviewing officials on Plaintiff's 2000 EER expressed substantial concerns of Plaintiff's supervisory skills and management abilities.  *See* 2000 EER at 3-5, Attached Ex. 38.

128.    Plaintiff did not provide a statement or refute the criticisms contained in his 2000 EER.  *See id.* at 6.

129.    Plaintiff's 2001 EER, while generally positive, further noted that Plaintiff had problems dealing with certain management activities, specifically noting his area for improvement was "Managerial Skills," and that "more attention to maintaining self-restraint in trying circumstances would pay dividends."  *See* 2001 EER at 5, Attached Ex. 39.

130.    The reviewing official on Plaintiff's 2001 EER noted that Plaintiff had difficulty timely submitting certain work.  *See id.* at 5 ("Matt needs to be more consistent in the timely submission of program evaluations, especially exchange program results reports.").

131.    Plaintiff was suspended for six days for misconduct relating to his departure from his post in South Africa, which occurred before his Assignment to ECA.  *See* FSGB Decision of 08/27/2004, Attached Ex. 40.

132.    Plaintiff does not have any contemporaneous writings of the conversations that form the basis for his claims regarding his opposition to Mr. Wunder's alleged direction to document Ms. Montgomery's performance.  *See* McGrath Dep. Tr. at 138-39, 144, Attached Ex. 1.

133.    Plaintiff has identified no evidence, aside from his own statements (including statements made by him to other State employees), that could support his claims regarding his opposition to Mr. Wunder's alleged direction to document Ms. Montgomery's performance..  *See* Pl's Resps to Interrogs at 8-9, Attached Ex. 41.

134.    Because of Plaintiff's involuntary curtailment, Mr. Wunder rated Plaintiff's staff in the 2002 performance appraisal process.  *See* Compl. at ¶ 43; McGrath Dep. Tr. at 151, Attached Ex. 1.

135.    In the 2002 performance review cycle for Plaintiff's former staff, Mr. Wunder rated Ms. Montgomery at the "excellent" level.  *See* Compl. at ¶ 43.

136.    To Plaintiff's knowledge he is unaware of Ms. Montgomery ever receiving a low performance rating.  *See* McGrath Dep. Tr. at 150-51, Attached. Ex. 1.

137.    Ms. Montgomery continues to be an employee of the State Department.  *See* Montgomery EEO Tr. at 357, Attached Ex. 42; McGrath Dep. Tr. at 151, Attached Ex. 1.

138.    Ms. Montgomery does not recall Mr. Wunder assigning her any "additional" duties during Plaintiff's extended home leave.  *See* Montgomery EEO Tr. at 354, Attached Ex. 42.

139.    After Plaintiff failed to take any actions to accommodate Ms. Montgomery's physical disabilities, Mr. Wunder himself explored the possibility of obtaining voice recognition software for Ms. Montgomery to ease the burdens associated with her typing.  *See* Wunder EEO Tr. at 535, Attached Ex. 16.

140.    Mr. Wunder raised the idea of voice recognition software for Ms. Montgomery at the early-January meeting with Plaintiff.  *See* Wunder Dep. Tr. at 59-62, Attached Ex. 3; McGrath EEO Tr. at 572, Attached Ex. 2 ("Q: Did Mr. Wunder ever raise with you the idea of purchasing voice recognition software for Ms. Montgomery prior to April 2002?  A: I don't recall it before April.  April was a contentious month.  I heard him say January, but we didn't -- we didn't get into the specifics about E.J. or really anyone to the extent he was relating.").

141.    Mr. Wunder obtained voice recognition software for Ms. Montgomery.  *See* Wunder EEO Tr. at 535, Attached Ex. 2; Montgomery EEO Tr. at 357, Attached Ex. 42.

142.    The staff of ECA is nearly unanimous that Mr. Wunder did not harbor any racial animus or took any action based upon his staff's race.  *See* Baker EEO Tr. at 316-17, Attached Ex. 6; Wainscott EEO Tr. at 406, Attached Ex. 7; Chapman EEO Tr. at 422, Attached Ex. 8; Proctor EEO Tr. at 436, Attached Ex. 9; Hart EEO Decl. at 6, Attached Ex. 22; Hunsley EEO Decl. at 7, Attached Ex. 43.

143.    Aside from his own statements (including statements made by him to other State employees), Plaintiff identified no evidence that could support the notion that any of Mr. Wunder's directions were based upon Ms. Montgomery's race, gender, age or disability.  *See* Pl's Resps to Interrogs at 8-9, Attached Ex. 41.

144.    Plaintiff believes that he first brought up Ms. Montgomery's race in his purported discussion with Mr. Wunder.  *See* McGrath Dep. Tr. at 112, Attached Ex. 1.

145.    Plaintiff did not begin EEO counseling until April 16, 2002.  *See* EEO Counselor's Report at 2, Attached Ex. 44.

146.    Plaintiff acknowledges that his race claim is premised solely upon the allegation that "Mr. Wunder did not previously order any of the minorities and/or woman in the office to take discriminatory action against Ms. Montgomery."  *See* Pl's Resps. To Interrogs. at 11, Attached Ex. 41.

147.    Plaintiff did not timely remit payment for a hotel bill charged to his government credit card.  *See* Compl. at ¶ 49.

148.    Plaintiff was sent multiple notices, both to his work address and home address, notifying him that his balance on his government credit card was delinquent.  *See* Notice Letters, Attached Ex. 45.

149.    After the Agency initially proposed that Plaintiff be suspended for two-days because of his delinquency, the Agency afforded Plaintiff a full opportunity to respond to the charges.  *See* Letter of 10/23/2002, Attached Ex. 46; Letter of 12/31/2002, Attached Ex. 47.

150.    After considering Plaintiff's response, the Agency decided to reduce Plaintiff's sanction to a Letter of Admonishment, which was only placed in Plaintiff's Office of Employee Relations file, not his Official Personnel File, for one year.  *See* Letter of 12/31/2002, Attached Ex. 47.

151.    Mr. John Campbell had no connection to, involvement in, or knowledge of Plaintiff's prior EEO activity or supposed opposition to discrimination.  *See* Letter of 12/31/2002, Attached Ex. 47.

152.    Plaintiff was issued his Letter of Admonishment more than six months after he filed his formal EEO complaint, which was then Plaintiff's most recent protected activity. *Compare* EEO Compl., Attached Ex. 26, *with* Letter of 12/31/2002, Attached Ex. 47.

Dated:  September 14, 2008
        Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*