**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
MATTHEW JOSEPH MCGRATH,                )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civil Action No. 05-2011 (RBW)
                                       )
HILLARY RODHAM CLINTON, Secretary      )
United States Department of State      )
                                       )
            Defendant.                 )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Matthew McGrath brings this action against Hillary Rodham Clinton, in her

official capacity as the Secretary of State,[1] under Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e-2000e-17 (2006), for "reprisal for engaging in protected activity,"

Complaint ("Compl.") ¶ 1.  Currently before the Court is the defendant's motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56.  After carefully considering the party's

pleadings, the defendant's motion, and all memoranda of law and exhibits submitted with these

filings,[2] and for the reasons set forth below, the Court concludes that it must grant the

defendant's motion.

---

[1]  The plaintiff's complaint, filed October 11, 2005, names Condoleeza Rice, the Secretary for the Department of State at the time, as the defendant in this case.  The Court has substituted Secretary Clinton as the defendant in lieu of former Secretary Rice pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2]  In addition to the plaintiff's complaint and the defendant's motion for summary judgment ("Def.'s Mot."), the Court considered the following documents in reaching its decision: (1) the defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") (2) the Defendant's Statement of Undisputed Facts ("Def.'s Stmt. of Facts"), (3) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Supporting Memorandum ("Pl.'s Opp'n"), (4) the Plaintiff's Statement of Disputed Facts ("Pl.'s Stmt. of Facts"), (5) the Defendant's Reply in Further Support of Defendant's Motion for Summary Judgment ("Def.'s Reply"), and (6) the Defendant's Response to Plaintiff's Statement of Disputed Facts ("Def.'s Resp.").

# I. BACKGROUND

Viewing the evidence in the light most favorable to the plaintiff, the facts underlying this lawsuit are the following.

The plaintiff, a white male, "began his service as a Foreign Service Officer [("FS Officer")] on June 10, 1984" and "was terminated by [the] defendant effective on November 30, 2004," after "serv[ing] in a variety of responsible posts in numerous countries throughout the world . . . ."  Id. ¶ 11.  The plaintiff "achieved Grade 1 – the highest level for a regular [FS Officer] – in a time period much faster than the usual FS Officer [and] . . . [h]is performance ratings from 1984 through 1999 were outstanding."  Id. ¶ 12.  The plaintiff assumed his position as the Chief of the Division of Cultural Programs for the Department of State (the "Chief") on September 10, 2001, which was under the supervision of S. Van Wunder.  Id. ¶ 13.  According to the plaintiff, "[w]ithin the first weeks of [his] employment in his new position . . . [Mr.] Wunder[] began to attempt to undermine [the plaintiff's] authority as Chief," id., "by going directly to [his subordinates] about assignments, instead of going through [him]," id. ¶ 14.  "In late September, 2001, Mr. Wunder began to question [the plaintiff] concerning gossip Mr. Wunder [had] heard that [the plaintiff] had a 'big grievance,' which, at the time, [according to the plaintiff,] was inaccurate[, and an inquiry the plaintiff considered] inappropriate since Mr. Wunder had no business interfering with the grievance process as [the plaintiff's] supervisor."  Id. ¶ 18.

When the plaintiff first commenced his duties as Chief, he "attempted to have regular staff meetings and then, when he and other employees concluded that each [meeting] was a disruptive and frustrating event, he began having one-on-one meetings with staff instead."  Pl.'s

Stmt. of Facts ¶ 24.  The plaintiff "did not attempt to resume the . . . group meetings" despite Mr.

Wunder's direction to do so at a meeting between the two of them on March 8, 2002, concluding

that they would still be "ineffective" and that he "had been holding frequent individual meetings

with his staff."  Id. ¶ 72.

The plaintiff asserts that "Mr. Wunder treated African American women differently than

he did white women in the office – in that he gave white women promotions and better work

assignments than African American women."  Compl. ¶ 14.  The plaintiff claims that "[o]n at

least three occasions, Mr. Wunder . . . wanted [the plaintiff] to intervene [in disputes] on the side

of the white women."  Id. ¶ 21.  The plaintiff also claims that "Mr. Wunder . . . cited his own

success in terminating an employee to whom Mr. Wunder referred as that 'Cuban' – Mo Garcia,"

id. ¶ 31, although Mr. Wunder flatly denies this allegation, Pl.'s Opp'n, Exhibit ("Ex.") 35

(Defendant's Response to Plaintiff's Request for Admissions No. 4).  As another example of Mr.

Wunder's alleged insensitivity towards minorities, the plaintiff points to his "repeated[] and

strong[] disagree[ment] with Mr. Wunder about the allocation of the Division's limited cultural

funds."[3]  Compl. ¶ 20.  The defendant acknowledges that the "[p]laintiff routinely objected to the

manner in which the Festival Fund was operated," but states that "when Mr. Wunder gave [the

p]laintiff the opportunity to prepare a package for the fund's partners suggesting certain

modifications, [the p]laintiff refused."  Def.'s Mem. at 14.  In response to this allegation, the

---

[3] The plaintiff objected to what he perceived as

> funds which were disproportionately given to Western Europe [rather than] to Africa and the Third
> World.  [The plaintiff] believes that the main reason for Mr. Wunder's disagreement with [the
> plaintiff about reallocating funds] was Mr. Wunder's discriminatory bias against people of color
> and people who advocate for fair treatment for racial and ethnic minorities.

Compl. ¶ 20.

plaintiff states both that "[c]ontrary to [the d]efendant's assertion, [the plaintiff] never refused to complete a plan for reformation of the fund," Pl.'s Opp'n at 6 n.4, and that he had not prepared a plan for reformation because he "was unwilling to participate in an exercise in futility," Pl.'s Stmt. of Facts ¶ 78.

According to the plaintiff, in the fall of 2001 Mr. Wunder "began pressing [him] to prepare documentation that would lead to the termination of the employment [of] an elderly disabled African American female employee, E.J. Montgomery," Compl. ¶ 31, which the plaintiff refused to do, id. ¶ 32, telling Mr. Wunder that his "instructions . . . [were] unethical and illegal discrimination based upon Ms. Montgomery's age, race, and disability," id. ¶ 33. "Mr. Wunder specifically denies that he directed [the p]laintiff to document Ms. Montgomery's performance to terminate her," Def.'s Mem. at 23-24, and the defendant notes that "Ms. Montgomery continue[d] to be an employee of the State Department" as of the date the defendant filed her summary judgment motion,[4] id. at 26. While the plaintiff was on leave in January and February, 2002, he contends that Mr. Wunder began assigning "large amount[s] of work . . . to Ms. Montgomery," Compl. ¶ 34, which the plaintiff believes was motivated by Mr. Wunder's desire to create "a set-up for her anticipated failure," id. ¶ 35. However, Ms. Montgomery indicated that she doesn't recall any additional duties assigned to her by Mr. Wunder during February, 2002. Def.'s Mem., Ex. 42 (Mar. 16, 2005 Deposition of Evangeline Montgomery ("Montgomery Dep.")) at 354. Around this same time, Mr. Wunder rescinded Ms. Montgomery's travel authorization, which had previously been approved by the plaintiff.

---

[4] The plaintiff maintains that Ms. Montgomery's continued employment, her "excellent" rating on that year's evaluation, Def.'s Mem. at 2, and her receipt of voice recognition software to accommodate her disability, id. at 26, were all efforts by Mr. Wunder to insulate himself from claims of discrimination, Compl. ¶ 43; Pl.'s Opp'n at 15 n.14, 25.

Compl. ¶ 35.  The defendant explains this action, stating that "Mr. Wunder concedes that he rescinded [the p]laintiff's approval of Ms. Montgomery's travel because [the p]laintiff had improperly authorized travel that was not directly tied to matters that Ms. Montgomery was working on."  Def.'s Mem. at 25.  The plaintiff highlights Mr. Wunder's inconsistency on this matter, noting that he also "claimed that his decision to deny travel for Ms. Montgomery was connected to a review of all travel in the office" during his Equal Employment Opportunity Commission ("EEOC") testimony.  Pl.'s Opp'n at 16.

On January 17, 2002, shortly before the plaintiff was scheduled to be on extended leave commencing the following day, [5] Compl. ¶¶ 22, 24, "Mr. Wunder asked [the plaintiff] if there were any pending projects" he had not completed, id. ¶ 22.  Since the plaintiff "did not consider the signing of a Certificate of Appreciation by the Secretary of State [for presentation to a jazz musician at a reception that the plaintiff did not believe would occur] to be a[n] urgent pending matter at the time he spoke with Mr. Wunder," the plaintiff replied that there were none.  Id. ¶ 23.  Shortly after speaking to Mr. Wunder, however, the plaintiff "became concerned that the matter concerning the presentation of [the] award to the musician might still occur prior to [the plaintiff's] return from home leave," id. ¶ 24, but the plaintiff could not locate Mr. Wunder to tell him about the matter, id. ¶ 25.  Included in the plaintiff's responsibilities for the award ceremony was drafting talking points for the Secretary and organizing the printing of the Certificate of Appreciation for the awardee.  Def.'s Mem., Ex. 16 (Mar. 16, 2005 Deposition of Van  Samuel Wunder ("Wunder Dep.")) at 456-57.  Although the plaintiff could not find Mr. Wunder before departing for his extended home leave, he "wrote a cover memorandum explaining the situation and left the memorandum and file [for] Mr. Wunder."  Compl. ¶ 25.  "[T]he ceremony occurred

_____

[5]  The plaintiff was scheduled to be on leave until February 21, 2002.

[on January 20, 2002] with [former Secretary of State Colin Powell's[6] wife] handing a blank certificate to [the awardee's] daughter."  Def.'s Mem. at 10; Def.'s Mem., Ex. 16 (Wunder Dep.) at 457-59. Although "[s]ubsequently, Secretary Powell signed and shipped a finalized certificate to [the awardee]," Def.'s Mem. at 10; Def.'s Mem., Ex. 16 (Wunder Dep.) at 457-59, Mr. Wunder, displeased with what had occurred, wrote the plaintiff an e-mail immediately after the ceremony was completed expressing his "displeasure with [the p]laintiff's performance . . . ." Def.'s Mem. at 10.

In addition to the Award Ceremony incident, the defendant highlights a number of other minor incidents during the plaintiff's tenure as Chief of the Division of Cultural Programs, including the plaintiff's inattentiveness to budget constraints and his lack of communication with his subordinates and supervisors.  Def.'s Mem. at 11.  Specifically, the defendant claims that the plaintiff significantly overran budgetary constraints on one project, id., and that several subordinates "each confirmed that [the p]laintiff was noticeably absent or 'non-existent' in his supervisory role and that they were frustrated working for him because he gave them no guidance or information," id.; see id. at 11-12 ("[A] number of [the p]laintiff's subordinates, who were principally responsible for certain . . . programs, were often left in the dark as to budgeting details of their own projects, as [the p]laintiff did not meet with them to review budgets and plans.").  The plaintiff, however, states that he "inherited [the budgetary overrun] from his predecessor," and that he "informed the . . . staff of both their individual budgets and overall budget."  Pl.'s Opp'n at 18.  Mr. Wunder also states that when the plaintiff "returned from home leave at the end of February, 2002, [he] did not let Mr. Wunder know that he had returned to the office," and that shortly "[t]hereafter, in early-March, [the p]laintiff missed two meetings that

---

[6]  Secretary Powell was the Secretary of State at the time of the ceremony.

Mr. Wunder had instructed the plaintiff to attend." Def.'s Mem. at 12. The plaintiff counters

that "he did give Mr. Wunder notice that [one of] the meeting[s] conflicted with a previously

scheduled medical appointment" and that he "did not recall whether he attended the [second]

meeting and, in addition, . . . that as there were so many meetings to cover he was often

unavailable to attend meetings but would send a subordinate in his place." Pl.'s Stmt. of Facts ¶

63.

On March 8, 2002, Mr. Wunder met with the plaintiff to address his concerns about the

plaintiff's inadequate performance. Id. ¶ 71. During this meeting, which became "heated," the

plaintiff alleges that "Mr. Wunder told [him] that if he did not begin the process of terminating

Ms. Montgomery, Mr. Wunder would give [him] a negative performance rating." Compl. ¶ 38.

Since the plaintiff "realized that Mr. Wunder was serious about trying to terminate [the

plaintiff's] employment[,] . . . [he] promptly sought EEO counseling in March, 2002." Id. Then,

on April 11, 2002, the plaintiff received the first of two negative employee evaluation reports.

Pl.'s Opp'n at 21. The first did not include a review by the plaintiff's second-line supervisor,

Mr. Sexton, because he had left his position in early February, and Mr. Wunder claims that he

did not think that Mr. Sexton's review was necessary. Id. Prior to 2002, the plaintiff's

evaluations had been generally positive, with the exception of one in 1999, which chastised him

for "unauthorized use of [official] vehicles for home-to-office transportation and other personnel

use," Def.'s Mem., Ex. 37 (June 2, 1999 McGrath Officer Evaluation Report ("1999 Evaluation

Report") at 4, and one in 2000, which criticized his management style because he "sparked low

morale among a majority of his existing staff" and "[p]robably half [of his staff] comment[ed]

that they ha[d] been intimidated in recent months by his behavior which include[d] shouts,"

Def.'s Mem., Ex. 38 (May 1, 2000 McGrath Officer Evaluation Report ("2000 Evaluation Report") at 3.  The plaintiff explains the negative review of his management style in his 2000 evaluation report, noting that "this [report] was issued during a time of great upheaval in the office," Pl.'s Opp'n at 4, when "numerous employees in the office left for personal reasons or because they were terminated for misconduct or security reasons," Pl.'s Opp'n at 4 n.2.  On April 16, 2002, the plaintiff made a formal complaint with the EEOC, Pl.'s Opp'n, Ex. 2 (Initial Contact Sheet/EEO Counselor's Report ("Initial Contact Sheet")) at 2, and shortly thereafter he informed Stephen Hart, his second-line supervisor at the time, that he had filed the EEOC complaint, Compl. ¶ 29.  On April 24, 2002, the plaintiff received "a second [evaluation report], this time with a reviewing statement written by Mr. Sexton," id., which the plaintiff believes "was written in retaliation for his filing a discrimination complaint," id. ¶ 30.  "[T]he only substantive change [to the second report] was the addition of Mr. Sexton's review."  Def.'s Stmt. of Facts ¶ 99.  Although the defendant initially claimed that the "[p]laintiff did not submit a statement concerning his performance rating or indicating any inaccuracies in Mr. Wunder's narrative,"[7] id. ¶ 91, the plaintiff contends that he actually did "prepare[] and submit[] a statement for inclusion in his [evaluation report], [but] . . . [the d]efendant would not allow [the p]laintiff's statement to be included because he referred to his pending EEO complaint," Pl.'s Stmt. of Facts ¶ 91.  The plaintiff generally "disputes the veracity of Mr. Wunder and Mr. Sexton's statements" contained in his negative evaluation reports and asserts that contrary to the defendant's contention, he did "provide updates on . . . [a] grant competition[,] . . . spent

---

[7] The defendant later admits that the plaintiff did in fact "attempt[] to submit a statement concerning his performance rating for inclusion in his [evaluation report]," but that it was barred because "the [United States Department of State] forbids the inclusion of statements concerning EEO complaints in employee evaluations."  Def.'s Resp. at 5-6.

considerable time searching for the right people to be on the panel [for the competition,] . . . [and,] contrary to Mr. Wunder's claims, . . . did not routinely fail to return telephone calls nor . . . fail to respond to e-mails." Pl.'s Opp'n at 22. The plaintiff also asserts that the negative evaluation reports "virtually ignore [his] accomplishments while Chief," id. at 22, including the fact that "the [reports do] not provide [the plaintiff] with credit for the successful Thelonius Monk Institute reception held in February,"[8] id. at 22 n.22.

The defendant claims that "[a]fter [the p]laintiff received his [evaluation reports], instead of taking steps to improve his performance, [the p]laintiff's performance worsened," Def.'s Stmt. of Facts ¶ 101, and according to Mr. Wunder "'frankly it became extremely difficult to get [a] response from [the plaintiff] to the right e-mails or telephone messages,'" id. ¶ 102. Although the plaintiff "admits that he may not have responded to a request to contact an individual at the Korean Embassy, this request was not communicated until the very end of [his] tenure," Pl.'s Opp'n at 19 n.19, and he maintains that he "was . . . diligent about his supervisory responsibilities . . . [and] he maintained an open door policy and was always available to answer questions," Pl.'s Opp'n at 19. The plaintiff claims that "Mr. Wunder . . . continued his retaliation [after the negative evaluation reports] . . . by sending him a series of false accusatory memoranda on May 8, 2002; May 16, 2002; May 20, 2002; and May 21, 2002; and by attempting to intimidate him." Compl. ¶ 42. On June 10, 2002, the plaintiff "was involuntarily curtailed from his position of Chief of the Division of Cultural Programs[,]" which according to the plaintiff

---

[8] The plaintiff proposed "to have then Secretary of State Colin Powell convene a reception in honor of the Institute and the winner of its international jazz competition." Pl.'s Opp'n at 7. The plaintiff states that when he "defended his idea to Mr. Wunder and pointed out that the event would make a great Black History Month event – Mr. Wunder grimaced. Mr. Wunder denies that he was opposed to the reception." Id.

was "in retaliation for his refusal to terminate Ms. Montgomery and in retaliation for his EEO activity." Id. ¶ 50.

In a separate incident that occurred during January, 2002, the plaintiff "charged $399.66 on his Government issued credit card because he stayed in a hotel for two nights in New York City on Government business." Id. ¶ 44. "[B]ecause of the security initiatives post-September 11, 2001, mail addressed to Government offices was seriously delayed," id. ¶ 45, and the plaintiff learned that the charge remained outstanding when he "received a telephone call from Citibank on May 10, 2002," id. ¶ 46. "During that call, he paid Citibank over the phone . . . [and] believed . . . that the bill was paid in full." Id. However, the plaintiff "accidentally failed to give Citibank the four zeros before the account number," id., and as a result "his credit union . . . refused [to honor the plaintiff's] check," id. ¶ 47. Since the plaintiff no longer worked at the Bureau of Educational and Cultural Affairs after June 10, 2002, he was not "contacted by Citibank [until September 2002, at which point he was] informed about the returned check for the first time, and [he] immediately paid the bill again successfully." Id. ¶ 53. Initially, the "Bureau of Human Resources proposed a two-day suspension of" the plaintiff because of the late payment, but eventually "the proposed suspension was reduced to a Letter of Admonishment on December 31, 2002," and, although the plaintiff claims that the letter "was placed in [his] Official Personnel File for one year," id. ¶ 55, the letter itself states that "[t]his letter of Admonishment will not be placed in your Official Personnel File but will be maintained by the Office of Employee Relations for one year," Def.'s Mem., Ex. 47 (December 31, 2002 Letter of Admonishment to Matthew McGrath ("Letter of Admonishment")) at 2 (emphasis added).

Eventually, in February, 2003, the plaintiff "was assigned to a position as an examiner at the Declassification Unit . . . reading and designating documents that were previously classified to be declassified." Pl.'s Opp'n at 28. The delay in obtaining a new position was "due, at least in part, to the fact that by the summer of 2002 almost all positions coming open in the fall of 2002 had already been filled" and "because of concerns regarding the abrupt curtailment." Pl.'s Opp'n at 28. "In April 2004, the State Department's Performance Standards Board reviewed [the plaintiff's] Performance File and determined, based in substantial part on the 2002 [evaluation reports], to designat[e the plaintiff] for separation from the Foreign Service." Id. at 31. His separation became effective November 30, 2004. Id.

## II.  STANDARD OF REVIEW

In order to grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). Additionally, the moving party must show that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In responding to the motion, the non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477

11

U.S. 242, 248 (1986) (internal quotation and citation omitted) (second omission in original).  In other words, the non-moving party cannot present "conclusory allegations unsupported by factual data [to] create a triable issue of fact."  <u>Pub. Citizen Health Research Group v. FDA</u>, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation and citation omitted).  Thus, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment is granted."  <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

## III.  LEGAL ANALYSIS

The defendant argues that she is entitled summary judgment because no reasonable juror could conclude that the adverse employment decisions taken against the plaintiff stemmed from a retaliatory motive, and that he cannot show that the reasons offered for his termination were pretextual.  The plaintiff no longer alleges that discrimination based on race was a reason for his involuntary curtailment.[9]  Additionally, beyond simply asserting gender discrimination in his complaint, Compl. ¶¶ 1, 60-65, the plaintiff makes no such further allegations in support of this claim and the Court will therefore dismiss it.[10]  And to the extent that it was ever asserted, the

---

[9]  The plaintiff initially asserted claims of discrimination based on his race. Compl. ¶¶ 1, 60-65.  However, the plaintiff subsequently withdrew his race discrimination claim. Pl.'s Opp'n at 1 n.1.

[10]  Although the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment does not directly address the gender discrimination claim, the defendant does assert that "the Court should enter summary judgment in [the d]efendant's favor on the totality of [the p]laintiff's claims." Def.'s Mem. at 3.  While the plaintiff explicitly abandons only his race discrimination claim, Pl.'s Opp'n at 1 n.1, he implicitly abandons his gender discrimination claim as well, since his Opposition to Defendant's Motion for Summary Judgment and Supporting Memorandum never mentions a gender discrimination claim, and focuses exclusively on his retaliation claim, <u>see generally</u> Pl.'s Opp'n.  Furthermore, even if the plaintiff had addressed his gender discrimination claim, he would still have failed to survive summary judgment.  Since the "plaintiff belongs to the male majority, his [gender discrimination] claim is one of reverse discrimination." <u>Hunter v. Rice</u>, 480 F. Supp. 2d 125, 135 (D.D.C. 2007); <u>see also Mastro v. Potomac Elec. Power Co.</u>, 447 F.3d 843, 851 (D.C. Cir. 2006).  Under a reverse discrimination claim, he "must show additional background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." <u>Mastro</u>, 447 F.3d at 851 (internal quotation omitted).  The plaintiff has done nothing that would meet this burden, and nothing in the record suggests that the plaintiff's supervisor (also a male) is that unusual employer.

plaintiff does not contest the defendant's arguments regarding his hostile workplace claim, and

therefore the Court deems this argument conceded.[11]

Until recently, it was the practice when assessing summary judgment motions in all cases

involving Title VII claims, including retaliation claims, to conduct the entire burden-shifting

framework pronounced by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973); <u>see</u> <u>Lathram v. Snow</u>, 336 F.3d 1085, 1087 n.3 (D.C. Cir. 2003) (explaining that the

retaliation cases are analyzed under the same <u>McDonnell Douglas</u> framework as discrimination

cases but with slightly different "phrasing of the prima facie case"), as was noted recently by the

District of Columbia Circuit in <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 493 (D.C.

Cir. 2008) ("The [district] court's focus on the prima facie case was not atypical: When resolving

an employer's motion for summary judgment or judgment as a matter of law in employment

discrimination cases, district courts often wrestle with the question whether the employee made

out a prima facie case.").  However, the Court subsequently announced that when a defendant

asserts a non-discriminatory or non-retaliatory reason for the adverse action being challenged by

a plaintiff, the "<u>McDonnell Douglas</u> framework – with its presumptions and burdens – is no

---

[11] "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the government, a court may treat those arguments that the plaintiff failed to address as conceded." <u>Buggs v. Powell</u>, 293 F. Supp. 2d 135, 141 (D.D.C. 2003).  This power derives from Local Civ. R. 7.1(b), which states:

> Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.  <u>If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.</u>

(Emphasis added.)  "Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion." <u>United States v. Real Prop.</u>, 287 F. Supp. 2d 45, 61 (D.D.C. 2003).  Moreover, the plaintiff's hostile workplace claim would have failed even if he had not conceded the argument, because the degree of severity of the conduct did not rise to a level that would permit a jury to find for the plaintiff.  <u>See</u> <u>Barbour v. Browner</u>, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999) (explaining that a workplace environment only becomes "hostile" under Title VII when the defendant's conduct creates an abusive working environment including intimidation, ridicule, and insult).

longer relevant," <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510 (1993), "and the sole

remaining issue [is] discrimination [or retaliation] <u>vel non</u>," <u>Reeves</u>, 530 U.S. at 142 (citation

and internal quotation omitted).  In other words, "[w]here the defendant has done everything

required of [her] if the plaintiff had properly made out a prima facie case, whether the plaintiff

really did so is no longer relevant."  <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711,

715 (1983).  In such circumstances, "[t]he district court has before it all the evidence it needs to

decide whether the defendant intentionally [retaliated] against the plaintiff."  <u>Id.</u>; <u>Jones v.

Bernanke</u>, 557 F.3d 670, 678 (D.C. Cir. 2009) ("[T]hese principles apply equally to retaliation

claims . . . .") (citation omitted).  Accordingly, the Circuit Court made clear in <u>Brady</u> that "the

question whether the employee made out a prima facie case is almost always irrelevant," 520

F.3d 493, therefore making "the prima facie case . . . a largely unnecessary sideshow," <u>id.</u> at

494.  Thus, "in considering an employer's motion for summary judgment," when the "employer

has asserted a legitimate, non-discriminatory reason for the decision [being challenged by the

employee], the district court need not – <u>and should not</u> – decide whether the plaintiff actually

made out a prima facie case under <u>McDonnell Douglas</u>."  <u>Id.</u>

    At this stage, the only issue is whether the plaintiff "produced sufficient evidence for a

reasonable jury to find that the employer's asserted . . . reason was not the actual reason and that

the employer intentionally [retaliated] against the employee [for an unlawful reason]."  <u>Id.</u> at

494.  In making this determination, courts must weigh all the relevant evidence adduced by both

the plaintiff and the defendant.  <u>Reeves</u>, 530 U.S. at 148-49; <u>Brady</u>, 520 F.3d at 495; <u>Czekalski v.

Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1289

(D.C. Cir. 1998) (en banc).  These categories include evidence that supports the plaintiff's prima

facie case, any evidence of pretext, and any other relevant evidence which "'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." Jones, 557 F.3d at 679 (quoting Waterhouse v. District of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002)). To establish a prima facie case in the retaliation context, the plaintiff must establish that "(1) [he engaged in] protected activity; (2) the employer's action ha[d] an adverse impact on [him]; and (3) a causal relationship between the protected activity and the adverse action [existed]." Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 31 (D.C. Cir. 1997). And there are "multiple ways" for an employee to cast doubt on the employer's asserted reason for its adverse action against the employee, including comparisons to others similarly situated who received more favorable treatment, evidence showing that the employer has lied about the predicate facts used to justify its decision, and failure to follow established protocol or procedure, among others. See Brady, 520 F.3d at 495 (summarizing various techniques used by Title VII employees to show pretext in an employer's asserted reason for the challenged action).

With this framework as its guide, the Court will now turn to each of the acts of purported retaliation: the plaintiff's claims concerning the negative evaluation reports, his involuntary curtailment, the Letter of Admonishment, his assignment to the Declassification Unit, and his eventual separation from the Foreign Service.

## A.  The Plaintiff's Negative Evaluation Reports and Involuntary Curtailment

The plaintiff asserts that the negative evaluation reports and involuntary curtailment stemmed from his refusal to terminate Ms. Montgomery and the filing of his complaint with the EEOC.[12]  Compl. ¶¶ 61, 63.  The defendant, on the other hand, cites various shortcomings in the

---

[12] In order for a claim to be actionable under Title VII, the plaintiff must have suffered an adverse employment action.  42 U.S.C. § 2000e-3(a); Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007).  Although not all formal

(continued . . . )

plaintiff's performance as justification for these actions.  Def.'s Mem. at 5-15.  Because the

defendant has offered a non-retaliatory justification for these actions, the Court must look at the

evidence as a whole, including proof of the plaintiff's prima facie case, the non-retaliatory

justification provided by the defendant, and any other evidence the plaintiff can offer to bolster

his prima facie case or undermine the defendant's proffered justification.  See Brady, 520 F.3d at

494 ("[I]n considering an employer's motion for summary judgment . . . , the district court must

resolve one central question: Has the employee produced sufficient evidence for a reasonable

jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason").

To support his claim that he had been instructed to take improper action that would result

in Ms. Montgomery's termination, the plaintiff testifies that he was told in the fall of 2001 by

Mr. Wunder to document her performance for the ultimate purpose of terminating her

employment, and that the pressure to take action against Ms. Montgomery intensified in early

2002.  Pl.'s Opp'n at 9; see also Compl. ¶ 38.  The plaintiff "believed that the pressure exerted

by Mr. Wunder regarding Ms. Montgomery was unwarranted and racially motivated, and he

opposed the pressure on the ground [that] it was discriminatory."  Pl.'s Opp'n at 9.  On March 8,

2002, the plaintiff contends that he and Mr. Wunder "had a lengthy, heated discussion

concerning Ms. Montgomery . . . , during which Mr. Wunder told [the plaintiff] that if he did not

begin the process of terminating Ms. Montgomery, Mr. Wunder would give [the plaintiff] a

negative performance rating."  Compl. ¶ 38.  As a result of this meeting, the plaintiff contends

that he realized "that Mr. Wunder was serious about trying to terminate" him based on his refusal

---

(. . . continued)
criticism of an employee constitutes an adverse employment action, Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir.
1999), because the plaintiff's negative evaluation reports led directly to his involuntary curtailment, this Court finds
that the negative reports were adverse action within the meaning of Title VII, see Weber, 494 F.3d at 185-86
(concluding that the "two performance evaluations . . . challenged . . . qualify[ied] as adverse actions insofar as they
resulted in [the plaintiff] losing a financial award").

to oust Ms. Montgomery.  Id.  The plaintiff spoke to several of his co-workers about his

perception that Mr. Wunder was "placing pressure on him to terminate Ms. Montgomery,"

thereby indicating his contemporaneous belief that Mr. Wunder was asking him to do something

discriminatory.  Pl.'s Opp'n at 20.  Additionally, the plaintiff was predisposed to believe that Mr.

Wunder had a negative attitude towards African Americans, whether or not this was true,

because he was told by a co-worker that Mr. Wunder treated black and white employees

differently.  Pl.'s Opp'n, Ex. 41 (Affidavit of LaFaye Proctor ("Proctor Aff.")) ¶ 8.  From this

evidence, the Court finds that a jury could determine that the plaintiff refused to cooperate with

Mr. Wunder's desire to terminate Ms. Montgomery because of a good faith, reasonable belief

that Mr. Wunder was engaging in discriminatory conduct.  See Clark County Sch. Dist. v.

Breeden, 532 U.S. 268, 270 (2001) (citing with approval a Ninth Circuit case for the proposition

that a plaintiff is protected from retaliation for opposing any employer activity that he reasonably

believes is unlawful, regardless of whether the activity actually is unlawful).  The plaintiff

refusing to obey orders he perceived to be discriminatory satisfies the first prong of the prima

facie case.[13]  See George v. Leavitt, 407 F.3d 405, 417 (D.C. Cir. 2005) (allowing that so long as

the employee "reasonabl[y] belie[ved] that the challenged practice violates Title VII," that

conduct  represents protected activity) (quoting Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012,

1020 (D.C. Cir. 1981)).  Concerning the other elements of the plaintiff's prima facie case, his

negative evaluation reports and his subsequent involuntary curtailment clearly qualify as adverse

actions, see note 12, supra, and the plaintiff alleges that Mr. Wunder repeatedly demanded that

---

[13] As noted earlier, although evaluating a plaintiff's prima facie case is no longer the necessary prerequisite it was
thought to have been by many district judges prior to Brady, 520 F.3d at 493, it remains a relevant part of the
analysis in evaluating whether the plaintiff can defeat the defendant's summary judgment motion.  Jones, 557 F.3d
at 679.

he initiate the termination of Ms. Montgomery beginning in the fall of 2001, Compl. ¶ 31, with the confrontation culminating during their March 8, 2002 meeting, id. ¶ 38. Therefore, the negative April evaluation reports, which confirmed the sincerity of Mr. Wunder's alleged threat during the March 8 meeting and occurred approximately one month after that meeting, would satisfy the causal connection prong of the prima facie case. See Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985) ("[C]ausal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after the activity."). While strong evidence of a prima facie case may alone be sufficient to survive summary judgment, Aka, 156 F.3d at 1289 n.4, generally the plaintiff must establish a "prima facie case, combine[d] with [other] sufficient evidence to find that the employer's justification is false," Reeves, 530 U.S. at 148.

The plaintiff also alleges that the filing of his complaint with the EEOC resulted in further retaliation against him by the defendant. There is no question that the plaintiff engaged in protected activity when he filed his EEOC complaint on April 16, 2002. Jones, 557 F.3d at 679. The plaintiff asserts in his complaint filed with the Court that he first spoke to an EEO counselor on March, 2002, Compl. ¶ 38, and although he infers that Mr. Wunder learned of this contact, he does not allege that the first negative evaluation report was in retaliation for this contact, see Pl.'s Opp'n at 23 (submitting that "[i]t is reasonable to infer therefore, that Mr. Wunder learned of [the plaintiff's EEO contact] . . . and issued the second [evaluation report] to punish" the plaintiff) (emphasis added). Thus the plaintiff states only that the additional four paragraphs inserted into the second evaluation report by the plaintiff's second line supervisor constituted further retaliation. Id.

Mr. Wunder offers multiple non-retaliatory justifications for the actions taken against the plaintiff.  He asserts that his March 8, 2002 meeting was to address the plaintiff's many job performance deficiencies, including his failure to appear at two meetings, his failure to contact Mr. Wunder after he returned to work following an extended period of leave, his failure to prepare for the award ceremony, and his problematic managerial style.  Def.'s Mem. at 13.  For the most part, the plaintiff does not contest that these events occurred, but simply claims that he had valid excuses for them or that Mr. Wunder is deliberately exaggerating the deficiencies to justify the poor evaluation reports and his involuntary curtailment.  See, e.g., Compl. ¶¶ 22-25 (describing the events surrounding the award ceremony).  While the plaintiff seeks to explain away Mr. Wunder's characterization of his performance, "courts are not free to second-guess an employer's business judgment."  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).  Accordingly, this Court declines, as it must, "to serve as a 'super-personnel department that reexamines an entity's business decisions.'"  Holcomb, 433 F.3d at 897 (quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).

Despite the plaintiff's attempt to raise a factual dispute concerning whether his performance was deficient, there is no dispute that he departed the office for extended leave in January, 2002, without completing his responsibilities associated with the award ceremony. Compl. ¶ 25.  The plaintiff does assert, however, that he did not believe the ceremony would occur as planned because of Secretary Powell's absence from the country and the awardee's illness, id. ¶ 23, but admits that he was concerned about leaving without contacting Mr. Wunder, and attempted to locate Mr. Wunder to inform him about the unfinished project,  id. ¶ 24. According to Mr. Wunder, the plaintiff's failure to complete the assignment resulted in a barely

averted disaster.  Def.'s Mem. at 10.  While the plaintiff contests the seriousness of his error, he does not dispute its occurrence.  Pl.'s Stmt. of Facts ¶¶ 40-42, 46.  Therefore, this incident was a perfectly valid reason for Mr. Wunder being upset with the plaintiff's performance, criticizing him in the March 8, 2002 memorandum, and issuing the subsequent negative evaluation reports.  The plaintiff has done nothing to demonstrate any pretext for these actions.  See Santa Cruz v. Snow, 402 F. Supp. 2d 113, 124 & n.8 (D.D.C. 2005) (accepting that the plaintiff's failure to complete several assignments was a proper foundation for his Notice of Proposed Suspension).

With regards to Mr. Wunder's complaint that the plaintiff was a poor supervisor, there is conflicting evidence in the record on this score.  Ms. Chapman and Ms. Proctor both state that the plaintiff was a good supervisor.  Pl.'s Opp'n, Ex. 40 (Affidavit of Deborah Chapman ("Chapman Aff.")) ¶ 4; Pl.'s Opp'n, Ex. 41 (Proctor Aff.) ¶ 5.  Ms. Rouse, similarly, seems generally positive about the plaintiff's performance as a supervisor.  Pl.'s Opp'n, Ex. 15 (Declaration of Sandy Rouse ("Rouse Decl.")) at 5:18-6:6.  On the other hand, several employees, including Mses. Baker, Wainscott, and Mella complained of the plaintiff's "non-existent" supervision.  Def.'s Mem. at 11.  However, with three employees complaining about the plaintiff's supervisory performance, representing nearly half of the plaintiff's staff, Mr. Wunder had a good faith basis to believe that the plaintiff's supervisory performance was, in fact, deficient.  See George, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false"); Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (emphasizing that the issue is not whether the non-retaliatory reason for the personnel decision was true or false, but only whether the employer honestly believed the reason when taking the

personnel action).  Additionally, reports from the plaintiff's subordinates are not entirely

inconsistent with his prior evaluation reports, which although for the most part were positive,

contained some criticism about his management style in 2000.  Def.'s Mem., Ex. 38 (2000

Evaluation Report) at 3.  These complaints, coupled with the other concerns regarding the

plaintiff's job performance, provide a legitimate, non-retaliatory justification for the plaintiff's

negative evaluation reports and his involuntary curtailment.  See Brown v. Brody, 199 F.3d 446,

458 (D.C. Cir. 1999) (affirming the grant of summary judgment for the defendant because it was

the plaintiff "who had the ultimate burden of persuasion, [and who] offered nothing beyond her

own speculations and allegations to refute the [defendant's] legitimate, non-discriminatory

reasons for its decisions").

One of the primary reasons the plaintiff contends that he received the negative evaluation

reports and the resultant involuntary curtailment was his refusal to comply with Mr. Wunder's

repeated instructions that the plaintiff take steps leading to Ms. Montgomery's termination.  The

plaintiff's only evidence showing that Mr. Wunder or anyone else requested that Ms.

Montgomery's performance be reviewed for the purpose of terminating her employment are his

own allegations, and this is insufficient to rebut his employer's legitimate reasons for his

negative evaluation reports and involuntary curtailment.  Cf. Brady, 520 F.3d at 495 (outlining

the methods by which a plaintiff may rebut the defendant's non-retaliatory justification,

including demonstrating that the employer falsified the underlying facts upon which it based its

justification).  In fact, nothing in Mr. Wunder's behavior towards Ms. Montgomery indicates his

desire to have discriminatory action taken against her, and indeed circumstantial evidence

indicates the contrary.  Not only did Mr. Wunder give Ms. Montgomery an "excellent" on her

evaluation rendered after the request was allegedly made to monitor her performance, Def.'s

Mem. at 2, 23-27, but as of March, 2005, three years after the request had allegedly been made,

Ms. Montgomery was still employed at the Bureau of Educational and Cultural Affairs, Def.'s

Mem., Ex. 42 (Montgomery Dep.) at 352.   The plaintiff contends that Mr. Wunder's "excellent"

evaluation of Ms. Montgomery's performance was an effort to "insulate himself from [the

plaintiff's] complaints."  Pl.'s Opp'n at 25.  Although this Court may not draw any inferences

from the facts adverse to the non-moving party at the summary judgment stage, Anderson, 477

U.S. at 255, the facts related to Ms. Montgomery certainly do not undermine the defendant's

non-retaliatory justifications.  Finally, while the plaintiff asserts that Mr. Wunder treated Ms.

Montgomery poorly on various occasions, including assigning her difficult-to-complete work

while the plaintiff was on leave, Compl. ¶¶ 34-35, once again, the plaintiff offers only his own

assertions that this actually happened, while Ms. Montgomery herself does not remember being

assigned any such burdensome work assignments, Def.'s Mem., Ex 42 (Montgomery Dep.) at

354.

The plaintiff seeks to compare his case to Goos v. National Ass'n of Realtors, 715 F.

Supp. 2 (D.D.C. 1989), where the plaintiff survived summary judgment based on her claim that

she was fired shortly after refusing to fire an employee when directed to do so by her supervisor

because she believed the demand was "racially motivated."  Id. at 4.  However, this case is

markedly different, because in Goos, the defendant did not even advance a non-retaliatory

justification for its termination of the plaintiff.  See id. at 3 (dismissing the defendant's argument

that the entire McDonnell Douglas burden shifting framework should not be employed "because

the plaintiff ha[d] failed to make out a prima facie case of retaliatory discharge.")  Additionally,

while it is true that plaintiff need only have "a good faith, reasonable belief that the challenged

practice violates Title VII," George, 407 F.3d at 417 (quoting Parker v. Balt. & Ohio R.R. Co.,

652 F.2d 1012, 1020 (D.C. Cir. 1981)), a plaintiff must do more to establish that the unlawful

employment practice occurred than to simply allege it without any supporting evidence, see

Hamilton v. Paulson, 542 F. Supp. 2d 37, 60 (D.D.C. 2008) (dismissing the plaintiff's claim of

retaliation in part because a "'plaintiff may not rest on mere speculation alone[,] but must

produce some objective evidence' in support of his theories") (quoting Guerrero v. Univ. of

District of Columbia, 251 F. Supp. 2d 13, 15 (D.D.C. 2003)).

   Although the plaintiff claims that the addition of Mr. Sexton's four paragraphs in his

second evaluation report amounted to further retaliation for the filing of his EEOC complaint,

Mr. Wunder justifies this inclusion stating that while he did not initially think a review by Mr.

Sexton, the plaintiff's second-line supervisor, was necessary, human resources informed him that

it was.  Def.'s Stmt. of Facts ¶ 96.   Thus, the defendant has provided a non-retaliatory

justification for the issuance of the second evaluation report, and in any event, the four paragraph

addition is consistent with the overall tone and evaluation of the first report.  Compare Pl.'s

Opp'n, Ex. 21 (McGrath Evaluation Report, April 24, 2002 ("April 24, 2002 Evaluation

Report")) with Pl.'s Opp'n, Ex. 20 (McGrath Evaluation Report, April 11, 2002 ("April 11, 2002

Evaluation Report")).   The plaintiff challenges this proposition, reaffirming his belief that the

second evaluation report, with the inclusion of Mr. Sexton's commentary, was retaliatory, but he

does not offer any evidence that Mr. Wunder's explanation – that human resources required the

addition of a statement by the plaintiff's second-line supervisor – is pretextual.  Pl.'s Stmt. of

Facts ¶ 96.  Thus, once again, aside from making bald assertions, the plaintiff has done nothing

to undermine the defendant's non-retaliatory justification for this action.  See Barbour, 181 F.3d at 1347 (concluding that the district court should have granted the defendant's request for judgment as a matter of law because the plaintiff "ha[d] nothing to buttress her evidence of pretext").

In sum, the plaintiff has asserted only the bare facts necessary to establish a prima facie case of retaliation.  Although under Brady, the Court is counseled against delving into the burden-shifting framework created in McDonnell Douglas, 411 U.S. at 802, the strength of the plaintiff's prima facie case remains a relevant consideration in determining whether a reasonable jury could find for the plaintiff, Jones, 557 F.3d at 679.  In order to succeed on a claim for retaliation, a plaintiff must have more than bald assertions of fact.  Barbour, 181 F.3d at 1347.  The defendant, on the other hand, has presented multiple, non-retaliatory reasons for the plaintiff's negative evaluation reports and involuntary curtailment.  Therefore, this Court finds that no reasonable jury could conclude that these two adverse employment actions more likely than not resulted from the retaliatory motive asserted by the plaintiff.

## B.    Letter of Admonishment

The plaintiff also asserts that the Letter of Admonishment issued by his employer because of his delinquent payment of a credit card bill was retaliatory.  However, the plaintiff has not demonstrated that the Letter of Admonishment was an "adverse action" actionable under Title VII.  See Brown, 199 F.3d at 458 (affirming the district court's conclusion that a letter of admonishment did not constitute an adverse action, and noting that a "thick body of precedent . . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions"); see also Runkle v. Gonzales, 391 F. Supp. 2d 210, 225 (D.D.C. 2005) ("Formal letters

of admonishment and disciplinary notices that have no effect on an employee's grade or salary

level, job title, duties, benefits or work hours, for example, do not constitute adverse actions.").

In this case, the Letter of Admonishment appears not to have even been placed in the plaintiff's

Personnel File.  Def.'s Mem., Ex. 47 (Letter of Admonishment) at 2.  Therefore, on the record

before the Court, the plaintiff has failed to demonstrate that the Letter of Admonishment

amounted to an adverse employment action and accordingly the retaliation claim based on the

letter cannot be maintained.

**C.     The Plaintiff's Assignment to the Declassification Unit**

    The plaintiff first notes that his assignment to the Declassification Unit, even though it

occurred ten months after he filed his formal EEOC complaint, was still temporally close enough

to infer a causal relationship between the two events, considering that the EEOC investigation

was not concluded until December, 2002, Pl.'s Opp'n at 38, and the assignment was made in

February, 2003, id. at 28.  An ongoing EEOC investigation in which the plaintiff is actively

involved does indeed confer continued protection from retaliation to an employee.  See Casole v.

Johanns, 577 F. Supp. 2d 138, 140 (D.D.C. 2008) (recognizing continued protection during the

course of ongoing "EEO-protected activities" and not just at the time when the complaint was

filed).  However, the plaintiff's own description of his assignment to the Declassification Unit

belies his claim that it was retaliatory.  The plaintiff blames his difficulty in finding a new

position on his involuntary curtailment, referring to it as "a scarlet U on his sweater."  Pl.'s

Opp'n at 27.  Indeed, he characterizes the assignment to the Declassification Unit as a

"snowball" effect from his involuntary curtailment, id., and complains that finding a position

before 2003 was difficult specifically because "by the summer of 2002 almost all positions

coming open in the fall of 2002 had already been filled and . . . because of concerns regarding the abrupt curtailment," id. at 28 (emphasis added).  Essentially, the plaintiff has himself provided the non-retaliatory justification for his delayed reassignment and ultimate assignment to a less desirable position:  namely, that the timing of his curtailment meant that most positions had already been filled and the involuntary curtailment made him a less desirable candidate than other applicants.  Id. at 28-29.  Therefore, his assignment to the Declassification Unit cannot be characterized as retaliatory.

**D.   The Plaintiff's Separation From the Foreign Service**

The decision regarding the plaintiff's ultimate separation from the foreign service was made in April, 2004, Pl.'s Opp'n, Ex. 30 (April 21, 2004 Letter to Matthew McGrath re: Designation for Selection from Foreign Service ("Separation Letter")), although the final separation did not occur until November 30, 2004, Compl. ¶ 3.  Thus, his eventual separation from the Foreign Service took place two years after the filing of his April, 2002 EEOC complaint, and sixteen months after the conclusion of the EEOC investigation.  Pl.'s Opp'n at 38.  This timeframe places the adverse action outside the timeframe from which a jury could infer a causal relationship.  See Breeden, 532 U.S. at 273-74 (citing cases with three to four month intervals between protected conduct and adverse employment action as too remote to infer a causal relationship); Mayers v. Laborers' Health and Safety Fund of North America, 478 F.3d 364, 369 (D.C. Cir. 2007) ("[T]he eight- or nine-month gap between the final protected activity . . . and the [adverse employment action] is far too long") (emphasis added).

Moreover, the Performance Standards Board charged with making a recommendation regarding the plaintiff's separation, based their determination primarily on the plaintiff's four

most recent evaluation reports and his unsatisfactory performance and management style described above.  Pl.'s Opp'n, Ex. 30 (Separation Letter) at 3-7.  Specifically, the Performance Standards Board relied on the plaintiff's unauthorized use of an official vehicle, Def.'s Mem., Ex. 37 (1999 Evaluation Report) at 4, his late submission of evaluations of subordinates, Def.'s Mem., Ex. 38 (2000 Evaluation Report) at 4, documented poor interpersonal skills leading to low morale and intimidation, id. at 3, and his poor performance during his time at the Bureau of Educational and Cultural Affairs, discussed more extensively in Part III.A, supra, as documented by Mr. Wunder, including failing to complete a major assignment before going on leave and failing to communicate with his subordinates, Pl.'s Opp'n, Ex. 21 (April 24, 2002 Evaluation Report) at 3-6.  The Performance Standards Board did note that the plaintiff's performance appeared to improve in his 2000-2001 evaluation report.  Pl.'s Opp'n, Ex. 30 (Separation Letter) at 3.  However, although it acknowledged this brief improvement, in making its decision the Performance Standards Board focused primarily on the three more negative evaluation reports, and noted that the plaintiff "declined to submit a personal statement to [his 2001-2002 evaluation report," making it impossible to evaluate his side of the story.  Id. at 2.

Although the Performance Standards Board had at its disposal the plaintiff's entire record, it relied primarily on the most recent evaluation reports because "[a] marked lack of growth potential may itself be a valid reason for selection out," id. at 1, and that "[a]lthough [the plaintiff] has received annual feedback on the reasons for [his] low-ranking, the Board found no evidence in the file showing that [the plaintiff] ha[d] overcome or systematically addressed these weaknesses," id. at 2.  Therefore, just as the defendant provides a non-retaliatory justification for the negative evaluation reports and involuntary curtailment, so too has the defendant asserted a

27

non-retaliatory justification for its decision to separate the plaintiff from the Foreign Service.  Id. at 3-7.  The plaintiff has done nothing to raise a genuine issue as to the credibility of the defendant's rationale for his termination, other than to assert the inaccuracies in his 2002 evaluation reports.  See Pl.'s Opp'n at 31 (contesting the Performance Standards Board's decision because it "quotes almost exclusively from the 2002 [evaluation report] issued by Mr. Wunder).  And this Court has already dismissed the plaintiff's contention that the 2002 evaluation reports were issued in retaliation for his participation in protected activity.  Supra Part III.A.  Accordingly, the plaintiff has failed to demonstrate that a reasonable jury could find that the defendant's justification for terminating his employment was pretextual.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff could not carry his evidentiary burden of proving to a reasonable jury that it was more likely than not that the defendant retaliated against him when it issued the two negative evaluation reports in 2002, involuntarily curtailed him, issued the Letter of Admonishment, assigned him the Declassification Unit, and ultimately separated him out of the Foreign Service.  Accordingly, the defendant's motion for summary judgment must be granted.

**SO ORDERED** this 11th day of December, 2009.[14]

REGGIE B. WALTON
United States District Judge

---

[14] An order will be entered contemporaneously with this memorandum opinion granting the defendant's motion for summary judgment and closing this case.